No. 26-10369-CC

# In the United States Court of Appeals for the Eleventh Circuit

GREENFLIGHT VENTURE CORPORATION,
on behalf of itself and all others similarly situated,
and DR. JEFFREY D. ISAACS

*Plaintiffs-Appellants,*

*v.*

GOOGLE LLC

*Defendant-Appellee,*

On Appeal from the United States District Court
for the Southern District of Florida
Case No. 9:24-cv-80395-KMM

Hon. K. Michael Moore | Hon. Robin L. Rosenberg, prior district judge

**OPENING BRIEF OF APPELLANT GREENFLIGHT**

KEITH MATHEWS
AMERICAN WEALTH PROTECTION
1000 Elm Street #800
Manchester, NH 03101
(603) 622-8100
*Counsel for Greenflight Venture Corporation*

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Eleventh Circuit Rule 26.1-2(c), counsel certifies that the Certificate of Interested Persons and Corporate Disclosure Statement previously filed in this appeal is correct and complete. Greenflight Venture Corporation has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

## STATEMENT REGARDING ORAL ARGUMENT

This is the first-to-file publisher/developer class action invoking the Department of Justice's Sherman Act liability ruling on Google's Search Engine Services (GSE) monopoly. Plaintiffs-Appellants respectfully request oral argument.

The appeal raises relevant questions about free digital services and quality and choice as forms of consumer harm in a multi-sided digital platform. It represents a fundamental private antitrust enforcement which the district court dismissed as floodgates litigation. Additionally, the court below dismissed independent State Competition and Clayton Act injunctive relief theories without applying their respective legal standards, a structural error warranting oral argument.

# TABLE OF CONTENTS

**CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT** ........................................................................... II

**STATEMENT REGARDING ORAL ARGUMENT** .......................................... III

**TABLE OF CONTENTS** ............................................................................ IV

**TABLE OF AUTHORITIES** ...................................................................... VII

**JURISDICTIONAL STATEMENT** ................................................................ 1

**STATEMENT OF THE ISSUES** ................................................................... 2

**STATEMENT OF THE CASE** ...................................................................... 4

*A. Proceedings Below* ........................................................................... 4

*B. Facts Pleaded In The SAC* ............................................................... 6

*C. The Dismissal* ................................................................................ 7

*D. Standards Of Review* ....................................................................... 9

**SUMMARY OF ARGUMENT** .................................................................... 10

SECTION I ................................................................................................ 13

THE DISTRICT COURT ERRED BY RECASTING THE SAC'S GOOGLE SEARCH PLATFORM AS A STANDALONE WEBMASTER TOOLS MARKET. ................................................................................................. 13

*A. The GSE Is A Multi-Sided Search Distribution Platform.* ............. 13

*B. The Court Did Not Need To Resolve The Amex Classification To Reverse The Dismissal.* ......................................................................... 15

*C. Google's "Webmaster Tools Market" Argument Was A Strawman That Plaintiffs Did Not Plead.* ............................................................. 17

*D. The Court's "Incoherent Jargon" Finding And "For That Reason Alone" Disposition Converted A Disputed Market Definition Theory Into Waiver.* ... 19

*E. The "Every Website" Footnote Substituted Policy For Doctrine: Rule 23 Is The Answer.* ................................................................................... 20

*F. Relief.* ............................................................................................ 22

SECTION II ............................................................................................... 23

EVEN APART FROM AMEX, PLAINTIFFS PLEADED ANTITRUST INJURY AND 'EFFICIENT ENFORCER' STANDING. ................................. 23

    *A. McCready Requires Inextricable Intertwinement, Not Literal Conduit Status.* ............................................................................................................ *24*

    *B. The Injury Is Direct And Cognizable Under Brunswick.* ........................... *26*

    *C. 'Zero Price' Quality Degradation Is Consumer Welfare Harm.* ................ *27*

    *D. The AGC Efficient-Enforcer Factors Favor Greenflight.* .......................... *28*

    *E. Specialized Vertical Providers Are Not Remote Bystanders.* ..................... *29*

    *F. The District Court Failed To Apply Monopoly Leveraging Doctrine To The Pleaded Downstream Submarkets.* ..................................................................... *30*

    *G. The Standing Ruling Would Nullify Private Antitrust Enforcement In Digital Platform Markets.* ................................................................................... *31*

SECTION III .......................................................................................................... 32

THE DISTRICT COURT FAILED TO SEPARATELY ANALYZE STANDING FOR PROSPECTIVE INJUNCTIVE RELIEF UNDER CLAYTON ACT § 16: A QUESTION GOOGLE NEVER RAISED AND THE COURT NEVER ADDRESSED............................................................................................................. 32

    *A. The Issue Was Preserved Below And Was A Pure Omission By Google And The Court.* ............................................................................................................ *32*

    *B. Clayton §16 Standing Is Materially Different Than §4 Standing: AGC's Damages Factors Do Not Apply To Injunctive Relief.* ...................................... *33*

    *C. The District Court's "Floodgates" Concern Is A Damages Concern That Has No Doctrinal Force Against Injunctive Relief.* ......................................... *35*

    *D. Relief.* ........................................................................................................ *37*

SECTION IV .......................................................................................................... 37

THE DISTRICT COURT ERRED BY COLLAPSING CALIFORNIA'S INDEPENDENT UCL PRONGS INTO THE SHERMAN DISMISSAL........... 37

    *A. Plaintiffs Pleaded UCL Theories That Were Not Merely Sherman Act Theories.* ............................................................................................................ *39*

    *B. The Unlawful Prong Survives Because § 1512 Was A Specific Borrowed Predicate, Not A Vague Reference.* .................................................................. *41*

    *C. The Unfair Prong Survives Under Cel-Tech Even If The Sherman Counts Require Further Proof.* ...................................................................................... *42*

    *D. The Fraudulent Prong Was Dismissed On The Wrong Question.* .............. *44*

SECTION V............................................................................................................ 45

THE DISTRICT COURT ERRED IN DISMISSING THE ISA BASED SHERMAN § 1 CLAIM AS TOO REMOTE AT RULE 12. ............................. 45

SECTION VI ...................................................................................................... 47

THE DISTRICT COURT ADDED A JOINT VENTURE REQUIREMENT TO ASPEN SKIING AND RESOLVED DISPUTED DEINDEXING FACTS AT RULE 12. ............................................................................................................. 47

SECTION VII ..................................................................................................... 49

THE DISTRICT COURT CONVERTED A VALID AMERICAN TOBACCO PARAPHRASE INTO A FABRICATION FINDING. ..................................... 49

SECTION VIII .................................................................................................... 52

THE COURT BELOW ABUSED ITS DISCRETION IN DENYING RULE 59(E) RELIEF; *YELP V. GOOGLE* DEMONSTRATES MANIFEST INJUSTICE. ....................................................................................................... 52

*A. Yelp v. Google Sustained Materially Analogous SERP Suppression And UCL Claims Past Rule 12, Twice.* .................................................................... 52

*B. The Court Below Conflated Three Independent Rule 59(e) Grounds.* ........ 53

*C. Yelp's Persuasive Force Demonstrates Manifest Injustice On Materially Analogous Pleadings.* .................................................................................. 54

*D. The Court Separately Erred By Treating The UCL § 1512 Omission Argument As "Relitigation."* .......................................................................... 56

*E. Relief.* ........................................................................................................ 58

**CONCLUSION** ................................................................................................... 58

**CERTIFICATE OF COMPLIANCE (FRAP 32(G))** ....................................... 59

**CERTIFICATE OF SERVICE (FRAP 25(D))** ................................................. 60

# TABLE OF AUTHORITIES

## CASES

American Tobacco Co. v. United States, 328 U.S. 781 (1946)----------------------- 4

Amgen Inc. v. Connecticut Retirement Plans, 568 U.S. 455 (2013)----------------22

Ashcroft v. Iqbal, 556 U.S. 662 (2009) --------------------------------------------20

Aspen Skiing Co. v. Aspen Highlands Skiing Corp., 472 U.S. 585 (1985) --------- 3

Associated General Contractors of California v. California State Council of

    Carpenters, 459 U.S. 519 (1983) ------------------------------------------------ 2

Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007) -------------------------------42

Blue Shield of Virginia v. McCready, 457 U.S. 465 (1982)------------------------- 2

Brown Shoe Co. v. United States, 370 U.S. 294 (1962)------------------------------ 2

Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477 (1977) --------------- 2

Burger King Corp. v. Ashland Equities, Inc., 181 F. Supp. 2d 1366 (S.D. Fla.

    2002) ------------------------------------------------------------------------------53

California v. American Stores Co., 495 U.S. 271 (1990) --------------------------36

Cargill, Inc. v. Monfort of Colorado, Inc., 479 U.S. 104 (1986)--------------------- 2

Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co., 20 Cal.

    4th 163 (1999)------------------------------------------------------------------- 3

Dreamstime.com, LLC v. Google LLC, No. 20-16472, 2022 WL 17427039 (9th

Cir. Dec. 6, 2022)----------------------------------------------------------------- 44

Duty Free Americas, Inc. v. Estee Lauder Companies, Inc., 797 F.3d 1248 (11th

Cir. 2015) -------------------------------------------------------------------------- 47

Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451 (1992) -------- 30

Epic Games, Inc. v. Apple, Inc., 67 F.4th 946 (9th Cir. 2023) ---------------------- 38

Erie R.R. Co. v. Tompkins, 304 U.S. 64 (1938)----------------------------------------- 3

Hadley v. Kellogg Sales Co., 243 F. Supp. 3d 1074 (N.D. Cal. 2017) -------------- 43

Hawaii v. Standard Oil Co., 405 U.S. 251 (1972)------------------------------------- 21

Hill v. White, 321 F.3d 1334 (11th Cir. 2003)------------------------------------------ 9

In re Multidistrict Vehicle Air Pollution, 591 F.2d 68 (9th Cir. 1979) -------------- 34

In re Tobacco II Cases, 46 Cal. 4th 298 (2009) ---------------------------------------- 44

Interstate Circuit, Inc. v. United States, 306 U.S. 208 (1939) ----------------------- 51

JES Properties, Inc. v. USA Equestrian, Inc., 2005 WL 1126665 (M.D. Fla. May 9,

2005) -------------------------------------------------------------------------------- 51

Lorain Journal Co. v. United States, 342 U.S. 143 (1951) ---------------------------- 3

Lozano v. AT&T Wireless Services, Inc., 504 F.3d 718 (9th Cir. 2007) ----------- 37

MCI Communications Corp. v. AT&T, 708 F.2d 1081 (7th Cir. 1983) ------------ 49

Michael Linet, Inc. v. Village of Wellington, 408 F.3d 757 (11th Cir. 2005)------ 57

Midwest Gas Servs., Inc. v. Indiana Gas Co., 317 F.3d 703 (7th Cir. 2003) ------- 51

Mr. Furniture Warehouse, Inc. v. Barclays American/Commercial Inc., 919 F.2d 1517 (11th Cir. 1990) -----------------------------------------------------------------------25

Ohio v. American Express Co., 138 S. Ct. 2274 (2018)------------------------------- 2

Pielage v. McConnell, 516 F.3d 1282 (11th Cir. 2008) ------------------------------ 9

Procaps S.A. v. Patheon Inc., 845 F.3d 1072 (11th Cir. 2016) ----------------------20

Region 8 Forest Service Timber Purchasers Council v. Alcock, 993 F.2d 800 (11th Cir. 1993) --------------------------------------------------------------------------53

Reiter v. Sonotone Corp., 442 U.S. 330 (1979) --------------------------------------21

Ross v. Buckeye Cellulose Corp., 980 F.2d 648 (11th Cir. 1993) -------------------33

Sunbeam Television Corp. v. Nielsen Media Research, Inc., 711 F.3d 1264 (11th Cir. 2013) --------------------------------------------------------------------------25

Todorov v. DCH Healthcare Authority, 921 F.2d 1438 (11th Cir. 1991)-----------32

Toys R Us, Inc. v. FTC, 221 F.3d 928 (7th Cir. 2000) -------------------------------51

United States v. Google LLC, 747 F. Supp. 3d 1 (D.D.C. 2024) -------------------- 3

United States v. Microsoft Corp., 253 F.3d 34 (D.C. Cir. 2001)--------------------30

United States v. Patten, 187 F. 664 (S.D.N.Y. 1911) --------------------------------50

Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP, 540 U.S. 398 (2004) -------------------------------------------------------------------------12

Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338 (2011)-------------------------------36

Watson Laboratories, Inc. v. Rhone-Poulenc Rorer, Inc., 178 F. Supp. 2d 1099 (C.D. Cal. 2001) --------------------------------------------------------------------------- 44

Yelp Inc. v. Google LLC, ECF Nos. 47, 58 (N.D. Cal. Apr. 22 & Oct. 22, 2025) - 4

STATUTES

15 U.S.C. § 26 (Clayton Act § 16) ---------------------------------------------------- 2

15 U.S.C. §§ 1–2 (Sherman Act §§ 1, 2) --------------------------------------------- 1

15 U.S.C. §§ 15, 26 (Clayton Act §§ 4, 16)------------------------------------------- 1

18 U.S.C. § 1512----------------------------------------------------------------------- 3

18 U.S.C. § 1513(b) -----------------------------------------------------------------57

28 U.S.C. § 1291----------------------------------------------------------------------- 1

28 U.S.C. § 1331----------------------------------------------------------------------- 1

28 U.S.C. § 1337(a) ------------------------------------------------------------------- 1

28 U.S.C. § 1367----------------------------------------------------------------------- 1

Cal. Bus. & Prof. Code § 17200 -----------------------------------------------------37

OTHER AUTHORITIES

U.S. House of Representatives Subcommittee on Antitrust, Commercial, and Administrative Law, Investigation of Competition in Digital Markets (Oct. 2020) --------------------------------------------------------------------------------56

RULES

x

Fed. R. App. P. 32(a)------------------------------------------------------------------59

Fed. R. App. P. 32(f) ------------------------------------------------------------------59

Fed. R. App. P. 4(a)(4)(A)(iv) -------------------------------------------------------- 1

Fed. R. Civ. P. 12(b)(6) --------------------------------------------------------------- 2

Fed. R. Civ. P. 23(b)(2) --------------------------------------------------------------22

Fed. R. Civ. P. 23(b)(3) --------------------------------------------------------------22

Fed. R. Civ. P. 58(c)(2)(B) ------------------------------------------------------------ 1

Fed. R. Civ. P. 59(e)------------------------------------------------------------------- 1

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1337(a) because the operative complaint asserted claims under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1–2, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26. SAC ¶ 4, DE 61 at 4. The district court had supplemental jurisdiction under 28 U.S.C. § 1367 over Plaintiffs' California Unfair Competition Law claim.

This Court has jurisdiction under 28 U.S.C. § 1291. The district court entered orders dismissing Plaintiffs' claims on February 4 and February 14, 2025, and closed the case on February 14. DE 65; DE 69. No separate Rule 58 judgment was entered, so judgment was deemed entered 150 days after the closing order under Federal Rule of Civil Procedure 58(c)(2)(B). Plaintiffs filed a timely Rule 59(e) motion within the resulting 28-day window. DE 71; DE 74. The district court denied Rule 59(e) relief on December 22, 2025. DE 78. Plaintiffs filed their notice of appeal on January 19, 2026, within 30 days of that order. DE 80; DE 83. Under Federal Rule of Appellate Procedure 4(a)(4)(A)(iv), the appeal is timely as to DE 65, DE 69, and DE 78.

1

## STATEMENT OF THE ISSUES

I. Whether the district court erred at Rule 12(b)(6) by recasting the Second Amended Complaint's pleaded multi-sided Google Search platform (end users on one side, developers and publishers supplying indexed content on another, and Google intermediating click-through access between them) as an incoherent standalone "webmaster tools market," without analyzing whether the pleaded structure fit the transaction platform framework of *Ohio v. American Express Co.*, 138 S. Ct. 2274 (2018), or a multiple sided platform under *Brown Shoe Co. v. United States*, 370 U.S. 294 (1962).

II. Whether, even apart from Plaintiffs' platform theory, the district court misapplied antitrust standing by converting *Blue Shield of Virginia v. McCready*, 457 U.S. 465 (1982), into a literal "conduit only" rule, disregarding *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477 (1977), and *Associated General Contractors of California v. California State Council of Carpenters*, 459 U.S. 519 (1983), and treating quality degradation in a 'zero price' market and foreclosure of specialized vertical providers as noncognizable injury.

III. Whether the district court erred (on a question Google never raised) by failing to separately analyze Plaintiffs' standing to seek prospective injunctive relief under Clayton Act § 16, 15 U.S.C. § 26, when *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 111 n.6 (1986), holds that § 16 standing is less

stringent than § 4 standing because the *Associated General Contractors* factors do not apply with full force to injunctive relief.

IV. Whether the district court erred in dismissing the California Unfair Competition Law claim by collapsing the UCL's independent unlawful, unfair, and fraudulent prongs into the dismissed Sherman Act counts, contrary to *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938), and *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.*, 20 Cal. 4th 163 (1999), and by failing to adjudicate the pleaded 18 U.S.C. § 1512 retaliation predicate.

V. Whether the district court erred in dismissing Plaintiffs' Sherman Act § 1 claim based on the Apple & Google Information Search Agreement, the same distribution agreement found unlawful in *United States v. Google LLC*, 747 F. Supp. 3d 1 (D.D.C. 2024), by deeming Plaintiffs' injury "remote" without applying the prerequisite causation analysis.

VI. Whether the district court erred in dismissing the *Aspen Skiing* refusal-to-deal claim by adding a formal "joint venture" requirement not found in *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985), resolving disputed de-indexing facts through its own off-the-record search experiment, and failing to apply *Lorain Journal Co. v. United States*, 342 U.S. 143 (1951).

VII. Whether the district court erred in dismissing the duopoly claim by adopting Google's accusation that Plaintiffs' *American Tobacco* citation was

3

"fabricated," and by foreclosing concerted-action liability under *American Tobacco Co. v. United States*, 328 U.S. 781, 811 (1946).

VIII. Whether the court below abused its discretion in denying Rule 59(e) relief (DE 78) by refusing to consider the persuasive authority of *Yelp Inc. v. Google LLC*.

## STATEMENT OF THE CASE

### A. Proceedings Below

The original complaint was filed in April 2024. DE 1. Google moved to dismiss and stay discovery. DE 41; DE 42. The district court stayed discovery, so Plaintiffs never obtained discovery into Google's reasons for de-indexing OkCaller, despite three years of attempts which included significant pre-litigation requests for mediation. DE 43.

On November 8, 2024, the district court dismissed the federal antitrust counts and permitted amendment. DE 53. Plaintiffs filed the operative Second Amended Complaint on December 17, 2024. DE 61. The SAC pleaded Sherman Act claims under Sections 1 and 2, a California UCL claim, and class allegations for web developers and specialized providers affected by Google's search gatekeeping. SAC ¶¶ 96–105, DE 61 at 41–42.

4

Google moved to dismiss the SAC on January 6, 2025. DE 62. Plaintiffs opposed on January 21, 2025. DE 63. Google replied on January 28, 2025. DE 64. While the motion was pending, Plaintiffs prepared a sur-reply addressing Google's reply misdirections, including the reply's treatment of *Ohio v. American Express Co.* and the GSE/GWT issue. DE 66. The proposed sur-reply's lead heading on that issue was: "GWT is Part of the GSE — Plaintiffs Are Participants in the Multi-Sided Market." DE 66 at 6.

On February 4, 2025, the district court dismissed Greenflight's claims without leave to amend and ordered Dr. Isaacs to show cause why his claims should not be dismissed for the same reasons. DE 65. The next day, Greenflight filed its prepared Motion for Reconsideration and Sur-Reply; the court denied leave by paperless order. DE 66; DE 67. Dr. Isaacs's show cause response identified specific statutory subsections supporting the UCL retaliation predicate. DE 68 at 13. The court dismissed his claims "for the same reasons" and closed the case. DE 69.

After a sister federal court sustained materially analogous *Yelp* SERP-suppression and UCL theories past Rule 12, Plaintiffs raised *Yelp* in Rule 59(e) proceedings. DE 71; DE 74; DE 75. The court below denied relief, holding that *Yelp* was not controlling and treating the UCL § 1512 omission argument as relitigation. DE 78. Plaintiffs timely appealed. DE 80; DE 83.

### B. Facts Pleaded In The SAC

Greenflight operates OkCaller.com, a specialized reverse phone and directory information platform. SAC ¶¶ 7, 23–25, DE 61 at 5, 11–12. OkCaller grew substantially through Google Search. From 2013 through 2022, it generated approximately 293 million users and 605 million pageviews, as reflected in a Google Analytics screenshot reproduced in the SAC. SAC ¶ 25, DE 61 at 12.

The relationship was longstanding and profitable. Google invited OkCaller into "Enhanced Support and Optimization," called it a "trusted partner," and hosted Dr. Isaacs at Google's Miami office. SAC ¶¶ 28–29, DE 61 at 13. OkCaller generated millions in profits each year for Google, with 2022 alleged as record earnings. SAC ¶ 26, DE 61 at 12.

On Thanksgiving Eve 2022, Google de-indexed OkCaller. SAC ¶ 30, DE 61 at 13. The SAC alleges that Google had previously indexed vast telephone directory volumes of OkCaller pages. After the termination, a Google search for OkCaller returned zero documents. Id. The de-indexing occurred on the same day Dr. Isaacs filed an Apple antitrust appellate brief in the Ninth Circuit, which was also about one year after the underlying Apple litigation began. SAC ¶ 38, DE 61 at 16. The SAC further alleges that similarly situated phone directory competitors, including alleged copycats, were not cancelled. Id.

The SAC defined the central market as general search services (GSE) mirroring the DOJ complaint, and pleaded it as a multiple-sided platform serving both developers/publishers and consumers. Paragraph 64 alleged that "[g]eneral search engines act as digital platforms serving two symbiotic customer groups: end-users seeking information and the developers and publishers who supply content to be discovered." SAC ¶ 64, DE 61 at 28. The same paragraph alleged that website owners effectively "purchase" distribution through tools and analytics so their content can be found by end users. Id. Paragraph 67 pleaded the zero-price SSNDQ test: in a nominally free search market, market power appears through decreased quality, visibility, transparency, and access rather than a cash price increase. SAC ¶ 67, DE 61 at 29–30.

The SAC also pleaded adjacent specialized markets, including vertical search providers, directory information services, Google-referred organic traffic, and internet content access (ICAM). SAC ¶¶ 71–89, DE 61 at 31–40. The theory was not that OkCaller was another Bing. It was that Google's GSE monopoly was used to suppress a specialized provider whose traffic, data, quality, and user access constrained Google and improved search output.

### C. The Dismissal

The dismissal first reframed the case as one about whether Greenflight was already a direct competitor in "general search services." DE 65 at 6 n.3, 10–13. It

7

then described Plaintiffs' response to Google's market and standing arguments this

way:

> "Greenflight's response to Google's focused arguments is consistently an incoherent collection of technical jargon and legal phrases. In the Court's opinion, Greenflight's response is so incoherent that Greenflight has failed to meet its obligation to respond to the cogent points raised in Google's motion."
>
> DE 65 at 7.

The court then quoted the paragraph it viewed as an example:

> "Plaintiffs, as direct users of Google's Webmaster Tools (GWT) and overall GSE services, plead that they have no meaningful alternative for distribution, making them effectively consumers of Google's platform. Even if they are not themselves offering general search querying, they suffer inextricably intertwined injury from Google's alleged manipulation and self-preferencing. Because market power in GSE allows Google to withhold or degrade distribution, the alleged harm—OkCaller's dramatic traffic decline—flows directly from conduct in that market.
>
> >
>
> The Supreme Court in Brown Shoe recognized that market definition and the effects of alleged monopolistic behavior often involve intricate factual inquiries (e.g., cross-elasticities of demand, distribution channels, barriers to entry). Here, Plaintiffs' theory rests on facts—such as behind-the-scenes ranking changes, data indexing decisions, exclusive default agreements, and new to the SAC – whether GWT is part of the GSE platform."
>
> DE 65 at 7–8, quoting DE 63 at 7–8.

That paragraph was the heart of Plaintiffs' *Amex* and *Brown Shoe* response.

The dismissal treated it as non-responsive, and later stated that "for that reason

alone, Google's motion is due to be granted." DE 65 at 14.

The order also dismissed the UCL count by treating non-Sherman predicates

as "vague references," even though the SAC identified 18 U.S.C. § 1512. DE 65 at

15; SAC ¶ 139, DE 61 at 53. It dismissed the fraudulent prong by asking whether

8

Google had a general duty to disclose its algorithm, rather than whether the pleaded neutral-search representation was likely to deceive. DE 65 at 16. It dismissed the unfair prong because it overlapped with the dismissed federal counts. DE 65 at 17.

The order dismissed the ISA-based Section 1 claim as "incidental or remote at best." DE 65 at 13. It dismissed the *Aspen Skiing* claim after treating *Aspen* as requiring a relationship resembling a joint venture and after relying on the court's own observation that OkCaller's homepage could still be found. DE 53 at 11–12 n.9; DE 65 at 16 n.6. It dismissed the *American Tobacco* concerted-action count after accepting Google's assertion that Plaintiffs' quotation was "fabricated or hallucinated." DE 65 at 18–19.

Finally, the order denied leave to amend, found further amendment futile and prejudicial, and stated that future motion practice such as reconsideration could be summarily denied without explanation. DE 65 at 20–21.

## D. Standards Of Review

This Court reviews a Rule 12(b)(6) dismissal de novo, accepting well-pleaded factual allegations as true and construing them in Plaintiffs' favor. *Hill v. White*, 321 F.3d 1334, 1335 (11th Cir. 2003); *Pielage v. McConnell*, 516 F.3d 1282, 1284 (11th Cir. 2008).

9

**SUMMARY OF ARGUMENT**

The SAC alleged a concrete sequence: Google maintained monopoly power in general search; OkCaller supplied indexed directory content through Google Search; Google profited from that relationship for years; and after protected antitrust petitioning, Google deindexed OkCaller while sparing comparable rivals. The district court did not test that pleaded theory under the governing Rule 12 standard. It replaced it with a "webmaster tools market" Plaintiffs never pleaded, treated Plaintiffs' actual response as "incoherent," collapsed separate statutory claims into the Sherman dismissal, and denied Rule 59 relief without engaging materially analogous Google litigation. The result was not a narrow merits ruling. It was a threshold foreclosure of discovery on a complaint that pleaded recognizable antitrust, UCL, and prospective injunctive relief theories.

The dismissal should be reversed for eight independent reasons.

First, the district court did not engage the SAC's central market theory. Plaintiffs pleaded Google Search as a multi-sided, zero price platform connecting users with developers and publishers through indexing, ranking, and click-through distribution. SAC ¶¶ 64–67. Google recast that theory as a freestanding "webmaster tools market," and the court adopted that strawman, labeled Plaintiffs' actual response "incoherent," and made non-responsiveness an independent ground for dismissal. DE 65 at 7–14. Whether the theory is analyzed under *Ohio v.*

10

*American Express Co.*, 138 S. Ct. 2274 (2018), *Brown Shoe Co. v. United States*, 370 U.S. 294 (1962), or conventional GSE-monopoly principles, the court had to analyze the pleaded market rather than replace it. That framing error drives the rest of the dismissal. Once the court refused to treat Plaintiffs as participants in the pleaded GSE platform, it converted standing into a question whether OkCaller was already another Bing. It then rejected antitrust injury through a "floodgates" concern that every website might sue.

Second, standing survives even apart from *Amex*. OkCaller was the direct target of de-indexing; the injury is measurable; and the pleaded harm is zero-price quality degradation, reduced output, diminished choice, and foreclosure of a specialized vertical provider. The district court substituted a "conduit only" gloss and floodgates concern for *Brunswick*, *McCready*, and *AGC*.

Third, the court separately failed to analyze Clayton Act § 16 standing. Google did not raise § 16, and the order did not apply *Cargill*'s less stringent standard for prospective injunctive relief. The damages concerns governing *AGC* do not apply to prospective, forward looking injunctive relief.

Fourth, the court collapsed California's independent UCL prongs into the Sherman dismissal. Plaintiffs pleaded an unlawful §1512 retaliation predicate, unfair opaque and retaliatory platform foreclosure under *Cel-Tech*, and fraudulent

11

neutral-search deception. *Erie* forbids narrowing California law into a federal antitrust duplicate.

Fifth, the ISA-based Section 1 claim pleaded that the Apple-Google Information Search Agreement preserved Google's search monopoly and enabled downstream suppression of specialized providers. The district court deemed the injury "remote" without taking that causal chain as true.

Sixth, the *Aspen Skiing* claim pleaded a decade-long profitable course of dealing, abrupt termination, disparate treatment, no legitimate explanation, and short-term profit sacrifice. *Aspen* does not require a formal joint venture, and *Trinko* does not immunize active bottleneck weaponization under *Lorain Journal*.

Seventh, the *American Tobacco* dismissal rested on a factual mistake. The order accepted Google's charge that Plaintiffs' correctly paraphrased citation was "fabricated or hallucinated," although the operative language appears at 328 U.S. 811. That mistake cannot support dismissal with prejudice or futility.

Eighth, the court below abused its discretion in denying Rule 59(e) relief. Eleven weeks after dismissal, a sister federal court sustained materially analogous Google SERP suppression and UCL claims past Rule 12; six months later, the same court sustained *Yelp*'s claims through a renewed motion to dismiss. *Yelp Inc. v. Google LLC*, ECF Nos. 47, 58 (N.D. Cal. Apr. 22 and Oct. 22, 2025). Google's Rule 59(e) opposition told the court that "the Yelp decision in fact dismissed

12

Yelp's tying, leveraging, and refusal to deal claims" (DE 73 at 4), omitting that the same order sustained *Yelp*'s core monopolization, attempted monopolization, and UCL theories, and that the October order later sustained the amended tying claim. The court did not engage either *Yelp* order's reasoning or Plaintiffs' correction of Google's characterization. It treated *Yelp*'s noncontrolling status as dispositive and recharacterized Plaintiffs' UCL § 1512 omission argument as relitigation. That was a Rule 59(e) framework error.

At Rule 12, the question is whether the SAC plausibly alleged those theories and whether the district court applied the correct legal standards. It did not. Plaintiffs respectfully ask this Court to reverse the dismissal and remand for discovery under the legal standards the district court did not apply.

## SECTION I

## THE DISTRICT COURT ERRED BY RECASTING THE SAC'S GOOGLE SEARCH PLATFORM AS A STANDALONE WEBMASTER TOOLS MARKET.

### A. The GSE Is A Multi-Sided Search Distribution Platform.

The SAC's relevant Sherman market section opens with the conventional definition: general search engines are "platforms such as Google, Bing, and DuckDuckGo," providing a "one-stop shop" for broad internet content. SAC ¶ 63, DE 61 at 27–28. It then immediately pleads the second side of the platform:

> "General search engines act as digital platforms serving two symbiotic customer groups: end-users seeking information and the developers and

publishers who supply content to be discovered. While the end-user facing aspect of GSEs is straightforward, the developer-facing dimension—encompassing search visibility, indexing feedback, and webmaster tools—is equally critical. Through these tools and analytics, website owners effectively 'purchase' distribution services from GSEs, ensuring their content can be found by the end-user population."

SAC ¶ 64, DE 61 at 28.

The SAC alleges that this interdependence creates "a developer-oriented component within the GSE market," because developers "cannot realistically forego Google's platform or find alternatives with comparable reach," giving Google control not only over how users access content but over "the terms by which developers can achieve online visibility." SAC ¶ 65, DE 61 at 28–29. It alleges that opaque ranking and indexing decisions allow Google to disadvantage independent sites and distort competition, with "both user-facing and developer-facing aspects of the GSE market" intertwined. SAC ¶ 66, DE 61 at 29. And because the relevant services are zero-price, the SAC pleads the appropriate analytical tool, the Small but Significant and Non-Transitory Decrease in Quality (SSNDQ) test, under which monopoly power is expressed through degraded transparency, slower indexing, weakened analytics, and reduced distribution access rather than through a price increase. SAC ¶ 67, DE 61 at 29–30.

That is a pleaded multi-sided platform. The market is general search; users participate on one side; developers and publishers participate on another; the platform mediates between them; and the platform's competitive output is

14

responsive routing of queries to indexed content. Whatever the doctrinal label, the structure is economically real and pleaded with specificity.

## B. The Court Did Not Need To Resolve The *Amex* Classification To Reverse The Dismissal.

The pleaded mechanism is plausibly transactional under *Ohio v. American Express Co.*, 138 S. Ct. 2274 (2018), which held that two-sided platforms must be analyzed as a single market when they intermediate between groups whose participation is interdependent and when the platform's output requires simultaneous engagement from both sides. *Id.* at 2280, 2286–87. When a user clicks an organic Google result, Google intermediates a realtime digital handshake: the user's browser is routed to the publisher's server, the publisher receives the visit Google's index and ranking made possible, and Google monetizes the interaction through advertising, data, and platform engagement. Each side gives up something of economic value (attention, data, or content) and receives something of economic value (information, distribution, or visibility). SAC ¶¶ 64–67.

The SAC's theory is therefore plausibly like a transaction, even though neither side pays a cash price at the moment of search. SAC ¶¶ 64–67.

But even if the panel were to conclude that Google Search is *not* a strict *Amex* transaction platform (for instance, because *Amex* itself contemplated that not every two-sided platform requires single market analysis, 138 S. Ct. at 2286), the

15

dismissal still cannot stand. The district court did not analyze the pleaded multi-sided platform on *any* terms. It did not apply the *Amex* test and conclude the SAC failed it. It did not apply a non-transaction multi-sided framework. It did not apply *Brown Shoe*'s practical indicia analysis. It instead recast the theory as a freestanding "webmaster tools market" Plaintiffs never pleaded, and then dismissed the theory it had recast.

If Google Search is an *Amex* transaction platform, the court erred by refusing to analyze both sides of the platform together. If Google Search is a non-transaction multi-sided platform, the court erred by refusing to analyze the developer-publisher side at all. If Google Search is best treated as a conventional GSE monopoly with a developer facing distribution side, the court erred by refusing to recognize the distribution side as part of the same monopolized market. Whichever doctrinal answer is right, the dismissal (premised on the conclusion that GWT is a separate market and that the actual platform theory was "incoherent") does not survive any of them.

That alternative structure is what makes this an unambiguous Rule 12 error rather than a close call. The panel needs only to recognize that the court below committed to none of the three frameworks, and substituted a strawman.

16

## C. Google's "Webmaster Tools Market" Argument Was A Strawman That Plaintiffs Did Not Plead.

Google's motion to dismiss attacked a market Plaintiffs did not allege:

"Plaintiffs now argue that they are market participants in the general search engine market by virtue of being users of 'GWT' … But the SAC does not allege a market for webmaster tools. Google Search and GWT are different, non-interchangeable products serving different groups of users, see SAC ¶¶ 60, 62, and there is no well-pleaded allegation to the contrary. The two cannot be a part of the same antitrust market."

DE 62 at 3–4.

That argument assumes its conclusion. Multi-sided platforms by definition serve different groups through different interfaces. The fact that end users use Google's search box while developers and publishers use crawling, indexing, search visibility, Search Console, webmaster feedback, and optimization tools is not a defect in the platform theory — it is the platform theory. SAC ¶¶ 64–67 plead exactly that integrated structure.

Plaintiffs' MTD Opposition refuted the strawman directly:

"Nor can Google dismiss Plaintiffs' standing argument by insisting that GSE services and Google's Webmaster Tools (GWT) are categorically separate product markets. The GWT component is integral for content providers seeking visibility in that same platform. *This is not simply 'another market' for GWT.* Rather, GWT is part of the multi-sided GSE ecosystem: end-users rely on Google to retrieve information, while web developers rely on Google for indexing and distribution. As such, Plaintiffs participate on the developer-facing side of the same GSE platform."

DE 63 at 3–4 (emphasis added).

17

Plaintiffs represented that the sur-reply had been prepared before the dismissal order issued, filed it the next day with a motion for leave to file a sur-reply and for reconsideration, and the court denied leave by paperless order. DE 65 (entered Feb. 4, 2025); DE 66 (filed Feb. 5, 2025); DE 67 (paperless denial). Its lead heading on the issue was: *"GWT is Part of the GSE—Plaintiffs Are Participants in the Multi-Sided Market."* DE 66 at 6. The sur-reply explained:

> "Plaintiffs have alleged a multi-sided GSE ecosystem in which they are directly engaged… Plaintiffs plausibly allege that Google's GSE operates on multiple sides: (1) end-users performing queries, and (2) developers submitting and optimizing content through GWT. SAC ¶¶ 64–66. By refusing to accept OkCaller's content or systematically de-indexing it, Google wields monopoly power over the developer-facing side of its GSE platform. Plaintiffs are thus 'consumers' of GSE distribution—an integral side of the same market."

DE 66 at 6–7. Dr. Isaacs's *pro se* Show Cause memorandum made the point identically: *"GWT is not a separate market but an integral, interdependent component of the GSE ecosystem."* DE 68 at 6.

The same theory appears across the SAC, Plaintiffs' MTD Opposition, the proposed sur-reply, and Dr. Isaacs's *pro se* submission: GWT is not a market unto itself; it is the developer-facing interface of the multi-sided GSE platform, and Plaintiffs participate in that platform on the developer-publisher side. Google's premise, that pleading GWT means pleading a separate market, was a misreading. The court below adopted the misreading.

**D. The Court's "Incoherent Jargon" Finding And "For That Reason Alone" Disposition Converted A Disputed Market Definition Theory Into Waiver.**

The dismissal order describes Plaintiffs' MTD Opposition as "consistently an incoherent collection of technical jargon and legal phrases," and characterizes it as "so incoherent that Greenflight has failed to meet its obligation to respond to the cogent points raised in Google's motion." DE 65 at 7. The order then identifies, as its illustrative example of supposed incoherence, the very passage in Plaintiffs' Opposition that pleaded the multi-sided platform: Plaintiffs' explanation that they are "direct users of Google's Webmaster Tools (GWT) and overall GSE services… effectively consumers of Google's platform" who suffer "inextricably intertwined injury" from Google's alleged conduct. DE 65 at 7–8 (quoting DE 63 at 7–8). The order then announces: "Greenflight's answer to this point, as discussed above in Section A, is sufficiently incoherent to be non-responsive. For that reason alone, Google's motion is due to be granted." DE 65 at 14.

That is the central reversible error. It rests on the "incoherent jargon" finding. The "incoherent jargon" was the multi-sided platform paragraph. Undersigned counsel has pled multi-sided platform ecosystems for nearly six years in various antitrust cases. The court's reduction of it to AI jargon contradicts a durable record in courts across the country. That record was largely created before any AI existed. Considering Google is widely credited for inventing the current AI LLM, it is bizarre that Undersigned Counsel is being wrongly scapegoated for the

19

notorious incoherence and hallucination problems Google created. The multi-sided Amex argument is a core theory in this case – not an LLM hallucination.

A district court applying Rule 12(b)(6) may not dismiss a complaint by labeling the plaintiff's key controlling doctrine analysis as "jargon" and treating the label as the equivalent of a substantive ruling. The court is required to apply governing law to the well-pleaded facts. *Iqbal*, 556 U.S. 662, 678–79 (2009). A novel but economically pleaded digital platform market theory should not be dismissed as waived because the court found it difficult. *Brown Shoe*, 370 U.S. at 325 (market definition is fact intensive); *Procaps*, 845 F.3d at 1083 (same).

The court could have analyzed the theory and rejected it. It did not.

The dismissal also overlooked that the discovery stay (DE 43) prevented Plaintiffs from developing the very evidence market definition requires: cross-elasticity data, indexing records, traffic flows, advertiser/publisher revenue allocation, and platform rule documentation. Dismissing a multi-sided platform theory at Rule 12 while denying the discovery that would test the theory is the reverse of what *Brown Shoe* mandates.

## E. The "Every Website" Footnote Substituted Policy For Doctrine: Rule 23 Is The Answer.

The dismissal's footnote 6 articulated a policy concern: "If one's influence on or use of Google's search engine results was sufficient to confer antitrust

standing… every person who has ever posted something on the internet (or typed something into Google search) has standing to sue Google as a competitor. That simply cannot be the law." DE 65 at 11 n.6. The order reinforced the same framing in the body: "every website on the internet with a search bar could say the same— every website on the internet with a search bar could sue in antitrust as a [competitor]." DE 65 at 12–13.

The policy concern of opening litigation floodgates carries no bearing on Rule 12 analysis for several reasons:

*First*, antitrust law has actual limiting doctrines: antitrust injury under *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977); efficient-enforcer analysis under *Associated General Contractors of Cal. v. Cal. State Council of Carpenters*, 459 U.S. 519, 540–46 (1983); directness; causation; participation in a cognizable market. The court did not apply those tests.

*Second*, broad private antitrust enforcement is the design of the Sherman and Clayton Acts. Section 4 authorizes "any person… injured in his business or property" to sue. *Reiter v. Sonotone Corp.*, 442 U.S. 330, 343 (1979) (Sherman Act is a "consumer welfare prescription" designed for broad private enforcement); *Hawaii v. Standard Oil Co.*, 405 U.S. 251, 262 (1972) (broad private enforcement is the policy). A district court that treats the breadth of a monopolist's gatekeeping

21

reach as a reason to deny one of the gatekeeper's injured counterparties a forum has inverted the statutory scheme.

*Third*, when many similarly situated plaintiffs share common questions, Federal Rule of Civil Procedure 23(b)(3) (and, for forward-looking remedies, Rule 23(b)(2)) supplies the procedural mechanism. *Amgen Inc. v. Connecticut Retirement Plans*, 568 U.S. 455 (2013). The SAC was pleaded as a class action, "on behalf of themselves and all others similarly situated." DE 61 at 1. Footnote 6's observation that many websites might have similar grievances is not itself a Rule 12 standing defense. Antitrust law supplies its own limiting doctrines (*Brunswick*, *AGC*, causation, directness, and market participation), and Rule 23 supplies a later mechanism for managing common claims if Plaintiffs satisfy certification requirements.

## F. Relief.

This Court should reverse the dismissal of Counts I and II to the extent they rested on the district court's rejection of the pleaded multi-sided GSE platform theory. The SAC plausibly alleged that Google Search operates as a multi-sided, zero price platform; that developers and publishers form an integral side of that platform; and that Plaintiffs participated on that side through OkCaller's indexed content, search visibility, and dependence on Google's distribution channel. SAC ¶¶ 64–67.

If the SAC fits *Amex*, it should be analyzed as an *Amex* transaction platform. If it fits a non-transaction multi-sided framework, the developer/publisher side should be analyzed under conventional principles. Each of those paths is open on remand. None of them sustains the dismissal entered below.

What the dismissal cannot survive is the framing it adopted: a strawman "webmaster tools market" and a label of incoherence that operated as the standalone basis for dismissal, setting aside well settled competition law frameworks. This Court should reverse.

## SECTION II

### EVEN APART FROM AMEX, PLAINTIFFS PLEADED ANTITRUST INJURY AND 'EFFICIENT ENFORCER' STANDING.

Even if the GSE market is analyzed as a single sided monopoly, the standing dismissal still fails. Plaintiffs alleged that Google used anticompetitive conduct to de-index a specialized vertical provider, reduce consumer access to independent directory information, and chill developer competition. That is antitrust injury, and Greenflight is an efficient enforcer.

The district court did not apply the governing framework. It treated *McCready* as if it required Plaintiffs to be a literal "conduit" used to harm Bing. DE 53 at 5; DE 65 at 11. It treated the possibility that many websites may be injured by Google's monopoly as a reason to dismiss rather than as a reason

23

antitrust law and Rule 23 exist. DE 65 at 11 n.6. And it expressed skepticism because "Google search is (for the most part) free." DE 65 at 20. Each premise is wrong.

## A. *McCready* Requires Inextricable Intertwinement, Not Literal Conduit Status.

The facts of *Blue Shield of Virginia v. McCready*, 457 U.S. 465 (1982), supply the controlling framework. Blue Shield of Virginia, a health-insurance plan, conspired with the Neuropsychiatric Society of Virginia (a psychiatrists' association) to exclude psychologists from the market for psychotherapy reimbursement. *Id.* at 467–69. Under the conspiracy, Blue Shield refused to reimburse subscribers who consulted psychologists for psychotherapy, while reimbursing them for the same services performed by psychiatrists. *Id.* The plaintiff, *McCready*, was a Blue Shield subscriber, *not* a psychologist, *not* a competitor in the psychotherapy market. She sued under the Sherman Act for the reimbursement she was denied. *Id.* at 469.

The Supreme Court held that *McCready* had antitrust standing even though she was a consumer rather than a competitor in the targeted market. The Court's reasoning was practical: harming consumers like *McCready* by denying reimbursement was the very mechanism by which the conspiracy could harm psychologists. *Id.* at 479. *McCready*'s injury was therefore "inextricably

24

intertwined with the injury the conspirators sought to inflict on psychologists and the psychotherapy market." *Id.* at 484. The standing test the Court announced does not require the plaintiff to be a competitor, a customer of the targeted competitor, or a literal conduit through which harm passes. It requires only that the plaintiff's injury be inextricably intertwined with the harm to competition and flow from what makes the defendant's conduct unlawful. *Id.* at 479, 484.

The Eleventh Circuit reads *McCready* faithfully. *Sunbeam Television Corp. v. Nielsen Media Research, Inc.*, 711 F.3d 1264, 1271 (11th Cir. 2013), recognizes that antitrust standing exists where the plaintiff's injury "flow[s] from that which makes defendants' acts unlawful." *Mr. Furniture Warehouse, Inc. v. Barclays American/Commercial Inc.*, 919 F.2d 1517, 1521 (11th Cir. 1990), applied *McCready* to a plaintiff class whose injury was the necessary mechanism for excluding the targeted competitors.

The district court narrowed *McCready* into a "conduit only" test. It asked whether Greenflight was "used as a conduit for the Defendant to harm competing search engines, such as Bing." DE 53 at 5; *see also* DE 65 at 11. That phrasing has no support in *McCready*. The Supreme Court used the word "conduit" once, to describe the practical mechanism of the *McCready* conspiracy, not to articulate a doctrinal requirement. The actual test is inextricable intertwinement. 457 U.S. at 484.

25

The SAC satisfies that test. The mechanism here parallels *McCready*: a dominant firm (Google, like Blue Shield) excludes a class of providers (specialized vertical providers like OkCaller, like the psychologists) by foreclosing access to a critical channel (search distribution, like reimbursement) that the providers and their customers cannot reach on competitive terms outside the dominant actor's control. The de-indexing of OkCaller simultaneously injured Plaintiffs, reduced consumer access to independent directory information, deprived users of high-quality directory content, and signaled to other specialized providers that Google could suppress them without explanation. SAC ¶¶ 30, 38, 56–58, 90–95. The injury was not collateral. It was the exclusionary mechanism.

## B. The Injury Is Direct And Cognizable Under *Brunswick*.

*Brunswick* requires injury "of the type the antitrust laws were intended to prevent" that flows from the defendant's unlawful conduct. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). Greenflight pleaded exactly that.

The injury is direct because Google allegedly removed OkCaller's indexed pages, causing a collapse in search traffic, advertising revenue, visibility, and market presence. SAC ¶¶ 25, 30, 38. There is no intervening purchaser or distributor. The same entity that controlled the bottleneck allegedly caused the injury, and the same property that was de-indexed suffered the traffic loss.

26

The injury is antitrust injury because the alleged conduct reduced output and quality in a specialized information vertical. OkCaller was not merely a private website that lost traffic. The SAC alleges it was a specialized directory provider that had served hundreds of millions of users, improved reverse phone results, and offered a privacy respecting alternative to lower quality or heavily monetized substitutes. SAC ¶¶ 23–26, 48–49, 56–58, 75–79. De-indexing that provider allegedly reduced consumer choice, impaired innovation, and degraded the quality of search output.

## C. 'Zero Price' Quality Degradation Is Consumer Welfare Harm.

The district court's observation that Google Search is "free" misses how digital search markets work. In zero priced platform markets, consumers pay with attention, data, time, and exposure to advertising. Competition therefore occurs through quality, privacy, relevance, output, transparency, and choice. *Ohio v. American Express Co.*, 138 S. Ct. 2274, 2284–87 (2018), recognizes decreased quality and reduced output as anticompetitive effects.

The SAC pleaded that consumer harm. Consumers lost an independent directory source and were pushed toward Google's self-preferenced, ad heavy, or favored alternatives. SAC ¶¶ 75–79, 90–95, 134–135. That is cognizable consumer welfare harm even if the cash price of Google Search remained zero.

27

Treating zero price as immunity would exempt the core business model of modern search monopolies from antitrust scrutiny. The Sherman Act does not require a price increase where the competitive product is quality, privacy, innovation, and choice.

## D. The *AGC* Efficient-Enforcer Factors Favor Greenflight.

Associated General Contractors supplies the limiting doctrine the district court's floodgates footnote neglected. *Associated General Contractors of California v. California State Council of Carpenters*, 459 U.S. 519, 540–46 (1983). Those factors favor standing at the pleading stage.

Directness favors Plaintiffs. Google allegedly de-indexed OkCaller itself, and Greenflight owns the injured platform. SAC ¶¶ 7, 25, 30. The injury runs in one step from de-indexing to lost traffic and revenue.

The nature of the injury favors Plaintiffs. Reduced output, degraded search quality, diminished consumer choice, and foreclosure of a specialized vertical provider are the types of harms antitrust law prevents.

Speculativeness favors Plaintiffs. The injury can be measured through Google Analytics, traffic records, AdSense revenue, indexing records, and a discrete before-and-after event. SAC ¶ 25.

The existence of more direct victims favors Plaintiffs. Bing does not own OkCaller's lost traffic. The DOJ's search case does not compensate Greenflight.

Users may suffer degraded quality, but Greenflight is the directly de-indexed provider.

Duplicative recovery and apportionment favor Plaintiffs. The damages flow from a discrete site, a discrete de-indexing event, and measurable traffic and revenue losses. No complex pass-through damages chain is needed.

The district court did not walk through those factors. It substituted a categorical concern that Plaintiffs' theory would let "every person who has ever posted something on the internet" sue. DE 65 at 11 n.6. *AGC* is the answer to that concern. Rule 12 dismissal based on a generalized floodgates fear is not. Moreover, it misses the point of this first-to-file class action: require transparency and fairness through an injunction, so website publishers co-exist in a competitive and democratic internet. Then there will be no litigation floodgates.

## E. Specialized Vertical Providers Are Not Remote Bystanders.

The DOJ recognized this structure in United States v. Google. Its findings identify Specialized Vertical Providers, including *Yelp*, Amazon, and Expedia, as competitive constraints in specific search verticals. *United States v. Google LLC*, 747 F. Supp. 3d 1, FoF ¶ 141. OkCaller is the same kind of provider in reverse-phone and directory search. SAC ¶¶ 23, 45, 71–79.

Plaintiffs are therefore not remote employees, suppliers, or shareholders claiming incidental fallout. They allege they were the target of the exclusionary

act: de-indexing. When a monopolist uses search gatekeeping to remove a specialized directory generating hundreds of millions of pageviews, the injury to that directory is not a ripple effect. It is the mechanism of foreclosure.

## F. The District Court Failed To Apply Monopoly Leveraging Doctrine To The Pleaded Downstream Submarkets.

The district court rejected Plaintiffs' VSP and directory information submarket allegations as "too broad" and held that Google was not a monopolist in those secondary markets. DE 53 at 6–8. *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 479–80 (1992), and *United States v. Microsoft Corp.*, 253 F.3d 34, 70 (D.C. Cir. 2001), support the economic relevance of monopoly leveraging and downstream foreclosure. The SAC pleads leveraging directly: "Google has leveraged its monopoly power in the GSE market to control the downstream markets in which Plaintiffs operate." SAC ¶ 19; *see also* SAC ¶¶ 91, 110, 116–118. Plaintiffs' opposition invoked the same concept, citing *Microsoft* for the principle that "exclusionary deals that preserve monopoly leverage and harm related markets can be cognizable under antitrust laws." DE 63 at 11. At minimum, those allegations bear on antitrust injury, UCL unfairness, and prospective relief; whether they also plead attempted monopolization in a downstream market depends on market facts that should not have been resolved through a categorical Rule 12 dismissal.

**G. The Standing Ruling Would Nullify Private Antitrust Enforcement In Digital Platform Markets.**

The practical effect of the district court's ruling is stark. The DOJ can prove that Google unlawfully maintained its search monopoly through exclusionary distribution agreements, yet the specialized publishers allegedly crushed by downstream deployment of that monopoly power cannot sue because they are deemed "too remote." That would leave private enforcement only to hypothetical full-scale horizontal "Bing" search engines while excluding the actual businesses most exposed to Google's gatekeeping.

Congress did not design antitrust enforcement that way. Sections 4 and 16 of the Clayton Act authorize private enforcement precisely because public enforcement alone cannot redress every monopoly injury. *Hawaii v. Standard Oil Co.*, 405 U.S. 251, 262 (1972); *Reiter v. Sonotone Corp.*, 442 U.S. 330, 344 (1979). Standing doctrines are real limits, but they cannot be transformed into a categorical bar against the real world victims of digital platform anticompetitive behavior.

31

## SECTION III

## THE DISTRICT COURT FAILED TO SEPARATELY ANALYZE STANDING FOR PROSPECTIVE INJUNCTIVE RELIEF UNDER CLAYTON ACT § 16: A QUESTION GOOGLE NEVER RAISED AND THE COURT NEVER ADDRESSED.

### A. The Issue Was Preserved Below And Was A Pure Omission By Google And The Court.

Plaintiffs invoked Clayton §16 throughout the proceedings[1]. Despite that clear invocation, Google's MTD (DE 62) and Google's MTD Reply (DE 64) did not address §16 standing. Neither brief contains the terms "Section 16," "Clayton §16," "injunctive standing," or "*Cargill*." Google's standing argument was framed entirely around §4 treble damages standing under *AGC*, addressing duplicative recovery, damages apportionment, and an "every website" floodgates concern that only attaches to damages multiplication.

The district court's order (DE 65) did not separately analyze §16. The order's only reference to *Cargill* is a parenthetical citation embedded in a cite of *Todorov v. DCH Healthcare Authority*, 921 F.2d 1438 (11th Cir. 1991). DE 65 at 21. That supports the order's §4 *AGC* discussion. It does not address whether

---

[1]The SAC's caption: *"FOR DAMAGES AND INJUNCTIVE RELIEF."* DE 61 at 1; SAC ¶ 4: jurisdiction invoked under "Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26." DE 61 at 4; SAC ¶¶ 104–105: pleads "Injunctive and declaratory relief" and that "final injunctive relief or corresponding declaratory relief is" warranted. DE 61 at 43; SAC Prayer ¶ C: requests specific prospective relief: transparency requirements, non-retaliation orders, restored indexing, and related forward looking remedies. DE 61 at 56–57.

Plaintiffs have standing to seek the prospective injunctive relief they specifically requested. Nor does the order anywhere apply the *Cargill* test for § 16 standing or distinguish damages concerns from injunctive concerns.

That is a structural error. The Eleventh Circuit has held that a district court's failure to address a properly pleaded claim is reversible. *Ross v. Buckeye Cellulose Corp.*, 980 F.2d 648 (11th Cir. 1993). And on appeal, this Court reviews legal error questions on Rule 12 dismissal *de novo*. *Hill v. White*, 321 F.3d at 1335. Plaintiffs invoked §16 and requested prospective relief; Google's motion did not separately analyze §16; and the order did not apply the §16 standard. The dismissal of prospective relief therefore requires separate review.

In short, because the strict damages standing limitations of McCready and AGC do not apply to claims for injunctive relief, the district court's blanket dismissal is plainly defective as a matter of law. The case must proceed, at a minimum, for the injunctive relief sought.

## B. Clayton §16 Standing Is Materially Different Than §4 Standing: *AGC*'s Damages Factors Do Not Apply To Injunctive Relief.

The Supreme Court and the Eleventh Circuit recognize a structural distinction between standing to seek money damages under Clayton Act §4 and standing to seek prospective injunctive relief under Clayton Act §16. The district court conflated the two, substituting a §4 floodgates anxiety about calculating

damages for the required §16 analysis. Because Google never challenged § 16 standing and the district court never adjudicated it, the dismissal of Plaintiffs' prospective relief is a pure, unforced error of law requiring vacatur.

Section 16 of the Clayton Act, 15 U.S.C. §26, authorizes private suits seeking "injunctive relief… against threatened loss or damage by a violation of the antitrust laws." The Supreme Court in *Cargill* recognized that §16 standing may be "less stringent" than §4 standing because several damages-related concerns (including duplicative recovery and complex apportionment) are not present in the same way when a plaintiff seeks forward-looking injunctive relief. 479 U.S. at 111 n.6. *Cargill* held that antitrust injury is still required (479 U.S. at 112–14), but lower courts have since recognized that not all of the *AGC* damages-specific factors apply with full force in the §16 context. *Todorov v. DCH Healthcare Authority*, 921 F.2d 1438, 1452 n.27 (11th Cir. 1991); *In re Multidistrict Vehicle Air Pollution*, 591 F.2d 68, 71–72 (9th Cir. 1979).

The distinction is structural. An injunction does not create duplicative recoveries, require apportionment of past damages, or force the court to quantify historical losses among competing claimants. It operates prospectively against the defendant. The district court's damages concerns therefore could not dispose of Plaintiffs' separate request for prospective relief.

Section 16 standing therefore reduces to the *Cargill / Brunswick* core: (1) threatened loss or damage; (2) of the type the antitrust laws were designed to prevent; (3) flowing from what makes the defendant's conduct unlawful. *Cargill*, 479 U.S. at 113.

Furthermore, reducing standing to a literal 'conduit' test ignores the forward looking, prophylactic nature of Clayton Act §16, which protects market participants from threatened anticompetitive destruction before they are fully wiped out. In short, using the conduit test to block prospective relief effectively writes Clayton Act §16 out of the statute, stripping courts of the power to halt a monopolist before the market is irreparably harmed.

## C. The District Court's "Floodgates" Concern Is A Damages Concern That Has No Doctrinal Force Against Injunctive Relief.

The dismissal's footnote 6 ("every person who has ever posted something on the internet (or typed something into Google search) has standing to sue Google as a competitor," DE 65 at 11 n.6) is a damages multiplication fear. The reasoning rests on the volume of potential plaintiffs each seeking treble damages. That concern is the exact concern the *AGC* damages apportionment factor addresses.

For prospective injunctive relief, that concern has no force. First, A single injunction addresses many similarly situated plaintiffs. An injunction requiring transparent SERP-ranking metrics or barring retaliatory de-indexing applies to all

developers without doubling against any of them. The number of beneficiaries of an injunction is not a defendant-side cost. Second, Rule 23(b)(2) class actions are designed for injunctive-relief class treatment. Where many plaintiffs share a common claim for forward-looking relief, the class device, not a Rule 12 dismissal, is the procedural answer. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 360–61 (2011) (Rule 23(b)(2) is designed for indivisible injunctive remedies). Third, Apportionment of past damages is not at issue. Injunctive relief does not require dividing past harms; it operates against the defendant going forward.

The court's "every website could sue" concern therefore offers no doctrinal basis to dismiss Plaintiffs' §16 claim. At most, it supports skepticism about the size of any *damages* award; a §4 issue, not a §16 issue.

The SAC requested injunctive relief that no damages award can substitute for: restored indexing, transparent ranking standards, non-retaliation against antitrust petitioners, and related prospective protections. SAC Prayer ¶ C, DE 61 at 56–57. A monopolist who has de-indexed a specialized provider has no independent incentive to lift the de-indexing absent an injunction. Treble damages compensate yesterday's loss; they do not restore tomorrow's distribution. *California v. American Stores Co.*, 495 U.S. 271, 282 (1990) (§ 16 "authorizes broad equitable relief… extending beyond what damages can cure"). This is precisely the kind of injury §16 was designed to permit.

36

**D. Relief.**

This Court should vacate the dismissal as to prospective injunctive relief and remand for separate §16 analysis under the *Cargill / Brunswick* framework. The vacatur is warranted independently of the disposition of Sections I and II; even if those sections were rejected (and they should not be), the §16 omission is pure legal error. Google did not raise §16; the court did not analyze §16. The dismissal of the prospective relief Plaintiffs explicitly sought cannot stand on a record that nowhere addresses the standard governing it.

**SECTION IV**

**THE DISTRICT COURT ERRED BY COLLAPSING CALIFORNIA'S INDEPENDENT UCL PRONGS INTO THE SHERMAN DISMISSAL.**

California's Unfair Competition Law reaches any unlawful, unfair, or fraudulent business practice. Cal. Bus. & Prof. Code § 17200. The California Supreme Court holds that the UCL's prongs are independent, and that the statute "borrows violations of other laws and treats them as unlawful practices that the unfair competition law makes independently actionable." *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.*, 20 Cal. 4th 163, 180 (1999). Each prong of the UCL is a separate and distinct theory of liability. *Lozano v. AT&T Wireless Services, Inc.*, 504 F.3d 718, 731 (9th Cir. 2007).

The district court acknowledged that rule at the beginning of its UCL analysis, stating that "[e]ach prong is a distinct theory of liability." DE 65 at 14.

37

But the analysis that followed did the opposite. The court treated the unlawful prong as derivative of the dismissed Sherman counts; treated the unfair prong as duplicative because it overlapped with the same facts; and treated the fraudulent prong as if Plaintiffs were asking for disclosure of Google's entire algorithm. DE 65 at 14–17. That was legal error reviewed de novo. *Hill v. White*, 321 F.3d 1334, 1335 (11th Cir. 2003).

The error matters because Plaintiffs did not plead a UCL claim that lived or died with Sherman Act liability. They pleaded three independent theories. The unlawful theory included 18 U.S.C. § 1512 retaliation and related statutory predicates. The unfair theory alleged non-transparent, exclusionary, retaliatory, and competition distorting platform conduct that violates the policy and spirit of antitrust law even if the federal Sherman counts require further pleading or proof. The fraudulent theory alleged that Google's public presentation of neutral, organic search results is likely to deceive users, developers, publishers, and specialized vertical providers when Google is allegedly self-preferencing, suppressing, or retaliatorily de-indexing competitors behind an undisclosed black box.

Under *Erie*, a federal court sitting in diversity or supplemental jurisdiction may not narrow a state law cause of action because federal antitrust doctrine is more demanding. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938). *Cel-Tech* supplies the controlling California rule. *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th

946, 1000–04 (9th Cir. 2023), confirms how that rule operates in platform markets: conduct may fail to establish Sherman Act liability on the proof presented and still violate the UCL's unfair prong. The district court's contrary approach erroneously converted the UCL into a redundant Sherman Act appendix.

## A. Plaintiffs Pleaded UCL Theories That Were Not Merely Sherman Act Theories.

The SAC alleged unlawful conduct: "Google's conduct … constitutes unlawful business practices in violation of the UCL because it violates the Sherman Act, as well as other federal and state laws." SAC ¶ 134, DE 61 at 52. Five paragraphs later, the SAC identified a specific federal statute: "Google's actions are unfair and illegal to the extent the company retaliates against antitrust advocates, such as Plaintiffs. Beyond being unfair and un-American, the conduct violates federal witness protection statutes, including 18 USC 1512, and therefore is protected conduct under UCL." SAC ¶ 139, DE 61 at 53.

Second, the SAC pleaded unfair conduct independent of Sherman Act success. Paragraph 136 alleged that Google's practices "offend established public policy," and have "the effect of stifling competition, reducing innovation, and causing significant financial harm to Plaintiffs and the class." SAC ¶ 136, DE 61 at 52. Paragraph 137 then made the theory concrete: developers invest "substantial time, money, and resources to bring competitive services to consumers," but are

39

"squelched and (de)indexed or suppressed in Google Search," while Google refuses to implement transparent quality metrics that would let developers "fairly compete and improve their work products." SAC ¶ 137, DE 61 at 52.

Third, the SAC pleaded fraudulent conduct. Paragraph 135 alleged that Google "misled and deceived consumers, publishers, and developer competitors" by presenting search as reasonably fair and competitive while manipulating rankings to favor Google's products and strategic partners and disadvantage independent developers and specialized content providers. SAC ¶ 135, DE 61 at 51–52. The pleaded deception was not that Google failed to disclose every ranking signal. It was that users and market participants reasonably understand Google's organic results to be merit-based and neutral when Plaintiffs allege they are affected by undisclosed self-preferencing, retaliation, and exclusion.

Plaintiffs' identified non-Sherman unfair practices, including Google-Apple control of distribution channels, preferential treatment for heavily advertised directory services, tolerance of copycat competitors, and lack of ranking transparency. DE 63 at 16–18. The record before the district court contained these reasonable examples of unfair business practices. The order did not adjudicate them independent of Sherman Act.

**B. The Unlawful Prong Survives Because § 1512 Was A Specific Borrowed Predicate, Not A Vague Reference.**

The district court dismissed the unlawful prong on the ground that, "[o]ther than the federal antitrust counts in the Second Amended Complaint, Greenflight has not identified claims or facts with reasonable particularity that could support an unlawful prong claim." DE 65 at 15. That sentence overlooks the actual pleading.

The SAC identified 18 U.S.C. § 1512 by name and number. SAC ¶ 139. It also pleaded the facts that made the statute relevant: Plaintiffs engaged in protected antitrust petitioning; Google allegedly learned of that petitioning and Google never provided a legitimate technical or quality control explanation despite extended pre-suit correspondence. SAC ¶¶ 22, 26, 28, 30, 38, 139.

Google's own motion and reply show that the predicate was not too vague to understand. Google did not say Plaintiffs had identified no non-Sherman statute. It quoted the § 1512 paragraph and argued that Plaintiffs had not specified which subsection of § 1512, with which elements and mens rea, Google allegedly violated. DE 62 at 12–13; DE 64 at 6. That is a specificity objection, not a notice objection. And if the district court believed a subsection was required, the proper remedy at Rule 12 was leave to amend or a narrow clarification, not dismissal with prejudice of an entire independent UCL prong.

41

The retaliation predicate was plausible. *Twombly* requires enough factual matter to raise a reasonable expectation that discovery will reveal evidence, not a pre-discovery probability showing. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007). The SAC pleaded more than timing: a drastic deviation from a decade-long profitable course of dealing and Google's recharacterization of Plaintiffs' pre-litigation inquiries as "harassment." SAC ¶¶ 22, 26, 28, 30, 38, 139.

## C. The Unfair Prong Survives Under *Cel-Tech* Even If The Sherman Counts Require Further Proof.

The unfair prong is where the district court's collapse of California law is most visible. *Cel-Tech* does not say that an unfair claim fails whenever a Sherman claim fails. It says that competitor unfairness must be tethered to "some legislatively declared policy or proof of some actual or threatened impact on competition," and that unfair conduct includes conduct that "threatens an incipient violation of an antitrust law," "violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law," or "otherwise significantly threatens or harms competition." 20 Cal. 4th at 186–87. The unfair prong is therefore *broader* than Sherman Act liability, not coextensive with it.

The SAC pleads multiple distinct unfair-prong facts that do not depend on Sherman Act success, including two decade failure to publish neutral, transparent

SERP ranking metrics, despite holding 90%+ market share. SAC ¶¶ 134, 137, DE 61 at 52.

The same principle applies here at the pleading stage. Plaintiffs did not need to prove a completed Sherman violation to plead that Google's opaque de-indexing, undisclosed self-preferencing, and retaliation against antitrust advocates significantly threaten competition and violate the policy or spirit of antitrust law. Each of the four pleaded facts above independently supports an unfair-prong claim under *Cel-Tech*'s "incipient violation" / "policy or spirit" test, regardless of the disposition of the Sherman counts.

The district court relied on *Hadley v. Kellogg Sales Co.*, 243 F. Supp. 3d 1074, 1104–05 (N.D. Cal. 2017), reasoning that the unfair prong "overlapped" with the dismissed Sherman counts. DE 65 at 17. But overlap in facts is not identity in legal theory. *Hadley* addresses a pleading that adds no independent unfairness theory beyond the dismissed claims. Plaintiffs did add such a theory: the *Cel-Tech* "incipient violation" / "policy or spirit" framework, applied to platform misconduct, retaliatory exclusion, and zero-price quality degradation. The court's *Hadley* "overlap" rationale erased *Cel-Tech* by making Sherman dismissal automatically dispositive of a broader state law claim, exactly the result *Cel-Tech*, *Lozano*, *Epic*, and *Erie* foreclose.

**D. The Fraudulent Prong Was Dismissed On The Wrong Question.**

The fraudulent prong asks whether the challenged business practice is likely to deceive members of the public. *Watson Laboratories, Inc. v. Rhone-Poulenc Rorer, Inc.*, 178 F. Supp. 2d 1099, 1121 (C.D. Cal. 2001); *In re Tobacco II Cases*, 46 Cal. 4th 298, 312 (2009). Plaintiffs pleaded that Google's search product is presented to users, publishers, and developers as a reasonably neutral way to access the best organic information, while Google allegedly manipulates rankings to favor itself and strategic partners and to disadvantage independent specialized providers. SAC ¶ 135. That is a deception theory.

The district court instead reframed the claim as a demand that Google disclose how it generates every search result. It held that "Google has no duty to disclose how it generates its search results," relying on *Dreamstime.com, LLC v. Google LLC*, No. 20-16472, 2022 WL 17427039, at 2 (9th Cir. Dec. 6, 2022). DE 65 at 16. But *Dreamstime* concerned whether Google had a contractual duty to disclose a confidential algorithmic revision. It did not hold that a dominant search platform may publicly market organic search as neutral while secretly using search visibility to self-preference, retaliate, or foreclose specialized competitors.

The distinction is dispositive. The SAC does not allege a general duty to publish Google's algorithm. It alleges that Google's search representations and omissions are likely to deceive because they conceal material self-interest in what

44

users and developers experience as organic search. SAC ¶ 135; DE 66 at 7–8. Google may dispute that factual premise, but those are factual and context dependent defenses, not Rule 12 grounds for dismissing a consumer deception and fraud theory.

## SECTION V

## THE DISTRICT COURT ERRED IN DISMISSING THE ISA BASED SHERMAN § 1 CLAIM AS TOO REMOTE AT RULE 12.

The Sherman § 1 claim is anchored to the Apple Google Information Search Agreement. The SAC pleaded that the ISA maintained Google's general search monopoly and enabled Google to suppress OkCaller and other specialized providers. SAC ¶¶ 113 to 121. The district court dismissed that causal theory (a key finding in the DOJ case) as "incidental or remote at best." DE 65 at 13. That improperly resolved causation at the pleading stage.

The ISA is not speculative. The DOJ proved it. *United States v. Google LLC*, 747 F. Supp. 3d 1 (D.D.C. 2024), found that Google's distribution agreements, including the Apple ISA, helped unlawfully maintain Google's general search monopoly by foreclosing search distribution channels and depriving rivals of scale. The SAC incorporated those findings. SAC ¶¶ 9, 12, 106 to 121.

Google blurred two questions below. To the extent Plaintiffs alleged tacit arrangements with advertisers or strategic partners, Google argued that plus factors were required. DE 62 at 11 to 12. But Count II expressly pleaded "exclusionary

agreements such as the so called ISA Agreement with Apple." SAC ¶ 116, DE 61 at 46. The ISA itself is the agreement. The question is whether the SAC plausibly alleged restraint and causation.

It did. The SAC pleaded that the ISA locks Google into default search distribution on Apple devices, preserves Google's overwhelming GSE scale, protects Google's control over search visibility and indexing, and enables downstream suppression of specialized providers. SAC ¶¶ 9, 12, 30, 38, 60 to 67, 90 to 95, 116 to 120. Whether that causal chain is ultimately proven requires discovery into default distribution, scale, ranking, deindexing, traffic diversion, and comparable reverse phone providers.

Plaintiffs are not collateral bystanders. They allege that Google used monopoly power maintained by the ISA to remove OkCaller's indexed pages and reduce consumer access to an independent directory. SAC ¶¶ 30, 38, 75 to 79, 116 to 120. If only full scale GSE rivals could sue over downstream deployment of ISA protected power, the Clayton Act would exclude the specialized providers most exposed to Google's gatekeeping. The ISA helped Google reduce quality and choice, quintessential monopolist conduct.

At Rule 12, the question is whether the SAC plausibly alleged that the ISA caused antitrust injury, not whether Plaintiffs can prove the full causal chain before

discovery. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007). The district court's "remote" reasoning resolved that question on the pleadings.

The ISA dismissal should be vacated. Plaintiffs should be allowed discovery into the connection between Google's default distribution monopoly power, its treatment of OkCaller, the treatment of comparable providers, and the traffic diversion that followed.

## SECTION VI

### THE DISTRICT COURT ADDED A JOINT VENTURE REQUIREMENT TO ASPEN SKIING AND RESOLVED DISPUTED DEINDEXING FACTS AT RULE 12.

*Aspen Skiing* preserves a narrow Section 2 claim where a monopolist terminates a voluntary, profitable course of dealing without a legitimate business justification and sacrifices short term benefits to achieve exclusionary ends. *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 603 to 05 (1985). The district court narrowed *Aspen* by treating its "joint venture" facts as a legal requirement. DE 53 at 11. But *Aspen* turns on a preexisting profitable course of dealing, not a formal joint venture. *Duty Free Americas, Inc. v. Estee Lauder Companies, Inc.*, 797 F.3d 1248, 1266 (11th Cir. 2015).

The SAC pleaded that course of dealing. Google treated OkCaller as a "trusted partner," invited it into "Enhanced Support and Optimization," hosted Dr. Isaacs at Google's Miami office, and allegedly received approximately $2 million

47

per year in AdSense profits from OkCaller, with 2022 as the record profit year. SAC ¶¶ 26, 28 to 29, DE 61 at 12 to 13.

Google then allegedly deindexed millions of OkCaller pages on Thanksgiving Eve 2022, the same day Dr. Isaacs filed an Apple antitrust appellate brief, one year after the operative complaint was initiated, while directory competitors and alleged copycats were not similarly deindexed. SAC ¶¶ 30, 38. The SAC also alleged no legitimate technical, spam, quality, or business justification in the pleaded record. SAC ¶¶ 22, 30, 38, 139. Those facts plausibly plead profitable dealing, abrupt termination, short term revenue sacrifice, disparate treatment, and exclusionary or retaliatory motive.

*Trinko* does not require dismissal. It preserves *Aspen* as the outer boundary of refusal to deal liability. *Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 to 09 (2004). Nor is this merely a refusal to help a rival. Plaintiffs allege affirmative removal of existing, popular phonebook pages from the public search index after a decade of mutually profitable dealing. That is closer to *Lorain Journal Co. v. United States*, 342 U.S. 143, 149 to 54 (1951), than to passive nonassistance.

The district court also relied on its own observation that OkCaller's homepage could still be found. DE 53 at 12 n.9; DE 65 at 16 n.6. That was strictly forbidden factfinding by a district judge at the pleading stage. Moreover, this

48

factfinding was directly refuted by the SAC, which said "zero" pages were indexed. In fact, Google appeared to alternate between zero and one pages over the course of the litigation, but the entire phonebook, covering most of America and Canada, had long since disappeared. That was the claim: practical deindexing of approximately twelve million pages of directory information content. SAC ¶¶ 30, 56 to 58. A directory site can be commercially destroyed if its content pages vanish from search while its homepage remains technically findable. The discovery stay (DE 43) prevented Plaintiffs from obtaining the true scope and cause of de-indexing on a developed record.

Finally, the essential facilities allegations remain at least a supplemental theory. The SAC pleaded each *MCI* element: Google controlled search distribution, OkCaller could not duplicate Google's scale, Google denied access by deindexing, and access was feasible because Google had provided it for a decade. SAC ¶¶ 126 to 131; *MCI Communications Corp. v. AT&T*, 708 F.2d 1081, 1132–33 (7th Cir. 1983). The dismissal of Count III should be vacated and remanded for discovery into Google's actual reasons for the termination, comparable provider treatment, and the practical scope of OkCaller's deindexing.

## SECTION VII

## THE DISTRICT COURT CONVERTED A VALID AMERICAN TOBACCO PARAPHRASE INTO A FABRICATION FINDING.

The district court's footnote at DE 65 at 19 stated:

"In response, instead of conceding the lack of legal authority for its claim, Greenflight relies upon a quotation that is either fabricated or hallucinated. … That quotation does not appear in *American Tobacco*, and the text of the opinion does not lend support to Greenflight's quotation."

The premise was wrong. *American Tobacco* states at the cited page, quoting

*United States v. Patten*, 187 F. 664, 672 (S.D.N.Y. 1911):

"It is undoubtedly true… that trade and commerce are 'monopolized' within the meaning of the federal statute when, as a result of efforts to that end, such power is obtained that *a few persons, acting together,* can control the prices of a commodity moving in interstate commerce."

*American Tobacco Co. v. United States*, 328 U.S. 781, 811 (1946). Plaintiffs

reproduced the passage with their proposed surreply. DE 66 at 8. Plaintiffs'

paraphrase, "three persons acting in concert," compressed "a few persons, acting

together." It should have been in single quotes, rather than double, but it was not

fabricated. Have we actually reached the point where the largest duopoly in history

can dodge our venerable competition laws – around since 1890 – over a

single/double quote error?

That distinction matters because the court used the fabrication finding as a

substitute for any meaningful antitrust analysis. A court may correct an imprecise

citation. It may not convert the imprecision into a credibility finding and then use

that finding to support dismissal with prejudice on a valid, not to mention

important, claim.

Other antitrust authorities confirm that concerted exclusion is analyzed on its

substance, not dismissed because multiple firms acted together. *Interstate Circuit,*

50

*Inc. v. United States*, 306 U.S. 208, 226–27 (1939); *Toys "R" Us, Inc. v. FTC*, 221 F.3d 928, 935–36 (7th Cir. 2000) (hub-and-spoke). Plaintiffs cited those authorities to show that concerted exclusion is a cognizable antitrust concept, not to invite this Court to create a new shared-monopoly doctrine.

Nor did the authorities cited by the district court resolve the pleaded theory. *JES Properties* and *Midwest Gas* rejected shared monopoly theories based on parallel or independent conduct without an agreement. DE 65 at 18. Count V was anchored to an agreement, the Apple Google Information Search Agreement, the same agreement Judge Mehta found unlawful in *United States v. Google LLC*, 747 F. Supp. 3d 1 (D.D.C. 2024). SAC ¶¶ 9, 12, 145 to 151. The ISA is not conscious parallelism. It is a documented contract, and it connects Google's control of Search with Apple's control of Smartphone Apps, to duopolize the entire ICAM (internet content access methods). In simpler terms, Apple and Google control how information is discovered on the internet.

The Court should remand on the grounds that the ICAM market deserves further discovery under Brown Shoe before it is tossed over double quotation mark usage.

## SECTION VIII
## THE COURT BELOW ABUSED ITS DISCRETION IN DENYING RULE 59(e) RELIEF; *YELP v. GOOGLE* DEMONSTRATES MANIFEST INJUSTICE.

**A. *Yelp v. Google* Sustained Materially Analogous SERP Suppression And UCL Claims Past Rule 12, Twice.**

In *Yelp Inc. v. Google LLC*, the Northern District of California denied in substantial part Google's motion to dismiss a vertical search/directory provider's SERP suppression and UCL claims. ECF No. 47 (N.D. Cal. Apr. 22, 2025). Six months later, the same court denied Google's renewed motion to dismiss in substantial part and recognized continuing violations from Google's 2021 SERP redesign and 2024 AI Overviews. *Id.* ECF No. 58 (N.D. Cal. Oct. 22, 2025).

The pleading stage overlap with this case is substantial. Both plaintiffs are specialized vertical/directory providers. Both allege Google SERP suppression of their content. Both depend on the DOJ-adjudicated *United States v. Google LLC*, 747 F. Supp. 3d 1 (D.D.C. 2024), monopolization findings as the antitrust predicate. Both invoke California's UCL alongside federal antitrust theories. The April and October 2025 *Yelp* orders applied the *Cel-Tech / Erie / Epic* UCL framework that Section IV of this brief argues should have governed below; the October order also recognized post-2024 Google conduct as continuing violations of the same kind alleged in the SAC. DE 74 at 4 n.1; DE 71 at 2–3.

52

**B. The Court Below Conflated Three Independent Rule 59(e) Grounds.**

Rule 59(e) authorizes a district court to alter or amend a judgment on three *independent* grounds: (1) an intervening change in controlling law; (2) the availability of new evidence; or (3) the need to correct clear error or prevent manifest injustice. *Burger King*, 181 F. Supp. 2d at 1369; *Region 8 Forest Service*, 993 F.2d at 806. The grounds are disjunctive; a movant who satisfies any one is entitled to relief.

The order recited the three-ground rule (DE 78 at 5) and then collapsed its analysis into the first ground. The court held that *Yelp* could not constitute an "intervening change in *controlling* law" because the Northern District of California does not bind the Southern District of Florida. DE 78 at 5–6. From that conclusion, the order stated in a single sentence that *Yelp* "also" did not demonstrate clear error or manifest injustice. *Id.* at 6.

That conclusory disposition is not a Rule 59(e) analysis; it is a refusal to engage two of the three independent grounds. The "controlling law" inquiry asks whether a court is *bound* to follow new authority. The "clear error / manifest injustice" inquiry is different in substance: it asks whether allowing the original ruling to stand would produce an unjust outcome on the merits. *Burger King*, 181 F. Supp. 2d at 1369–70. Persuasive 'sister court' authority on materially identical

53

pleadings is plainly relevant to the second inquiry even if it is not "controlling" for the first. The Eleventh Circuit reviews that framework error *de novo*.

**C. *Yelp*'s Persuasive Force Demonstrates Manifest Injustice On Materially Analogous Pleadings.**

A district court's rejection of a vertical/directory provider's claims as "incoherent" and "implausible," when a sister federal court has *twice* sustained materially analogous claims past Rule 12 against the same defendant applying the same controlling doctrines, is the paradigm of manifest injustice under *Burger King*. The relevance is not whether *Yelp* binds the Eleventh Circuit. The relevance is that *Yelp*'s reasoned analysis demonstrates that the same theories were sufficient at Rule 12 in another forum applying the same Supreme Court authority.

The April 22, 2025 order applied the multi-sided platform and *Cel-Tech* / *Epic* / *Erie* UCL frameworks that Sections I and IV of this brief argue should have governed Plaintiffs' claims here. The October 22, 2025 order extended the analysis to continuing violation theory under the same factual structure as the SAC's post-2022 de-indexing allegations. *Yelp* is therefore not generic appellate material; it is a direct comparator demonstrating that the dismissed pleadings would have survived Rule 12 in a federal court applying the same governing law. The Eleventh Circuit has recognized that the manifest injustice prong of Rule 59(e) reaches

54

exactly that situation: a final judgment that, in light of subsequent authority, cannot be justified on its own legal terms. *Region 8 Forest Service*, 993 F.2d at 806.

The manifest injustice analysis is sharpened by Google's own conduct in the Rule 59(e) briefing. Google's opposition told the court that "the *Yelp* decision in fact dismissed Yelp's tying, leveraging, and refusal to deal claims, 2025 WL 1168900, at *15*–18." DE 73 at 4. That representation was misleading. The same April 22, 2025 *Yelp* order denied Google's motion to dismiss as to the core monopolization, attempted-monopolization, and UCL claims; the tying and refusal-to-deal claims received leave to amend for technical pleading issues, not merits dismissal. Plaintiffs corrected the record in their Notice of Supplemental Authority filed August 29, 2025: the *Yelp* court "did not treat these as merits absolutions of Google's SERP conduct; to the contrary, the core plausibility of SERP suppression as a competition and UCL problem was preserved. Therefore, Google's depiction of *Yelp* seems at odds with reality (at best)." Notice of Supp. Auth. at 2 (Aug. 29, 2025). The October 22, 2025 *Yelp* follow-on order then sustained the amended tying claim against renewed Rule 12 attack, confirming that the theories Google represented as "dismissed" in fact survived. *Yelp*, ECF No. 58 at 8–17.

The asymmetry in the district court's treatment is striking. The court was prepared to dismiss Count V on the basis of an imprecise *American Tobacco*

paraphrase, while the same court accepted without comment Google's contemporaneous false representation that the *Yelp* decision had "in fact dismissed Yelp's tying, leveraging, and refusal to deal claims" (DE 73 at 4), even after Plaintiffs corrected the record by Notice of Supplemental Authority. That asymmetric treatment, exacting scrutiny of Plaintiffs' citations paired with deference to a Big Tech defendant's mischaracterization (at best) of the *Yelp* court dismissal – which never happened – is exactly the underenforcement pattern Congress documented in the United States House of Representatives Subcommittee on Antitrust, Commercial, and Administrative Law, *Investigation of Competition in Digital Markets* (Oct. 2020). This milestone regulatory document urged that district courts not underenforce the Sherman Act against dominant digital platforms.

The court below did not engage either *Yelp* order's actual reasoning, nor did it engage Plaintiffs' rebuttal of Google's mischaracterization. The order addressed only whether *Yelp* was "controlling" and stopped. That was an abuse of discretion at minimum.

## D. The Court Separately Erred By Treating The UCL § 1512 Omission Argument As "Relitigation."

Plaintiffs' Rule 59(e) motion also argued that the original order had not adjudicated the UCL count's independent 18 U.S.C. § 1512 retaliation predicate,

the same omission Section IV of this brief addresses. DE 71 at 9–11; SAC ¶ 139, DE 61 at 53. The court characterized that argument as "in effect asking the Court to 'relitigate old matters' and rais[ing] arguments 'that could have been raised prior to the entry of judgment.'" DE 78 at 6 (quoting *Michael Linet, Inc. v. Village of Wellington*, 408 F.3d 757, 763 (11th Cir. 2005)).

That characterization rests on a category error. Plaintiffs' argument was not that the original ruling should reach a different conclusion on facts already adjudicated; that is what *Michael Linet* forbids as relitigation. Plaintiffs' argument was that the order had not addressed an *independent statutory predicate identified in the SAC*, that is, an analytical gap, not a redo. The Eleventh Circuit has held that a court's failure to address a properly pleaded claim is reversible. *Ross v. Buckeye Cellulose Corp.*, 980 F.2d 648 (11th Cir. 1993).

The court's rejoinder, that the original order "was aware" of the retaliation theory (DE 78 at 6, citing DE 73 at 4), does not engage the actual argument. Awareness of an allegation is not adjudication of an independent statutory predicate. Dr. Isaacs's *pro se* Show Cause memorandum specifically identified § 1512(d)(1) and § 1513(b) as the operative subsections. DE 68 at 13. Neither order addressed those subsections by name. Treating that non-adjudication argument as "relitigation" misapplied *Michael Linet* to a different category of Rule 59(e) error. That misapplication is reviewable *de novo* as an underlying legal premise.

57

## E. Relief.

This Court should vacate the Rule 59(e) denial (DE 78) and remand for analysis under the correct framework. *Yelp*'s persuasive force on materially analogous Rule 12 pleadings bears on the manifest injustice and clear error prongs that the court below did not analyze. The relief is independent of the substantive grounds in Sections I–VII; even if this Court affirms any aspect of the underlying dismissal, the Rule 59(e) denial rests on a legal framework error that warrants separate vacatur.

## CONCLUSION

This Court should reverse the dismissal and remand for class certification proceedings and adjudication under the governing standards. The discovery stay should be lifted so Plaintiffs may finally obtain, after over three years of diligent efforts, evidence concerning Google's reasons for de-indexing OkCaller.

Respectfully submitted,

/s/ Keith Mathews
KEITH MATHEWS
1000 Elm Street #800
Manchester, NH 03101
(603) 622-8100
*Counsel for Plaintiff-Appellant*

## CERTIFICATE OF COMPLIANCE (FRAP 32(G))

I certify that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because, excluding the parts exempted by Federal Rule of Appellate Procedure 32(f), it contains 12,734 words.

I further certify that this brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman.

Date: April 30, 2026

/s/ Keith Mathews
KEITH MATHEWS
1000 Elm Street #800
Manchester, NH 03101
(603) 622-8100
*Counsel for Plaintiff-Appellant*

## CERTIFICATE OF SERVICE (FRAP 25(D))

I certify that on April 30, 2026, I electronically filed the foregoing Appellants' Opening Brief with the Clerk of the United States Court of Appeals for the Eleventh Circuit using the appellate CM/ECF system. I further certify that all participants in this case who are registered CM/ECF users will be served by the CM/ECF system, including Counsel for Defendant-Appellee Google LLC.

Date: April 30, 2026

/s/ Keith Mathews

KEITH MATHEWS
1000 Elm Street #800
Manchester, NH 03101
(603) 622-8100
*Counsel for Plaintiff-Appellant*

60