**No. 26-10369-CC**

# In the United States Court of Appeals for the Eleventh Circuit

GREENFLIGHT VENTURE CORPORATION,
on behalf of itself and all others similarly situated,
and DR. JEFFREY D. ISAACS,

*Plaintiffs-Appellants,*

*v.*

GOOGLE LLC

*Defendant-Appellee.*

On Appeal from the United States District Court
for the Southern District of Florida
Case No. 9:24-cv-80395-KMM

Hon. K. Michael Moore | Hon. Robin L. Rosenberg, prior district judge

**JOINT APPENDIX — VOLUME 1 OF 2**

Keith Mathews
American Wealth Protection
1000 Elm Street #800
Manchester, NH 03101
(603) 622-8100
*Counsel for Plaintiffs-Appellants*

USCA11 Case: 26-10369    Document: 27-1    Date Filed: 05/07/2026    Page: 2 of 235

# INDEX

| Description | Vol. | App. Page | Tab |
|---|---|---|---|
| District Court Docket Sheet | 1 | 1 | A |
| Joint Scheduling Report with Exhibits 1–4 (Aug. 22, 2024) | 1 | 12 | 34 |
| Google's Motion for Protective Order (Oct. 21, 2024) | 1 | 34 | 35 |
| Google's Motion to Stay Discovery (Nov. 8, 2024) | 1 | 76 | 42 |
| Order Dismissing First Amended Complaint (Mar. 14, 2025) | 1 | 90 | 53 |
| Second Amended Complaint (May 9, 2025) | 1 | 109 | 61 |
| Google's Motion to Dismiss Second Amended Complaint (June 6, 2025) | 1 | 167 | 62 |
| Plaintiffs' Opposition to Motion to Dismiss (June 20, 2025) | 1 | 192 | 63 |
| Google's Reply in Support of Motion to Dismiss (July 3, 2025) | 1 | 218 | 64 |
| Order Granting Motion to Dismiss / Order to Show Cause (Aug. 8, 2025) | 2 | 234 | 65 |
| Motion for Reconsideration and Proposed Sur-Reply (Aug. 22, 2025) | 2 | 255 | 66 |
| Dr. Isaacs's Response to Order to Show Cause (Sept. 8, 2025) | 2 | 270 | 68 |
| Plaintiff's Rule 59(e) Motion to Alter or Amend Judgment (Sept. 22, 2025) | 2 | 296 | 71 |
| Google's Opposition to Rule 59(e) Motion (Oct. 6, 2025) | 2 | 314 | 73 |
| Greenflight's Motion to Conform and Adopt Rule 59(e) Relief (Oct. 10, 2025) | 2 | 320 | 74 |
| Notice of Supplemental Authority re Yelp Inc. v. Google LLC (Oct. 14, 2025) | 2 | 328 | 75 |
| Order Denying Rule 59(e) Motion (Nov. 13, 2025) | 2 | 332 | 78 |
| Certificate of Service | 2 | 339 | — |

**Query**     **Reports** ▾     **Utilities** ▾     **Help**     **Log Out**

APPEAL,BER,CLOSED,PATENT,RECOUT,REF_DISCOV

# U.S. District Court
## Southern District of Florida (West Palm Beach)
## CIVIL DOCKET FOR CASE #: 9:24-cv-80395-KMM

| | |
|---|---|
| Isaacs v. Google LLC | Date Filed: 04/01/2024 |
| Assigned to: Judge K. Michael Moore | Date Terminated: 07/02/2024 |
| Referred to: Magistrate Judge Bruce E. Reinhart | Jury Demand: Plaintiff |
| Case in other court:  USCA, 26-10369-C | Nature of Suit: 830 Patent |
| Cause: 35:0271 Patent Infringement | Jurisdiction: Federal Question |

**Plaintiff**

**Dr. Jeff Isaacs**
*on behalf of themselves and all others similarly situated*

represented by **Jeff Isaacs**
11482 Key Deer Circle
Wellington, FL 33449
610-202-1460
Email: jeffreydi@gmail.com
PRO SE

**Ayelet Gaito Faerman**
Faerman Law P. A.
4613 N University Dr 578
#578
Coral Springs, FL 33067
9542718484
Email: ayelet@faerman.law
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Greenflight Venture Corporation**

represented by **Keith A Mathews**
American Wealth Protection PLLC
1000 Elm Street, Suite 800
Manchester, NH 03102
603-622-8100
Email: keith@awplegal.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ayelet Gaito Faerman**
(See above for address)
*ATTORNEY TO BE NOTICED*

App. 1

V.

**Defendant**

**Google LLC**                                    represented by **Aaron P. Maurer**
                                                               Williams & Connolly, LLP
                                                               680 Maine Avenue SW
                                                               Washington, DC 20024
                                                               202-434-5282
                                                               Email: amaurer@wc.com
                                                               *PRO HAC VICE*
                                                               *ATTORNEY TO BE NOTICED*

                                                               **Ana Maria Barton**
                                                               Reed Smith LLP
                                                               200 South Biscayne Boulevard
                                                               Ste 2600
                                                               Miami, FL 33131
                                                               786-747-0200
                                                               Fax: 786-747-0299
                                                               Email: abarton@reedsmith.com
                                                               *ATTORNEY TO BE NOTICED*

                                                               **Edward Maurice Mullins**
                                                               Reed Smith LLP
                                                               1001 Brickell Bay Drive
                                                               Suite 900
                                                               Miami, FL 33131-2847
                                                               786-747-0200
                                                               Fax: 786-747-0299
                                                               Email: emullins@reedsmith.com
                                                               *ATTORNEY TO BE NOTICED*

                                                               **Erika H. Warren**
                                                               Warren Kash Warren
                                                               2261 Market Street, No. 606
                                                               San Francisco, CA 94114
                                                               (415) 895-2940
                                                               Email: erika@warrenkashwarren.com
                                                               *PRO HAC VICE*
                                                               *ATTORNEY TO BE NOTICED*

                                                               **Kenneth Smurzynski**
                                                               Williams & Connolly LLP
                                                               680 Maine Avenue SW
                                                               Washington, DC 20024
                                                               202-434-5000

App. 2

Email: ksmurzynski@wc.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Madeline A. Woodall**
Warren Kash Warren
2261 Market Street, No. 606
San Francisco, CA 94114
(415) 895-2940
Email: madeline@warrenkashwarren.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Matthew S. Warren**
Warren Kash Warren
2261 Market Street, No. 606
San Francisco, CA 94114
(415) 895-2940
Email: matt@warrenkashwarren.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sujey Scarlett Herrera**
Reed Smith LLP
1001 Brickell Bay Drive
Suite 900
Miami, FL 33131
7867470200
Fax: 7867470299
Email: sherrera@reedsmith.com
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 04/01/2024 | [1] | COMPLAINT against Google LLC. Filing fees $ 405.00 Receipt#: 8838, filed by Jeff Isaacs. (Attachments: # [1] Civil Cover Sheet, # [2] Exhibit, # [3] Summon(s))(mee) (Entered: 04/01/2024) |
| 04/01/2024 | 2 | Clerks Notice of Judge Assignment to Judge Robin L. Rosenberg and Magistrate Judge Bruce E. Reinhart.<br><br>Pursuant to 28 USC 636(c), the parties are hereby notified that the U.S. Magistrate Judge Bruce E. Reinhart is available to handle any or all proceedings in this case. If agreed, parties should complete and file the Consent form found on our website. It is not necessary to file a document indicating lack of consent.<br><br>Pro se (NON-PRISONER) litigants may receive Notices of Electronic Filings (NEFS) |

| | | via email after filing a Consent by Pro Se Litigant (NON-PRISONER) to Receive Notices of Electronic Filing. The consent form is available under the forms section of our website. (mee) (Entered: 04/01/2024) |
|---|---|---|
| 04/01/2024 | 3 | Clerks Notice of Receipt of Filing Fee received on 4/1/2024 in the amount of $ 405.00, receipt number 8838 (mee) (Entered: 04/01/2024) |
| 04/01/2024 | 4 | Summons Issued as to Google LLC. (mee) (Entered: 04/01/2024) |
| 04/01/2024 | 5 | FORM AO 120 SENT TO DIRECTOR OF U.S. PATENT AND TRADEMARK (Attachments: # 1 Complaint, # 2 Exhibits) (mee) (Entered: 04/01/2024) |
| 04/11/2024 | 6 | ORDER OF REFERENCE TO MAGISTRATE JUDGE AND ORDER OF COURT-MANDATED REQUIREMENTS ON SERVICE, DEFAULTS, AND JOINT SCHEDULING REPORTS : Pursuant to 28 U.S.C. § 636(b)(l)(A) and the Magistrate Judge Rules of the Local Rules of the Southern District of Florida, the above-captioned cause is referred to United States Magistrate Judge Bruce E. Reinhart for appropriate disposition of all pro hac vice motions, motions to substitute counsel, and pretrial motions related to discovery. Signed by Judge Robin L. Rosenberg on 4/11/2024. *See attached document for full details*. (wce) (Entered: 04/11/2024) |
| 04/12/2024 | 7 | STANDING DISCOVERY ORDER FOR MAGISTRATE JUDGE BRUCE REINHART. Signed by Magistrate Judge Bruce E. Reinhart on 4/12/2024. *See attached document for full details*. (dc00) (Entered: 04/12/2024) |
| 05/02/2024 | 8 | SERVICE OF PROCESS STATUS UPDATE FOR MAY 2024 by Jeff Isaacs. (wce) (Entered: 05/02/2024) |
| 05/22/2024 | 9 | PAPERLESS ORDER informing the Plaintiff that, absent a showing of good cause, the Court may dismiss this case for lack of service upon the expiration of the deadline for service in Rule 4. Signed by Judge Robin L. Rosenberg (bkd) (Entered: 05/22/2024) |
| 06/11/2024 | 10 | Consent by Pro Se Litigant (Non-Prisoner) Jeff Isaacs to receive Notices of Electronic Filing at email address: jeffreydi@gmail.com (scn) (Entered: 06/11/2024) |
| 06/11/2024 | 11 | SERVICE STATUS UPDATE by Jeff Isaacs. (scn) (Entered: 06/11/2024) |
| 07/02/2024 | 12 | PAPERLESS ORDER. No proof of service appears in the court file. Pursuant to the Court's order to show cause at docket entry 9, the Plaintiff's failure to serve the Defendant by the deadline imposed by Rule 4, and the lack of good cause for no service on corporate Defendant Google LLC, this case is dismissed without prejudice for lack of service. Signed by Judge Robin L. Rosenberg (bkd) (Entered: 07/02/2024) |
| 07/08/2024 | 13 | SUMMONS (Affidavit) Returned Executed on 1 Complaint with a 21 day response/answer filing deadline pursuant to Fed. R. Civ. P. 12 by Jeff Isaacs. Google LLC served on 6/25/2024, response/answer due 7/16/2024. (Attachments: # 1 Complaint & Exhibits)(scn) (Entered: 07/08/2024) |
| 07/10/2024 | 14 | Defendant's MOTION for Extension of Time to File Response/Reply/Answer as to 1 Complaint by Google LLC. Attorney Ana Maria Barton added to party Google LLC(pty:dft). (Attachments: # 1 Text of Proposed Order)(Barton, Ana) (Entered: |

| | | |
|---|---|---|
| | | 07/10/2024) |
| 07/16/2024 | 15 | PAPERLESS ORDER granting in part and denying in part 14 Motion for Extension of Time to File Response/Answer to a Complaint or Other Case Initiating Document insofar as the deadline for Google LLC to file a responsive motion or pleading is 7/30/2024. Signed by Judge Robin L. Rosenberg (bkd) (Entered: 07/16/2024) |
| 07/30/2024 | 16 | Defendant's MOTION TO DISMISS 1 Complaint FOR FAILURE TO STATE A CLAIM by Google LLC. Attorney Edward Maurice Mullins added to party Google LLC(pty:dft). Responses due by 8/13/2024. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F)(Mullins, Edward) (Entered: 07/30/2024) |
| 08/02/2024 | 17 | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Matthew S. Warren. Filing Fee $ 200.00 Receipt # AFLSDC-17729309 by Google LLC. Responses due by 8/16/2024. (Barton, Ana) (Entered: 08/02/2024) |
| 08/02/2024 | 18 | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Madeline A. Woodall. Filing Fee $ 200.00 Receipt # AFLSDC-17729332 by Google LLC. Responses due by 8/16/2024. (Barton, Ana) (Entered: 08/02/2024) |
| 08/02/2024 | 19 | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Erika H. Warren. Pay.gov Agency Tracking ID FLSDC-17729265. Filing Fee $ 200.00 by Google LLC. Responses due by 8/16/2024. (Barton, Ana) (Entered: 08/02/2024) |
| 08/05/2024 | 20 | PAPERLESS ORDER granting 17 Motion to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Attorney Matthew S. Warren. Signed by Magistrate Judge Bruce E. Reinhart on 8/5/2024. (vbi) (Entered: 08/05/2024) |
| 08/05/2024 | 21 | PAPERLESS ORDER granting 18 Motion to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Attorney Madeline A. Woodall. Signed by Magistrate Judge Bruce E. Reinhart on 8/5/2024. (vbi) (Entered: 08/05/2024) |
| 08/05/2024 | 22 | PAPERLESS ORDER granting 19 Motion to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Attorney Erika H. Warren. Signed by Magistrate Judge Bruce E. Reinhart on 8/5/2024. (vbi) (Entered: 08/05/2024) |
| 08/05/2024 | 23 | Defendant's Corporate Disclosure Statement by Google LLC identifying Other Affiliate Greenflight Venture Corporation, Other Affiliate XXVI Holdings Inc., holding company of Google LLC, Other Affiliate Alphabet Inc., holding company of XXVI Holdings Inc. for Google LLC (Mullins, Edward) (Entered: 08/05/2024) |
| 08/13/2024 | 24 | First AMENDED COMPLAINT against All Defendants, filed by Jeff Isaacs, Greenflight Venture Corporation. (Attachments: # 1 Exhibit Exhibit A - USPTO RE48847))(Faerman, Ayelet) (Entered: 08/13/2024) |

| | | |
|---|---|---|
| 08/13/2024 | 25 | Defendant's MOTION for Extension of Time to File Joint Scheduling Report re 6 Order Referring Case to Magistrate Judge,,, Order of Requirements,, by Google LLC. Responses due by 8/27/2024. (Barton, Ana) (Entered: 08/13/2024) |
| 08/14/2024 | 26 | ORDER granting 16 Motion to Dismiss for Failure to State a Claim. Signed by Judge Robin L. Rosenberg *See attached document for full details*. (bkd) (Entered: 08/14/2024) |
| 08/14/2024 | 27 | PAPERLESS ORDER granting in part and denying in part 25 Motion for Extension of Time. The JSR is due by August 20, 2024. Signed by Judge Robin L. Rosenberg (bkd) (Entered: 08/14/2024) |
| 08/14/2024 | | Reset Deadline per DE#27: Joint Scheduling Report due by 8/20/2024. (scn) (Entered: 08/15/2024) |
| 08/15/2024 | 28 | Defendant's MOTION for Extension of Time to File Response/Reply/Answer as to 24 Amended Complaint/Amended Notice of Removal by Google LLC. (Barton, Ana) (Entered: 08/15/2024) |
| 08/15/2024 | 29 | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Keith Mathews. Filing Fee $ 200.00 Receipt # AFLSDC-17761660 by Greenflight Venture Corporation. Responses due by 8/29/2024. (Attachments: # 1 Certification Certification of Keith Mathews, # 2 Text of Proposed Order Proposed Order Granting Motion)(Faerman, Ayelet) (Entered: 08/15/2024) |
| 08/16/2024 | 30 | PAPERLESS ORDER granting 28 Motion for Extension of Time to File Response/Answer to a Complaint or Other Case Initiating Document. Google LLC Response/Answer due 9/10/2024. Signed by Judge Robin L. Rosenberg (bkd) (Entered: 08/16/2024) |
| 08/19/2024 | 31 | PAPERLESS ORDER granting 29 Motion to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Attorney(s) Keith Mathews. Signed by Magistrate Judge Bruce E. Reinhart on 8/19/2024. (vbi) (Entered: 08/19/2024) |
| 08/20/2024 | 32 | Unopposed MOTION for Extension of Time to file Joint Scheduling Report by Google LLC. Attorney Sujey Scarlett Herrera added to party Google LLC(pty:dft). Responses due by 9/3/2024. (Herrera, Sujey) (Entered: 08/20/2024) |
| 08/21/2024 | 33 | PAPERLESS ORDER granting 32 Motion for Extension of Time. Signed by Judge Robin L. Rosenberg (bkd) (Entered: 08/21/2024) |
| 08/22/2024 | 34 | Joint SCHEDULING REPORT - **Rule 16.1** by Greenflight Venture Corporation (Attachments: # 1 Exhibit 1 - Proposed Scheduling Order, # 2 Exhibit A - Letter Dated November 3, 2023, # 3 Exhibit B - Letter from AWP dated August 24, 2023, # 4 Exhibit C - Letter from AWP dated October 2023)(Faerman, Ayelet) (Entered: 08/22/2024) |
| 08/27/2024 | 35 | Defendant's MOTION for Protective Order *Regarding Dr. Isaacs' Pro Se Discovery* by Google LLC. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 |

| | | |
|---|---|---|
| | | Exhibit)(Mullins, Edward) (Entered: 08/27/2024) |
| 08/27/2024 | 36 | PAPERLESS ORDER clarifying the Court's Order at docket entry 26. For the avoidance of all doubt, the Court clarifies that all discovery in this case for Mr. Isaacs' pro se claim is STAYED. As a result, the Defendant's Motion for a Protective Order 35 is DENIED AS MOOT. Signed by Judge Robin L. Rosenberg (bkd) (Entered: 08/27/2024) |
| 09/04/2024 | 37 | Defendant's MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Aaron P. Maurer. Filing Fee $ 200.00 Receipt # AFLSDC-17808737 by Google LLC. Responses due by 9/18/2024. (Herrera, Sujey) (Entered: 09/04/2024) |
| 09/04/2024 | 38 | Defendant's MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Kenneth C. Smurzynski. Filing Fee $ 200.00 Receipt # AFLSDC-17808774 by Google LLC. Responses due by 9/18/2024. (Herrera, Sujey) (Entered: 09/04/2024) |
| 09/05/2024 | 39 | PAPERLESS ORDER granting 37 Motion to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Attorney Aaron P. Maurer. Signed by Magistrate Judge Bruce E. Reinhart on 9/5/2024. (vbi) (Entered: 09/05/2024) |
| 09/05/2024 | 40 | PAPERLESS ORDER granting 38 Motion to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Attorney Kenneth C. Smurzynski. Signed by Magistrate Judge Bruce E. Reinhart on 9/5/2024. (vbi) (Entered: 09/05/2024) |
| 09/10/2024 | 41 | Defendant's MOTION TO DISMISS 24 Amended Complaint/Amended Notice of Removal FOR FAILURE TO STATE A CLAIM by Google LLC. Responses due by 9/24/2024. (Mullins, Edward) (Entered: 09/10/2024) |
| 09/10/2024 | 42 | MOTION to Stay *Discovery Pending Ruling on Dispositive Motion to Dismiss First Amended Complaint (DE 41)* by Google LLC. Responses due by 9/24/2024. (Attachments: # 1 Exhibit 1 - Plaintiff's First Request for Production of Documents, # 2 Exhibit 2 - Plaintiff's First Set of Requests for Admissions, # 3 Exhibit 3 - Plaintiff's First Set of Written Interrogatories, # 4 Exhibit 4 - Plaintiff's Notice of Corporate Representative Deposition)(Herrera, Sujey) (Entered: 09/10/2024) |
| 09/11/2024 | 43 | PAPERLESS ORDER granting 42 Motion to Stay. The Court exercises its case management discretion to stay all discovery in this case until such time as (i) the Defendant files an answer or (ii) the Plaintiff's pleading survives a motion to dismiss. Signed by Judge Robin L. Rosenberg (bkd) (Entered: 09/11/2024) |
| 09/18/2024 | 44 | MOTION for Leave to File Excess Pages by Jeff Isaacs. (Faerman, Ayelet) (Entered: 09/18/2024) |
| 09/19/2024 | 45 | PAPERLESS ORDER denying 44 Motion for Leave to File Excess Pages. Signed by Judge Robin L. Rosenberg (bkd) (Entered: 09/19/2024) |
| 09/24/2024 | 46 | RESPONSE in Opposition re 41 Defendant's MOTION TO DISMISS 24 Amended |

| | | |
|---|---|---|
| | | Complaint/Amended Notice of Removal FOR FAILURE TO STATE A CLAIM filed by Jeff Isaacs. Replies due by 10/1/2024. (Faerman, Ayelet) (Entered: 09/24/2024) |
| 09/24/2024 | 47 | RESPONSE in Opposition re 42 MOTION to Stay *Discovery Pending Ruling on Dispositive Motion to Dismiss First Amended Complaint (DE 41)* filed by Jeff Isaacs. Replies due by 10/1/2024. (Attachments: # 1 Exhibit Exhibit A, DOJ Decision, # 2 Exhibit Exhibit B, Email bw counsels)(Faerman, Ayelet) (Entered: 09/24/2024) |
| 10/01/2024 | 48 | REPLY to Response to Motion re 41 Defendant's MOTION TO DISMISS 24 Amended Complaint/Amended Notice of Removal FOR FAILURE TO STATE A CLAIM filed by Google LLC. (Herrera, Sujey) (Entered: 10/01/2024) |
| 10/07/2024 | 49 | STRICKEN Plaintiff's REPLY to Response to Motion re 42 MOTION to Stay *Discovery Pending Ruling on Dispositive Motion to Dismiss First Amended Complaint (DE 41) Sur-Reply* filed by Jeff Isaacs. (Faerman, Ayelet) Modified Text per DE 51 on 10/8/2024 (wce). (Entered: 10/07/2024) |
| 10/07/2024 | 50 | Plaintiff's MOTION for Leave to File *Sur-Reply* by Greenflight Venture Corporation. (Attachments: # 1 Exhibit Proposed Sur-Reply, # 2 Text of Proposed Order Proposed Order)(Faerman, Ayelet) (Entered: 10/07/2024) |
| 10/07/2024 | 51 | NOTICE of Striking 49 Reply to Response to Motion filed by Jeff Isaacs by Greenflight Venture Corporation (Faerman, Ayelet) (Entered: 10/07/2024) |
| 10/08/2024 | 52 | PAPERLESS ORDER denying 50 Motion for Leave to File Sur-Reply. In the event the Court concludes that a sur-reply is needed, the Court will order a sur-reply. Signed by Judge Robin L. Rosenberg (bkd) (Entered: 10/08/2024) |
| 11/08/2024 | 53 | ORDER granting in part and reserving in part on 41 Motion to Dismiss for Failure to State a Claim. Signed by Judge Robin L. Rosenberg *See attached document for full details*. (bkd) (Entered: 11/08/2024) |
| 11/15/2024 | 54 | Defendant's NOTICE *Brief in Support of CAFA Jurisdiction* by Google LLC re 53 Order on Motion to Dismiss for Failure to State a Claim (Mullins, Edward) (Entered: 11/15/2024) |
| 11/15/2024 | 55 | Plaintiff's NOTICE *of Filing Brief* by Greenflight Venture Corporation re 53 Order on Motion to Dismiss for Failure to State a Claim (Faerman, Ayelet) (Entered: 11/15/2024) |
| 11/18/2024 | 56 | NOTICE by Jeff Isaacs re 53 Order on Motion to Dismiss for Failure to State a Claim (Attachments: # 1 Exhibit Exhibit A, # 2 Exhibit Exhibit B) (Faerman, Ayelet) (Entered: 11/18/2024) |
| 11/18/2024 | 57 | Clerk's Notice to Filer re 56 Notice (Other). **Login/Signature Block Violation**; CORRECTIVE ACTION REQUIRED WITHIN 3 DAYS - The name of attorney e-filing this document via their CM/ECF login does not match the name of attorney on the signature block of the document. The name used for login must match typed name on signature block of the document. This filing is a violation of Section 3J(1) of CM/ECF Admin Procedures and LR 5.1(b). Filer must File a Notice of Striking, then refile document pursuant to CM/ECF Admin Procedures and Local Rules. (wce) (Entered: 11/19/2024) |

| | | |
|---|---|---|
| 11/19/2024 | 58 | PAPERLESS ORDER. Pursuant to the Court's order to show cause at docket entry 53 and the Court's review of the Plaintiff's response to that order, the Court dismisses Plaintiff Jeff Isaacs' antitrust claim(s) for the same reasons the Court previously dismissed Plaintiff Greenflight's identical antitrust claims. Additionally, upon review of the parties' briefing on the Court's jurisdiction at docket entries 54 and 55, the Court is satisfied that there is federal jurisdiction over this case and no further briefing on that subject is required. However, the parties' briefing on the legal sufficiency of Plaintiff Greenflight's state law class action claims was limited and, as a result, the Court grants the parties the collective opportunity to amend the pending briefing on those counts. Plaintiffs' motion to amend their complaint, should they elect to file such a motion, is due by December 8, 2024. The Court hereby AMENDS that deadline to the next day, December 9, 2024, which is a Monday. In the event the Court does not grant a motion for leave to amend by December 13, 2024, the Defendant may file an amended motion to dismiss specific to the state law counts that remain pending by December 20, 2024. In the event the Defendant elects to amend its motion to dismiss, Greenflight's amended response shall be due on January 8, 2024, and Defendant's amended reply shall be due on January 15, 2024. Alternatively, if the Court grants leave to amend the Court will set a different briefing schedule for any renewed motion to dismiss. Signed by Judge Robin L. Rosenberg (bkd) (Entered: 11/19/2024) |
| 12/09/2024 | 59 | NOTICE by Greenflight Venture Corporation re 58 Order,,,,,, 53 Order on Motion to Dismiss for Failure to State a Claim (Attachments: # 1 Exhibit Second Amended Complaint - Exhibit 1 per court order) (Faerman, Ayelet) (Entered: 12/09/2024) |
| 12/16/2024 | 60 | PAPERLESS ORDER granting Plaintiffs leave to amend their complaint. The Plaintiffs shall separately file their amended complaint within two days of the date of rendition of this Order. The Defendant's responsive motion or pleading is due by January 6, 2025. Responses and replies shall be filed in accordance with the Local Rules. The Defendant's prior motion to dismiss, upon which the Court reserved ruling in part as to the Plaintiffs' state-law claims, is denied as moot in part. Discovery in this case remains stayed. Litigation on the pro se Plaintiff's claims remains stayed. The only active claims in this case are therefore the claims brought by the corporate Plaintiff. Signed by Judge Robin L. Rosenberg (bkd) (Entered: 12/16/2024) |
| 12/17/2024 | 61 | Second AMENDED COMPLAINT against Google LLC, filed by Jeff Isaacs, Greenflight Venture Corporation.(Faerman, Ayelet) (Entered: 12/17/2024) |
| 01/06/2025 | 62 | Defendant's MOTION TO DISMISS 61 Amended Complaint/Amended Notice of Removal FOR FAILURE TO STATE A CLAIM by Google LLC. Responses due by 1/21/2025. (Mullins, Edward) (Entered: 01/06/2025) |
| 01/21/2025 | 63 | RESPONSE in Opposition re 62 Defendant's MOTION TO DISMISS 61 Amended Complaint/Amended Notice of Removal FOR FAILURE TO STATE A CLAIM filed by Greenflight Venture Corporation. Replies due by 1/28/2025. (Faerman, Ayelet) (Entered: 01/21/2025) |
| 01/28/2025 | 64 | Defendant's REPLY in Support of Motion re 62 Defendant's MOTION TO DISMISS 61 Amended Complaint/Amended Notice of Removal FOR FAILURE TO STATE A CLAIM . filed by Google LLC. (Mullins, Edward) (Entered: 01/28/2025) |

| 02/04/2025 | 65 | ORDER granting 62 Motion to Dismiss for Failure to State a Claim and ORDER to show cause. Signed by Judge Robin L. Rosenberg on 02/4/2025 *See attached document for full details*. (bkd) Modified Signature Date on 2/5/2025 (wce). (Entered: 02/04/2025) |
| --- | --- | --- |
| 02/05/2025 | 66 | MOTION for Reconsideration re 65 Order on Motion to Dismiss for Failure to State a Claim, 64 Reply in Support of Motion by Greenflight Venture Corporation. (Attachments: # 1 Exhibit Proposed Sur reply)(Faerman, Ayelet) (Entered: 02/05/2025) |
| 02/10/2025 | 67 | PAPERLESS ORDER denying 66 Motion for Reconsideration. Signed by Judge Robin L. Rosenberg (bkd) (Entered: 02/10/2025) |
| 02/11/2025 | 68 | RESPONSE TO ORDER TO SHOW CAUSE re 65 Order on Motion to Dismiss for Failure to State a Claim by Jeff Isaacs. (Faerman, Ayelet) (Entered: 02/11/2025) |
| 02/14/2025 | 69 | PAPERLESS ORDER. Upon review of the filing at docket entry 68 and pursuant to the Court's order to show cause at docket entry 65, the Court dismisses pro se Plaintiff Jeffrey Isaacs's claims for the same reasons the Court previously dismissed the (identical) claims brought by Plaintiff Greenflight. This case is hereby closed. Signed by Judge Robin L. Rosenberg (bkd) (Entered: 02/14/2025) |
| 02/14/2025 | 70 | FORM AO 120 SENT TO DIRECTOR OF U.S. PATENT AND TRADEMARK (Attachments: # 1 Paperless Order Closing Case) (cds) (Entered: 02/14/2025) |
| 08/11/2025 | 71 | PLAINTIFF'S RULE 59(e) MOTION TO ALTER OR AMEND JUDGMENT by Jeff Isaacs. Responses due by 8/25/2025. (Attachments: # 1 Text of Proposed Order)(cwc) (Entered: 08/11/2025) |
| 08/18/2025 | 72 | CLERK'S NOTICE OF REASSIGNMENT OF CLOSED CASE. Case reassigned to Judge K. Michael Moore for all further proceedings. Judge Robin L. Rosenberg no longer assigned to case. (vjk) (Entered: 08/18/2025) |
| 08/25/2025 | 73 | RESPONSE in Opposition re 71 MOTION to Alter Judgment filed by Google LLC. Replies due by 9/2/2025. (Mullins, Edward) (Entered: 08/25/2025) |
| 08/31/2025 | 74 | MOTION to Adopt/Join 71 MOTION to Alter Judgment by Greenflight Venture Corporation. (Attachments: # 1 Text of Proposed Order)(Faerman, Ayelet) (Entered: 08/31/2025) |
| 08/31/2025 | 75 | Notice of Supplemental Authority re 71 MOTION to Alter Judgment, 74 MOTION to Adopt/Join 71 MOTION to Alter Judgment by Greenflight Venture Corporation (Attachments: # 1 Exhibit) (Faerman, Ayelet) (Entered: 08/31/2025) |
| 09/08/2025 | 76 | RESPONSE in Opposition re 74 MOTION to Adopt/Join 71 MOTION to Alter Judgment filed by Google LLC. Replies due by 9/15/2025. (Mullins, Edward) (Entered: 09/08/2025) |
| 09/15/2025 | 77 | REPLY in Support of Motion re 74 MOTION to Adopt/Join 71 MOTION to Alter Judgment . filed by Greenflight Venture Corporation. (Attachments: # 1 Exhibit A - Docket of Case with Yelp, # 2 Exhibit B - News Article)(Faerman, Ayelet) (Entered: 09/15/2025) |

| | | |
|---|---|---|
| 12/22/2025 | 78 | ORDER DENYING 71 Motion to Alter Judgment and DENYING 74 Motion to Adopt/Join. Signed by Judge K. Michael Moore on 12/22/2025. *See attached document for full details*. (hyn) (Entered: 12/22/2025) |
| 01/19/2026 | 79 | STRICKEN (per DE 82 ) Notice of Compliance of Filing Fees $605.00, receipt number AFLSDC-19130106 - Notice of Appeal by Greenflight Venture Corporation, Jeff Isaacs re 57 Clerk's Notice of Docket Correction and Instruction to Filer - Attorney,, (Faerman, Ayelet) Modified text on 2/2/2026 (apz). (Entered: 01/19/2026) |
| 01/19/2026 | 80 | NOTICE *of Appeal* by Greenflight Venture Corporation, Jeff Isaacs re 79 Notice of Compliance of Filing Fee - Notice of Appeal, (Faerman, Ayelet) (Entered: 01/19/2026) |
| 01/19/2026 | 83 | Notice of Appeal re 78 Order on Motion to Alter Judgment, Order on Motion to Adopt/Join, 65 Order on Motion to Dismiss for Failure to State a Claim, 69 Order, by Greenflight Venture Corporation, Jeff Isaacs. FILING FEE: $605.00. Receipt#: AFLSDC-19130106. Within fourteen days of the filing date of a Notice of Appeal, the appellant must complete the Eleventh Circuit Transcript Order Form regardless of whether transcripts are being ordered [Pursuant to FRAP 10(b)]. For information go to our FLSD website under All Forms and look for Transcript Order Form www.flsd.uscourts.gov/forms/all-forms. (SEE DE 80 FOR IMAGE.) (apz) (Entered: 02/02/2026) |
| 01/19/2026 | 84 | Clerk's Notice to Filer re 80 Notice (Other). **Wrong Event Selected**; ERROR - The Filer selected the wrong event. The document was re-docketed by the Clerk, see DE 83 . It is not necessary to refile this document. (apz) (Entered: 02/02/2026) |
| 01/20/2026 | 81 | Clerk's Notice to Filer re 79 Notice of Compliance of Filing Fee - Notice of Appeal,. **Document Unreadable** No Document Attached; CORRECTIVE ACTION REQUIRED WITHIN 3 DAYS - Filer must file a Notice of Striking, then refile a legible copy of the document. (jas) (Entered: 01/20/2026) |
| 01/23/2026 | 82 | NOTICE of Striking 79 Notice of Compliance of Filing Fee - Notice of Appeal, filed by Greenflight Venture Corporation, Jeff Isaacs by Greenflight Venture Corporation, Jeff Isaacs (Faerman, Ayelet) (Entered: 01/23/2026) |
| 02/02/2026 | | Transmission of Notice of Appeal, Orders under appeal, and Docket Sheet to US Court of Appeals re 83 Notice of Appeal. Notice has been electronically mailed. (apz) (Entered: 02/02/2026) |
| 02/03/2026 | 85 | Acknowledgment of Receipt of NOA from USCA re 83 Notice of Appeal, filed by Greenflight Venture Corporation, Jeff Isaacs. Date received by USCA: 02/02/2026. USCA Case Number: 26-10369-C. (jgo) (Entered: 02/04/2026) |
| 02/11/2026 | 86 | TRANSCRIPT ORDER FORM filed by Greenflight Venture Corporation re 83 Notice of Appeal,, filed by Greenflight Venture Corporation, Jeff Isaacs. No Transcript Requested. (Faerman, Ayelet) (Entered: 02/11/2026) |
| 03/09/2026 | 87 | Pursuant to 11th Cir. R. 11-2 and 11th Cir. R. 11-3, the Clerk of the District Court for the Southern District of Florida certifies that the record is complete for purposes of this appeal re: 83 Notice of Appeal, Appeal No. 26-10369-CC. The entire record on appeal is available electronically. (jgo) (Entered: 03/09/2026) |

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

**Case No. 9:24-cv-80395-RLR-BER**

GREENFLIGHT VENTURE CORPORATION

    Plaintiff,

v.

GOOGLE LLC,

    Defendant.

_____

**JOINT SCHEDULING REPORT**

Pursuant to the Court's Order dated April 11, 2024 (Docket No. 6), Fed. R. Civ. P. 16 and 26, and Local Rule 16.1(b), Plaintiff Greenflight Venture Corporation ("Greenflight") and Defendant Google LLC ("Google") respectfully submit this Joint Scheduling Report. In accordance with Local Rule 16.1(b)(1), Greenflight and Google conferred by email and telephone starting on August 14, 2024, and ending on August 20, 2024, and report as follows:

The parties have set forth where they are in agreement; where a difference remains, it is stated herein.

**I.    DIFFERENTIATED CASE MANAGEMENT**

Greenflight and Google agree that this case should proceed on a Complex Case Management Track. Trial of this matter will occupy 10-12 trial days. For the Court's convenience, the Proposed Scheduling Order is attached as Exhibit 1. While Greenflight and

Google agreed on many dates, they did not agree on all of them.  Exhibit 1 shows where Greenflight and Google agree, and where they disagree.

**Greenflight's Statement**:  **The patent deadlines must reflect the involvement of third parties that have been induced or actively involved by Google to implement the reissue methods and systems. This will likely require at least two rounds of discovery from Google, and third-party subpoenas and expert witnesses to analyze a fairly complex telecommunications protocol. Contentions in October would severely prejudice Plaintiff in the adjudication of this complex and evolving technology,.**

**Google's Statement**:  The parties disagree in two areas.  First, Greenflight wishes to extend the time to modify pleadings or add parties into January 2025.  Google seeks an earlier deadline.  There is already an enormous amount of work necessary to get this case, which purports to be both a patent infringement action and a nationwide antitrust class action, ready for trial by the agreed trial date.  If the pleadings remain in flux into January 2025, which is only a year before the trial, it is unlikely that this schedule will hold.  The Court should order Google's proposed date of November 7, 2024.

Second, the parties disagree over deadlines for pretrial work necessary to patent litigation, including infringement and invalidity contentions and claim construction.  Greenflight wishes to postpone providing its infringement contentions until February 2025, despite having pleaded a claim of infringement in its First Amended Complaint.  This is quite deep into the discovery period.  As with its proposal for time to modify the pleadings, Greenflight's proposed patent-specific dates do not provide enough time for resolution of claim construction before the close of fact discovery, and thus increase the chance that the Court will confront a later motion to extend the schedule.  Google's proposal assists the parties and the Court in resolving the pretrial

patent issues. Google's position is that the documents attached as exhibits are inappropriate to this filing and do not agree to their inclusion.

## II.  CONFERENCE REPORT

### A.  The likelihood of settlement

Greenflight and Google will explore the possibility of settlement as appropriate throughout the pendency of this action, and will keep the Court apprised of the status of any possible settlement.

**Greenflight's Statement**:  Google has thus far been unwilling to mediate despite numerous written requests from counsel Mathews on behalf of Greenflight and its owners, spanning eighteen months.  Greenflight, through Mathews, sought to settle regarding the underlying controversy matter and avoid litigation through mediation.  Google falsely asserts that Mathews' correspondence did not pertain to this matter, when the written record clearly demonstrates otherwise.  Mathews wrote Google about Okcaller's mediation request at least 8 months prior to the KW dispute even existing, the lawsuit being filed, and/or subpoenas being issued.

Mathews' correspondence to Google, and Google's responses, were on November 3, 2023, (Exhibits A-C) evidencing that Google is being untruthful regarding the purported relation to KW, which did not exist as a federal court controversy at that time.  The correspondence clearly pertained to settling the OKCaller dispute on behalf of Greenflight and its owners.  It contained unusual language that Google was subject to "undue influence" by Apple.  This, and other language, may have resulted in Wilson Sonsoni's removal as attorneys from this matter, as they became witnesses to key facts. Nonsensically, Google seems to argue that pre-litigation attempts at settlement are not relevant, because the litigation did not exist at the time.  This is contrary to FRCP 26 & 37(e) evidence preservation law, which Google has also never confirmed

it preserved evidence beginning 18 months ago, as requested. **Plaintiff requests confirmation discovery was preserved when requested in Exhibit B, and Google product a diagram itemizing each item preserved (this is responsive as well to below preservation section).**

**Google's Statement**:  While Google is open to mediation when appropriate, this case is not in a posture where mediation now makes sense.  Greenflight's allegations are not well-founded and Google will move to dismiss Greenflight's Amended Complaint on September 10, 2024.  As set out below, Google has agreed to designate a mediator and schedule a time, date, and place for mediation on or before September 24, 2024.

Greenflight's statement about Google's purported "unwilling[ness]" to mediate in the past is both irrelevant and incorrect.  It appears to refer to previous discussions with former *pro se* plaintiff Dr. Isaacs in the context of purported third-party subpoenas to Google served in other litigation involving Dr. Isaacs' personal home, and potentially to other allegations that Dr. Isaacs has made against Google.  *See generally Isaacs v. Keller Williams Realty Inc.*, No. 9:23-cv-81393, Docket No. 85 (S.D. Fla. Feb. 9, 2024).  Whatever those allegations were, they are not relevant to mediation or settlement of this matter, as they occurred before Greenflight appeared here by filing the First Amended Complaint.  The Court has dismissed or severed and stayed Dr. Isaacs' pro se claims. *See* D.E 26, Order Granting Motion to Dismiss for Failure to State a Claim (Aug. 14, 2024). Google's position is that the documents attached as exhibits are inappropriate to this filing and do not agree to their inclusion. Google's position is that the documents attached as exhibits are inappropriate to this filing and do not agree to their inclusion.

> **B.** **The likelihood of appearance in the action of additional parties**

Greenflight and Google agree that the appearance of new parties is unlikely.

### C.        Proposed limits on time

Greenflight and Google submit the Proposed Scheduling Order attached as Exhibit 1, which includes the parties' agreed dates and sets forth their areas of disagreement.  Proposed hearing dates may require reconciliation by the Court to its own schedule.

### D.        Proposals for the formulation and simplification of issues, including the elimination of frivolous claims or defenses, and the number and timing of motions for summary judgment or partial summary judgment

Greenflight and Google will continue to work on simplification as necessary.  Absent further agreement between Greenflight and Google, the Federal Rules, Local Rules, and this Court's standing orders will govern.

**Greenflight's Statement**:  Greenflight has not been told the basis of any planned Motion to Dismiss. In light of the plain issues at dispute, and the DOJ's guilty verdict on verbatim, identical conduct allegations, Greenflight asserts an MTD appears to be frivolous and a dilatory tactic._

**Google's Statement**:  Google intends to file a motion to dismiss on September 10, 2024. Google contends that adoption of its schedule, including deadlines specific for patent issues, will simplify issues before trial.

### E.        The necessity and desirability of amendments to the pleadings

**Greenflight's Statement**:  Greenflight anticipates additional amendment may be necessary once discovery uncovers certain necessary facts not presently known, such as Google's internal communications and decision-making process for halting OkCaller's decade long success story. Additionally, source code and SS7 contracts and receipts are likely to augment certain infringement elements.

**Google's Statement**:  Google will respond appropriately to any amended pleadings, including without limitation any appropriate amendment to its own pleadings.

**F.      The possibility of obtaining admissions of fact and of documents, electronically stored information or things which will avoid unnecessary proof, stipulations regarding authenticity of documents, electronically stored information or things, and the need for advance rulings from the Court on admissibility of evidence**

Greenflight and Google will endeavor, in good faith, to obtain admissions of fact, make appropriate stipulations, exchange documents, and do such other things as will avoid unnecessary proof.  Greenflight and Google will endeavor to stipulate regarding authenticity of relevant documents and reserve arguments to interpretation of such documents.  At this time, Greenflight and Google do not see any need for advance rulings on admissibility of evidence.

**G.      Suggestions for the avoidance of unnecessary proof and cumulative evidence**

At this time, Greenflight and Google do not have specific suggestions for the avoidance of unnecessary proof and cumulative evidence, but they will endeavor to eliminate such issues through stipulated facts, stipulated authentication of certain documents, and joint exhibits at trial, where appropriate.

**H.      Suggestions on the advisability of referring matters to a Magistrate Judge or master**

**Greenflight's Statement:**  Plaintiff asserts it is advisable to refer discovery-related matters to the Magistrate Judge, which was contrary to Google's position, apparently until this evening.  Absent clarification by Google, Greenflight consents to jurisdiction of the Magistrate.

**Google's Statement**:  Google notes that the Court already has entered an order of referral to the magistrate, D.E. 6, and does not seek additional referrals from the Court at this time. Google does not consent to the jurisdiction of the Magistrate at this time.

**I.      Preliminary estimate of the time required for trial**

Greenflight and Google agree that this case will require 10-12 days of trial time.

        **J.**        **Requested date or dates for conferences before trial, a final pretrial conference, and trial**

Please see the Proposed Scheduling Order attached as Exhibit 1.

        **K.**        **Any Issues About:**

        **1.**        **Disclosure, discovery, or preservation of electronically stored information, including the form or forms in which it should be produced**

Google and Greenflight will work toward agreement on a protocol to govern the general exchange of such material and may adapt the form and timing of such production based on specific production issues.  Google and Greenflight also may submit a proposed order addressing such issues for the Court's consideration.

        **Greenflight's Statement**: Greenflight seeks Google's prompt and early disclosure of any impact in light of Department of Justice proceedings concerning auto-delete, in which substantial amounts of important ESI was proven to be spoliated by Google's unlawful policies. **Absent agreement on protocols above, discovery should use reasonable forms of transmission and storage form.**

        **Google's Statement**:  Google disputes that characterization and any contention that any "auto-delete" issue, which Google assumes refers to the preservation of Google Chats, impacts any issue in this case.  Google maintains that discovery should follow the ordinary course in this purported hybrid patent and antitrust matter.

        **2.**        **Claims of privilege or of protection as trial-preparation materials, including – if the parties agree on a procedure to assert those claims after production – whether to ask the court to include their agreement in an order under Federal Rule of Evidence 502**

At this time, Google and Greenflight do not foresee issues with claims of privilege or protection of trial-preparation materials.  Google and Greenflight agree that the inadvertent disclosure of information protected by the attorney-client privilege, the work-product privilege,

or any other privilege shall not constitute a waiver of an otherwise valid claim of privilege.  A party that receives privileged information shall return it to the producing party immediately upon demand by the producing party or upon discovery of the privileged information by the receiving party, and the receiving party shall not retain a copy of the privileged information.

Google and Greenflight will comply with the Court's rules governing redaction of account and social security numbers.

> **3.** **When the parties have agreed to use the ESI Checklist available on the Court's website (www.flsd.uscourts.gov), or matters enumerated on the ESI Checklist**

Google and Greenflight have not agreed to use the Court's ESI Checklist, but expect that any agreed protocol to govern the disclosure and production of electronically stored information will incorporate appropriate provisions in the Court's ESI Checklist.

> **L.** **Other information that might be helpful**

**Greenflight's Statement**:  *U.S. v. Google* is presently in the penalty stage following a felony verdict against Google.  The GSE market anticompetitive conduct in that case is verbatim alleged in this case, and also affects "downstream" reverse search and VSP markets alleged in this case.

A USDJ has commented that a "decade" of "bad conduct" will require meaningful redress, which presumably includes developers/VSP stakeholders, and which overlap with the class redress sought in this case. Coordination of remedies in this case, amicus filings, witness statements, and discovery may be in the interest of judicial economy.

**Google's Statement**:  Greenflight's statement is both incorrect and irrelevant.  Google understands Greenlight to be referring to the *U.S. v. Google* case relating to Google Search.  That case is a civil monopoly maintenance case in which no final judgment has issued.  It concerns

general search engines and search advertising, unlike the claims brought here on behalf of a company that owns a reverse phone lookup application.

### III.   RULE 26(f) DISCOVERY PLAN

In accordance with Federal Rule 26(f), the Parties provide the following views and proposals on a discovery plan.

**Greenflight's Statement**:  Discovery in this case began last week, per 26(f) conference between former Plaintiff Dr. Isaacs and Google.  Isaacs served discovery on Google last week which Greenflight would like to see the responses to.  Greenflight denies that it waived such right to see any responses to prior issued discovery.  In fact, Greenflight counsel is unable to retract a pro se parties' independent discovery, as this would be improper, but it appears Google wishes it to do so.  Greenflight is serving related discovery this evening.

**Google's Statement:**  Dr. Isaacs served discovery on Google before the Court dismissed, and severed and stayed, his claims.  Greenflight also propounded its own discovery.  Greenflight subsequently has confirmed its view that Google should respond to Dr. Isaacs' discovery.

Discovery served by Dr. Isaacs as a *pro se* plaintiff, signed by Dr. Isaacs and not by counsel, is no longer operative after the Court granted Google's motion to dismiss and severed and stayed of Dr. Isaacs' claims.  Google therefore does not intend to respond to Dr. Isaacs' *pro se* discovery and requests that the Court so order.  As noted below, Google maintains that Greenlight's discovery is premature.

#### A.   Changes in timing, form, or requirement for disclosures under Rule 26(a)

**Greenflight's Statement**:  Greenflight requests initial disclosures proceed **in late October**.  Greenflight, through written correspondence issued by Counsel Mathews regarding the underlying dispute, has patiently waited over eighteen months to ascertain why a successful, patent-based phone book which helped 300 million Americans was suddenly terminated by

Google, and whether or not Google violated 18 USC § 1512 and retaliated against its officers for antitrust witness participation.

**Google's Statement**:  Google proposes that Google and Greenflight file their initial disclosures within 35 days from the submission of this Joint Scheduling Report in light of the multiple new issues potentially in dispute and need for coordination.  Greenflight's statement regarding a period of "eighteen months" is both incorrect and irrelevant for the reasons explained above; Greenflight was not a party to this action until the First Amended Complaint.

**B.     Subject, timing, and phases of discovery**

**Greenflight's Statement**:  Greenflight asserts that the scope of discovery is reasonably ascertainable at this moment for Patent, Sherman Act claims and State Competition Claims.  Greenflight has provided its first round of discovery to Google, which complements' discovery served upon Google last week by Isaacs.  The parties had agreed to begin discovery during last week's 26(f) conference with Isaacs.

Greenflight contends that discovery will include both liability and damages for alleged patent infringement.  Additionally, Greenflight has brought claims under Sherman Act based on last week's DOJ verdict against Google.  Similarly, State Competition Laws (FL) have been invoked.

Greenflight asserts discovery will include communications and internal documents to be sought in an initial discovery requests, including the transfer of the DOJ discovery file.

Greenflight was informed Google plans to file a 12(b)(6) motion on this case, but Plaintiff believes that in light of the DOJ guilty verdict and verbatim claims in this case, such a filing would be frivolous and possibly violate Rule 11.  In no circumstances should discovery of the underlying antitrust matter, of which Google is guilty, be stayed, as this would predudice Plaintiff and be contrary to the interests of justice.

**Google's Statement**:  Google believes that discovery should await resolution of the pleadings.  Google intends to file a motion to dismiss all claims on September 10, 2024, and a motion to stay discovery pending same.  Until resolution of the motion to dismiss, it will not be possible to determine the appropriate scope of discovery.

> **C.     Any issues about disclosure, discovery, or preservation of electronically stored information**

Google and Greenflight will meet and confer to agree on an appropriate ESI protocol and confidentiality agreement.

> **D.     Any issues about claims of privilege or of protection as trial-preparation materials**

**Greenflight's Statement**:  Discovery shall proceed without delay as per FRCP until, and if, the parties finalize such a motion.  If not agreed upon by the first discovery deadlines, the failure to reach a protective order shall not delay discovery. Greenflight will endeavor to agree to a reasonable protective order.

**Google's Statement**:  **Google and Greenflight will submit a joint motion for a Protective Order to protect information that is within the scope of Fed. R. Civ. P. 26(c).**

As Google stated above, Google believes that discovery should await resolution of the scope of the case in accordance with its motion on the pleadings.

> **E.     Changes in the limitations on discovery imposed under the Federal or Local Rules, and other limitations to be imposed**

At this time, Google and Greenflight do not suggest any changes in the limitations on discovery imposed under the Federal and Local Rules.  As noted above, Google and Greenflight anticipate submitting a protocol on electronically stored information to the Court for approval. Should any other need arise, Google and Greenflight will confer and submit any issues to the Court.

**F.** **Any other orders that should be entered by the Court under Rule 26(c) or under Local Rule 16(b) and (c).**

Google and Greenflight anticipate agreement on a joint protective order to address

confidentiality concerns and will submit a motion to the Court for such an appropriate order.

Date: August 22, 2024

Respectfully submitted,

__/s/Ayelet Faerman_____
Ayelet Faerman (Fl. Bar 102605)
FAERMAN LAW, P.A.
3859 NW 124th AVE
CORAL SPRINGS, FL 33065
ayelet@faerman.law

*Attorney for Plaintiff*

Respectfully submitted,

_____
Edward M. Mullins (Florida Bar No. 863920)
Ana M. Barton (Florida Bar No. 85721)
REED SMITH LLP
200 South Biscayne Boulevard, Suite 2600
Miami, Florida, 33131
        +1 (786) 747-0200
+1 (786) 747-0299 facsimile
emullins@reedsmith.com
abarton@reedsmith.com

Matthew S. Warren (*pro hac vice*)
Erika H. Warren (*pro hac vice*)
Madeline A. Woodall (*pro hac vice*)
WARREN KASH WARREN LLP
        2261 Market Street, No. 606
        San Francisco, California, 94114
        +1 (415) 895-2940
        +1 (415) 895-2964 facsimile
        24-80395@cases.warrenlex.com

*Attorneys for Defendant Google*

LLC

**Exhibit 1**

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION**

**Case No. 9:24-cv-80395-RLR-BER**


GREENFLIGHT VENTURE CORPORATION

    Plaintiff,

v.

GOOGLE LLC,

    Defendant.

---

**PROPOSED SCHEDULING ORDER**

Pursuant to the joint request of Plaintiff, GREENFLIGHT VENTURE CORPORATION

(the "Plaintiff"), and Defendant GOOGLE LLC (the "Defendant") (collectively, the "Parties"),

IT IS HEREBY ORDERED that this case shall proceed along the following schedule:

1.      Pursuant to Local Rule 16.1(A), this case shall be assigned to the Complex Case

Management Track, with the parties expecting trial to take 10-14 days and propose the following

schedule:

| Event | Agreed Deadline | Plaintiff's Proposal | Defendant's Proposal |
|---|---|---|---|
| Discovery Begins | | Discovery began on August 12, when a prior party correctly served discovery per completion of the 26(f) conference.  At a minimum, discovery begins immediately. | Discovery opened with the conference between Greenflight and Google on August 20; Isaacs' previous *pro se* discovery is moot and Google need not respond |
| The Parties shall file their initial disclosure under Federal Rule of Civil Procedure 26(a)(1) | | October 28, 2024 | September 24, 2024 |
| The Parties shall designate a mediator and schedule a time, date, and place for mediation | September 24, 2024 | | |
| Plaintiff shall serve preliminary infringement contentions | | February 15, 2025 | October 24, 2024 |
| Any additional parties shall be added by, or amendments to the pleadings shall be made by, or motion filed by | | January 7, 2025 | November 7, 2024 |
| Defendant shall serve preliminary invalidity contentions | | February 22, 2025 | December 19, 2024 |
| The Parties shall exchange proposed claim terms for construction | | March 1, 2025 | January 9, 2025 |
| The Parties shall exchange proposed claim constructions | | March 1, 2025 | January 16, 2025 |
| Defendant shall file its opening claim construction brief | | March 15, 2025 | January 30, 2025 |

| Event | Agreed Deadline | Plaintiff's Proposal | Defendant's Proposal |
|---|---|---|---|
| Plaintiff shall file its responsive claim construction brief | | March 29, 2025 | February 13, 2025 |
| Defendant shall file its reply claim construction brief | | April 6, 2025 | February 27, 2025 |
| Any motions for class certification shall be filed | March 6, 2025 | | |
| Any response to motions for class certification shall be filed | March 27, 2025 | | |
| A *Markman* hearing will be held | | May 1, 2025 | April 3, 2025 |
| Any reply to motions for class certification shall be filed | April 10, 2025 | | |
| Fact discovery shall be completed | June 6, 2025 | | |
| Any non-expert discovery motions shall be filed | June 13, 2025 | | |
| The Parties shall identify experts and serve expert reports pursuant to Fed. R. Civ. P. 26(a)(2)(B) | June 27, 2025 | | |
| Each party shall identify rebuttal experts, and serve rebuttal expert reports for the same | July 31, 2025 | | |
| Expert discovery, including no more than one deposition per expert, absent Court order of the Parties' agreement, shall be completed | August 21, 2025 | | |

| Event | Agreed Deadline | Plaintiff's Proposal | Defendant's Proposal |
|---|---|---|---|
| Mediation shall occur by | November 20, 2025 | | |
| Dispositive motions (including summary judgment motions but excluding motions affecting the conduct of trial) may be filed at any time but shall be filed by this date. All responses to such motions shall be filed within two weeks of service of the initial motion.  All replies shall be filed within seven days of service of any responses. | October 9, 2025 | | |
| Motions in limine shall be filed by this date.  All responses to such motions shall be filed within two weeks of service of the initial motion.  All replies shall be filed within seven days of service of any responses. | | | |
| Trial | February 16, 2026 | | |

2.      Pretrial conference and trial dates will be scheduled at the convenience of the

Court; however, the Parties submit that this case will be ready for trial any time after February

16, 2026.

3.      The pretrial conference shall be held on _____.

ORDERED THIS DATE:

Dated: _____                        _____
                                                  Judge Robin L. Rosenberg

# WILSON SONSINI

Wilson Sonsini Goodrich & Rosati
Professional Corporation

One Market Plaza
Spear Tower, Suite 3300
San Francisco, California 94105-1126

O: 415.947.2000
F: 866.974.7329

ANDREW KRAMER
Internet: AKRAMER@wsgr.com

November 3, 2023

**Via Email and U.S. Mail**

Keith Mathews
1000 Elm Street, Suite 800
Manchester, New Hampshire 03101
keith@awplegal.com

>        **Re:    *OkCaller.com***

Dear Counsel:

We represent Google LLC ("Google"). We write in response to your August 24 and October 17, 2023 letters regarding *Coronavirus Reporter v. Apple Inc.* and the supposed removal of OkCaller.com ("OkCaller") from Google Search results.

As Google explained in its August 29, 2023 correspondence, OkCaller remains listed in Google Search and is equally eligible to appear in Search results for user queries. Nonetheless, you claim that Google removed certain "reverse phone queries" from Search results and that such removal constitutes "evidence corruption under 18 U.S.C. § 1512." Oct. 17, 2023 Ltr. from K. Mathews at 1. Specifically, you assert that the intellectual property "underlying" OkCaller is the subject of claims brought against Apple in the *Coronavirus Reporter* case and that, "[i]nsofar as OkCaller's success on Google . . . evidenced a stark contrast to Apple's treatment of the underlying intellectual property," Google's supposed actions constitute "witness tampering." Aug. 24, 2023 Ltr. from K. Mathews ("August 24 Letter") at 1. Those claims are frivolous.

Section 1512 prohibits the "corrupt[]" and "intent[ional]" obstruction of justice. *See* 18 U.S.C. § 1512(b), (c); *see also Arthur Andersen LLP v. United States*, 544 U.S. 696, 708 (2005) ("If the defendant lacks knowledge that his actions are likely to affect the judicial proceeding, . . . he lacks the requisite intent to obstruct."). Google had (and continues to have) no reason to think that its Search results have any bearing on the *Coronavirus Reporter* case.[1] Google is not involved in that case, and your current claim that Google Search results are somehow relevant is makeweight. In any event, you acknowledge that any removal of Search results occurred ***after***

---

[1] Your statement that "Apple and/or Gibson Dunn corruptly influenced Google" to take action against OkCaller is fantasy. *See* August 24 Letter at 2. Even in that imaginary scenario, ***Google*** would be the victim of undue influence.

AUSTIN   BEIJING   BOSTON   BOULDER   BRUSSELS   HONG KONG   LONDON   LOS ANGELES   NEW YORK   PALO ALTO
SALT LAKE CITY   SAN DIEGO   SAN FRANCISCO   SEATTLE   SHANGHAI   WASHINGTON, DC   WILMINGTON, DE

**WILSON
SONSINI**

Keith Mathews
November 3, 2023
Page 2

the *Coronavirus Reporter* case was dismissed, and your letters show that OkCaller already has records of its historical performance in Search. Section 1512 has no application here.

The law does not prohibit Google from removing content from its Search results. To the contrary, it protects Google's editorial judgments about what to publish or not publish on its service. *See, e.g., NetChoice, LLC v. AG, Fla.*, 34 F.4th 1196, 1210 (11th Cir. 2022) (First Amendment protects online services' decisions about whether to "'disclose,' 'publish,' or 'disseminate' information" on their services); *Gonzalez v. Google LLC*, 2 F.4th 871, 944 (9th Cir. 2021), *vacated on other grounds*, 143 S. Ct. 1191 (Section 230 of the Communications Decency Act immunizes online service providers' decisions about "whether to publish, withdraw, postpone or alter [third-party] content").[2] The First Amendment and Section 230 bar any claim that Google must include in Search results the particular content that OkCaller desires. Google has every right to determine the content of its Search results. Any removal of content is not only protected by the First Amendment and federal law, it is also irrelevant (and unrelated) to the *Coronavirus Reporter* case. But again, OkCaller.com remains listed in Search and accessible to Search users.

Google will not engage with you further on this matter.

Very truly yours,

WILSON SONSINI GOODRICH & ROSATI
Professional Corporation

Andrew Kramer

---

[2] *See also, e.g., Hopson v. Google*, LLC, No. 21-CV-320-WMC, 2023 WL 2733665, at *7-8 (W.D. Wis. Mar. 31, 2023) (First Amendment protects Google's decisions to exclude search results); *Langdon v. Google, Inc.*, 474 F. Supp. 2d 622, 629-30 (D. Del. 2007) (Section 230 immunizes Google's decisions to "screen[] and delet[e]" content).



American Wealth Protection

Google Office of General Counsel
1600 Amphitheatre Parkway
Mountain View, CA 94043

RE: OkCaller.com

Dear Google,

I represent Coronavirus Reporter and a proposed class in a Sherman Act and RICO action against Apple Inc. pending appeal in the Ninth Circuit.[1] The primary source of funds for Coronavirus Reporter is OkCaller.com, a web property featured in Google search results for nine years. The day our closing brief was tendered to the Ninth Circuit, Google removed OkCaller.com from its listings. Google employees that had been in contact with OkCaller.com, since its inception, similarly went silent and stopped responding to correspondence. A dozen competitors in the reverse-search space were unaffected.

I write you to request an immediate investigation into our substantiated concern that this removal of a nine-year old strategic advertising partner constituted witness tampering pursuant to 18 U.S.C. §1512.

Insofar as OkCaller.com's success on Google and Bing evidenced a stark contrast to Apple's treatment of the underlying intellectual property, the removal from your system materially alters evidence for the Apple federal antitrust proceeding. The relevant portions are found in section §1512(b) and/or §1512(c) and apply to Apple's and/or Google's role (if material), respectively:

> *"(b) Whoever knowingly uses intimidation, threatens, or corruptly persuades another person, or attempts to do so, or engages in misleading conduct toward another person, with intent to— (1) influence, delay, or prevent the testimony of any person in an official proceeding; (2) cause or induce any person to— (A) withhold testimony, or withhold a record, document, or other object, from an official proceeding; (B) alter, destroy, mutilate, or conceal an object with intent to impair the object's integrity or availability for use in an official proceeding; ...*
>
> *(c) Whoever corruptly— (1) alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with the intent to impair the object's integrity or availability for use in an official proceeding; or (2) otherwise obstructs, influences, or impedes any official proceeding, or attempts to do so, shall be fined under this title or imprisoned not more than 20 years, or both."*

The developer of OkCaller and inventor of the underlying patent is a party to the Coronavirus Reporter case. I have represented this developer, Dr. Isaacs, for over a decade in efforts to enforce an acquittal that permitted him to practice medicine. Apple counsel Gibson Dunn is alleged, in the pending RICO action, to have taken increasingly damaging actions against Dr.

---

[1] Case No. 3:21-cv-5567-EMC in the United States District Court for the Northern District of California, and Case Nos. 22-15166 & 22-15167 in the United States Court of Appeals for the Ninth Circuit.

August 24, 2023
Page 2 of 2

Isaacs' career over the years. Dr. Isaacs, despite worsening medical disability, has nonetheless been proud of his ability to work with Google while his medical career was stalled. With Google, he provided a useful and free service to over two hundred million end-users. It now appears Apple and/or Gibson Dunn corruptly influenced Google and rather suspiciously terminated Dr. Isaacs' last remaining career. As alleged, 18 U.S.C. §1512(d) applies directly and/or as a RICO predicate act by this longstanding enterprise.

> *"(d)Whoever intentionally harasses another person and thereby hinders, delays, prevents, or dissuades any person from— (1) attending or testifying in an official proceeding; shall be fined under this title or imprisoned not more than 3 years, or both."*

Additionally, the conduct violates 18 U.S.C. §1513, which prohibits retaliation against a witness. Terminating a decade-old profitable business line, which served as the primary funding for a Sherman Act civil action, falls squarely within this statute:

> *"(b)Whoever knowingly engages in any conduct and thereby ... damages the tangible property of another person, or threatens to do so, with intent to retaliate against any person for— (1) the attendance of a witness or party at an official proceeding, or any testimony given or any record, document, or other object produced by a witness in an official proceeding;"*

This letter serves as notice of your obligation to preserve all evidence, including ESI, relevant to this concern. Please investigate the matter to the extent necessary to identify the individuals at Apple, Gibson Dunn, and/or Google who influenced the improper take-down of OkCaller.

Google's decision to drop my client's website, in favor of cached PII sites such as spokeo.com, is particularly perplexing considering the recent request by the US Marshals to limit cached PII of federal judges (see *https://www.law.com/nationallawjournal/2023/03/16/federal-judges-got-thepower-to-remove-their-private-info-from-the-internet-and-theyre-using-it/*). As you are aware, OkCaller is unique in that it worked with Google back in 2013 to ensure that the SERPs never cache CNAM caller ID. This was the only website to seek this protection of PII, well ahead of its time over a decade ago. Google needs to promptly reimplement this unique protective measure.

To avoid a motion for emergency injunctive relief, sent under separate cover, I request that you respect the *status quo* present at the initiation of the Coronavirus Reporter case and immediately preserve OkCaller.com's properly earned place in Google's search results until this matter is fully adjudicated.

Finally, I wish to point out that 18 U.S.C. §1505 directly applies to obstruction of certain antitrust proceedings. I appreciate your attention to these matters and hope we can achieve an amicable and prompt resolution.

Sincerely,

Keith Mathews, Esq.



**American Wealth Protection**

Google Office of General Counsel
1600 Amphitheatre Parkway
Mountain View, CA 94043

RE: OkCaller.com
October 17, 2023

Dear Google Legal Team,

I write to address the alleged termination of Google's long-standing strategic reverse phone search partnership with OkCaller.com. This termination has raised serious concerns about potential evidence corruption under 18 U.S.C. §1512.

On August 24, 2023, I sent a letter requesting an investigation into the apparent §1512 matter, specifically with regard to the *Coronavirus Reporter* case. My letter emphasized the necessity of preserving the *status quo* as it existed at the outset of the *Coronavirus Reporter* case, along with all pertinent evidence, including Electronically Stored Information (ESI). Furthermore, on February 13, my client sent a direct email to your office, seeking confirmation that evidence preservation procedures had been appropriately initiated.

Regrettably, these requests seem to have been misdirected to a generic "Removals" department and have, unfortunately, remained unaddressed. While we acknowledge the receipt of your response in good faith, it appears that Google has not sufficiently investigated the core issue. The response from removals@google.com contained the following statement:

> "We received your August 24, 2023 letter regarding your client, Coronavirus Reporter, and the website and your 'advertising partner' OkCaller.com. Contrary to your assertion that 'Google removed OkCaller.com from its listings,' OkCaller.com remains listed in Search and is equally eligible to appear in Search results for user queries."

To clarify, the alleged conduct revolves around Google's removal of OkCaller from Google's reverse phone search algorithm, rather than a straightforward domain removal. Since 2013, when users queried phone numbers like "8005551212" on Google, they were generally redirected to OkCaller or a handful of other competitors. Google had identified OkCaller as a "strategic" account in an email dated 2014. Since then, OkCaller successfully handled a significant portion of Google's mobile phone reverse phone searches, processing up to a quarter million queries daily.

As outlined in my previous letter, on Thanksgiving 2022, Google abruptly removed over 98% of the reverse phone queries that had been directed to OkCaller since 2013. As a result, Google users seeking information about the owners of American mobile phone numbers are no longer directed to OkCaller, rendering the website unviable for ongoing operation. Google employees who had been in contact with OkCaller.com for years have ceased communication. Curiously, a dozen competitors in the reverse-search field remain unaffected.

October 17, 2023
Page 2 of 2

We kindly request confirmation that Google has indeed investigated this matter and is fully compliant with evidence preservation regulations. We further request that all individuals involved in this matter be identified and their names preserved for possible subpoena in *Coronavirus Reporter.*

It remains perplexing why Google chose to drop OkCaller in favor of cached Personally Identifiable Information (PII) websites, such as spokeo.com. Particularly, this decision seems contradictory in light of the recent request by the U.S. Marshals to restrict cached PII of federal judges. As you are aware, OkCaller collaborated with Google back in 2013 to ensure that the reverse search Search Engine Results Pages (SERPs) never cached CNAM caller ID. OkCaller was the first website to seek this level of PII protection, more than a decade ago. It is paramount that Google swiftly reintroduces this unique protective measure.

Google's advertising partnership with OkCaller has been mutually profitable since its inception in 2013, generating over $5 million annually, with a 60/40 split between OkCaller and Google AdSense. This revenue has now decreased by 98% to $30,000 per annum. Under Sherman and RICO treble damages provisions, OkCaller has already incurred damages exceeding $10 million. Litigation in this matter would undoubtedly be expensive for both parties. A conservative estimate suggests that a three-year trial could accumulate over $30 million in damages and $15 million in attorney's fees.

I respectfully urge Google to consider an alternative dispute resolution (ADR) mediation process to address what appears to be a persistent misunderstanding of this critical issue. If Google is amenable to ADR, please contact me at your earliest convenience. In the absence of ADR, I anticipate escalating this matter within the Department of Justice sometime this month.

Sincerely,

Keith Mathews, Esq.

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

**Case No. 9:24-cv-80395-RLR-BER**

GREENFLIGHT VENTURE CORPORATION,

    Plaintiff,

v.

GOOGLE LLC,

    Defendant.

———————————————————————

**DEFENDANT GOOGLE'S MOTION FOR PROTECTIVE**
**ORDER REGARDING DR. ISAACS' *PRO SE* DISCOVERY**

App. 34

## INTRODUCTION

Dr. Isaacs served written discovery on Google before the Court dismissed, or severed and stayed, all of his claims.  When Dr. Isaacs left the case, his discovery went with him—or so Google asked Greenflight to confirm.  But Greenflight refused, claiming instead that Dr. Isaacs' discovery continued even without Dr. Isaacs' claims, and that Greenflight could take over Dr. Isaacs' zombie discovery, prosecute his requests, and even take the deposition he noticed.

Greenflight is wrong.  A party's discovery requests do not survive dismissal of the requesting party's claims.  This Court specifically ordered that only Greenflight's claims could proceed, and only through documents bearing an attorney's Rule 11 signature.  And Greenflight's attempt to take over Dr. Isaacs' discovery would allow it to circumvent the Court's limits on discovery.  Google therefore respectfully requests that the Court enter a protective order confirming that Dr. Isaacs' *pro se* discovery requests are no longer valid, and that Google need not respond to them.

## BACKGROUND

**A.      Dr. Isaacs Commences This Action As a *Pro Se* Plaintiff**

On April 1, 2024, Dr. Jeffery Isaacs filed this action, asserting against Google LLC a single claim of infringement of U.S. Patent No. RE48,847.  Docket No. 1.  On July 30, 2024, Google timely moved to dismiss Dr. Isaacs' *pro se* complaint under Fed. R. Civ. P. 12(b)(1) for lack of standing and Fed. R. Civ. P. 12(b)(6) for failure to state a claim.  Docket No. 16.

**B.      Dr. Isaacs Serves Discovery *Pro Se***

On August 12, 2024, Dr. Isaacs served written discovery on Google, including his First Request for Production of Documents (Ex. 1); First Set of Interrogatories (Ex. 2); First Set of Requests for Admissions (Ex. 3); and a Notice of Deposition of Google LLC.  (Ex. 4).  The

Notice of Deposition sought to take Google's corporate deposition "on August 28, 2024, at 1PM at Mandarin Brickell Hotel in Miami, Florida," and included ten topics of examination.  *See id.*

### C.      Greenflight Venture Corporation and Dr. Isaacs File the First Amended Complaint

On August 13, 2024, one day after Dr. Isaacs served his written discovery on Google, Dr. Isaacs and plaintiff Greenflight Venture Corporation ("Greenflight") filed the First Amended Complaint.  Docket No. 24.  The First Amended Complaint again asserted infringement of U.S. Patent No. RE48,847, and added claims under Sherman Act Sections 1 and 2, the Florida Deceptive and Unfair Trade Practices Act, and California's Unfair Competition Law, seeking to certify a class regarding most of these new claims.

### D.      The Court Dismisses, or Severs and Stays, All of Dr. Isaacs' Claims

On August 14, 2024, this Court dismissed, or severed and stayed, all of Dr. Isaacs' claims in the First Amended Complaint.  Docket No. 26.  The Court found that "due to a lack of standing, Mr. Isaacs's patent infringement claim must be dismissed" (*id.* ¶ 5), and that because "a *pro se* plaintiff cannot bring class action claims," Dr. Isaacs' "class action claims are therefore dismissed as unauthorized under the Federal Rules of Civil Procedure."  *Id.* ¶¶ 7-8.  Noting that Dr. Isaacs had "brought one claim in his *pro se* capacity that is not a class action claim and is not a claim for patent infringement—a Sherman Act antitrust claim," the Court exercised its "case management discretion" to sever and stay that claim until "after a final resolution of Greenflight Venture's case against the Defendant."  *Id.* ¶¶ 9-10.  As the Court noted:

> Going forward, then, the only active claims in this case are the claims brought by Greenflight Venture, represented by attorney Ayelet Faerman, and future Rule 11 signature/certifications shall be stylized accordingly.

*Id.* ¶ 11.

**E.       Greenflight Serves Discovery on Google**

On August 20, 2024, Greenflight served its own discovery on Google, including its First

Request for Production of Documents (Nos. 1-19), First Set of Requests for Admission (Nos.

1-42), First Set of Interrogatories (Nos. 1-21), and Notice of Deposition of Google LLC.

**F.       Greenflight Claims Google Must Answer Dr. Isaacs' *Pro Se* Discovery**

With Dr. Isaacs' *pro se* claims dismissed, or severed and stayed, Google asked

Greenflight to confirm that Dr. Isaacs' *pro se* discovery served on August 12 was no longer

operative, leaving only Greenflight's discovery served on August 20.  But Greenflight would not

agree:  in the parties' Joint Scheduling Report, Greenflight stated:

> Discovery in this case began last week, per 26(f) conference between former Plaintiff Dr.
> Isaacs and Google.  Isaacs served discovery on Google last week which Greenflight
> would like to see the responses to.  Greenflight denies that it waived such right to see any
> responses to prior issued discovery.  In fact, Greenflight counsel is unable to retract a pro
> se parties' independent discovery, as this would be improper, but it appears Google
> wishes it to do so.

Docket No. 34 at 9.  Greenflight later stated that it had "provided its first round of discovery to

Google, which complements' discovery served upon Google last week by Isaacs." *Id.* at 10.

On August 26, 2024, Greenflight contacted Google to press its assertion that the

deposition noticed by Dr. Isaacs should proceed on August 28.  *See* Ex. 5.  Greenflight's counsel,

Keith Mathews, stated:

> My understanding of the Courts' order is that Isaacs pro se claims will be covered by my
> representation of Greenflight, hence I plan to take over the lead of this deposition.  I do
> not represent Isaacs, to be clear, but my advocacy for Greenflight permits my attendance
> at the deposition, which would now be lead, given the Court's order.
>
> As Isaacs originally noticed, we are amenable to video deposition.  Please provide your
> availability and suggested video deposition vendors, otherwise, I have some I can
> arrange.  Given the imminent timing, your prompt response is appreciated.
>
> While I note that you indicated in the Joint Report that you will not comply with Isaacs'
> discovery requests, our position is that you have not obtained any leave for relief from the

discovery, and therefore I expect you to comply with all outstanding discovery requests, especially as you had 18 months to prepare for this with Wilson Sonsoni.

*Id.* Greenflight thus confirmed its view that Dr. Isaacs' *pro se* discovery remains operative in this action, and that Greenflight may step into Dr. Isaacs' shoes to prosecute his discovery in addition to its own.

## ARGUMENT

### I.    When Isaacs' Claims Left This Case, His Discovery Left With Them

The "purpose of discovery is to enable parties to an action to obtain material 'which is relevant to the subject matter in the pending action,' a purpose that obviously can no longer be served once a case has been dismissed." *Pub. Citizen v. Liggett Grp., Inc.*, 858 F.2d 775, 781 (1st Cir. 1988). "The proceeding is no more, so the requests are no more." *Usher v. U.S.*, 698 F. Supp. 3d 174, 177 (D.D.C. 2023); *see, e.g.*, *Montez v. U.S.*, No. 23-1483, 2024 WL 3242290, at *2 (W.D. Tex. June 27, 2024) (finding discovery motions moot based on dismissal of action); *Giroux v. Schwehr*, No. 13-62, 2016 WL 1089231, at *1 (D.N.D. Mar. 18, 2016) (same); *Parkinson v. United States*, 175 F. Supp. 2d 1233, 1247 (D. Idaho 2001) (same). Isaacs' proceeding is no more: the Court dismissed, or severed and stayed, his claims. *See supra* § D. Thus Isaacs' discovery requests are no more. *See, e.g., Twin Disc, Inc. v. Big Bud Tractor, Inc.*, 582 F. Supp. 208, 216 (E.D. Wis. 1984) (finding moot motion to compel discovery brought by a dismissed party).

Greenflight offers no way around this bedrock rule. Instead, Greenflight claims that Dr. Isaacs' *pro se* discovery is simultaneously autonomous ("unable to retract [Dr. Isaacs'] independent discovery") and yet somehow within Greenflight's control ("tak[ing] over the lead of this deposition.") *Supra* § F. Greenflight provides no support for this view, and none exists.

It is not a matter of Greenflight "retract[ing]" the discovery. When Dr. Isaacs' claims exited the case, his discovery exited with them as a matter of law.

## II.   Greenflight's Effort to Arrogate Dr. Isaacs' Discovery Violates This Court's Order

Greenflight's attempt to proceed on Dr. Isaacs' *pro se* discovery violates this Court's order of August 14, 2024. Docket No. 26. That order stated that "the only active claims in this case are the claims brought by Greenflight Venture, represented by attorney Ayelet Faerman, and future Rule 11 signature/certifications shall be stylized accordingly." Docket No. 26 ¶ 11. Dr. Isaacs' *pro se* discovery was exactly that: *pro se*, without a Rule 11 signature from counsel. *See supra* § B. Greenflight's attempt to arrogate Dr. Isaacs' *pro se* discovery thus violates the Court's order. It also undermines a key purpose of staying Dr. Isaacs' sole remaining claim, to "promote judicial economy and efficiency by avoiding the litigation of issues that may become irrelevant or moot." *Morrissey v. Subaru of Am., Inc.*, Case No. 15-21106, 2015 WL 4512641, at *2 (S.D. Fla. July 24, 2015). If Greenflight could proceed on Dr. Isaacs' *pro se* discovery, it would undermine the Court's severance and stay of that claim. Greenflight cannot avoid the Court's Order by continuing to prosecute Dr. Isaacs' discovery.

## III.   Greenflight's Takeover of Dr. Isaacs' Discovery Exceeds Discovery Limits

Absent a court order, "a party may serve on any other party no more than 25 written interrogatories, including all discrete subparts." Fed. R. Civ. P. 33. In his *pro se* discovery, Dr. Isaacs served 22 interrogatories, while Greenflight served 21 additional non-duplicative interrogatories. Greenflight's attempt to take over Dr. Isaacs' discovery would allow it to propound 43 interrogatories, well over the limit. Greenflight's attempt to circumvent the rules "limiting the number of interrogatories is an abuse of the discovery process" that the Court

should neither reward nor allow.  *In re Olympia Holding Corp.*, 189 B.R. 846, 853 (Bankr. M.D. Fla. 1995).

## IV.       The Court Should Enter a Protective Order

"Under Federal Rule of Civil Procedure 26(c)(1) a court may 'issue an order to protect a party or person from annoyance, embarrassment, oppression or undue burden or expense' upon a showing of 'good cause.'  The good cause standard 'calls for a sound basis or legitimate need to limit discovery of the subject information.'"  *Doe v. Lynn Univ., Inc.*, No. 16-80850, 2017 WL 275448, at \*1 (S.D. Fla. Jan. 19, 2017) (quoting *Sierra Equity Group v. White Oak Equity Partners, LLC*, 672 F. Supp. 2d 1369, 1370 (S.D. Fla. 2009))  "In addition to requiring good cause, [the Eleventh Circuit] has also required the district court to balance the interests of those requesting the order."  *Doe*, 2017 WL 275448, at \*1 (quoting *McCarthy v. Bennett Bank of Polk County*, 876 F.2d 89, 91 (11th Cir. 1989)) (alteration in original).

Google's motion easily clears this bar.  Google has a "sound basis or legitimate need to limit discovery" based on the Court's removal of Dr. Isaacs' claims from this case (*supra* § I), its order requiring Rule 11 signatures from counsel (*supra* § II), and Greenflight's improper attempt to evade this Court's discovery limits (*supra* § III).  Google has a strong interest in avoiding improper and harassing discovery; Greenflight can, and has, promulgated its own discovery and thus has no legitimate interest in prosecuting Dr. Isaacs' *pro se* discovery.  The Court should enter a protective order barring Greenflight's improper attempt to proceed with Dr. Isaacs' discovery.

**CONCLUSION**

For the foregoing reasons, Google respectfully requests that the Court enter a protective order confirming that Dr. Isaacs' *pro se* discovery requests are no longer valid, and that Google need not take any action in response to them.

**LOCAL RULE 7.1 CERTIFICATION**

Under Local Rule 7.1(a), counsel for Google has conferred with Greenflight in a good faith effort to resolve the issues raised in this motion. Greenflight opposes.  *See* L. R. 7.1(a)(3).

Date:  August 27, 2024

Respectfully submitted,

/s/ *Edward M. Mullins*
Edward M. Mullins (Florida Bar No. 863920)
Ana M. Barton (Florida Bar No. 85721)
Sujey S. Herrera (Florida Bar No. 92445)
REED SMITH LLP
200 South Biscayne Boulevard, Suite 2600
Miami, Florida, 33131
+1 (786) 747-0200
+1 (786) 747-0299 facsimile
emullins@reedsmith.com
abarton@reedsmith.com
sherrera@reedsmith.com

Matthew S. Warren (*pro hac vice*)
Erika H. Warren (*pro hac vice*)
Madeline A. Woodall (*pro hac vice*)
WARREN KASH WARREN LLP
2261 Market Street, No. 606
San Francisco, California, 94114
+1 (415) 895-2940
+1 (415) 895-2964 facsimile
24-80395@cases.warrenlex.com

*Attorneys for Defendant Google LLC*

## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that on August 27, 2024, a true and correct copy of the

foregoing was electronically filed with the Clerk of the Court by using the CM/ECF system,

which will send a notice of electronic filing to all counsel of record.

By:   /s/ Edward M. Mullins
       Edward M. Mullins

# EXHIBIT 1

Jeffrey D. Isaacs, M.D.
11482 Key Deer Circle
Wellington, FL 33449
212-257-0737
jeffreydi@gmail.com

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| DR JEFF ISAACS<br><br>　　　　　　Plaintiff,<br><br>vs.<br><br>GOOGLE LLC<br><br>　　　　　　Defendant. | Case No. **24-cv-80395-RLR**<br><br><br>**PLAINTIFF'S FIRST REQUEST<br>FOR PRODUCTION OF DOCUMENTS**<br><br><br>DISCOVERY |

App. 44

## PLAINTIFF'S FIRST REQUEST FOR PRODUCTION OF DOCUMENTS

To: Google LLC Legal Team

Date: August 12, 2024

Pursuant to Federal Rule of Civil Procedure 34, Plaintiff, Dr. Jeff Isaacs, hereby requests that Defendant, Google LLC, produce the following documents within thirty (30) days and convey to Plaintiff via overnight courier or electronic transfer through Google Drive, or another mutually agreed method.

### DEFINITIONS

"Document(s)" refers to the full scope of items contemplated by Federal Rule of Civil Procedure 34, including, but not limited to, writings, drawings, graphs, charts, recordings, photographs, data, electronic or digital information, and any other data or data compilations from which information can be obtained.

"Relevant Time Period" refers to the time frame from June 1, 2014, to the present unless otherwise specified. At a minimum, five years of records are requested.

### REQUESTS FOR PRODUCTION

1. All communications, including emails, memos, and internal notes, related to the substantial changes (hereafter "effective termination") in OkCaller.com's appearance on and rankings in Google Search in November 2022. For background, please see each

App. 45

and every subpoena served upon Google LLC in January 2024 by Attorney Keith Mathews as part of the "Keller Williams Realty Inc" lawsuit.

2. All documents and communications pertaining to any investigation conducted by Google LLC into the effective termination of its SERP listings of and/or partnership with and/or business dealings with OkCaller.com.

3. Any documents related to the decision-making process behind the changes in Google's search algorithm that affected the ranking and visibility of OkCaller.com.

4. Any documents related to the decision to select OkCaller as a "trusted partner," its ranking amongst reverse search providers beginning in 2014, comparisons with its competitors, its owners and operators, and analysis of all traffic sent organically since 2014.

5. Any documents relating to or explaining any deficiencies in OkCaller that lead to termination, and documents relating to what methods or changes OkCaller could implement to resolve these purported deficiencies and regain substantive listing on Google Search.

6. Any documents related to the decision-making process behind the non-algorithmic (i.e. direct, manual, or human) changes in Google Search that affected the ranking and visibility of OkCaller.com.

7. All documents and communications related to Google's assessment or analysis of the alleged infringement of Dr. Isaacs' patent (RE48847) by the top twenty competitors (as measured by Google Search organic phone search traffic) such as RevealName, USPhoneBook, CallerName, SocialCatfish, Nuwber, WhitePages, and Spokeo.

8. All documents and communications related to Google's (or its attorneys) interactions, agreements, or communications with Apple Inc. (or its attorneys) that could have impacted the operation or ranking of OkCaller.com.

9. All documents detailing Google's policies or practices regarding the preservation, auto-deletion, or retention of electronic evidence relevant to OkCaller.com and the allegations in the lawsuit.

10. Any documents evidencing Google's diligence in assessing infringement of the reissue patent on Play Store Reverse Phone Apps and/or AdSense/AdX monetized phone directory websites.

11. Any additional documents, whether listed or not, that are relevant to the issues outlined in the subpoenas dated January 2024, including but not limited to communications, policies, procedures, and internal investigations relating to the matters in question.

12. All documents, evidence, and communications included in the entire discovery file from the *DOJ v. Google* antitrust lawsuit recently concluded, including any rulings, reports, or findings relevant to search engine market practices, partnerships, or any other matters that may pertain to the current case. Sealed or privileged documents may be identified by description and withheld from production.

You are required to produce these documents within thirty (30) days of the date of service of this request. Should you have any objections to the production of any requested documents, please state the specific grounds for your objection and produce the remaining documents not subject to objection.

App. 47

Issued on this 12th day of August 2024.

/s/ Jeffrey D. Isaacs
Jeffrey D. Isaacs, M.D.
11482 Key Deer Circle
Wellington, FL 33449
212-257-0737
jeffreydi@gmail.com

App. 48

**CERTIFICATE OF SERVICE**

I hereby certify that on August 12, 2024, a true and correct copy of the foregoing Plaintiff's First Request for Production of Documents was served via email upon the following:

Google LLC Legal Team

/s/ Jeffrey D. Isaacs
Jeffrey D. Isaacs, M.D.
11482 Key Deer Circle
Wellington, FL 33449
212-257-0737
jeffreydi@gmail.com

# EXHIBIT 2

Jeffrey D. Isaacs, M.D.
11482 Key Deer Circle
Wellington, FL 33449
212-257-0737
jeffreydi@gmail.com

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| DR JEFF ISAACS | Case No. **24-cv-80395-RLR** |
| Plaintiff, | |
| vs. | **PLAINTIFF'S FIRST SET OF INTERROGATORIES** |
| GOOGLE LLC | |
| Defendant. | |
| | DISCOVERY |

App. 51

## <u>PLAINTIFF'S FIRST SET OF INTERROGATORIES TO GOOGLE LLC</u>

To: Google LLC Legal Team

Date: August 12, 2024

Pursuant to Rule 33 of the Federal Rules of Civil Procedure, Plaintiff Dr. Jeff Isaacs, hereby requests that Defendant Google LLC respond to the following interrogatories in writing and under oath within thirty (30) days of service.

1. Describe in detail all reasons and decision-making processes that led to the substantial November 2022 changes (hereby "effective termination") of the partnership between Google LLC and OkCaller.com and Google Search placement and/or SERP rankings of its phone directory pages.

2. Identify all individuals at Google LLC, or its attorneys, who were involved in or consulted about the decision to change the search algorithm or manual curation that negatively impacted OkCaller.com's appearance in Google search results.

3. Describe the specific changes made to Google's search algorithm, or manual curation settings, that affected the visibility and ranking of OkCaller.com in search results.

4. Identify and describe any communications between Google LLC or its legal representatives and Apple Inc. or Apple's legal representatives regarding Dr. Jeff Isaacs' involvement as a witness and/or party in the Apple antitrust litigation.

5. Identify all instances in which Google LLC became aware of or was informed about Dr. Jeff Isaacs' role as a party to or witness in the Apple antitrust litigation, including the source of this information.

6. Describe any discussions or communications within Google LLC regarding Dr. Jeff Isaacs' involvement in the Apple antitrust litigation and how it may impact the partnership with OkCaller.com or rankings or appearance in Search.

7. Identify all reverse phone search websites that Google LLC ranks in its search engine results that have features or functionalities similar to those initially implemented by OkCaller.com. Identify the processes and procedures involved in curating and/or ranking these websites in Search.

8. Describe Google LLC's awareness of any reverse phone search websites that replicated the interface, design, or functionality of OkCaller.com since its inception, and explain any actions taken by Google LLC in response to this awareness.

9. Describe in detail any investigation or analysis conducted by Google LLC concerning the potential infringement of Dr. Jeff Isaacs' patent (RE48847) by other reverse phone search websites or Play Store apps.

10. Explain the rationale behind Google LLC's decision not to engage in mediation with Dr. Jeff Isaacs or OkCaller.com/Greenflight regarding a resolution of this matter.

11. Explain any specific changes OkCaller could implement to regain its presence on Google search and prior organic traffic levels.

12. Identify all individuals or entities outside of Google LLC, including legal representatives, who have communicated with Google LLC about Dr. Jeff Isaacs' role

as a witness in any litigation, including the Apple antitrust case, or about allegations against him.

13. Describe any agreements or understandings between Google LLC and Apple Inc. that could have influenced the decision to terminate the partnership with OkCaller.com or to alter its ranking in search results. Specifically this shall include any purported security knowledge exchanges between the companies. In other words, could or did Apple flag OkCaller as an unsafe or otherwise adverse risk site, leading to Google's subsequent effective termination.

14. Identify and describe any internal policies or guidelines at Google LLC related to the treatment of websites that replicate the key features and functionalities of existing sites like OkCaller.com. Include global sites for other phone systems that copied the look and feel and functionality of OkCaller.

15. Explain the steps, if any, taken by Google LLC to address or remedy the decline in OkCaller.com's search rankings after Dr. Jeff Isaacs raised concerns about the issue.

16. Explain any lost or auto-deleted ESI that may impact this case, why it occurred, and what remediation is possible.

17. Explain how reverse phone sites are manually curated by Google and selected based on criteria for inclusion in Search. Explain specifically how this industry, and other information portals, have millions of pages that each may have a PageRank or derived metric score, but are subject to human and or manual curation and selection. In other words, explain how sites like OkCaller are featured on Google not purely algorithmically, but on human scoring and deliberation of factors. Explain what factors

App. 54

are considered in phone search, and information portals/directorys/vertical search niches, generally.

18. Identify and describe and explain how aspiring competitors to currently ranked vertical niche search portals can establish competitive and meaningful rankings on Search. Include discussion of the Webmaster/Search Console submission tools such as sitemaps. Include documentation or knowledge Google possesses that many valid competitors are never ranked, despite substantial investments in time and money and developer resources.

19. Explain why FactMed.com was removed from substantial search presence, and how it compared to the Search's primary listing in that field (FDA adverse event informatics). Explain the losses to consumers and patients from only ranking the less accurate information provided by the main competitor.

20. Identify and describe generally what efforts Google has contemplated to provide more transparency to developers of vertical niche informatics sites (such as FactMed or OkCaller) as to the metrics used to evaluate them. Include what impact this could have on competition. Include comparison to established best practices such as government-bidding contract scoring, where a search site like FactMed or Okcaller could see how it compares to competitors in scoring, and either dispute these scores or improve areas to foster competition and obtain ranking, resulting in better overall search results for consumers. Explain why Google has not implemented such transparency in nearly two decades. Provide information if such transparency was ever researched and considered by Google.

21. Identify and describe Google's estimates on the overall loss of time and developer resources that results from vertical search sites never being ranked on Search, despite having preferable and or higher quality data and interface. Explain the corresponding estimate on loss of quality and quantity of consumer search results from the non-ranking/erroneous ranking of seach sites that out-compete existing SERP results, such as FactMed or Okcaller and their respective competitors.

22. Identify and describe the impact of the *DOJ v Google* verdict on Google's policies and procedures relevant to web developers of vertical niche search sites like FactMed and/or OkCaller.

Issued on this 12th day of August 2024.

/s/ Jeffrey D. Isaacs
Jeffrey D. Isaacs, M.D.
11482 Key Deer Circle
Wellington, FL 33449
212-257-0737
jeffreydi@gmail.com

App. 56

**CERTIFICATE OF SERVICE**

I hereby certify that on August 12, 2024, a true and correct copy of the foregoing Plaintiff's First Set of Interrogatories was served via email upon the following:

Google LLC Legal Team

/s/ Jeffrey D. Isaacs
Jeffrey D. Isaacs, M.D.
11482 Key Deer Circle
Wellington, FL 33449
212-257-0737
jeffreydi@gmail.com

# EXHIBIT 3

Jeffrey D. Isaacs, M.D.
11482 Key Deer Circle
Wellington, FL 33449
212-257-0737
jeffreydi@gmail.com

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| DR JEFF ISAACS | Case No. **24-cv-80395-RLR** |
| Plaintiff, | |
| vs. | **PLAINTIFF'S FIRST SET OF REQUESTS FOR ADMISSIONS** |
| GOOGLE LLC | |
| Defendant. | DISCOVERY |

App. 59

## **PLAINTIFF'S FIRST SET OF REQUESTS FOR ADMISSIONS TO GOOGLE LLC**

To: Google LLC Legal Team

Date: August 12, 2024

Pursuant to Rule 36 of the Federal Rules of Civil Procedure, Plaintiff Jeffrey D. Isaacs, M.D., hereby requests that Defendant Google LLC admit the following matters within thirty (30) days of service of this request.

1.  Admit that OkCaller.com was previously ranked among the top reverse phone search websites by Google for the years 2014-2022.

2.  Admit that OkCaller.com received substantial organic traffic of approximately 100,000 to 200,000 daily users from Google's search engine prior to its effective termination with Google LLC.

3.  Admit that Google LLC's decision and intent to change its manual curation of reverse phone sites negatively affected the ranking of OkCaller.com in Google search results.

4.  Admit that other reverse phone search websites continued to receive substantial organic traffic from Google after OkCaller.com's ranking declined, including those that copied OkCaller's key features.

5.  Admit that in November 2022 Google LLC was aware of the patent (RE48847) held by Dr. Jeff Isaacs for the reverse phone search web caller name ID technology used on OkCaller.com.

App. 60

6. Admit that Google LLC did not investigate the potential infringement of Dr. Jeff Isaacs' patent (RE48847) by other reverse phone search websites and android apps monetized with Google products.

7. Admit that other reverse phone search websites and android apps monetized with Google products infringe upon the reissue patent.

8. Admit that other reverse phone search websites and android apps monetized with Google products provide caller name (CNAM) identification functionality.

9. Admit that Google LLC has partnerships with other reverse phone search websites that generate revenue through Google's services.

10. Admit that OkCaller.com was one of the top ten reverse phone search websites on SERPs in terms of user traffic before the algorithm changes by Google LLC.

11. Admit that Google LLC did not provide Dr. Jeff Isaacs with a specific opportunity to address or remedy any alleged issues before terminating the partnership with OkCaller.com.

12. Admit that Google LLC has not provided an explanation to Dr. Jeff Isaacs for the decline in OkCaller.com's ranking in search results.

13. Admit that OkCaller.com's decline in ranking occurred within hours after Dr. Jeff Isaacs tendered a Closing Brief in an Apple antitrust appeal, and almost one year exactly after the district court dismissal – the typical timeframe for reopening a case.

14. Admit that Google LLC did not offer Dr. Jeff Isaacs any assistance or support after the termination of the partnership with OkCaller.com, which was the loss of his second primary career (after medicine).

15. Admit that Google LLC was aware of the significant financial impact that the termination of the partnership would have on Dr. Jeff Isaacs and OkCaller.com.

16. Admit that Google LLC's actions regarding OkCaller.com were not consistent with the treatment of other reverse phone search websites with similar functionality and interface.

17. Admit that FactMed was dropped from rankings several years ago, despite having considerable competitive advantage over the primary SERP result in that field.

18. Admit that Google LLC does not include OkCaller.com in its search engine's top rankings as of today, despite previously being ranked highly for nearly a decade.

19. Admit that OkCaller substantially overhauled its website within the last several months, and Google subsequently lowered the little remaining traffic it sent OkCaller.

20. Admit that Google LLC's effective termination of OkCaller.com could be easily reversed by Google and improve user phone SERP results, or at least, have no negative impact.

21. Admit that Google LLC did not offer Dr. Jeff Isaacs an opportunity to appeal the termination of the partnership with OkCaller.com.

22. Admit that Google LLC did not disclose any internal analysis or reports to Dr. Jeff Isaacs regarding the effects of the search algorithm changes, or manual changes, on OkCaller.com.

23. Admit that Google LLC was aware of Dr. Jeff Isaacs' involvement as a witness and or party in the Apple antitrust litigation before the termination of OkCaller.com's partnership.

24. Admit that Google LLC received information about Dr. Jeff Isaacs' role as a witness in the Apple antitrust litigation from a third party.

25. Admit that Google LLC had direct or indirect via counsel communication with Apple Inc. regarding the Apple antitrust litigation in which Dr. Jeff Isaacs was a witness.

26. Admit that Google was aware of the USC Keck settlements in November 2022.

27. Admit that Google has not taken a position on Isaacs' medical credentials.

28. Admit that Google considers Dr. Isaacs to have a valid medical degree.

29. Admit that Google is aware of a dispute with a presidential political appointee which resulted in the appointee leaving that position.

30. Admit that Google LLC had discussions internally about Dr. Jeff Isaacs' involvement in the Apple antitrust litigation and/or other litigation, before Thanksgiving 2022.

31. Admit that Google LLC considered OkCaller.com's performance competitive and worthy of substantial ranking and referral of organic SERP traffic prior to November 2022.

32. Admit that Google LLC referred at least two hundred million SERP queries for phone numbers to OkCaller.com between June 2014 and November 2022.

33. Admit that suddenly terminating a site with 200 million users is rare and would typically involve communication and opportunities for the site to remediate.

34. Admit that OkCaller.com had key features and functionalities, such as live CNAM data integrated with user-generated reporting, before the launch of competing websites with similar features.

35. Admit that Google LLC was aware of the launch of reverse phone search websites that closely resembled OkCaller.com in terms of interface and user experience.

36. Admit that CallerName copied much of OkCaller's interface and was sent substantial (millions) Google traffic for at least five years.

37. Admit that Google LLC did not take sufficient action to demote or penalize reverse phone search websites that copied OkCaller.com's key features in its search rankings.

38. Admit that Google LLC continues to provide organic traffic to reverse phone search websites that had copied key elements of OkCaller.com.

39. Admit that Google has contemplated but never implemented providing more transparency to developers of vertical niche informatics sites (such as FactMed or OkCaller) as to the subjective quality metrics used to evaluate them.

40. Admit that best practices in transparent, stemming from government bidding procedures, could or would likely result in improved overall search results for consumers.

41. Admit that some sites, perhaps including FactMed, OkCaller, and or Dreamstime, offer superior quality to sites featured in rankings, and that consumers would benefit from their fair ranking and inclusion in results.

42. Admit that there is an overall loss of time and developer resources that results from vertical search sites never being ranked on Search, despite having preferable and or higher quality data and interface.

43. Admit that this case concerns developers who as a whole suffered antitrust injury under the verdict of *DOJ v Google*, including but not limited to exclusion of valid and competitive VSPs from Google Search.

44. Admit that at this time Google is unwilling to simply return OkCaller to its historic search presence, in order to resolve this dispute and litigation.

Issued on this 12th day of August 2024.


/s/ Jeffrey D. Isaacs

Jeffrey D. Isaacs, M.D.
11482 Key Deer Circle
Wellington, FL 33449
212-257-0737
jeffreydi@gmail.com

**CERTIFICATE OF SERVICE**

I hereby certify that on August 12, 2024, a true and correct copy of the foregoing Plaintiff's First Set of Requests for Admissions was served via email upon the following:


Google LLC Legal Team

*Jeffrey D. Isaacs*

/s/ Jeffrey D. Isaacs
Jeffrey D. Isaacs, M.D.
11482 Key Deer Circle
Wellington, FL 33449
212-257-0737
jeffreydi@gmail.com

# EXHIBIT 4

Jeffrey D. Isaacs, M.D.
11482 Key Deer Circle
Wellington, FL 33449
212-257-0737
jeffreydi@gmail.com

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| DR JEFF ISAACS | Case No. **24-cv-80395-RLR** |
| Plaintiff, | |
| vs. | **NOTICE OF DEPOSITION** |
| GOOGLE LLC | |
| Defendant. | DISCOVERY |

## NOTICE OF DEPOSITION OF GOOGLE LLC PURSUANT TO RULE 30(b)(6)

To: Google LLC Legal Team

Date: August 12, 2024

PLEASE TAKE NOTICE that pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, Plaintiff Dr Jeff Isaacs will take the deposition upon oral examination of the person(s) most knowledgeable and designated by Google LLC to testify on its behalf, amongst any and all Google salaried administrators, concerning the related issues detailed below.

MATTERS FOR EXAMINATION

1. The November 2022 changes (hereby referred to as "effective termination") of the reverse phone search listings of OkCaller.com directory pages in Google SERPs.

2. Google LLC's investigation into the effective termination of OkCaller.com.

3. The decision-making process and changes in Google's search algorithm that affected OkCaller.com over the past 5 years, and with specific focus on November 2022.

4. Google's correspondence and communications with Dr. Jeff Isaacs regarding his status as a "trusted partner."

5. Google's assessment of alleged patent infringements related to Dr. Isaacs' patent (RE48847) by competitors.

6. Google's interactions and agreements with Apple Inc. that could have impacted OkCaller.com.

App. 69

7. Google's policies regarding evidence preservation, auto-deletion, and retention relevant to OkCaller.com. Specifically to include, whether the auto-delete issues that plagued the DOJ case against Google impact ESI related to this case.

8. Google's rankings and organic referral to reverse phone search sites over the past 8 years, including rankings and methodologies of the top ten reverse lookup sites.

9. Any knowledge Google had, or its attorneys had, of Isaacs' litigation history, including antitrust witness activity protected under federal law, up through and including November 2022

10. Any and all other matters documented in the January 2024 subpoenas issued by Attorney Keith Mathews to Google regarding OkCaller, as part of the "Keller Williams" lawsuit.

DATE AND LOCATION OF DEPOSITION

11. The deposition will take place on August 28, 2024 at 1PM, at Mandarin Brickell Hotel in Miami, Florida, or at another mutually agreed-upon location. If an alternative location is preferred or if you wish to conduct the deposition remotely, please notify the undersigned immediately so that suitable arrangements can be made.

METHOD OF RECORDING

12. The deposition will be recorded by stenographic means and may also be videotaped.

App. 70

FAILURE TO APPEAR

13. Failure to designate and produce the requested person(s) for deposition or to provide the

requested documents may result in sanctions by the Court, including but not limited to the

exclusion of evidence, the imposition of monetary sanctions, or other appropriate relief.

Issued on this 12th day of August 2024.

/s/ Jeffrey D. Isaacs
Jeffrey D. Isaacs, M.D.
11482 Key Deer Circle
Wellington, FL 33449
212-257-0737
jeffreydi@gmail.com

App. 71

## CERTIFICATE OF SERVICE

I hereby certify that on August 12, 2024, a true and correct copy of the foregoing Notice of Deposition of Google LLC Pursuant to Rule 30(b)(6) was served via email upon the following:

Google LLC Legal Team

/s/ Jeffrey D. Isaacs
Jeffrey D. Isaacs, M.D.
11482 Key Deer Circle
Wellington, FL 33449
212-257-0737
jeffreydi@gmail.com

App. 72

# EXHIBIT 5

## Greenflight Venture Corporation v. Google LLC, No. 24-80395 (S.D. Florida)

**Keith Mathews** <Keith@awplegal.com>                                    Mon, Aug 26, 2024 at 5:44 AM
To: "Mullins, Edward M. (MIA)" <EMullins@reedsmith.com>, Matt Warren <matt@warrenkashwarren.com>, Ayelet Faerman <ayelet@faerman.law>, "Barton, Ana M." <ABarton@reedsmith.com>, "Herrera, Sujey S." <SHerrera@reedsmith.com>, "Jeffrey D. Isaacs" <jeffrey.isaacs.wg03@wharton.upenn.edu>
Cc: "Greenflight Venture Corporation v. Google LLC" <24-80395@cases.warrenlex.com>

Hi Ed,

I have not heard back from you about either the use of Slack for discovery organization (or Google Chat, or similar tool you may propose). I have also not heard back about the deposition noticed by Isaacs, which covers largely the same issues requested in the now 8 month old subpoena request. Because there was an obligation of Wilson Sonsoni to investigate and preserve these matters 18 months ago, and again 8 months ago, this should be a simple deposition.

My understanding of the Courts' order is that Isaacs pro se claims will be covered by my representation of Greenflight, hence I plan to take over the lead of this deposition. I do not represent Isaacs, to be clear, but my advocacy for Greenflight permits my attendance at the deposition, which would now be lead, given the COurt's order.

As Isaacs originally noticed, we are amenable to video deposition. Please provide your availability and and suggested video deposition vendors, otherwise, I have some I can arrange. Given the imminent timing, your prompt response is appreciated.

While I note that you indicated in the Joint Report that you will not comply with Isaacs' discovery requests, our position is that you have not obtained any leave for relief from the discovery, and therefore I expect you to comply with all outstanding discovery requests, especially as you had 18 months to prepare for this with Wilson Sonsoni.

Thanks,

Keith


Get Outlook for iOS

**From:** Mullins, Edward M. (MIA) <EMullins@reedsmith.com>
**Sent:** Thursday, August 22, 2024 7:06:09 PM
**To:** Matt Warren <matt@warrenkashwarren.com>; Keith Mathews <Keith@awplegal.com>; Ayelet Faerman <ayelet@faerman.law>; Barton, Ana M. <ABarton@reedsmith.com>; Herrera, Sujey S. <SHerrera@reedsmith.com>
**Cc:** Greenflight Venture Corporation v. Google LLC <24-80395@cases.warrenlex.com>
**Subject:** RE: Greenflight Venture Corporation v. Google LLC, No. 24-80395 (S.D. Florida)


Here it is


**From:** Matt Warren <matt@warrenkashwarren.com>
**Sent:** Thursday, August 22, 2024 6:53 PM
**To:** Keith Mathews <keith@awplegal.com>; Ayelet Faerman <ayelet@faerman.law>; Mullins, Edward M. (MIA) <EMullins@reedsmith.com>; Barton, Ana M. <ABarton@reedsmith.com>; Herrera, Sujey S. <SHerrera@reedsmith.com>
**Cc:** Greenflight Venture Corporation v. Google LLC <24-80395@cases.warrenlex.com>
**Subject:** Greenflight Venture Corporation v. Google LLC, No. 24-80395 (S.D. Florida)


**External E-Mail - FROM matt@warrenkashwarren.com** <matt@warrenkashwarren.com>

App. 74

> I'm not at a computer so I have no other ways to attach documents. The changes are in bold. Are you unable to access the link? I sent the exhibits the same way earlier.

Your email notes that you're using Outlook for iOS; it can attach documents.  The links are not working for me.  Please send attachments, which is the industry standard mechanism for communication between counsel.

Best Regards,

Matt Warren

--

Matt Warren    matt@warrenkashwarren.com    +1 (415) 895-2928

This E-mail, along with any attachments, is considered confidential and may well be legally privileged. If you have received it in error, you are on notice of its status. Please notify us immediately by reply e-mail and then delete this message from your system. Please do not copy it or use it for any purposes, or disclose its contents to any other person. Thank you for your cooperation.

RSUSv12021

App. 75

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION**

**Case No. 9:24-cv-80395-RLR-BER**

GREENFLIGHT VENTURE CORPORATION,

    Plaintiff,

v.

GOOGLE LLC,

    Defendant.

_____

**<u>DEFENDANT GOOGLE'S MOTION FOR STAY OF DISCOVERY</u>**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

A.    Plaintiff's Owner and Counsel Have Sought Abusive Discovery Before . . . . . . . . . . . . 1

B.    Plaintiff Seeks Abusive Discovery in This Action . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

I.    The Court Should Stay Discovery in This Action Until Resolution of the Pleadings . . . . 5

II.   The Balance of Interests Favors a Stay of Discovery Until Google Files an Answer . . . . 7

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

LOCAL RULE 7.1 CERTIFICATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

## TABLE OF AUTHORITIES

*Cases*                                                          **Pages**

*Ali v. 7-Eleven, Inc.*,
    No. 22-20328, 2022 WL 713665 (S.D. Fla. Mar. 10, 2022) . . . . . . . . . . . . . . . . . . . . . . . 9

*Associated Gen. Contractors of Cal., Inc. v. Carpenters*,
    459 U.S. 519 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544, 558 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 8

*Car Carriers, Inc. v. Ford Motor Co*,
    745 F. 2d 1101 (7th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Coronavirus Rep. v. Apple, Inc.*,
    85 F.4th 948, 959 (9th Cir. 2023), *cert. denied*, No. 23-1089, 2024 WL 2116338
    (U.S. May 13, 2024) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*DJ Lincoln Enters., Inc. v. Google, LLC*,
    No. 20-14159, 2022 WL 3754182 (S.D. Fla. Aug. 30, 2022) . . . . . . . . . . . . . . . . . . . . 6, 7

*Feldman v. Flood*,
    176 F.R.D. 651 (M.D. Fla. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6

*Johnson v. Bd. of Regents of Univ. of Ga.*,
    263 F.3d 1234 (11th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 8

*Kaylor v. Fields*,
    661 F.2d 1177 (8th Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Koock v. Sugar & Felsenthal, LLP*,
    No. 09-60917, 2009 WL 2579307 (M.D. Fla. Aug. 19, 2009) . . . . . . . . . . . . . . . . . . . . 6

*Nankivil v. Lockheed Martin Corp.*,
    216 F.R.D. 689 (M.D. Fla. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Skuraskis v. NationsBenefits Holdings, LLC*,
    No. 23-60830, 2023 WL 8698324 (S.D. Fla. Dec. 15, 2023) . . . . . . . . . . . . . . . . . . . . 5

*Squitieri v. Nocco*,
    2020 WL 13597996 (M.D. Fla. May 7, 2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Taylor v. Serv. Corp, Int'l*,
    No. 20-60709, 2020 WL 6118779 (S.D. Fla. Oct. 16, 2020) . . . . . . . . . . . . . . . . . . . . 6

*United States v. Med-Care Diabetic & Med. Supplies, Inc.*,
    2014 WL 12284078 (S.D. Fla. Oct. 16, 2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

**TABLE OF AUTHORITIES**
*(continued)*

*Cases*                                                                        **Pages**

*Varga v. Palm Beach Cap. Mgmt., LLC,*
    No. 09-82398, 2010 WL 8510622 (S.D. Fla. Sept. 3, 2010) . . . . . . . . . . . . . . . . . . . . . . . 8

*Zamperla, Inc. v. I.E. Park SrL,*
    No. 13-180737, 2014 WL 11332269 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Other Proceedings*

*Coronavirus Rep. v. Apple Inc.,*
    No. 21-05567, Docket No. 41(N.D. Cal. Sept. 6, 2021) . . . . . . . . . . . . . . . . . . . . . . . . 1

*Coronavirus Rep. v. Apple Inc.,*
    No. 21-05567, Docket No. 51(N.D. Cal. Sept. 24, 2021). . . . . . . . . . . . . . . . . . . . . . . . . 2

*Coronavirus Rep. v. Apple Inc.,*
    No. 21-05567, Docket No. 72 (N.D. Cal. Oct. 29, 2021) . . . . . . . . . . . . . . . . . . . . . . . . 2

*Coronavirus Rep. v. Apple Inc.,*
    No. 21-05567, Docket No. 85 (N.D. Cal. Nov. 30, 2021) . . . . . . . . . . . . . . . . . . . . . . .2

*Coronavirus Rep. v. Apple Inc.,*
    No. 21-05567, Docket No. 96 (N.D. Cal. Jan. 21, 2022) . . . . . . . . . . . . . . . . . . . . . . . . 2

*DJ Lincoln Enters., Inc. v. Google, LLC,*
    No. 20-14159, Docket No. 41 (S.D. Fla. Nov. 21, 2020) . . . . . . . . . . . . . . . . . . . . 5, 6, 7, 9

*Dulcio v. Environmental Protection Agency,*
    No. 22-81908, Docket No. 66 (S.D. Fla. Dec. 9, 2022) . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9

*Isaacs v. Keller Williams Realty Inc.,*
    No. 23-81393, Docket No. 25 (S.D. Fla. Nov. 15, 2023). . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Isaacs v. Keller Williams Realty Inc.,*
    No. 23-81393, Docket No. 29 (S.D. Fla. Nov. 29, 2023). . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Isaacs v. Keller Williams Realty Inc.,*
    No. 23-81393, Docket No. 85 (S.D. Fla. Jan. 9, 2024). . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Isaacs v. Keller Williams Realty Inc.,*
    No. 23-81393, Docket No. 91 (S.D. Fla. Feb. 21, 2024). . . . . . . . . . . . . . . . . . . . . . . . . .3

*Isaacs v. Keller Williams Realty Inc.,*
    No. 23-81393, Docket No. 93 (S.D. Fla. Feb. 25, 2024). . . . . . . . . . . . . . . . . . . . . . . . . 3

*Isaacs v. Keller Williams Realty Inc.,*
    No. 23-81393, Docket No. 107 (S.D. Fla. Mar. 12, 2024). . . . . . . . . . . . . . . . . . . . . . . . 3

**INTRODUCTION**

Google respectfully requests that the Court stay discovery in this action until resolution of the pleadings.  Google today filed its motion under Fed. R. Civ. P. 12(b)(6) to dismiss all counts of the First Amended Complaint ("FAC").  That motion shows that the FAC has fundamental, incurable defects.

This is an unusual case.  Plaintiff Greenflight Venture Capital and its owner Dr. Jeffrey D. Isaacs, represented by the same counsel, have already sought abusive discovery against Google, both previously and in this action, where they demanded that Google respond to Dr. Isaacs' *pro se* discovery even after dismissal or stay of his *pro se* claims.  This past is prologue:  the FAC confirms that plaintiff plans to keep abusing discovery in this action.  Rather than identifying any actionable claim, the FAC repeatedly concedes that plaintiff filed it as a tool to delve into as many of Google's actions as possible to attempt to find a legal claim, referring, for example, to "concerns that may be ascertained during discovery" (FAC ¶ 56) and admitting that "discovery is necessary to identify the infringing products."  *Id.* ¶ 160.  As Google explains in its motion to dismiss, the FAC fails to state a claim for relief.  Until and unless plaintiff files a complaint that can state a claim, Google respectfully requests that the Court stay discovery in this matter.

**BACKGROUND**

A.      **Plaintiff's Owner and Counsel Have Sought Abusive Discovery Before**

Plaintiff's owner Jeffrey D. Isaacs and plaintiff's counsel in this action have previously sought abusive discovery, including from Google.  Their war against Google began during other litigation, a putative antitrust class action against Apple and the Federal Trade Commission filed by Mr. Mathews on behalf of Dr. Isaacs and affiliated companies.  *Coronavirus Rep. v. Apple Inc.*, No. 21-05567, Docket No. 41 (N.D. Cal. Sept. 6, 2021).  Dr. Isaacs and Mr. Mathews used

abusive tactics in that action as well:  they moved to strike Apple's motion to dismiss, *see id.*, Docket No. 51; sought to compel top Apple executives and the Chair of the Federal Trade Commission to testify at a motions hearing, *see id.*, Docket No. 72; and sought sanctions against Apple and its counsel for, among other things, allegedly "laugh[ing] at Dr. Isaacs when he asked they refrain from calling him 'Mr. Isaacs.'"  *Id.*, Docket No. 96.

On November 30, 2021, the Northern District of California dismissed all claims, finding that the complaint failed to plead a relevant market and failed to "sufficiently plead antitrust injury in the FAC even if the Court were to assume a relevant market had been defined."  *Id.*, Docket No. 85 at 26:27-28.  Plaintiffs appealed, but the Ninth Circuit affirmed the dismissal and the Supreme Court denied a petition for *certiorari*.  *Coronavirus Rep. v. Apple, Inc.*, 85 F.4th 948, 959 (9th Cir. 2023), *cert. denied*, No. 23-1089, 2024 WL 2116338 (U.S. May 13, 2024).

While those appeals were pending, Dr. Isaacs and his counsel accused Google of retaliating against them on Apple's behalf.  On August 24, 2023, Mr. Mathews wrote to Google stating that "[t]he primary source of funds for Coronavirus Reporter is OkCaller.com, a web property featured in Google search results for nine years" and demanding "an immediate investigation into our substantiated concern that this removal of a nine-year old strategic advertising partner constituted witness tampering pursuant to 18 U.S.C. §1512."  D.E. 34-3.  On October 17, 2023, Mr. Mathews again wrote to Google to demand an investigation into "Google's removal of OkCaller from Google's reverse phone search algorithm, rather than a straightforward domain removal."  D.E. 34-4.

Meanwhile, on October 16, 2023, Dr. Isaacs filed *Isaacs v. Keller Williams Realty Inc.*, No. 23-81393 (S.D. Fla. October 16, 2023).  In *Keller Williams*, Dr. Isaacs, represented by counsel for plaintiff here, brought various claims regarding the sale of his personal residence in

Florida, which he claimed was nullified because the "sale agreement included a '*Force Majeure*' clause allowing either party to exit the contract if 'disrupted' by 'an act of war.' Plaintiff, and his partner, have been disrupted by the Ukranian-Russian war, and do not feel safe having their only apartment within 80 miles of an active international war zone." *Id.*, Docket No. 25 ¶ 79. Dr. Isaacs alleged that after selling his Florida house for $2.35 million he had nowhere to live but an unspecified "apartment in the former USSR" that was too close to the war in Ukraine. *Id.*, Docket No. 25 ¶ 77; *see id.*, Docket No. 29-1 ¶ 9.

These claims had nothing to do with Google. Still, Dr. Isaacs and his counsel used the *Keller Williams* action as a vehicle to seek abusive discovery from Google, serving six subpoenas on Google and its parent Alphabet, seeking information about topics including OkCaller.com's performance in Google Search, the same issue that animated Mr. Mathews' letters of 2023, and the same issue behind plaintiff's claims in this action. *See, e.g., Isaacs v. Keller Williams Realty Inc.*, No. 23-81393, Docket No. 85. When Google filed a motion to quash, Dr. Isaacs and his counsel did not withdraw these subpoenas, but claimed they were relevant because they addressed "substantial and relevant concerns of felony witness retaliation directly influencing Isaacs' duress in the underlying sale of his home." *Id.*, Docket No. 93 at 2. By then, this Court had already stayed all discovery in the *Keller Williams* matter, *see id.*, Docket No. 91; on March 12, 2024, the Court confirmed that this stay of all discovery prevented Dr. Isaacs and his counsel from obtaining discovery from Google. *Id.*, Docket No. 107. Three weeks later, Dr. Isaacs filed his *pro se* complaint in this action. D.E. 1.

## B.     Plaintiff Seeks Abusive Discovery in This Action

Current plaintiff Greenflight Venture Corporation ("GFVC"), controlled by Dr. Isaacs and represented by Dr. Isaacs' longstanding counsel, seeks to reprise the *Keller Williams* case by

mounting a broad and amorphous fishing expedition into Google's documents.  Indeed, they have already tried.  After this Court dismissed or stayed Dr. Isaacs' *pro se* claims, GFVC and its counsel pressed Google to respond to Dr. Isaacs' *pro se* discovery, claiming that "Greenflight counsel is unable to retract a pro se parties' independent discovery, as this would be improper" (D.E. 34 at 9), while simultaneously claiming that "[Isaacs'] pro se claims will be covered by my representation of Greenflight, hence I plan to take over the lead of this deposition."  D.E. 35-5.  GFVC's insistence on pursuing this discovery forced Google to seek a protective order, and only the Court's order addressing that motion, D.E. 36, stopped plaintiff from proceeding.

But that did not stop GFVC from propounding its own discovery, which continues the unfortunate pattern of abuse.  On August 20, 2024, GFVC served nineteen Requests for Production (Ex. 1), forty-two Requests for Admission (Ex. 2), twenty-one Interrogatories (Ex. 3), and a notice of deposition under Fed. R. Civ. P. 30(b)(6) that identifies no specific topics but rather seeks testimony "relevant to the Amended Complaint, and any responsive documents to outstanding discovery requests issued to Google LLC."  Ex. 4.  Among many other things, GFVC currently seeks "all internal presentations, strategic documents, or executive communications discussing Google's strategic shift from prioritizing search engine improvements to focusing on AI, quantum computing, and other emerging technologies" (Request for Production No. 2, Ex. 1); asks Google to "[e]xplain the rationale and decision-making process behind Google LLC's refusal to engage in mediation with Greenflight or its owners regarding a resolution of this matter" and "[i]nclude any internal communications or legal advice that influenced this decision" (Interrogatory No. 12, Ex. 3); and "[a]dmit that Google considers Plaintiff's CEO, Dr. Isaacs, to have a valid medical degree."  Request For

Admission No. 32, Ex. 2.  In these and other requests, GFVC's discovery wanders far afield even from the amorphous allegations in the FAC.

GFVC's allegations provide the final confirmation of GFVC's intent to evade *Twombly* to seek abusive discovery from Google.  The FAC repeatedly admits that its claims depend on the hope that discovery will fill the many gaps in its allegations.  *See, e.g.*, D.E. 24 ¶ 56 ("there are antitrust concerns that may be ascertained during discovery"); *id.* ¶ 160 ("discovery is necessary to identify the infringing products"); *id.* ("Source code serves as the final evidentiary link to GR-1188 operations, and is unavailable to Plaintiffs prior to discovery"); *id.* ¶ 168 ("Google appears to have further retaliated against the inventor for asserting patent rights, which will be elucidated in discovery and may necessitate amendment of this Complaint").  GFVC's FAC seeks, instead of redress for causes of action, to find something on which it can attempt to state a claim, and in the meantime to impose pain on Google through costs and distraction.

## ARGUMENT

## I.     The Court Should Stay Discovery in This Action Until Resolution of the Pleadings

Google respectfully requests the Court issue a stay of discovery until the pleadings are resolved.  "District courts enjoy broad discretion in deciding how to best manage the cases before them."  *Skuraskis v. NationsBenefits Holdings, LLC*, No. 23-60830, 2023 WL 8698324 (S.D. Fla. Dec. 15, 2023) (quoting *Johnson v. Bd. of Regents of Univ. of Ga.*, 263 F.3d 1234, 1269 (11th Cir. 2001)).  "In deciding whether to grant a stay pending the resolution of a dispositive motion, the Court must balance the harm of delaying discovery against the possibility that the motion will be granted and the need for discovery will be eliminated."  *DJ Lincoln Enters., Inc. v. Google, LLC*, No. 20-14159, Docket No. 41 (S.D. Fla. Nov. 21, 2020) (citing *Feldman v. Flood*, 176 F.R.D. 651, 652 (M.D. Fla. 1997)) (granting stay of discovery).  "As part

of this balance, the Court must take a 'preliminary peek' at the merits of the dispositive motion to see if it is clearly meritorious and case dispositive." *DJ Lincoln*, *supra,* Docket No. 41 (quoting *Feldman*, 176 F.R.D. at 652 & *United States v. Med-Care Diabetic & Med. Supplies, Inc.*, 2014 WL 12284078, at *1 (S.D. Fla. June 17, 2014)); *see also, e.g.*, *Taylor v. Serv. Corp. Int'l*, No. 20-60709, 2020 WL 6118779 at *2 (S.D. Fla. Oct. 16, 2020) (quoting *Koock v. Sugar & Felsenthal, LLP*, No. 09-60917, 2009 WL 2579307, at *2 (M.D. Fla. Aug. 19, 2009)).  A pending motion to dismiss meets this standard if "on the motion's face, 'there appears to be an immediate and clear possibility' that the Court will grant the motion." *Squitieri v. Nocco*, No. 19-906, 2020 WL 13597996, at *2 (M.D. Fla. May 7, 2020) (quoting *Feldman*, 176 F.R.D. 651).

Google's concurrently filed motion to dismiss clears this bar.  As Google's motion shows, plaintiff's Sherman Act claims fail for a variety of reasons.  Count I does not allege that GFVC is a participant in the proffered market (*id.* § I), Count II fails to plead non-conclusory facts as to any agreement between two or more persons to restrain trade (*id.* § II), and Count III fails to allege an unlawful refusal to deal (*id.* § III).  Similarly, GFVC's claim under the Florida Deceptive and Unfair Trade Practices Act largely borrows from the deficient Sherman Act claims and otherwise fails to plead with particularity as required under Rule 9(b) (*id.* § IV), and its claim under California's Unfair Competition Law fails for similar reasons.  *Id.* § V.  Finally, GFVC's claim of patent infringement fails to identify an allegedly infringing product, and admits instead that GFVC cannot identify an allegedly infringing product without discovery.  *Id.* § VI. These failings create a high probability that "that the motion will be granted and the need for discovery will be eliminated." *DJ Lincoln*, *supra,* Docket No. 41.  "Discovery should follow the filing of a well-pleaded complaint.  It is not a device to enable a plaintiff to make a case when his complaint has failed to state a claim." *DJ Lincoln Enterprises, Inc. v. Google, LLC*, No.

20-14159, 2022 WL 3754182, at *2 (S.D. Fla. Aug. 30, 2022) (quoting *Kaylor v. Fields*, 661 F.2d 1177, 1184 (8th Cir. 1981)).

**II.       The Balance of Interests Favors a Stay of Discovery Until Google Files an Answer**

Although the Court also must "balance the harm of delaying discovery," *DJ Lincoln, supra,* Docket No. 41, in this action, the balance tilts toward granting Google's motion.  As an initial matter, this Court previously found "no harm in delaying discovery" when "Plaintiff waited four months before seeking any discovery at all."  *DJ Lincoln*, *supra,* Docket No. 41.  Here, Dr. Isaacs waited three months even to effect service, doing so only after the Court warned of dismissal for failure to follow Fed. R. Civ. P. 4.  *See* D.E. 9, 11, 12, 13.  GFVC waited another six weeks to appear and to serve discovery, although its owner Dr. Isaacs could have amended the complaint at any time to assert claims on behalf of the true patent owner, an obvious defect.  GFVC thus waited longer than the "four months" in *DJ Lincoln* "before seeking any discovery at all."  *DJ Lincoln*, *supra,* Docket No. 41.

Regardless of its timing, GFVC's FAC and its discovery requests confirm that there will be no "harm of delaying discovery" here.  *DJ Lincoln*, *supra,* Docket No. 41.  The FAC repeatedly concedes that it cannot state a claim without obtaining discovery.  *See supra* § B.  And GFVC's requests seek voluminous and burdensome discovery far afield of its allegations, even if generously construed.  *See id.*  "Discovery is not a fishing expedition in which a party is allowed to probe all of the conduct of an opposing party to try to learn all the ways the opposing party has arguably infringed its rights.  Rather, discovery is limited to information relevant to the claims actually made."  *Zamperla, Inc. v. I.E. Park SrL*, No. 13-180737, 2014 WL 11332269, at *5 (M.D. Fla. Oct. 23, 2014).  This is all the more true here, given the nature of the claims: "[T]he costs of modern federal antitrust litigation and the increasing caseload of the federal

App. 86

courts counsel against sending the parties into discovery when there is no reasonable likelihood that the plaintiffs can construct a claim from the events related in the complaint." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 (2007) (quoting *Car Carriers, Inc. v. Ford Motor Co*, 745 F. 2d 1101, 1106 (7th Cir. 1984)).  In situations such as this one, "a district court must retain the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed." *Id.* (quoting *Associated Gen. Contractors of Cal., Inc. v. Carpenters*, 459 U.S. 519, 528 n.17 (1983)).

Finally, the actions of GFVC's owner and its counsel in this action further favor a stay. Dr. Isaacs filed this action shortly after this Court confirmed that he could not obtain burdensome and irrelevant discovery from Google in *Keller Williams*.  *See supra* § A.  In deciding this motion, the Court should consider counsel's discovery attempts in that action, as well as counsel's improper insistence in this action on maintaining Dr. Isaac's *pro se* discovery after the demise of his claims.  *See supra* § A, B.

For all of these reasons, the balance of interests favors a stay in this action.  "The Court has broad discretion over management of discovery, and a stay of discovery is appropriate where the movant shows good cause and reasonableness." *Dulcio v. Environmental Protection Agency*, No. 22-81908, Docket No. 66 (S.D. Fla. December 9, 2022) (citing *Johnson*, 263 F.3d 1234 at 1269; *Varga v. Palm Beach Cap. Mgmt., LLC*, No. 09-82398, 2010 WL 8510622, at *1 (S.D. Fla. Sept. 3, 2010)).  "A court may find good cause and reasonableness to stay discovery when the resolution of a preliminary motion may dispose of the entire action, and a short stay will not prejudice any party." *Dulcio*, *supra*, Docket No. 66 (citing *Nankivil v. Lockheed Martin Corp.*, 216 F.R.D. 689, 692 (M.D. Fla. 2003)).  That is the case here.  GFVC's "case is in its infancy—the complaint was filed just over a month ago—and this minimizes any potential

prejudice to the Plaintiff from a stay." *Ali v. 7-Eleven, Inc.*, No. 22-20328, 2022 WL 713665 at *2 (S.D. Fla. Mar. 10, 2022).  Conversely, Google will suffer prejudice if discovery proceeds, as many of plaintiff's requests are irrelevant to this action, *see supra* § B, and many of "the discovery requests Plaintiff has recently made seek highly confidential proprietary information about Google's search protocol and algorithms to which Google strenuously objects." *DJ Lincoln*, *supra*, Docket No. 41.

## CONCLUSION

For the foregoing reasons, Google respectfully requests that the Court stay discovery in this action until resolution of the pleadings before it.

## LOCAL RULE 7.1 CERTIFICATION

Under Local Rule 7.1(a), counsel for Google attempted to confer with plaintiffs in a good-faith effort to resolve the issues in this motion.  Plaintiffs did not respond to that effort. However, based upon prior communications with counsel regarding discovery, Google understands that plaintiffs oppose a stay.  If Plaintiffs do indicate that they will agree to a stay, Google will update the Court.  *See* L.R. 7.1(a)(3).

Date:  September 10, 2024

Respectfully submitted,

/s/ *Sujey S. Herrera*

| | |
|---|---|
| Kenneth C. Smurzynski (*pro hac vice*) | Edward M. Mullins (Florida Bar No. 863920) |
| Aaron P. Maurer (*pro hac vice*) | Ana M. Barton (Florida Bar No. 85721) |
| WILLIAMS & CONNOLLY LLP | Sujey S. Herrera (Florida Bar No. 92445) |
| 680 Maine Avenue, SW | REED SMITH LLP |
| Washington, DC 20024 | 200 South Biscayne Boulevard, Suite 2600 |
| +1 (202) 434-5000 | Miami, Florida, 33131 |
| ksmurzynski@wc.com | +1 (786) 747-0200 |
| amaurer@wc.com | +1 (786) 747-0299 facsimile |
| | emullins@reedsmith.com |
| Matthew S. Warren (*pro hac vice*) | abarton@reedsmith.com |
| Erika H. Warren (*pro hac vice*) | sherrera@reedsmith.com |
| Madeline A. Woodall (*pro hac vice*) | |
| WARREN KASH WARREN LLP | *Attorneys for Defendant Google LLC* |

2261 Market Street, No. 606
San Francisco, California, 94114
+1 (415) 895-2940
+1 (415) 895-2964 facsimile
24-80395@cases.warrenlex.com

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 24-CV-80395-ROSENBERG**

GREENFLIGHT VENTURE
CORPORATION,

     Plaintiff,

v.

GOOGLE LLC,

     Defendant.

_____/

**ORDER GRANTING IN PART AND RESERVING IN PART ON**
**THE DEFENDANT'S MOTION TO DISMISS AND ORDER TO SHOW CAUSE**

**THIS CAUSE** is before the Court the Defendant's Motion to Dismiss at docket entry 36. The Motion has been fully briefed. For the reasons set forth below, the Motion is granted in part and the Court reserves in part.

This is a case about Google search results. Plaintiff Greenflight is a "web developer" company that offers reverse phone number lookups. DE 24 at 2. It has sued Defendant Google LLC, alleging two different sorts of claims. First, Plainitff claims that the Defendant has utilized a monopoly on general search services to harm the Plaintiff's reverse phone number lookups by reducing the amount of internet traffic that the Plaintiff receives from the Defendant's search engine. Second, Plaintiff claims that the Defendant should be held liable for infringing on a reverse phone number lookup patent.

In response, the Defendant previously filed a motion to dismiss. The Court granted that motion and dismissed a patent infringement claim brought by another Plaintiff in this case, *pro se* Jeff Isaacs, who owns Greenflight. DE 26. Mr. Isaacs joined his (closely held) company, Greenflight, as a Plaintiff in this case and retained counsel to represent Greenflight. Shortly thereafter, the Court stayed Mr. Isaacs' *pro se* claims and also stayed discovery on all claims. *Id.*

App. 90

Due to the stay, the Court's references to "Plaintiff" in this Order are to Greenflight unless the Court specifies otherwise. This Order addresses the Defendant's motion to dismiss Greenflight's claims on a count-by-count basis.

### A. Count I – "Violation of Sherman Act § 2"

The Plaintiff's Count I is an antitrust claim under the Sherman Act. To bring such a claim, the Plaintiff must allege that the Defendant is monopolizing a particular market and that the Plaintiff is a participant in the market—the Plaintiff must allege that it is a market participant. *Fla. Seed Co., Inc. v. Monsanto Co.*, 105 F.3d 1372, 1374 (11th Cir. 1997) ("Basically, a plaintiff must show that it is a customer or competitor in the relevant antitrust market."). Here, the Plaintiff alleges that the relevant market is "general search services." DE 24 at 37. The Defendant argues that Count I should be dismissed because the Plaintiff has not alleged that it is a market participant in the general search services market.

In response, the Plaintiff effectively concedes that it is not a market participant in the general search services market because it argues that that it has standing through two different avenues—through two different theories. First, the Plaintiff argues that its operations are "inextricably linked to the general search services market," and that gives it standing. DE 46 at 4. For support, the Plaintiff relies upon *Blue Shield of Virginia v. McCready*, 457 U.S. 465 (1982). Second, the Plaintiff argues that: "[l]everaging monopoly power in one market to harm competition in another market" confers standing, and because it has alleged the same Count I may proceed. DE 46 at 5. The Court addresses each argument in turn.

#### Blue Shield of Virginia v. McCready and the "Inextricably Intertwined" Standard

In *McCready*, the plaintiff was a recipient of health insurance benefits. *McCready*, 457 U.S. at 468. Her health insurance plan allowed for her to receive psychotherapy, but only if the therapy was provided by a psych*iatrist*. *Id.* The plaintiff received psychotherapy, but not from a psychiatrist. *Id.* Instead, the plaintiff utilized a psych*ologist*. *Id.* When the plaintiff sought

2

reimbursement from her health insurance provider for her therapy, the provider denied her request. *See id.*

The plaintiff filed suit, alleging that psychiatrists and her health insurance provider had engaged in anticompetitive, monopolistic practices that forced her to use a psychiatrist for mental health services, instead of a psychologist. *Id.* at 469-70. In response, the provider argued that the plaintiff lacked standing—that she was not a participant in the market, such as a psychologist, nor had she (as a consumer in the market) been denied the services of a psychologist—she had instead successfully obtained those services. *Id.*

In grappling with the plaintiff's standing to sue for the alleged monopolistic practice, the Supreme Court struggled with where the line should be drawn. On the one hand, Congress intended antitrust law to serve an "expansive remedial purpose" to deter monopolistic practices and to deprive monopolies of the fruits of their illegal actions. *Id.* at 472. On the other hand, the Supreme Court acknowledged that: "Congress did not intend to allow every person tangentially affected by an antitrust violation to maintain an action to recover threefold damages of the injury to his business or property." *Id.* at 477. Lacking guidance or clarity from Congress, the Supreme Court "resort[ed] to an analysis no less elusive than that employed traditionally by courts at common law with respect to the matter of 'proximate cause.'" *Id.* Applying proximate cause principles to the plaintiff's case in *McCready*, the Supreme Court reasoned that the plaintiff's alleged injury was not too remote. *Id.* at 479. Instead, the Supreme Court reasoned that the express goal of the alleged conspiracy was to prevent persons like the plaintiff from obtaining services from a psychologist, and that was sufficient for standing. *Id.* In reaching this conclusion, the Supreme Court did indeed state, as the Plaintiff in the instant case emphasizes, that an injury that is "inextricably intertwined" with the injury the monopolistic competitors sought to inflict was sufficient for standing. *Id.*

Since *McCready*, circuit courts have authored guidance on how the inextricably intertwined exception should be applied. According to the First Circuit and the Second Circuit, the plaintiff in *McCready* had standing because she was a participant in "the very market directly distorted by the antitrust violation." *In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d 151, 160 (2d Cir. 2016). According to the Eleventh Circuit, the plaintiff in *McCready* had standing because: "Denying reimbursement to patients who were treated by psychologists was necessary to accomplish the desired result—the exclusion of psychologists—because the beneficiaries of the Blue Shield Plan would be forced either to go to psychiatrists or to forego reimbursement." *Mr. Furniture Warehouse, Inc. v. Barclays American/Commercial Inc.*, 919 F.2d 1517, 1521 (11th Cir. 1990). Consistent with the Eleventh Circuit's reading of *McCready*, the Third Circuit and Sixth Circuit have focused on the fact that in *McCready*, the plaintiff was "used as a conduit" to "harm the defendants' actual competitors." *Hanover 3201 Realty, LLC v. Village Supermarkets, Inc.*, 806 F.3d 162, 173 (3d Cir. 2015); *see also Province v. Cleveland Press Pub'lg Co.*, 787 F.2d 1047, 1052 (6th Cir. 1986).[1] The Court applies these principles to the instant case.

Here, what was the "desired result" of the alleged monopolistic practices? Stated differently, how was the Plaintiff used as a conduit for the Defendant to harm its competitors? To answer these questions, the Plaintiff relies upon a recent antitrust decision in favor of the Department of Justice and against the Defendant. DE 24 at 2. The author of that decision, Judge Amit P. Mehta, concluded that the Defendant was liable in antitrust as follows:

> Google has not achieved market dominance by happenstance. It has hired thousands of highly skilled engineers, innovated consistently, and made shrewd business decisions. The result is the industry's highest quality search engine, which has earned Google the trust of hundreds of millions of daily users.

---

[1] There is support in subsequent Supreme Court decisions for the circuit courts' understanding of *McCready*. In *Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 529 n.19 (1983), the Supreme Court clarified that a *McCready* plaintiff must be "directly harmed by the defendants' unlawful conduct" to establish injury.

4

**But Google also has a major, largely unseen advantage over its rivals: default distribution**. Most users access a general search engine through a browser (like Apple's Safari) or a search widget that comes preloaded on a mobile device. Those search access points are preset with a "default" search engine. The default is extremely valuable real estate. Because many users simply stick to searching with the default, Google receives billions of queries every day through those access points. Google derives extraordinary volumes of user data from such searches. It then uses that information to improve search quality. Google so values such data that, absent a user-initiated change, it stores 18 months-worth of a user's search history and activity.

. . .

Thus, most devices in the United States come preloaded exclusively with Google. **These distribution deals** have forced Google's rivals to find other ways to reach users. Google's dominance eventually attracted the attention of antitrust enforcers—the U.S. Department of Justice and nearly every state's Attorney General. They homed in on Google's distribution agreements and in late 2020 filed two separate lawsuits alleging that the agreements and certain other conduct violate Section 2 of the Sherman Act.

*U.S. v. Google LLC*, No. 20-CV-03010, DE 1033 at 6-7 (D.C. Aug. 5, 2024) (emphasis added).

The Court takes this decision to mean that the Defendant entered into agreements with web browser companies (such as Apple) and cell phone companies (such as Android) to ensure that its web browser was the default browser of choice. Based upon those agreements, the district court concluded that the Defendant stifled competition in the market of general search engines. *Id.* Consistent with those findings, the Plaintiff in the instant case has alleged that the Defendant's anticompetitive market is the market of general search services.

Returning to the germane questions posed by *McCready*, how was the Plaintiff in the instant case used as a conduit for the Defendant to harm competing search engines, such as Bing? Pursuant to the Plaintiff's allegations, it wasn't. No such allegations exist. Relatedly, how was harming the Plaintiff necessary for the Defendant's search engine monopoly to be accomplished? Also pursuant to the Plaintiff's allegations, it wasn't. No such allegations exist.

Instead of alleging that the Plaintiff has suffered harm because it was a conduit for the Defendant to accomplish a monopoly in the market of general search engines, what the Plaintiff

5

has alleged is, at best, that it has felt the effects of the alleged monopoly.[2]  Pursuant to Eleventh Circuit cases such as *Feldman v. American Dawn, Inc.*, 849 F.3d 1333 (2017), that is not sufficient.

In *Feldman*, the plaintiff alleged that two businesses engaged in an anticompetitive agreement to monopolize the sale of restaurant linens. *Id.* at 1341.  As part of the fallout from that alleged monopoly, the plaintiff alleged that he had lost his job selling linens. *Id.*  The Eleventh Circuit held that the plaintiff's injury was insufficient for standing because the monopoly concerned the *sale* of linens, not the *labor* market for linen-based employees. *Id.* ("[T]he conspiracy [pertained to] the market for restaurant linens, not to harm competition in the market for restaurant linens salesmen.").  In reaching this conclusion, the Eleventh Circuit expressly rejected the idea that the linen salesman could rely upon *McCready* to establish standing; his termination did not mean that his injury was inextricably intertwined with the alleged monopoly. *Id.*

Just so here.  The Plaintiff has not sufficiently alleged that it is a market participant in the general search services market, nor has the Plaintiff alleged any other basis for standing.[3]  The Plaintiff's Count I is dismissed for lack of standing.

### *Leveraged Monopoly Power*

The Plaintiff argues that the Defendant leveraged its monopoly power in general search services to harm competition in two other markets: the market for "vertical search providers" and the market for "reverse phone number lookup," and the Plaintiff alleges that it is a market participant in both such markets.  For such an allegation to be a cognizable antitrust claim, the Plaintiff must allege that the Defendant had specific intent to monopolize another market, and that

---

[2] Given that Google's search engine arguably impacts the entire globe, the Court thinks it would be fair to say that just about every company on the internet could argue that it has felt the effects of the alleged monopoly.  But the Court is not persuaded that every company on the internet would have, as a result of those effects, sufficient standing to sue the Defendant in antitrust.

[3] The Plaintiff also tangentially makes the argument that it could have "evolved" into a company capable of competing with the Defendant in the general search services market. DE 46 at 5. Such a claim is both implausibly pled and contradicted by the text of the Complaint itself for all of the reasons set forth in the Defendant's Motion and Reply.

6

a "dangerous probability of achieving monopoly power" existed. *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 447-48 (1993). To show a "dangerous probability," a plaintiff must allege a definition of the relevant market and must examine market power—can the defendant "destroy competition?" *Id.* at 455, 456. The Plaintiff's (very broad) definitions of the "vertical search provider" and "reverse phone lookup" markets defeats its reliance upon the same, and the Plaintiff's arguments on this point fail for the reasons set forth below.

### *The Vertical Search Provider Market*

The Plaintiff defines the vertical search provider market so broadly that it encompasses all websites that allow specialized searching including medical research, scholarly research, and internet shopping services that utilize search bars. DE 24 at 11-13. As a concrete example, the Plaintiff cites to Google Shopping as the Defendant's intrusion on the vertical search provider market, but the size of the alleged market—including shopping services that have a search bar— is staggering. *Id.* at 28. Using common knowledge,[4] Plaintiff's concrete example (internet shopping) would include Amazon and Walmart. How does the Plaintiff allege a "dangerous probability" that the Defendant will **monopolize** the internet shopping market, Amazon and Walmart notwithstanding? It doesn't. Similarly, the Plaintiff defines vertical search providers so broadly that its definition also includes Google Flights, but that market is very large as well. *Id.* What of booking.com or Expedia? How does the Plaintiff allege a "dangerous probability" that the Defendant will monopolize air travel? It doesn't.

### *The Reverse Phone Number Lookup Market*

The Plaintiff's allegations on the reverse phone lookup market are much the same. The Plaintiff alleges that market is so broad that it includes "many" competitors besides the Defendant, numbering in the "dozens." *Id.* at 24. How does the Plaintiff explain this market is monopolized

---

[4] When evaluating plausibility, a court may draw upon its common sense. *See Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

7

by the Defendant?  It doesn't, because when the Plaintiff's Complaint defines the market for reverse phone lookups it discusses only two, Whitepages and Spokeo. *Id.* at 31.  But for the Plaintiff to define the reverse phone number lookup market to be so broad as to include the Defendant's *general* search services (including someone typing a phone number into Google Search), the Plaintiff has defined a market so broad that it includes *any* general method to research a phone number with a search, such as other general search engines, social media platforms, online directories, etc.  Taken to its logical conclusion, what the Plaintiff argues is that the Defendant competes in any market that can be reached via the general Google search engine.  If the Defendant, therefore, competes in the reverse phone number lookup market because a Google search query can return information on the same, the Defendant would also compete in every market displayed in the search engine (such as the insurance market) despite not selling insurance, as well as any other number of absurdities.  In short, the Plaintiff has failed to plausibly allege that the Defendant both intends to monopolize the reverse phone number lookup market and that there is a dangerous probability that it will do so.[5]

### *Conclusions on Count I*

Instead of alleging standing based upon the Supreme Court's holding in *McCready*, as the Plaintiff argues, what the Plaintiff is really arguing is that because it appears lower in the Defendant's search engine results, it has standing to sue.  That is not the holding in *McCready*, and the Court fails to see how that could realistically be the law.  Were that sufficient, effectively every company in the entire world would have standing to sue the Defendant in antitrust when Google search results were not satisfactory to the company.  To analogize to *McCready*, it would

---

[5] Instead of plausibly alleging that the Defendant competes in the reverse phone search market, the Plaintiff argues just the opposite; in the Plaintiff's own words: "The reverse phone search market is a distinct relevant market characterized by a particular service that general search engines . . . do not necessarily provide." DE 46 at 9.  The Court also adopts and accepts as persuasive the Defendant's arguments on the Plaintiff's failure to plausibly plead general elasticity as set forth in the Motion and Reply.

be as if the psychologists' suppliers, such as office supply companies or utility companies, would have standing to sue for the loss of some of the psychologists' business.  After all, if the psychologists had increased business due to additional psychotherapy sessions, there would have been a greater demand for office supplies.

As contrasted with the narrow exception for standing set forth in *McCready*, in the Plaintiff's own words:

> The Department of Justice (DOJ) recently prevailed in a landmark case against Google, establishing that Google has unlawfully maintained a monopoly in the United States GSE market. **This case addresses the broader impact of Google's anticompetitive practices <u>on related markets</u>**, where Google's monopolistic behavior has stifled innovation, suppressed competition, and inflicted substantial economic harm on specialized search providers and web developers.

DE 24 at 2 (emphasis added).  The Court's interpretation of the Plaintiff's broad definition of standing is confirmed in a subsequent paragraph in the Complaint:

> Plaintiffs and other web developers operate in markets that depend on fair and competitive access to internet users through general search engines like Google. By leveraging its dominance in the GSE market, **Google has distorted competition in these downstream markets**, favoring its own products and those of its strategic partners while disadvantaging independent developers and specialized service providers.

*Id.* (emphasis added).  The Court is not persuaded that the Plaintiff's broad theory of standing can be squared with *McCready*, and the Plaintiff has failed to plausibly plead a claim premised upon the concept of "leveraged power" as well.  As a result, Count I is dismissed.

## B.  Count II – "Sherman Act § 1 Unreasonable Restraints of Trade"

The Plaintiff's Count II is also a Sherman Act antitrust claim, and it also alleges that the Defendant engaged in monopolistic practices.  For each of the three[6] reasons outlined in **bold** below, Count II is dismissed.

---

[6] In addition to the three grounds outlined below, Count II is ripe for dismissal for all of the reasons Count I was dismissed.

**First**, Count II is improperly premised upon an unrelated party's pleading. In the Plaintiff's own words: "A United States Courts of Appeals recently held that Google's self-preference and manipulation [of search results] could constitute a [Sherman Act claim.] This cause of action is intended to invoke the claim theory discussed in that circuit opinion." DE 24 at 38. This attempt to plead a claim through a citation to *dicta* in an appellate decision is so patently improper, the Court devotes no additional discussion to the topic. *See generally* Local Rule 15.1 (prohibiting a pleading from incorporating a prior pleading by reference). The Court does note, however, that the appellate case cited by the Plaintiff resulted in the affirmance of the dismissal of all antitrust claims brought against the Defendant. *See Dreamstine.com, LLC v. Google LLC*, 54 F.4th 1130, 1134 (9th Cir. 2022).

**Second**, for Count II to be legally sufficient, the Plaintiff must allege "an agreement between two or more persons to restrain trade, because unilateral conduct is not illegal." *Levine v. Cent. Fla. Med. Affiliates, Inc.*, 72 F.3d 1538, 1545 (11th Cir. 1996). Consistent with that requirement, the Plaintiff has alleged: "Google has entered into agreements and engaged in unilateral and bilateral practices that unfairly demote the search rankings of [Plaintiff]." DE 24 at 38. That allegation is conclusory. It contains no plausibly alleged, supporting facts. With whom did the Defendant enter in an agreement to demote the Plaintiff's search results? Ultimately, how did the alleged agreement harm the Plaintiff?

**Third**, to the extent the Plaintiff does allege a concrete agreement between two or more persons to restrain trade, it does so based upon facts with no alleged connection to this case. The Plaintiff relies upon antitrust agreements entered into between the Defendant and Apple.[7] DE 46

---

[7] The Court is unclear whether the Plaintiff relies upon the (brief) allegation that the Defendant favors "heavy advertising spenders" to support Count II. DE 24 at 38. If it does, that allegation is insufficient for the reasons set forth in the Defendant's Motion and Reply. *See Kendall v. Visa U.S.C., Inc.*, 518 F.3d 1042, 1049 (9th Cir. 2008) ("Allegations of facts that could just as easily suggest rational, legal business behavior of the defendants as . . . an illegal conspiracy are insufficient to plead a violation of the antitrust laws.").

at 11.  But the Plaintiff must show how it can bring a cause of action against the Defendant based upon that agreement: "plaintiff must be the target against which anticompetitive activity is directed . . . . [i]ncidental or consequential injury . . . does not give a plaintiff standing . . ." *Nat'l Indep. Theatre Exhibitors, Inc. v. Buena Vista Distribution Co.*, 748 F.2d 602, 608 (11th Cir. 1984).  The Plaintiff has not alleged, and it certainly has not plausibly alleged, how it has suffered some direct effect from this agreement.

For the foregoing reasons, Count II is dismissed.

### C.  Count III – "Refusal to Deal in Violation of § 2 of the Sherman Act"

The Plaintiff's Count III seeks to hold the Defendant liable under the Sherman Act for "refusing to deal."  Among other things, such a claim requires well-pled allegations of an antitrust market and a defendant's monopoly power in that market, as well as a plaintiff with antitrust standing. *E.g., Duty Free Americas v. Estee Lauder Cos., Inc.*, 797 F.3d 1248, 1263 (11th Cir. 2015).  Accordingly, for all of the reasons Count I and Count II were previously dismissed, Count III is also ripe for dismissal.

Count III additionally requires a refusal to deal.  The seminal case on this sort of claim, *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985), is cited and relied upon by the Plaintiff in its description of Count III.

In *Aspen Skiing*, the defendant skiing company owned most of the resorts in a particular area. *Id.* at 585.  The plaintiff was a competing resort. *Id.*  The parties had historically, in a sort of joint venture, sold tickets that allowed customers to access all of the parties' resorts. *Id.*  The defendant altered its course of dealing, however, and refused to continue to sell tickets that could be used to access the plaintiff-competitor's resort. *Id.*  That refusal—a refusal to deal—was held to be an actionable basis for antitrust by the Supreme Court. *Id.*

The refusal to deal present in *Aspen Skiing* is not analogous to the instant case for several reasons.  First, the facts in *Aspen Skiing* were "at or near the outer boundary" of antitrust liability,

11

and the instant case is far removed from the facts in *Aspen Skiing*. *See Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 399 (2004).  Second, the parties in this case are not alleged to have previously engaged in a joint venture, unlike *Aspen Skiing*; the Plaintiff is not even alleged to be a rival or competitor in the market of general search services.[8]  Third, the Plaintiff does not even adequately allege that the Defendant has refused to deal—the Plaintiff still appears on the Defendant's search results.[9]

The Plaintiff does not receive as much traffic from Google as it would like, but there is a "long recognized right of [a] trader or manufacturer engaged in an entirely private business, [to] freely exercise his own independent discretion as to parties with whom he will deal." *Id*. Moreover, the Supreme Court "has been very cautious in recognizing . . . exceptions" to the general rule that one need not deal with another company, "because of the uncertain virtue of forced sharing and difficulty of identifying and remedying anticompetitive conduct by a single firm." *Id*. at 408.  Simply stated, *Aspen Skiing* stands for the proposition that there *can* be liability when a defendant refuses to sell to a competitor-plaintiff at the defendant's own retail market price after the two parties previously engaged in a long-term profitable course of dealing. *Duty Free American*, 797 F.3d at 1266.  That does not even remotely resemble the allegations in the Plaintiff's Complaint.  For all of the reasons set forth above, the Plaintiff has failed to state a claim for failure to deal under *Aspen Skiing*, and Count III is dismissed.

### D.  Count VI – "Patent Infringement"

In its Motion, the Defendant argues that the Plaintiff's claim for direct patent infringement should be dismissed, relying upon the fact that the Complaint did not identify any product made

---

[8] The Court is unpersuaded that the Plaintiff's greater Google traffic in the past may be plausibly equated to the joint venture present in *Aspen Skiing*.

[9] For the reasons set forth in the Defendant's Motion, footnote 4, the Court is persuaded that it can consider DE 34-4, a letter from the Plaintiff's counsel, indicating that the Plaintiff's domain has not been removed from Google search. Anecdotally, the Court was easily able to locate the Plaintiff's domain using Google search.  Finally, for the reasons set forth in the Motion and Reply the Court can see no basis for the Plaintiff to plead that, as a competitor, it cannot be denied access to "an essential facility."

12

by the Defendant that infringed upon the Plaintiff's patent.  In its Response, the Plaintiff concedes that its patent infringement claim is not a direct infringement claim. DE 46 at 20 n.9 ("Counsel clarifies that Google is not alleged to directly infringe the '847 reissue patent."); *contra* DE 24 at 52 ("Google LLC has directly infringed . . .").  Instead, the Plaintiff clarifies that it has brought an indirect patent infringement claim against the Defendant. DE 46 at 20 n.9 ("This is essentially an indirect infringement case.").

An indirect patent infringement claim requires the Plaintiff to plead (1) direct infringement by a third party and (2) a basis for the Defendant to be held liable for inducing or contributing to that infringement. *See Intellectual Ventures I LLC v. Motorola Mobility LLC*, 879 F.3d 1320, 1322 (Fed. Cir. 2017).  However, just as the Plaintiff has not identified any specific product of the Defendant that infringes upon the Plaintiff's patent, the Plaintiff has also not identified any specific third-party product that infringes upon the Plaintiff's patent.  This is no small matter, as the identification of an infringing product is the most basic pleading requirement for a patent infringement claim. *E.g., Artrip v. Ball Corp.*, 735 F. App'x 708, 714-15 (Fed. Cir. 2018) (affirming dismissal of direct infringement claim because the complaint failed to identify an infringing product); *Cross v. Dick's Sporting Goods, Inc.*, No. 21-198, 2022 WL 138038, at *2 (N.D. Ind. Jan. 14, 2022) ("[A]n infringement claim must specifically identify the products accused of infringing[.]"); *Upstream Holdings, LLC v. Brekunitch*, No. 22-3513, 2022 WL 17371052, at *1 (C.D. Cal. Aug. 3, 2022) ("Plaintiff does not come close to alleging the necessary facts to plead a claim for patent infringement [because] Plaintiff does not identify an accused product.").

In lieu of a clear and plausible identification of an infringing product, the Plaintiff's Complaint intermixes technical jargon with vague statements:

> Based on these distinct GR-1188 formats, and process of elimination of data sets from credit bureaus, **numerous apps on the Google Play Store appear reasonably certain to infringe the patent**. In particular, these apps are a mobile

> phone application and system that functions independently of the called party's carrier and device. A user inputs a phone number into an entry field, which could come from any device, to determine who called from that number. When a result is found in a carrier's CNAM database, **the infringing apps** return a Caller Name result, identifying the name associated with the queried number. Upon information and belief, the Caller Name result in the infringing Google Play Apps may use extra steps like caching but ultimately return CNAM database rows accessed by SS7, including an SS7 interfacing node. In some cases, a more detailed CNAM result is obtained using LIDB, which is still an infringing behavior.

DE 24 at 50-51 (emphasis added). The Complaint therefore vaguely refers to potentially "infringing apps" and websites, but it does not identify any specific product. The Complaint is equally vague in identifying who these third-party "infringing apps" belong to, making repeated references to "app developers."

The only named third party "app developers" that the Court could locate in Count VI, Spokeo and Whitepages, are unconnected in any cogent way to the Plaintiff's allegations of infringement; how do Spokeo and Whitepages—parties the Plaintiff has elected not to sue for patent infringement in this case—infringe upon the Plaintiff's patent? Instead of clearly and plausibly alleging the answer to this question, the Plaintiff appears to concede that it lacks the intent to do so, alleging that: "Due to the large volume of apps on Play Store, and Google Ad monetized web sites, **discovery is necessary to identify the infringing products**." DE 24 at 50 (emphasis added). The Plaintiff's reference to its need for discovery is not isolated to the quotation above. *Id.* ("Source code serves as the final evidentiary link to GR-1188 operations, and is unavailable to Plaintiffs prior to discovery.").

A barrier to a plaintiff using discovery in a case to plead a legally sufficient claim is plausibility. Has the Plaintiff plausibly pled that a third party has infringed upon its patent? The Court is persuaded that the answer to this question is "no" because the Plaintiff has failed to identify any specific infringing product, but that is not the truly germane question before the Court because the Plaintiff has not sued any party for direct patent infringement. In other words, what is not before the Court is the question of whether the Plaintiff may proceed against Spokeo or

14

Whitepages for patent infringement, and take party discovery from those companies, because the Plaintiff has elected not to sue them.  Instead, the real question before this Court is whether the Plaintiff can proceed against the Defendant, and take party discovery from the Defendant, based upon its vague allegations against third-party infringers because, in the Plaintiff's own words, the Defendant is the "merchant of record." DE 46 at n.9.

For the Defendant to be liable for indirect infringement as "the merchant of record," there must be a basis for the Defendant to be liable for inducing or contributing to infringement.  But in order to evaluate the plausibility of the Defendant's alleged inducement or contributions to infringement, the Court must know what the infringement is. *See Intellectual Ventures*, 870 F.3d 1320, 1322 ("[A] finding of direct infringement is predicate to any finding of indirect infringement.").  And to know what the infringement is, the Court must know what the infringing product is.  That the Plaintiff has not alleged, and while a plaintiff may not be required, as a general matter, to plead information that is uniquely within the knowledge of a defendant, the products at issue (whatever they may be) are not alleged to belong to the Defendant.  The products are alleged to belong to parties the Plaintiff has elected not to sue.

For authority for the proposition that its allegations are sufficient, the Plaintiff cites to two patent cases that survived motions to dismiss after appellate review.  Far from showing the Plaintiff is correct, however, the cases demonstrate why the Plaintiff is wrong.  The Plaintiff relies upon *Disc Disease Solutions Inc. v. VGH Solutions, Inc.*, 888 F.3d 1256 (Fed. Cir. 2018), but in that case the plaintiff specifically identified the infringing product as a belt called the "DBB 3500." *Disc Disease Solutions Inc. v. VGH Solutions, Inc.*, No. 15-CV-00188, DE 1 (M.D. Ga. Nov. 30, 2015).  Lest there be any doubt, the complaint contained a picture of the DBB 3500:



*Id.* The Plaintiff also relies upon *Lifetime Industries, Inc. v. Trim-Lok, Inc.*, 869 F.3d 1372 (Fed. Cir. 2017), but in that case the plaintiff also provided specific allegations about the infringing product, again utilizing a picture:



*Lifetime Industries, Inc. v. Trim-Lok, Inc.*, No., DE 32 (N.D. Ind. Oct. 13, 2014).  Contrasted with the clear identification of infringing products in the Plaintiff's cited cases, the Plaintiff's identification of an infringing product in the instant case could be fairly summarized as "some apps in an app store."  That is insufficient under federal pleading standards.  *See Artrip*, 735 F. App'x at 714 (Fed. Cir. 2018) (affirming dismissal on plausibility grounds of an allegation that the infringing product was "one or more of the machines at least as [sic] the Bristol Plant").  Count VI is dismissed.[10]

### E. Count IV – "Violation of the Florida Deceptive and Unfair Trade Practices Act" and Count V – "Violation of California's Unfair Competition Law"

Because the Court, in this Order, dismisses all of the Plaintiff's federal claims, only the Plaintiff's state law claims remain.  The Court declines to exercise supplemental jurisdiction over the state-law claims.  *E.g., Parker v. Scrap Metal Processors, Inc.*, 468 F.3d 733, 743 (11th Cir.

---

[10] The Court is also persuaded by the Defendant's argument in its Motion and Reply that the Plaintiff has not plausibly alleged that the Defendant had knowledge of third-party infringement.

2006).  As a result, the Court is uncertain whether it has federal jurisdiction over the state law claims because those claims have been styled as class actions.  As potential class actions, the Court believes that if it has jurisdiction, it would be under the Class Action Fairness Act, or CAFA. *E.g., Lowery v. Ala. Power Co.*, 483 F.3d 1184, 1205 (11th Cir. 2007).  CAFA jurisdiction applies, *inter alia*, when there are a sufficient number of potential claimants and when at least $5,000,000 is at issue. *Id.*  The parties have not briefed whether the jurisdictional requirements of CAFA are met here, just as they have not briefed whether the parties would jointly prefer the state-law claims to be litigated in state court or whether, alternatively, either party believes that these matters should be decided by a federal court in another venue, such as California (given one of the counts is brought under California law).  The Court will order subsequent briefing on this topic, and the Court does not address the legal sufficiency of Count IV and Count V at this time.

### F.  Order to Show Cause

The Court construes the operative complaint as bringing claims not only on behalf of Plaintiff Greenflight, but also on behalf of *pro se* Plaintiff Jeff Isaacs. DE 24 at 55 (containing a *pro se* signature).  The Court previously stayed all claims brought *pro se*. DE 26 at 2.  Before dismissing any *pro se* claims, however, the Court will utilize an order to show cause process.  *Pro se* Plaintiff Jeff Isaacs is **ORDERED** to **SHOW CAUSE** by **November 15, 2024**, why his *pro se* antitrust claim(s) should not be dismissed for the same reasons Greenflight's antitrust claims were dismissed.  In the event no response to this order to show cause is filed, the Court will deem the *pro se* count(s) dismissed for the same reasons Greenflight's counts were dismissed.

### G.  Leave to Amend

As a threshold, general matter, *pro se* pleadings are held to a less stringent standard than counseled pleadings, but the Court does not believe that the less stringent standard applies in this case for three reasons. *E.g., Erickson v. Pardus*, 551, U.S. 89, 94 (2007).  First, while the original pleading in this case contained no signature of counsel, the operative pleading does—the *pro se*

17

Plaintiff in this case retained two attorneys to represent his (closely held) corporation and one of the attorneys signed the operative pleading. DE 24 at 55.  Second, the *pro se* Plaintiff in this case has substantial legal training,[11] and courts do not liberally construe the pleadings of those trained to draft such pleadings. *E.g., Barnes v. Madison*, 79 F. App'x 691, 696 n.4 (5th Cir. 2003); *see also Stuart v. Ryan*, No. 18-14244, 2019 WL 1235024, at *1 (S.D. Fla. Mar. 11, 2019) (declining to liberally construe the pleadings of a suspended attorney, acting *pro se*).  Third, pursuant to his own allegations, the *pro se* Plaintiff has decades of experience litigating in federal court, across various judicial districts and various circuit courts of appeals, including litigation pertaining to the revocation of his medical credentials and litigation pertaining to Apple and antitrust. DE 24 at 17. In light of these considerations, the Court analyzes whether its dismissal in this matter should be with leave to amend.

Normally, leave to amend is liberally granted. Fed. R. Civ. P. 15(a).  When further amendment would cause undue delay, when amendment is sought as part of a dilatory motive, when further amendment would be futile, or when further amendment would cause undue prejudice on the respondent, a court may deny leave to amend. *E.g., Burger King Corp. v. Weaver*, 169 F.3d 1310, 1319 (11th Cir. 1999).  Here, whether the Plaintiffs should be granted leave to amend is a close question.  Weighing in favor of denial of leave to amend is the fact that the Court has previously dismissed claims in this case,[12] the Defendant's motion to dismiss is the second such motion in this case, the Plaintiffs have previously amended their complaint, this is not the first litigation between the parties in this Court,[13] and there are facts to suggest that the Plaintiffs have leveraged discovery in this case to harass the Defendant. *See* DE 42-4 (noticing a Rule

---

[11] The *pro se* Plaintiff alleges that he "matriculated at Vanderbilt Law JD Program for almost two years, where he had been awarded a full scholarship." DE 24 at 5.

[12] DE 26.

[13] *See Isaacs v. Keller Williams Realty, Inc.*, No. 24-MC-80009 (S.D. Fla. Jan. 17, 2024) (containing a motion to quash subpoena by Google LLC issued by the Plaintiff in prior litigation).

18

30(b)(6) deposition almost immediately after the filing of the operative complaint); DE 42 (attaching requests for voluminous document discovery). On the other hand, the Court has yet to set a deadline for amended pleadings in this case and the case is less than one year old. The Court balances these competing considerations by allowing the Plaintiffs leave to amend once more, but the Plaintiffs shall do so by filing a motion for leave to amend that contains the proffered pleading attached as an exhibit. The deadline for the Plaintiffs to file a motion for leave to amend shall be **December 8, 2024**.

For the foregoing reasons, it is **ORDERED AND ADJUDGED** that the Defendant's Motion to Dismiss [DE 41] is **GRANTED IN PART** and the Court **RESERVES IN PART** as more fully set forth in this Order. The parties shall confer and file simultaneous briefing on the Court's jurisdiction over the state law claims by **November 15, 2024**. After review of the parties' filings the Court will, if necessary, set a schedule for further briefing on the motion to dismiss and the state-law claims.

**DONE AND ORDERED** in Chambers, West Palm Beach, Florida, this 8th day of November, 2024.

Copies furnished to:
Counsel of record

ROBIN L. ROSENBERG
UNITED STATES DISTRICT JUDGE

Ayelet Faerman, Esq.
Faerman Law P.A.
3859 NW 124 Ave
Coral Springs, FL 33065
954-271-8484
ayelet@faerman.law

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| GREENFLIGHT VENTURE CORPORATION, JEFFREY D. ISAACS, MD<br>*on behalf of themselves*<br>*and all others similarly situated*<br><br>Plaintiffs,<br><br>vs.<br><br>GOOGLE LLC<br><br>Defendant. | Case No. **24-cv-80395-RLR**<br><br>**SHERMAN ACT ANTITRUST CLASS ACTION**<br><br>**SECOND AMENDED COMPLAINT**<br><br>DEMAND FOR JURY TRIAL |

**PLAINTIFFS' SECOND AMENDED COMPLAINT**

**FOR DAMAGES AND INJUNCTIVE RELIEF**

### I.   INTRODUCTION

1. This class action lawsuit concerns Google's unlawful monopolization of the market for general search engines (GSE) and related anticompetitive conduct, in violation of the Sherman Act and California UCL. A Developer Compensation Fund provides redress for developers harmed in downstream markets, including specialized search and directory services.

2. The Department of Justice recently prevailed in a landmark case against Google, establishing that Google has unlawfully maintained a monopoly in the United States GSE market. This case addresses the broader impact of Google's anticompetitive practices on related markets, where Google's monopolistic behavior has stifled innovation, suppressed competition, and inflicted substantial economic harm on specialized search providers and web developers. A proposed remedy in the government action is to open Google search index data to developers like Plaintiffs, creating new incumbents in the GSE field. This proposal, similar to recent regulation in the European Union, unequivocally recognize developers and class members as competitors of the Defendant. This case complements other enforcement action, by implementing transparency measures for GSE results that mitigates future antitrust injury and expedites reform.

3. Plaintiffs and other web developers operate in markets that depend on fair and competitive access to internet users through general search engines like Google. By leveraging its dominance in the GSE market, Google has distorted competition in these downstream

markets, favoring its own products and those of its strategic partners while disadvantaging independent developers and specialized service providers.

## VENUE

4. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337(a), as the claims arise under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, and the Court has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367. In addition, the Court has jurisdiction under the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d), because the proposed class is sufficiently numerous, minimal diversity exists between the parties, and the amount in controversy exceeds $5,000,000, exclusive of interest and costs. Google LLC's nationwide and international business activities ensure that the challenged conduct affects a substantial class of web developers, content owners, and other market participants across multiple jurisdictions, thus satisfying CAFA's requirements for federal jurisdiction over interstate class actions.

5. Venue in the Southern District of Florida is proper under 15 U.S.C. § 22, which authorizes antitrust suits against corporations in any district where they transact business. It is further proper under 28 U.S.C. § 1391(b) and (c) because Google LLC resides in part, transacts business, and is found in this District, and a substantial portion of the events giving rise to Plaintiffs' claims occurred here. Google engaged directly with Plaintiffs for years, hosting meetings and events in Miami, Florida. These ongoing activities demonstrate Google LLC's substantial and continuous presence within the District, making it an appropriate venue for this litigation.

6. This Court also has personal jurisdiction over Google LLC. By conducting substantial business in this District, including the operation of search engine services central to the claims alleged, Google has purposefully availed itself of the privileges of doing business in Florida. Its continuous and systematic contacts, combined with the alleged anticompetitive conduct and related interactions with Plaintiffs in this jurisdiction, render the exercise of personal jurisdiction over Google consistent with traditional notions of fair play and substantial justice. The integrated presence of Google in Florida's economy, along with the alleged patent infringement impacts on a Florida resident, further solidifies the fairness and reasonableness of exercising personal jurisdiction in this District.

## II.    PARTIES

7. Plaintiff Greenflight Venture Corporation is a Florida C corporation with its principal place of business in Wellington, Florida. Greenflight Venture Corporation invests in diverse technology products, develops and operates specialized online services, including reverse phone search and medical research websites. The majority of the company's investment funds stem from its initial success working with Google on OkCaller.com. The company's success and growth are heavily reliant on fair access to users via general search engines. The company's previous success in large-data operations renders it a competitor to Google; with access to Googlebot's indexing raw data, Greenflight could, and would, develop competing GSE products. Google's monopolistic conduct has significantly impacted the corporation's ability to compete in all relevant markets described herein, resulting in representative antitrust injury.

8.  Plaintiff Jeffrey D. Isaacs, M.D. is a United States citizen and resident of Wellington, Florida. Dr. Isaacs is the founder and principal of Greenflight Venture Corporation, through which he developed and operated a specialized reverse phone search service and other web-based platforms. Dr. Isaacs has invested substantial time and resources into developing innovative online tools that depend on fair and competitive access to users through general search engines like Google. Dr Jeffrey D. Isaacs is a Dartmouth-trained medical doctor (M.D) and computer scientist (A.B., *hons)*. Dr. Isaacs additionally holds an MBA in international studies from Wharton and INSEAD. At University of Pennsylvania's School of Engineering, he was a Benjamin Franklin Scholar. He matriculated at the Vanderbilt Law JD program, where he had been awarded a full scholarship, and left in good standing to pursue medical studies. Dr. Isaacs aspires to complete medical residency, having attained a 99/99 score above the average neurosurgeon on the USMLE National Medical Boards.

9.  Defendant Google LLC is a limited liability company organized and existing under the laws of the State of Delaware, and is headquartered in Mountain View, California. Google is owned by Alphabet Inc., a publicly traded company incorporated and existing under the laws of the State of Delaware. Google operates the world's most widely used general search engine and engages in a range of business activities that substantially affect interstate commerce. Google provides a range of products and services that are marketed, distributed, and offered to consumers throughout the United States, across state lines, and internationally. Today, Google is a monopoly gatekeeper of the internet, controlling around 95% of every query for information. The Department of Justice recently secured a guilty verdict against Google for its conduct in monopolizing general search engines. This case invokes identical Sherman foremarket and causes of action as the DOJ case, which is

hereby incorporated by reference. As a result of its market power, Google is able to fully control how the majority of US customers look up phone numbers, by directing them to sites like OKCaller or competitors. Google profits from these queries through advertisements on websites, and/or a 30% share of phone directory app purchase commissions. The DOJ verdict indicated Google pays Apple, through the "ISA Agreement," $20 billion annually to maintain its search monopoly. Google's control of US search, combined with Apple's control over US smartphone apps, is alleged to constitute duopoly control over major United States internet content, access methods, and/or on-ramps generally.

### III.    <u>FACTUAL HISTORY</u>

10. Since its now famous inception as a "Do No Evil" fledgling startup, Google has taken a concerning, increasingly anticompetitive approach to internet search, leveraging vast economies of scale to further their own economic and even political interests.

11. There has been a growing international consensus that Google engages in anticompetitive conduct to monopolize internet search.  This is part of an emerging trend of global public interest in regulating "Big Tech." The world rapidly adopted smartphone internet connectivity over the past two decades, leading to vast economic and sociological implications. Recent government antitrust proceedings are of particular relevance to this case, which combined form an international consensus that Defendant harms competition and innovation by monopolizing internet search.

12. These include the August 2024 verdict in the Department of Justice antitrust lawsuit against Defendant for monopolizing the general search engine services and search advertising

markets. Relevant background information in that lawsuit (*20-cv-3010, D.C.*) is directly applicable and thus incorporated and asserted herein:

"Two decades ago, Google became [] an innovative way to search the emerging internet. That Google is long gone. The Google of today is a monopoly gatekeeper for the internet, and one of the wealthiest companies on the planet, with a market value of $1 trillion and annual revenue exceeding $160 billion. For many years, Google has used anticompetitive tactics to maintain and extend its monopolies in the markets for general search services, search advertising, and general search text advertising—the cornerstones of its empire.

For years, Google has entered into exclusionary agreements, including tying arrangements, and engaged in anticompetitive conduct to lock up distribution channels and block rivals…Google's exclusionary agreements cover just under 60 percent of all general search queries. Nearly half the remaining queries are funneled through Google owned-and- operated properties (e.g., Google's browser, Chrome). Between its exclusionary contracts and owned-and-operated properties, Google effectively owns or controls search distribution channels accounting for roughly 80 percent of the general search queries in the United States. Largely as a result of Google's exclusionary agreements and anticompetitive conduct, Google in recent years has accounted for nearly 90 percent of all general-search-engine queries in the United States, and almost 95 percent of queries on mobile devices.

Google has thus foreclosed competition for internet search. General search engine competitors are denied vital distribution, scale, and product recognition— ensuring they have no real chance to challenge Google. Google is so dominant that "Google" is not only a noun to identify the company and the Google search engine but also a verb that means to search the internet.

Google monetizes this search monopoly in the markets for search advertising and general search text advertising, both of which Google has also monopolized for many years. Google uses consumer search queries and consumer information to sell advertising. In the United States, advertisers pay about $40 billion annually to place ads on Google's search engine results page (SERP).

Google's anticompetitive practices are especially pernicious because they deny rivals scale to compete effectively. General search services, search advertising, and general search text advertising require complex algorithms that are constantly learning which organic results and ads best respond to user queries; the volume, variety, and velocity of data accelerates the automated learning of search and search advertising algorithms…

Google's grip over distribution also thwarts potential innovation. For example, one company recently started a subscription-based general search engine

App. 115

that does not rely on advertising profits derived from monetizing user information. Another, DuckDuckGo, differentiates itself from Google through its privacy-protective policies. But Google's control of search access points means that these new search models are denied the tools to become true rivals: effective paths to market and access, at scale, to consumers, advertisers, or data.

Google's practices are anticompetitive under long-established antitrust law. Almost 20 years ago, the D.C. Circuit in *United States v. Microsoft* recognized that anticompetitive agreements by a high-tech monopolist shutting off effective distribution channels for rivals … were exclusionary and unlawful under Section 2 of the Sherman Act.

Absent a court order, Google will continue executing its anticompetitive strategy, crippling the competitive process, reducing consumer choice, and stifling innovation. Google is now the unchallenged gateway to the internet for billions of users worldwide. As a consequence, countless advertisers must pay a toll to Google's search advertising and general search text advertising monopolies; American consumers are forced to accept Google's policies, privacy practices, and use of personal data; and new companies with innovative business models cannot emerge from Google's long shadow. For the sake of American consumers, advertisers, and all companies now reliant on the internet economy, the time has come to stop Google's anticompetitive conduct and restore competition."

13. The DOJ action was filed subsequent to and based in part upon the "*Investigation of Competition in Digital Markets*" majority staff report and recommendation by the United States House of Representatives Subcommittee on Antitrust, herein referred to as the "House report." The facts uncovered by the House report applicable to Google are hereby wholly incorporated herein. That report is incorporated by reference herein, and for convenience, relevant sections on specialized search, which describes Plaintiffs' service offerings, are directly restated:

Google's claim that it ''operates in a highly competitive environment'' is also at odds with the lived reality of market participants. Numerous companies—spanning major public corporations, small businesses, and upstart entrepreneurs—told the Subcommittee that they overwhelmingly depend on Google for traffic and that no alternate search engine even remotely approaches serving as a substitute. For example, J&J Smith, a printer repair shop based in Rhode Island, stated, ''Google is

our lifeblood. Foundem, a UK-based comparison shopping search provider, has noted that Google's ''overwhelming global dominance'' of horizontal search creates for most websites an ''uncomfortable but unavoidable reliance on Google.'' Many other companies described their dependence on Google in similar terms.

Furthermore, some of the same specialized search providers that Google identifies as competitors stated that their own businesses heavily rely on Google, in some cases for up to 80 percent of traffic on both desktop and mobile devices. One specialized search provider wrote that Google's business practices ''have a very material effect on [our] business, but due to Google's monopoly power in search, there is nowhere else for [us] to turn for additional search traffic. The company is beholden to how Google decides to structure its search results page and algorithm. Another told the Subcommittee, ''From [our] perspective, there are no adequate substitutes for Google,''and, ''[T]hanks to its monopoly in general internet search, Google has become the gatekeeper for vertical search rivals.'' One specialized search provider said that 97.6 percent of its traffic comes from Google; another said that Google accounted for such an outsized share of traffic that ''we don't even track non-Google sources.''

Google's apprehension about vertical search providers [is documented]. For example, a 2006 strategy memo identifying challenges asked, ''How do we deal with the problem of 'proliferating verticals?''' Another message noted, ''Vertical search is of tremendous strategic importance to Google. Otherwise, the risk is that Google is the go-to place for finding information only in the cases where there is sufficiently low monetization potential that no niche vertical search competitor has filled the space with a better alternative.'' In short, Google executives feared that vertical search providers would build direct relationships with users, thereby bypassing Google Search and diverting traffic, valuable data, and ad revenue. While vertical search providers were complements to Google in the short term, Google recognized their potential for disintermediating Google and therefore viewed them as a major competitive threat…

Documents show that Google developed a multi-pronged strategy to thwart the threat. Two of these tactics included: (1) misappropriating third-party content; and (2) privileging Google's own services while demoting those of third parties. Through these practices, Google exploited its dominance to weaken potential rivals and boost its search advertising revenue. Evidence shows that once Google built out its vertical offerings, it introduced various changes that had the effect of privileging Google's own inferior services while demoting competitors' offerings. This conduct has undermined the vertical search providers that Google viewed as a threat.

Additional market participants echoed the view that Google's self-preferencing comes at the expense of users. One search provider … noted that Google's limits on rival vertical search providers likely prevent consumers from seeing the cheapest or best-valued prices…

Google has actively demoted certain rivals through imposing algorithmic penalties. For example, in 2007 and in 2011, Google launched an algorithm that demoted sites that Google considered ''low quality.'' Among the websites especially hit were comparison shopping providers, which enable users to compare product offers from multiple merchant websites. In a submission to the Subcommittee, one publisher stated that Google's algorithmic penalty caused search leads and revenues to its website to fall by 85 percent.

In external messaging, Google justified the algorithmic penalties it imposed on third-party sites as a response to users' desire to see fewer ''low quality'' sites in their search results. However, Google did not subject its own vertical sites to the same algorithmic demotion, even though Google's vertical services aggregated and copied content from around the web—just like the third-party sites that Google had demoted. Indeed, Google's documents reveal that employees knew Google's own vertical sites would likely fit the demotion criteria that Google applied to other sites. When one employee suggested that Google index its comparison shopping site, Froogle, another responded that it was unlikely Froogle would get crawled ''without special treatment,'' noting, ''We'd probably have to provide a lot of special treatment to this content in order to have it be crawled, indexed, and rank well.''

Despite the fact that Google's own comparison shopping service was of such low quality that Google's product team couldn't even get it indexed, Google continued to give Froogle top placement on its search results page…

Through mis-appropriating third-party content and giving preferential treatment to its own vertical sites, Google abused its gatekeeper power over online search to coerce vertical websites to surrender valuable data and to leverage its search dominance into adjacent markets. Google's conduct both thwarted competition and diminished the incentive of vertical providers to invest in new and innovative offerings.

In an interview with the Subcommittee, one market participant observed that Google's conduct has sapped investment, as ''investors don't want to invest in companies that are producing content that relies on Google traffic,'' resulting in ''less capital invested in companies reliant on traffic from Google.'' The website noted that Google's business practices have also skewed the website's own investment decisions, leading it to allocate the vast majority of its revenue to creating ''news-like temporary content'' rather than ''evergreen content.'' It added, ''If we could trust that Google was not engaging in unfair search practices, we would be producing different content.'' A vertical provider, meanwhile, said that Google's conduct had held the firm's growth ''at bay'' and risks reducing innovation over the long term, as providers whose growth is capped by Google may be more reluctant to invest and expand. It added:

"Competitors are not the only ones who have a reduced incentive to innovate as a result of Google's conduct. The anticompetitive effects reduce Google's own

incentives to improve the quality of its services, because it does not need to compete on the merits with rival services." Several market participants told the Subcommittee that Google's business practices in online search have already foreclosed opportunity: "It is my view that Google has removed essentially all of the oxygen from the open internet ecosystem. There is no longer any incentive or even basic opportunity to innovate as I did back in 2008. If someone came to me with an idea for a website or a web service today, I would tell them to run. Run as far away from the web as possible. Launch a lawn care business or a dog grooming business— something Google can't take away as soon as he or she is thriving."

More broadly, market participants expressed concern that Google has evolved from a ''turnstile'' to the rest of the web to a ''walled garden'' that increasingly keeps users within its sites. Many observers have noted that when Google filed its initial public offering, Google cofounder Larry Page identified the company's mission as the following: ''We want you to come to Google and quickly find what you want. We want you to get you out of Google and to the right place as fast as possible. In recent years, however, studies have shown that more than half of all queries on Google either terminate on Google or result in a click to Google's own properties—a share that is growing over time.

14. The "Investigation of Competition in Digital Markets" majority staff report and recommendation by the United States House of Representatives Subcommittee on Antitrust provides compelling support and evidence supporting the Plaintiffs' claims.

15. Google has been found to control approximately 90% of the GSE market, which it has achieved and maintained through a series of exclusionary agreements and anticompetitive practices, such as the ISA Agreement with Apple. These practices have effectively foreclosed competition in the GSE market, preventing rivals from gaining the necessary scale to compete meaningfully.

16. Google's dominance in the GSE market has significant downstream effects on vertical and specialized search markets, which rely on fair access to users through general search engines. Web developers and specialized content providers, such as those offering reverse phone search, medical research tools, and other niche services, are directly harmed by Google's manipulation of search engine results. By favoring its own products and those of

its strategic partners, Google has distorted competition, suppressing the visibility and accessibility of independent developers' services.

17. Google has systematically undermined the ability of specialized content providers and developers to compete by: a. Manipulating Search Results: Google has intentionally ranked its own products and services, and those of its strategic partners, above those of independent developers, regardless of the quality or relevance of the content. This manipulation effectively forces independent developers to invest heavily in Google Ads or other Google services to maintain any visibility in search results. b. Exclusionary Agreements: Google has entered into agreements with major corporations and other partners that require the preinstallation of Google services on devices, further entrenching its monopoly and excluding competition from independent developers. c. Suppression of Innovation: By controlling the flow of traffic to specialized sites, Google has stifled innovation and limited consumer choice, forcing developers to either comply with Google's terms or risk being pushed out of the market entirely.

18. As a direct result of Google's anticompetitive conduct, Plaintiffs and other members of the proposed class, which includes web developers and operators of specialized content websites, have suffered substantial financial harm. This harm includes, but is not limited to: a. Loss of Revenue: Plaintiffs' websites have experienced a significant decrease in traffic due to their demotion in Google search results, directly leading to a loss of revenue. b. Diminished Market Share: Plaintiffs have lost market share as consumers are directed toward Google's own services or those of its preferred partners. c. Increased Costs: To maintain any visibility, Plaintiffs have been forced to spend considerable sums on Google Ads, effectively paying Google to compete in a market it already dominates. d. Suppressed

Innovation: Plaintiffs have been unable to fully develop and deploy new features or services due to the financial constraints imposed by Google's anticompetitive practices.

19. Google has leveraged its monopoly power in the GSE market to control the downstream markets in which Plaintiffs operate. By manipulating search algorithms and controlling access to search traffic, Google has insulated itself from competition, ensuring that independent developers cannot effectively compete without being subjugated to Google's terms and conditions.

20. For many years challenging Google rankings has been considered beyond the reach of the courts, in light of Section 230 and other law. But as the novelty of digital markets faded, and in light of the recent Google DOJ verdict, many antitrust scholars – and a population in overwhelming support of Big Tech reform – await a different outcome from cases like this, including a similar case brought by Yelp, now pending in Northern California District.

21. Indeed, the Ninth Circuit opined (in *dicta*) to the possibility of such litigation several years ago in the *Dreamstime* case. The redress sought by this lawsuit is not invented by undersigned counsel, but rather, marks an informed and cutting-edge measure to reflect a changing tide in the applicability of Sherman act to digital markets. Big Tech matches these efforts with their own aggressive steps to prevent the inevitable, including significant pressure tactics and retaliation against antitrust advocates.

22. For example, in this case, Plaintiffs politely sought from Google an explanation for the sudden termination of OkCaller, a website serving 300 million individuals. The termination was unusual, to say the least, and historically, abruptly ending such a lucrative partnership typically carried an explanation with it. However, Google has embarked on a blame-the-victim defense, alleging straightforward discovery requests to be "harassment." Put

differently, Google is on record as declaring Plaintiffs' legitimate antitrust inquiry – backed by multiple authorities for similar situations – constitute harassment. This is actionable under UCL and other law (see causes of action), and particularly egregious, considering antitrust violations constitute a felony, as does witness retaliation. Google is requested to provide prompt, specific responsive answers as to this improper conduct.

**Lead Plaintiffs Background – OkCaller.com & Greenflight Venture Corporation**

23. Plaintiffs Greenflight Venture Corporation are developers of web apps, smartphone apps, and related technologies. A substantial majority of the software applications developed by Plaintiffs could be considered specialized search websites and apps, and VSPs (vertical search providers). Two examples of such products are FactMed.com and OkCaller.com, which provide informatics portals for end-users in the pharmaceutical side effect and phone directory search services sectors, respectfully. As discovery will evidence, Plaintiffs spent much of the past decade developing around a dozen such software products. Plaintiffs are especially suited to represent the class of developers given the diversity of their projects, their extensive interactions with Google on both highly successful – and others less so – endeavors. Greenflight will demonstrate the inefficiencies and antitrust costs incurred when its investment products weren't subject to fair ranking or transparent evaluation by Google. For example, even on their most successful investment, OkCaller.com, Greenflight encountered systematic and routine difficulties with Google in its ability to improve their product or create competing, alternate versions for other markets. This resulted in significant lost investments of person-hours, monetary costs, goodwill, and other tangible and intangible losses. In most cases, both Greenflight and Dr. Isaacs had shared ownership interests in a particular VSP, and thereby suffered losses collectively.

Furthermore, Greenflight and/or Plaintiff Isaacs would often partner with co-investors, friends, and/or family on new startups.

24. In 2012, during his medical residency at Dartmouth-Hitchcock Hospital in New Hampshire, Dr. Jeff Isaacs faced a life-altering challenge when he became disabled. Undeterred by this setback on his goal to be a neurosurgeon, and determined not to rely indefinitely on Dartmouth's own-occupation long-term disability benefit, Dr. Isaacs founded OkCaller.com in 2013. This initiative led to the awarding of U.S. Patent RE48847 for the groundbreaking reverse phone search technology the website utilized. Google, recognizing the significance of Dr. Isaacs' contribution, quickly elevated OkCaller to a premier position among reverse phone search sites:



25. By Google's own Analytics records, OkCaller garnered 293 million new users since launch and 605 million pageviews, positioning it among the top 2000 websites on Google, comparable to established brand sites like Jeep.com. The above chart shows organic referral volume. Google is on record as having made misleading claims that this chart suggests longstanding decline of OkCaller. In fact, OkCaller's profitability grew steadily over the years, and its final year achieved record profits nearly double the average.

26. Compared to some normal fluctuation in user volume, profitability was unusually constant, which was largely influenced by Google's price per hundred as impressions (CPM). Greenflight always assumed Google "pegged" profitability and adjusted volume and CPM for their own internal purposes. Hence Greenflight specifically rejects Google's narrative that OkCaller was in decline, and alleges Google has attempted to mislead the Court, along with the aforementioned claims that prompt inquiry into the termination constituted harassment. Okcaller consistently generated around $2m each year in profits for Google, and the final year, before termination, was a record profit year. Termination of a $20m partnership without explanation formed a reasonable basis for inquiry. Google's attempts otherwise create a chilling effect on the free and open commerce this nation pioneered.

27. Combined with the other top 2000 websites, these revenues amounted to at least $4billion annually for Google. Hence by extrapolation, Okcaller and peers represent a pivotal business relationship for Google, especially in 2014 when the relationship commenced, and could be considered a joint-venture of internet content providers (or VSPs) that helped the company attain its current success.

28. Dr. Isaacs' site was operated by Greenflight Venture Corporation, a Florida C Corporation which he serves as CEO. Regular communications between Google, Greenflight, and Dr. Isaacs underscored a partnership marked as highlighted in a 2015 email from Google:

> "You are one of the few partners who we have invited for Enhanced Support and Optimization. Thank you for working with us! We are grateful to count you as a trusted partner, and we hope to continue improving our relationship to suit your business needs."

29. This "trusted partnership" transcended mere algorithmic website ranking, making OkCaller a Google success story and facilitated Dr. Isaacs' participation in workshops with senior Google personnel in their Miami office, significantly contributing to Google's AdSense revenue. Working with independent sites like OkCaller fundamentally allowed Google to reach the success it enjoys today.

30. That trusted partnership ended on Thanksgiving 2022. As of today, Google search returns zero pages for Okcaller.com, down from indexing millions of pages, consistently, for a decade. The below screenshot indicates Google completely terminated a longstanding, profitable business relationship (digital content advertising joint venture) by removing millions of directory pages completely from its index. From time to time, it appears Google may index one page, but transient indexing of one page is not meaningful, compared to the prior twelve million, and prevents OkCaller from serving in capacity as a VSP and/or information directory service.



31.     Because Dr. Isaacs ran the site efficiently, he gave away his patent for free, which allowed customers to save 90% on phone searches. Dr. Isaacs' invention saved US consumers over $100 million by estimate.  Phone searches are a lucrative and substantial part of search engine revenues. Historically they were an early, even perhaps the first major profit center for Google.

32.     Unlike nearly every competitor, Greenflight never sold information about its users to third-parties. Moreover, OkCaller was a decade early to implement privacy controls that the US Marshal service now asks all phone directories to do, to protect Federal Court personnel's residence data. That is a result of Dr. Isaacs' vision in 2013 to prevent forward lookups of confidential information, like phone numbers and addresses. OkCaller only permits "called parties" who received a text or phone call from an unknown "calling party" to look up the name of the person. The functionality of traditional Caller-ID over the web was novel and worthy of a patent, as it helped hundreds of millions safely find out, under "natural law," who communicated with them See OKCaller.com Terms, generally.

33. To wit, OkCaller was a successful Florida-based internet startup that offered the ideal phone directory: it worked, it didn't sell user data to anyone, it was free, and it prevented safety risks associated with forward-lookup caching , exemplifying Daniel's Law concerns. It was also a successful outcome of the disability system, allowing Dr. Isaacs to promptly get back on his feet and serve others.

*A Convergence of Complex Litigation Emerges*

34. OkCaller faced considerable legal obstacles in the effort to bring free caller ID to the general public. As OkCaller gained market share, competitors took note and began to infringe upon Dr. Isaacs' patent. Within six months of Apple Inc. learning that Isaacs' desired to give away his patent for free and prevent high-grossing apps like Whitepages from charging for the same information, Apple dropped OkCaller from their Top 10 ranked phone apps to an unranked position. Whitepages simultaneously commenced a lawsuit to invalidate the patent under the controversial Alice IP case law.  The patent went back to the drawing board, and the USPTO spent several years reviewing Federal Circuit findings while corresponding with Greenflight's MIT-trained intellectual property attorney to reissue the patent. Hence today, the reissue patent again enjoys presumption of validity, having survived double scrutiny by the USPTO and Federal Circuit Appeals Court.

35. Despite these obstacles, Google notably continued to support Dr. Isaacs' work, significantly aiding him in his endeavor to bring free caller ID services to the general public. Dr. Isaacs has faced nineteen years of federal litigation surrounding his medical credentials, and he believed he was improperly blacklisted from the federally-funded residency system.  Google allowed Dr. Isaacs to work from home, as he dealt with the worsening health issues and complex federal litigation to enforce the clearing of his name.

36. Between 2014-2022, a former Assistant United States Attorney[1] who specialized in complex health care matters worked tirelessly to help Dr. Isaacs return to active medical practice.

37. Recognizing that his clinical medical career was indefinitely delayed, in February 2020 Plaintiff partnered with the inventor of the gold-standard test for heart attacks to develop a Coronavirus tracking app. Apple rejected the app "Coronavirus Reporter," the first of its kind, in March 2020. Plaintiff subsequently became a lead witness in Apple antitrust matters concerning App censorship which are ongoing and have received considerable media attention.

38. On the day Dr. Isaacs tendered a Closing Brief to the Ninth Circuit in the Apple antitrust lawsuit, Google abruptly terminated the OkCaller partnership without any prior notice. Other competitors in Reverse Phone Search were unaffected, including blatant copycat sites which infringe upon the reissue patent. His previous contacts, who for a decade were happy to provide Dr. Isaacs with consultation, suddenly went silent. Similarly, no meaningful response was to be found on the Webmaster Forum, which had previously garnered a response from Google Executive Mr. Mueller worthy of news coverage by a major SEO blog.

---

1. [1] Former AUSA Mark Josephs, who spent almost a decade on a *pro bono* effort to reinstate what he called Dr. Isaacs' promising neurosurgery career, tragically passed away last year. In reviewing years of federal discovery files, AUSA Mark Josephs identified evidence that a California university was publishing false disciplinary records on national academic clearinghouses about Dr. Isaacs. The university had previously agreed, via two court-ordered federal settlement agreements, to acquit Isaacs of any controversies and seal the acquitted records. Two competent authorities, the American Academy of Medical Colleges, and a New Hampshire Employment Tribunal, both determined that the records had been expunged. Nonetheless, "leaked" records prevent Dr. Isaacs from practicing neurosurgery. Mr. Josephs sought declaratory action with the Department of Education and the California university. Both were blocked, due to statute of limitations and jurisdictional defenses raised by law firm Gibson Dunn. In 2020, The Ninth Circuit had a divided ruling with a stark dissent on the matter. This lawsuit will also seek the same declaratory judgment.

39. Isaacs, through his legal counsel, has spent the past year asking Google to investigate any link the aforementioned litigation, only to be stonewalled.

40. Plaintiff's legal counsel has determined that substantiated concerns exist that Google violated witness retaliation laws, such as Section 1512. A subpoena was issued to Google in a related lawsuit to seek information and evidence about the reasons for OkCaller's termination by Google.

41. Therefore, as best as Plaintiffs' can ascertain prior to discovery, Google dropped OkCaller's rankings after learning about his litigation history, including litigation against Big Tech. Notably, Google and Apple have jointly lobbied together to thwart antitrust enforcement.

42. Google has directly accused Plaintiff of "failed litigation" against Apple. That litigation is ongoing and Google's efforts to render perception of it as failed represents evidence of underlying retaliatory intent. But the reality is, Dr. Isaacs' longstanding anti-trust litigation threatened Apple as well as Google's duopoly business models.

43. Dr. Isaacs justifiably fears that in December 2022 his second career as a computer developer, was again blacklisted in violation of Section 1512, the same way his neurosurgery career had been wrongfully halted. Dr. Isaacs, with stellar medical credentials and absolutely no criminal record, has been prevented from practicing medicine, largely due to aforementioned legal pleadings being weaponized against him. That weaponization, Dr. Isaacs fears, spread to Google LLC around Thanksgiving 2022.

44. Dr. Isaacs practiced his invention through intricate collaboration with Google. The compensation he received from them, in part, reflected payment of patent royalties. Upon their termination of OKCaller, Dr. Isaacs requested Google reimburse him directly for

infringing conduct. Google refused to pay patent royalties owed to Isaacs. Hence this is not a patent case brought by a non-practicing entity; it is a case brought by a previously compensated inventor, who was potentially subjected to witness retaliation that resulted in total cessation of patent royalty payments by Google.

45. Plaintiffs' reverse search phone websites constitute a vertical search competitor as described in the Subcommittee report. Plaintiffs allege their experiences as a vertical search competitor are consistent with, and corroborate, the concerns and evidence presented in the Subcommittee report. Alternatively, over the past decade Plaintiff operated reverse phone search services and other websites that were subjected to similar anticompetitive conduct as documented in the Subcommittee report.

**Reverse Phone Search Industry Background**

46. The emergence of the reverse phone search industry, a subset of the directory services market, largely coincided with the initial growth of Defendant Google's search engine monopoly in the early 2000s. Prior to internet search engine availability, it was simply impractical to look up a phone number to see the corresponding name of the owner. Phone companies offered rudimentary services such physical reverse phone books and operator assisted phone queries, but these were highly specialized and localized, and for the most part, not used by the general population. They also typically only referenced landline numbers. The first dedicated online internet-based reverse phone search engines also suffered such limitations, derived from landline data and limited public records.

47. As mobile phones overtook landlines, the consumer demand for reverse phone search grew exponentially. Most consumers did not subscribe to Caller Name ID, which presented the name of an individual who called them from a wireless or landline phone. Text messages,

even for those who could afford Caller Name ID, often didn't implement the service, and still don't, to this day. As our culture shifted to online transactions on services like AirBnB, eBay, etc with strangers across the country – or the globe – knowing the identity of an incoming call or text message evolved from being a luxury convenience to a matter of safety.

48. Despite the need for such Caller Name ID, a complete void existed until 2013 whenever consumers would "Google someone" or "Google a number" to perform a reverse phone search. But until 2013, a typical reverse search query on Google's engine was plagued with inaccuracy and subscription-service scams.[2] The results presented to an end-user searching for a phone number would be lists of "keyword stuffed" mathematics lists, such as prime numbers, random numbers, and Fibonacci number lists, masquerading as phone numbers, directing them to an affiliate subscription, or presenting them with a Google advertisement.

49. While Google doesn't publish the number of phone and people searches conducted on its general search engine, the numbers are significant. Upon information and belief, in Google's early days over 25% of internet searches were simply phone or people searches. Today these numbers may be similar. Google knowingly ranked phone search spam in its results, such as prime number lists, as a way to monetize a large part of its search queries. Hence Google's early profitability as they grew their monopoly was built, at least in large part, on exploiting phone and people searches.

50. In 2013, recognizing this problem, Dr. Isaacs developed a method and technique to bridge the telecommunications Caller Name ID system with the internet IP web protocols. In

---

[2] In fact, this industry pioneered internet subscriptions, which are now, of course, ubiquitous.

simple terms, Dr. Isaacs invented and patented "Web Caller Name ID," and has spent the last decade on a mission to make the invention free to users.

51. OkCaller.com had been consistently ranked as a top provider in its field by web analysis firms such as SimilarWeb and Alexa. Plaintiffs' reverse phone search services platform ranked in the top few thousand websites in the United States. The platform ranked first among small-medium publishers; only Whitepages, Spokeo, and several other large corporations ranked higher, which typically offered additional directory information services functions.

52. Plaintiff's search platform was efficient to consumers. Plaintiffs spent a decade trying to ensure their Caller Name ID technology was offered free to end-users. Google recognized the novel value and directed a significant share of their search traffic to Plaintiffs' platform.

53. When Dr. Isaacs first submitted Web Caller Name ID to Google in 2014, the company flagged it as spam. Trying several different improvements, the Defendant repeatedly accused Dr. Isaacs of "keyword stuffing," when in fact, he had a website that was a *solution* to keyword stuffing. He submitted a question to Google's "Webmaster Forum," which eventually attracted the attention of Senior Executive Mueller. Mueller advised Isaacs to keep working on the interface, and that eventually, he would gain a userbase of organic Google traffic.

54. In fact, the reason the site was flagged as SPAM was because Plaintiffs took measures to ensure the safe use of Caller ID data. That meant they didn't allow Google bots to cache the "Caller Name ID," but only the phone number. However, Google saw large lists of phone numbers, without associated data, and incorrectly assumed it was SPAM.

55. Google eventually realized that OkCaller was not spamming them, but in fact, was trying to ethically and safely implement web caller ID.

56. Copycats weren't so careful, and allowed name search of Caller Name ID to phone numbers. These sites violate the intent and spirit and literal statute of "Daniel's Law" and other phone safety regulations. Were Google to block copycat websites, the web would be safer and there would be fewer "Daniel's Law" violations. That is because Plaintiffs would only license Web Caller ID to sites that shared opt-out information, and that didn't publish Caller Name ID's on SERPs for forward-lookup.

57. As Google recognized after Mr. Mueller's involvement, pairing Web Caller Name ID with user-vetted Spam reports provided a powerful combination. In one single screen, an end-user could see the name associated with a phone number, and submit or view crowdsourced reports pertaining to that number. Google recognized the potential of this novel combination as well, and the critical mass necessary to make its implementation successful. Almost overnight, Plaintiffs' reverse search service went from zero to approximately a half million user sessions a day.

58. The success of the site was immediately noted and emulated by many websites around the web. Within a year, dozens of phone websites all utilized the simple "Safe" and "Not Safe" user interface Plaintiffs' pioneered as "SafeCaller" adjacent to the Web Caller Name ID. Effectively, Plaintiffs set a user interface standard for phone search that instantly replaced the prime number and Fibonacci number sites, which largely disappeared within a year. The "look and feel" of the SafeCaller interface remains, to this day, a common interface standard for reverse phone search.

59. Nonetheless, Google has increasingly desired to fragment reverse search, and there are antitrust concerns that may be ascertained during discovery. Around 2017, a near-identical copycat of Plaintiffs' platform was awarded almost half of Plaintiffs' pre-2017 traffic, although OkCaller's profitability doubled from Google ads. Plaintiffs notified Google of the matter in 2017 but never regained the pre-2017 traffic level, but in light of the doubled CPMs, assumed Google "pegged" the site's income at a level they determined as fair. In other words, Google kept OkCaller in a competitive position that was valuable and reflected ongoing recognition of the patent validity and benefits of OkCaller, generally.

60. Plaintiffs tried to improve the platform over the years, but were never awarded increased traffic despite significant investments in platform improvement. For example, Plaintiffs developed a global reverse phone search platform with significant international telecommunication standards capability. Google awarded the international version effectively zero traffic. This was the beginning of Plaintiffs' realization, in conjunction with their FactMed experience, that Google's methodologies lacked in transparency, resulting in antitrust losses to consumers and developers alike.

61. Similarly, OkCaller was limited in improvement capability by Defendant Google. Google requested he transition his website to AMP technology, which Google had strategic interests in as a developer of AMP. Plaintiff did so, which meant foregoing other tools like Javascript to add functionality he had invested for the international version. In short, Plaintiff sought to innovate phone search, but his new platforms were ignored by Google and over the years, Google's conduct in advancing their own interests clearly increased.

62. Ongoing fragmentation from domestic and international copycats often presented fake Caller-Name data and had generally low quality control and risked public safety. Plaintiff's

reverse search services platform nonetheless maintained significant market share (and a record year of profits for OkCaller and Google) until Thanksgiving Eve 2022. Google removed millions and millions of the platform's pages of Caller Name IDs and Spam reports from their rankings. In other words, they were not merely lowered in rankings; they were removed from the index and censored for undisclosed reasons.

**Sherman Antitrust Relevant Market Theory**

*General Search Engines in the United States Is a Relevant Antitrust Market*

63. General search services (GSEs) in the United States constitute a relevant antitrust market. "General search engines" refers to platforms such as Google, Bing, and DuckDuckGo, which enable users to retrieve responsive information from the internet by entering keyword queries. These services are unique in that they provide a highly convenient, centralized "one-stop shop" for an extraordinarily broad range of content. Users rely on general search services for numerous types of queries—navigational, informational, and commercial—and other sources, whether offline media or niche online platforms, lack the universal scope, immediacy, and relevance that GSEs offer. Consequently, there are no reasonable substitutes for general search services, and a GSE monopolist could maintain service quality below competitive levels without losing the majority of its user base.

64. General search engines act as digital platforms serving two symbiotic customer groups: end-users seeking information and the developers and publishers who supply content to be discovered. While the end-user facing aspect of GSEs is straightforward, the developer-facing dimension—encompassing search visibility, indexing feedback, and webmaster tools—is equally critical. Through these tools and analytics, website owners effectively "purchase" distribution services from GSEs, ensuring their content can be found by the

end-user population. This arrangement mirrors a bookstore's role in distributing books from publishers to readers: the publisher (developer) relies on the bookstore (GSE) to reach readers (end-users), and the bookstore, in turn, provides valuable data, insights, and optimization guidance to ensure that the publisher's products are discoverable.

65. This interdependence establishes a developer-oriented component within the GSE market. While GSEs provide users with broad access to internet content, they also supply developers with the essential means to present, monitor, and improve their sites' visibility. Given Google's dominant share of global search queries, its webmaster tools have become the industry standard. Developers cannot realistically forego Google's platform or find alternatives with comparable reach, mirroring the concentrated conditions found in the consumer-facing side of the GSE market. Google's entrenched dominance thus allows it to control not only how users access content but also the terms by which developers can achieve online visibility.

66. This dominance raises serious concerns regarding transparency, fairness, and innovation. Because Google's search algorithms and penalties are opaque, developers struggle to understand or respond to changes in ranking and visibility. Without competitive pressure, Google can prioritize its own properties or favored partners, disadvantaging independent sites and distorting competition. In a market with few or no substitutes, developers lack meaningful recourse to alternative visibility tools, reducing incentives for rivals to innovate or enhance their services. In effect, both user-facing and developer-facing aspects of the GSE market are intertwined, giving a single dominant firm disproportionate influence over the entire chain of content discovery.

67. Since these services—both the general search results and the developer tools—are typically provided at no direct monetary cost, conventional price-based methodologies are less informative for market definition. Instead, the Small but Significant and Non-Transitory Decrease in Quality (SSNDQ) test is the appropriate analytical lens. Under the SSNDQ framework, if a hypothetical monopolist controlling GSE services and their associated webmaster tools were to degrade service quality—such as providing less transparent ranking criteria, slower indexing, or weakened analytics—users and developers would have no readily available substitutes offering comparable breadth, convenience, and audience reach. This inelasticity of demand with respect to quality confirms that GSEs form a distinct antitrust market, as stakeholders cannot simply shift to alternative platforms in response to quality declines. The SSNDQ test thus solidifies the conclusion that general search services in the United States constitute a relevant antitrust market.

68. Google has monopoly power in the United States general search services market, with 90% market share. There are currently only four meaningful general search providers in this market: Google, Bing, Yahoo!, and DuckDuckGo.

69. There are significant barriers to entry in general search services. The creation, maintenance, and growth of a general search engine requires a significant capital investment, highly complex technology, access to effective distribution, and adequate scale. For that reason, only two U.S. firms—Google and Microsoft—maintain a comprehensive search index, which is just a single, albeit fundamental, component of a general search engine. Google's large and durable market share and the significant barriers to entry in general search services demonstrate Google's monopoly power in the United States.

70. The Department of Justice and European competition authorities have recognized that significant barriers to entry, including the enormous cost of comprehensive indexing and the sophisticated webmaster tool infrastructures, prevent meaningful competition against an incumbent like Google. Were these barriers mitigated, by requiring Google to share indexing data, choosing a search engine would be more like selecting from a variety of podcasts or other easily accessed digital content, fostering new entrants and promoting a healthier competitive environment.

*Vertical Search Providers (VSPs) Is a Relevant Product Market*

71. Vertical search providers (VSPs) constitute a relevant antitrust market under the Sherman Act. A "vertical search provider" is a specialized online platform that indexes, curates, and retrieves information from a narrowly defined category of data or services, such as medical studies, legal precedents, reverse phone lookups, travel listings, or product reviews. Unlike general search engines, which offer users a broad, one-stop interface for queries spanning countless subject areas, VSPs deliver deeply contextualized results calibrated to the specific informational needs of their users. For example, a traveler seeking flight options on Expedia, a researcher investigating clinical drug trials on Pubmed, or a consumer searching for authoritative phone directory data on Yelp may turn to the corresponding vertical search platform whose depth and domain specificity general search services cannot reliably replicate.

72. The distinctiveness of VSPs arises from their curated focus on a particular field of information. This specialization renders VSPs uniquely valuable to users who require more targeted, authoritative, and domain-specific information than what general search engines can provide. Substitutes from alternative platforms—such as social media sites, traditional

directories, niche apps, or generalized web portals—fail to offer the same level of precision, integration, and relevance. As a result, users find themselves dependent on VSPs for solutions that general search engines or conventional directories cannot match, establishing VSPs as a separate, non-interchangeable product market.

73. From an antitrust perspective, the application of the Small but Significant and Non-Transitory Decrease in Quality (SSNDQ) test to the VSP market highlights its distinctiveness and the limited elasticity of both user and developer demand. Although no single vertical search provider is dominant, VSPs as a whole occupy a specialized, downstream position relative to general search engines (GSEs) and must compete on quality to earn placement and prominence in GSE search results. If VSPs' quality were systematically reduced—whether through diminished content curation, transparency, or indexing efficiency—there would be no readily available substitutes offering a similar depth of niche expertise. Users and developers, in turn, cannot simply shift their reliance to general search engines or unrelated platforms, as these do not deliver comparable vertical specificity. This dynamic means that even a modest, non-transitory deterioration in VSP quality fails to induce a meaningful competitive response or user migration, thereby underscoring that VSPs form a distinct antitrust market segment dependent on GSE gatekeeping practices and highlighting the vulnerability of this market to anticompetitive conditions. In sum, VSPs form a discrete and relevant antitrust market in the United States.

### *Directory Information Services in the United States Is a Relevant Antitrust Market*

74. Directory information services form a distinct and meaningful antitrust market within the digital economy. Historically dominated by printed white and yellow pages, these services have long served as a vital reference for finding individuals, businesses, and contact details.

As technology progressed, traditional directories gave way to online platforms such as Whitepages and Yellowpages, which transferred the familiar "lookup" function into a more accessible digital environment. Subsequently, newer entrants like Yelp and OkCaller emerged, bringing specialized capabilities, user reviews, and efficient reverse lookup functions to the fore. This array of providers—ranging from well-established directory brands to specialized newcomers—collectively offers comprehensive repositories of names, addresses, phone numbers, and related information that cannot be replicated by mere casual browsing or general web navigation.

75. Google's integration of directory functionalities within its General Search Engine (GSE) platform has fundamentally reshaped the competitive landscape. Leveraging its dominance in search, Google now incorporates business listings, contact information, and local results directly into its general search results pages. Through features like Google Maps business listings and "clickless" search results—where the user's query is fully answered on the search results page—Google effectively competes with and often displaces independent directory services. No longer must users click through to standalone directory websites; instead, Google centralizes and controls the flow of directory information, building on its established credibility, user trust, and broad user base to command a critical portion of the directory inquiries market.

76. From an antitrust perspective, the Small but Significant and Non-Transitory Decrease in Quality (SSNDQ) test underscores the vulnerability of this market to anticompetitive harm. Directory information services—provided largely at zero monetary cost—compete primarily on quality, reliability, and comprehensiveness. If a hypothetical monopolist directory provider, like Google acting through its integrated GSE ecosystem, were to

degrade the accuracy of its listings, reduce transparency about how businesses are ranked, or introduce friction into how users find contact information, consumers and businesses would have limited incentives or opportunities to migrate to competing platforms. The broad market share, brand recognition, and user familiarity with Google's offerings mean that even a sustained and noticeable decline in quality would not drive users or businesses to lesser-known, narrower directories. The unique trust and extensive reach that Google's integrated directory services command result in an inelastic demand with respect to quality, ensuring that users and content providers remain locked into its ecosystem.

77. In practical terms, this means that Google's integrated directory information services—spanning from Google Maps-based listings to featured snippets that obviate the need to visit third-party sites—constitute a non-substitutable resource for many users and businesses. The absence of equally influential competitors and the entrenched trust users place in Google's results provide Google with leverage that allows it to regulate visibility, control referral pathways, and shape market outcomes. Thus, directory information services, including those delivered through Google's GSE platform, can be identified as a relevant antitrust market. The SSNDQ analysis confirms that the combination of high user dependence, few practical substitutes, and Google's dual role as both information gateway and competitor creates precisely the conditions in which anticompetitive conduct can thrive, warranting careful scrutiny under antitrust law.

78. The United States constitutes a relevant geographic market for the directory information and related search services at issue. Cultural norms, regulatory frameworks, and consumer preferences differ significantly from those in other regions, affecting the way users interact with directories and the expectations placed on data accuracy, reliability, and transparency.

Local regulations, language use, and the nature of domestic advertising markets further distinguish U.S. conditions. Within this unique environment, Google's dominance is particularly pronounced. Google possesses and exercises market power in the U.S. directory information market, imposing nontransparent and discriminatory conditions that harm consumers and businesses alike. Upon information and belief, nearly half of information directory searches begin and complete on Google, and Google may possess monopoly power, pending discovery.

79. Reverse search services comprise a significant portion of the directory information services market. Pursuant to *Brown Shoe*, and because market contours are a matter for fact-finding by a jury, the directory search services market may be narrowed to the reverse search services market alleged in the prior operative complaint.

**There Exists a Single-Brand Relevant Market for Google Organic Traffic**

80. There exists a single-brand market for Google-referred traffic. This market aligns with the principles established in *Eastman Kodak Co. v. Image Technical Services, Inc.*, where the Supreme Court recognized that a single brand can constitute a separate market under certain conditions. Google's dominance and control over its search platform creates a distinct market with significant antitrust implications. Consumers inherently trust Google's search results due to the company's reputation for delivering relevant and authoritative information. This trust bestows upon Google-referred websites a perceived quality and legitimacy that is not easily replicated through other channels. For many users, the act of "Googling" has become synonymous with searching the internet, further entrenching Google's brand as the primary gateway to online content. Consequently, websites are heavily dependent on Google's organic search traffic to reach their audience and remain competitive.

81. The lack of viable substitutes reinforces this single-brand market characterization. While alternative search engines like Bing or Yahoo exist, their combined market share is negligible compared to Google's overwhelming dominance, which accounts for approximately 90% of search queries. For most businesses, the traffic derived from these alternatives is insufficient to sustain operations or achieve meaningful market presence. This reality mirrors the circumstances in *Kodak*, where customers had limited options for servicing their equipment despite the theoretical availability of alternatives.

82. Google's control over access to its GSE ecosystem allows it to exert significant influence over downstream markets such as this. By adjusting algorithms, prioritizing its own services, or selectively enforcing policies, Google can effectively determine which websites receive visibility and which are relegated to obscurity. This conduct has profound anticompetitive effects, as it enables Google to favor its own offerings and stifle competition without regard to the merits of the content or services provided by independent websites.

83. Moreover, website owners face substantial barriers to switching away from reliance on Google. Investing in search engine optimization (SEO) tailored to Google's algorithms requires considerable resources, and the knowledge and practices involved are often not transferable to other platforms. Additionally, consumers' entrenched preference for Google means that efforts to redirect marketing strategies toward alternative search engines or platforms yield minimal returns. These high switching costs and dependencies further support the single-brand market definition.

84. This market maintains and exploits Google's monopoly power in GSE. Google's dominance in this single-brand market is further confirmed by the application of the Small

but Significant and Non-Transitory Decrease in Quality (SSNDQ) test. Because these services are provided at zero monetary cost, quality becomes the key metric of competition. If Google were to reduce its transparency, alter its algorithm to favor certain partners more overtly, or otherwise degrade the quality of the referral process, neither users nor developers could effectively turn to alternative platforms. Rival search engines, holding negligible market shares, could not provide a comparable audience or deliver sufficient traffic to sustain most websites. This inelasticity with respect to quality illustrates that even a seemingly modest decline in service quality would not prompt users or developers to abandon Google. Instead, Google would retain control and continue to reap the benefits of its self-preferencing conduct, thereby entrenching its market power and compounding the anticompetitive harm. In such an environment, a small but significant and non-transitory deterioration in the services offered still fails to induce market entry or user migration, confirming the tightly defined, single-brand character of this market and its susceptibility to anticompetitive abuses.

**United States Internet Content Access Market**

85. General search engines and smartphone application distribution platforms, taken together, constitute a relevant antitrust market in which American consumers access the vast majority of internet content. In this "United States Internet Content Access Market," two dominant entities—Google and Apple—collectively control the primary channels or "on-ramps" by which users discover and engage with online information. Apple, through its near-total control over U.S. smartphone application distribution (i.e. the App Store), captures roughly 80% of user time and attention. Concurrently, Google, with its dominance in general web search, covers approximately 20%. While these shares reflect different

methods of accessing content (apps versus websites), their combined result is that nearly 100% of meaningful content discovery and referral in the United States flows through this duopolistic structure.

86. This market is unique because it combines two historically distinct access points—web search and smartphone apps—into a single, functionally integrated ecosystem. Users now rely heavily on dedicated apps for the bulk of their media consumption, while still turning to websites for particular content and services. Developers and content providers, in turn, must engage with and adapt to the policies and technical frameworks set by Apple and Google. Attempts to bypass one channel push content providers into the other's domain, yet Apple's restrictive policies (including limitations on API access for website-to-app functionalities) and Google's entrenched dominance in web indexing and referrals create a lockstep environment. This environment forecloses meaningful competition by ensuring no viable alternate routes exist for large-scale consumer reach. The lack of substitutes is stark: no independent suite of tools outside Apple's App Store or Google's search ecosystem can deliver comparable breadth and audience access. Even the creation of new platforms or distribution methods faces insurmountable barriers due to the duopolists' preexisting scale, incumbency advantages, and user habits.

87. OkCaller faced exclusion from both duopolists. After asserting its patent infringement claims against Apple in 2016, its App dropped off the Top Ten App Store list, where it had enjoyed years of leading position. And in 2022, Google dropped OkCaller. Hence Plaintiffs had no reasonable access to internet content access markets for their product.

88. The Small but Significant and Non-Transitory Decrease in Quality (SSNDQ) test illustrates the inelasticity of demand in this market. Were Apple and Google, acting individually or

in tacit coordination, to degrade the quality of their services—whether by injecting biased results, restricting developer access, or erecting additional barriers to entry—consumers and content providers would find no adequate substitutes capable of achieving similar nationwide reach and immediacy. Users who wish to access internet content would have nowhere else to turn for comprehensive coverage and seamless convenience. Developers dependent on these platforms to reach audiences would lack practical alternatives to bypass Apple's App Store restrictions or Google's indexing algorithms. This lack of elasticity in response to a reduction in quality or fairness confirms that the United States Internet Content Access Market is distinct and subject to antitrust scrutiny. Absent competitive pressure, Apple and Google can maintain or impose conditions detrimental to both consumer welfare and content innovation without facing the usual market-based checks.

89. In short, the United States Internet Content Access Market—encompassing both app-driven content access dominated by Apple and web-based search dominated by Google—forms a relevant antitrust market. The severe concentration, the absence of reasonable substitutes, and the inelasticity demonstrated by the SSNDQ framework substantiate that these combined on-ramps to the internet represent a definable and critical market for antitrust analysis. The US is an appropriate geographic market, given the aforementioned language and cultural issues for content preferences. Google and Apple collectively monopolize this market as a duopoly.

### ANTICOMPETITIVE INJURY

90. Google's unlawful maintenance of monopoly power and exclusionary conduct within and across the relevant markets identified—general search services, vertical search providers, directory information services, and the single-brand market for Google-referred traffic—

have inflicted substantial anticompetitive harm on consumers, developers, and the broader internet ecosystem. Google's dominance, combined with its use of exclusionary agreements, self-preferencing, and non-transparent algorithmic practices, has produced a marketplace where competitors struggle to gain visibility, scale, or meaningful access to users, thereby stifling innovation and diminishing the overall quality of services available.

91. By leveraging its position at the core of online content discovery, Google has substantially foreclosed competition in general search and directory-related services, effectively protecting the majority of U.S. search queries and directory lookups from any meaningful rival. This foreclosure takes multiple forms. First, Google's actions exclude would-be competitors, including reverse phone search and general search alternatives, from effective distribution channels. Such conduct denies rivals the necessary scale to compete effectively, reinforcing Google's entrenched dominance.

92. Second, Google fragments and restricts other potential distribution paths for vertical search providers and directory services, ensuring that even if a competing service emerges, it cannot achieve sufficient audience reach. As a result, barriers to entry rise steeply, excluding competition at critical emerging access points on both desktop and mobile devices. Reduced competition in these markets not only limits choices for consumers but also discourages the development of new or improved search technologies that might otherwise arise in a more open marketplace.

93. The absence of vigorous competition and the resulting imbalances in bargaining power have real-world consequences. The House of Representatives Subcommittee Report on Antitrust in Digital Markets, which has been referenced in and is incorporated into this Amended Complaint, documents analogous injuries befalling specialized search providers.

App. 147

These documented harms resonate directly with the conditions faced by Plaintiffs and similar businesses in these defined relevant markets, confirming that the restraints imposed by Google's market conduct are neither hypothetical nor distant—they are pressing, tangible, and well-documented.

94. Moreover, Google's internal vertical search and directory functionalities serve as reverse search (as a component of directory services) services that reinforce its dominance. By controlling the gateway to internet content and directing user queries to its own or preferred partners' offerings, Google ensures that would-be rivals in reverse search and related directory fields cannot rise to challenge its hegemony. Historical reliance on reverse phone lookups and person directory searches illustrates how a successful challenger could have diminished Google's monopolistic power, had it not been systematically excluded and undermined. Google's calculated fragmentation and marginalization of promising services like OkCaller, combined with the inability of general search rivals to gain a foothold, has undercut both consumer choice and developer opportunity, resulting in higher barriers to innovation and depressed quality of service.

95. In sum, the anticompetitive injuries inflicted by Google's conduct include, but are not limited to, suppressed innovation, reduced transparency, diminished consumer welfare, and the foreclosing of pathways for potential competitors to reach users at scale. These harms align squarely with the antitrust injury the Sherman Act seeks to prevent, and they warrant the Court's careful scrutiny and the corresponding relief appropriate to restore competition and fairness to these vital markets.

**<u>Putative Class Definitions</u>**

96. Plaintiff Greenflight Venture Corporation (and only this Plaintiff) brings this proposed class action pursuant to Fed. R. Civ. P. 23(b)(1), (2), and (3).

97. Plaintiff brings this action on behalf of itself and the following nationwide classes, for monetary and injunctive relief based on violations of Sherman Act or State Competition Laws:

> *- All web developers whose VSPs or Directory Information Services for United States internet consumers were not indexed, or not effectively indexed, on Google Search, from four years prior to filing of this Complaint through the present. (Google GSE non-indexed class)*

> *- All web developers whose VSPs or Directory Information Services for United States consumers were suppressed in Google SERPs, and not ranked according to objective quality metrics, causing developer investment losses, from four years prior to filing of this Complaint through the present. (SERP metric transparency class)*

> *- All publishers who consumed Google Webmaster Tools/Search Console services and whose content was not indexed, or not fairly indexed, on Google Search, from four years prior to filing of this Complaint through the present. (GWT Content non-indexed class)*

98. Excluded from these proposed classes are the Google defendants (i.e. Alphabet); Google defendants' affiliates and subsidiaries; Google defendants' current or former employees, officers, directors, agents, and representatives; and the district judge or magistrate judge to whom this case is assigned, as well as those judges' immediate family members.

99. **Numerosity:** The exact number of the members of the proposed classes is unknown and is not available to the plaintiffs at this time, but a reasonable estimate is that approximately 250,000 small developers submitted VSPs to Google Webmaster Tools / Search Console over the past five years.

100.     **Commonality:** Numerous questions of law and fact are common to the claims of the plaintiffs and members of the proposed classes. These include, but are not limited to: a. Google Defendants willful violations of State Competition Laws directed at each class member; b. Google Defendants willful violations of Sherman Act; c. Whether plaintiff and members of the proposed classes are otherwise entitled to any damages, including treble damages, or restitution, and to their attorney fees, costs, and expenses related to any recovery of such monetary relief; and h. Whether plaintiff and members of the proposed classes are entitled to any damages, including treble damages, or restitution incidental to the declaratory or injunctive relief they seek, and to their attorney fees, costs, and expenses related to any recovery of such monetary relief.

101.     **Typicality:** Plaintiff's claims are typical of the claims of the members of the proposed classes. The factual and legal bases of Google Defendants' liability are the same and resulted in injury to plaintiff and all of the other members of the proposed classes. The typicalness of these claims is evidenced by the fact they warranted entire sections in the House Report regarding specialized search services. To support apportionment of class compensation fund, web developers of VSPs may submit evidence of hours spent, resources dedicated, or monetary investments in non-indexed or ranking suppressed sites.

102.     **Adequate representation:** Plaintiff will represent and protect the interests of the proposed classes both fairly and adequately. Plaintiff retained counsel able to engage, and

experienced with, complex litigation and class actions. Plaintiff has no interests that are antagonistic to those of the proposed classes, and do not conflict with the interests of the proposed class members.

103.    **Prevention of inconsistent or varying adjudications:** If prosecution of a myriad of individual actions for the conduct complained of were undertaken, there likely would be inconsistent or varying results. This would have the effect of establishing incompatible standards of conduct for the defendant. Certification of Plaintiff's proposed classes would prevent these undesirable outcomes.

104.    **Injunctive and declaratory relief:** By way of its conduct described in this complaint, Google Defendants have acted on grounds that apply generally to the proposed classes. Accordingly, final injunctive relief or corresponding declaratory relief is appropriate respecting the classes as a whole.

105.    **Predominance and superiority:** This proposed class action is appropriate for certification. Class proceedings on these facts and this law are superior to all other available methods for the fair and efficient adjudication of this controversy, given that joinder of all members is impracticable. Even if members of the proposed classes could sustain individual litigation, that course would not be preferable to a class action because individual litigation would increase the delay and expense to the parties due to the complex factual and legal controversies present in this matter. Here, the class action device will present far fewer management difficulties, and it will provide the benefit of a single adjudication, economies of scale, and comprehensive supervision by this Court. Further, uniformity of decisions will be ensured.

## IV.    VIOLATIONS ALLEGED

**First Claim for Relief: Maintaining Monopoly of General Search Engines in Violation of Sherman Act § 2 (DOJ Verbatim Cause of Action)**

106.    Plaintiffs incorporate the allegations of paragraphs 1 through 95 above.

107.    General search engine services (GSE) in the United States is a relevant antitrust market and Google has monopoly power in that market.

108.    Google has willfully maintained and abused its monopoly power in GSEs through anticompetitive and exclusionary distribution agreements that lock up the preset default positions for search access points on browsers, mobile devices, computers, and other devices; require preinstallation and prominent placement of Google's apps; tie Google's search access points to Google Play and Google APIs; and other restrictions that drive queries to Google at the expense of search rivals.

109.    Google's exclusionary conduct has foreclosed a substantial share of the general search services market.

110.    Google's anticompetitive acts have had harmful effects on competition and consumers. Google has leveraged this monopoly to injure downstream VSPs and Directory Services as a whole by reducing competition and consumer choice. Plaintiffs are consumers of Google GSE platform through their provision of content via tools like GWT. Plaintiffs are competitors under [proposed] DOJ and [active] EU regulations to permit competing developers access to Googlebot data. (*added*)

111.    The anticompetitive effects of Google's exclusionary agreements outweigh any procompetitive benefits in this market, or can be achieved through less restrictive means.

112.    Google's anticompetitive and exclusionary practices violate Section 2 of the Sherman Act, 15 U.S.C. § 2.

**Second Claim for Relief: Maintaining Sherman Act § 1 Unreasonable Restraints of Trade in the GSE, VSP, and Directory Services, Internet Access, and Google Single-Brand Content Markets**

113.    Plaintiffs incorporate the allegations of paragraphs 1 through 95 above.

114.    This cause of action is brought under Section 1 of the Sherman Act, 15 U.S.C. § 1, which prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations."

115.    Google has entered into and enforced agreements, as well as engaged in unilateral and bilateral practices, that have unreasonably restrained trade in multiple markets, including the general search services market, vertical search provider (VSP) market, directory information services market, internet content access, and single-brand Google-referred traffic market. Through these arrangements and practices, Google systematically suppresses competitors, including Plaintiffs, who depend on fair and non-discriminatory access to search referrals and indexing.

116.    Google's anticompetitive agreements with strategic partners and its exercise of raw gatekeeper power have forced independent developers and specialized search providers to operate under conditions that drastically limit their ability to obtain visibility and scale. This coercion takes many forms, from prioritizing websites that spend heavily on Google Ads to entering into exclusionary agreements—such as the so-called ISA Agreement with Apple—which collectively lock up crucial distribution channels and preserve Google's entrenched position.

117.    As illustrated by industry examples, Google commonly prefers entities that amplify its advertising revenues or strategic interests. For instance, in *Dreamstime*, a vertical image

search service alleged that Google manipulated SERP rankings to favor certain partners, such as Getty Images, over independent rivals. Similarly, Plaintiffs here witnessed Google removing or demoting millions of OkCaller pages and other independent content providers' listings, effectively diverting user traffic to Google's own properties or those of favored partners. This discrimination distorts competition and impairs the very competitive process that the Sherman Act is designed to protect.

118.    This conduct amounts to more than mere unilateral self-preferencing; it arises from explicit and implicit understandings, arrangements, and contractual obligations that preserve Google's supremacy. By structuring relationships and technical policies that require dependency on Google's platform, Google's actions have reduced consumer choice, limited innovation, and forced independent developers to shoulder increased costs or risk invisibility. Ultimately, competitors cannot effectively challenge Google or maintain their presence without acceding to its restrictive conditions.

119.    These agreements and concerted actions serve no legitimate procompetitive purpose and do not improve consumer welfare or enhance market efficiency. Even under a rule-of-reason analysis, any claimed benefits are decisively outweighed by the anticompetitive harms. The restraints at issue harm both consumers—who lose access to diverse and innovative content—and developers—who face artificially inflated costs and suppressed opportunities. Under a per se or rule-of-reason framework, Google's practices constitute unreasonable restraints of trade.

120.    As a direct and proximate result of Google's unreasonable restraints of trade, Plaintiffs and members of the proposed class have suffered tangible antitrust injury, including lost revenue streams, reduced market shares, increased operational costs

stemming from the need to placate Google's ranking algorithms or purchase supplementary advertising to be seen at all, and diminished opportunities to introduce new or improved services. Such injuries are precisely the type of harm that the Sherman Act is intended to prevent.

121.    Plaintiffs and the class members are entitled to damages, including treble damages under the Clayton Act, and to injunctive relief preventing Google from continuing and renewing these anticompetitive agreements and practices. A judicial remedy is necessary to restore competition, fairness, and innovation within these critical segments of the digital economy.

**Third Claim for Relief:** Refusal to Deal in Violation of Section 2 of the Sherman Act (Aspen Skiing Co. v. Aspen Highlands Precedent)

122.    Plaintiffs incorporate the allegations of paragraphs 1 through 97 above.

123.    Defendant Google LLC, by leveraging its dominant position in the general search engine market, has engaged in a unilateral refusal to deal with independent web developers and specialized content providers, such as Plaintiffs, in violation of Section 2 of the Sherman Act.

124.    Google has terminated longstanding and profitable business relationships with developers like Plaintiffs, who were previously able to rely on Google's search engine for traffic and revenue generation. This conduct is analogous to the behavior condemned by the Supreme Court in *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985), where the Court held that a monopolist's refusal to deal with a competitor could give rise to a claim under Section 2 of the Sherman Act.

125.     *Aspen Skiing Co. V. Aspen Highlands Skiing Corp.* (472 U.S. 585, 1985) unequivocally broadens the examination of monopolistic behavior beyond the boundaries of market definition into the realm of exclusionary conduct. The Supreme Court has provided vital precedent, recognizing that a monopolist's refusal to deal with competitors, absent a credible efficiency rationale, can constitute a standalone concern under the purview of antitrust enforcement. The operative conduct under scrutiny is exclusion of rivals, not the defendant's power within a strictly defined market.

126.     Google's refusal to provide fair and equitable access to its search engine results constitutes exclusionary conduct intended to suppress competition and maintain its monopoly power. This refusal has resulted in significant harm to Plaintiffs and other class members, who have been denied access to a critical facility essential for competing in the market. Google sacrificed short-term profits, which they had received from OkCaller for a decade, to obtain long-term monopolistic gains (growth of their own directory and advertising ambitions), consistent with *Aspen* case law.

127.     As described in the preceding sections, OkCaller had a formidable and significant preexisting, profitable relationship with Google. OkCaller generated profits that represented around .1%, or 1/1000th of 2010 level profits. In the directory services niche, OkCaller vitally improved Google's abysmal SERPs from that timeframe, giving the search firm credibility and user satisfaction. In multiple regards, OkCaller was a profitable course of business amongst competitors, which terminated.  Google now shows -zero- pages for OkCaller (or perhaps one page) which represents an effective termination of the critical volume necessary for a directory services site to function and operate.

128. In addition, similar allegations by Yelp corroborate the conclusion that Google's refusal to deal is neither accidental nor justified by procompetitive aims. Yelp, a vertical search and directory provider, has publicly complained and initiated legal actions alleging that Google systematically favors its own products, steering users to "clickless" search results and Google Business Listings instead of directing them outward to independent providers like Yelp or Plaintiffs. Its complaint provides compelling evidence and market research incorporated herein. This broader pattern reinforces the absence of a legitimate business justification for Google's sudden withdrawal of cooperation. Rather than improving efficiency or enhancing user experience, Google's conduct aligns with a calculated strategy to diminish the visibility of competitors, reduce external innovation, and foreclose opportunities for rival services. Taken together, these facts further confirm that Google's refusal to deal, as alleged here, is precisely the sort of exclusionary, competition-harming conduct that *Aspen Skiing* proscribes. It also cannot be ruled out that Google sought to eliminate competition by retaliating against antitrust advocates, which is the case for both OkCaller and Yelp.

129. As a direct and proximate result of Google's refusal to deal, Plaintiffs and the members of the proposed class have suffered economic injury, including loss of revenue, diminished market share, and increased costs. Google's conduct is a clear violation of Section 2 of the Sherman Act, and Plaintiffs are entitled to damages, including treble damages, and injunctive relief to prevent further harm.

130. Plaintiffs similarly invoke all four elements of related MCI exclusionary conduct caselaw. *MCI Communications Corp. v. American Tel. & Tel. Co.,* 708 F.2d 1081 (7th Cir.), cert. denied, 464 U.S. 891 (1983), a case challenging AT&T's use of local telephone

networks to thwart competition in the long distance telephone service market. There, the court held that "to establish liability under the essential facilities doctrine [a plaintiff must show]: (1) control of the essential facility by a monopolist; (2) a competitor's inability practically or reasonably to duplicate the essential facility; (3) the denial of the use of the facility to a competitor; and (4) the feasibility of providing the facility." Id. at 1132-33."

131.     Here, Google controlled access to general and reverse search customers, OkCaller and Greenflight could not reasonably duplicate the facility, Google denied use of the facility by deindexing OkCaller, and Google could have, and did for a decade, feasibly provided the facility.

**Fourth Claim for Relief:  Violation of California's Unfair Competition Law (Cal. Bus. & Prof. Code §§ 17200, et seq.)**

132.     Plaintiffs incorporate the allegations of paragraphs 1 through 97 above.

133.     Defendant Google LLC has engaged in unlawful, unfair, and fraudulent business practices in violation of California's Unfair Competition Law (UCL), Cal. Bus. & Prof. Code §§ 17200, et seq. These practices include, but are not limited to, monopolistic and anticompetitive conduct that has harmed Plaintiffs and the proposed class.

134.     Google's conduct, as detailed in the preceding counts, constitutes unlawful business practices in violation of the UCL because it violates the Sherman Act, as well as other federal and state laws.

135.     Google's actions have misled and deceived consumers, publishers, and developer competitors regarding the nature and operation of its search engine, including the manipulation of search rankings to favor its own products and those of its strategic partners while disadvantaging independent developers and specialized content providers, such as

Plaintiffs. In short, consumers and developers believe their Google queries result in a reasonably fair and competitive SERP result, but this is often untrue. Google does not disclose when it provides unfair or self-preferencing SERP results, which violates UCL. Transparency metrics are needed to comply with UCL.

136. Google's practices are also unfair within the meaning of the UCL because they offend established public policy, are immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers, web developers, and specialized content providers. Google's conduct has had the effect of stifling competition, reducing innovation, and causing significant financial harm to Plaintiffs and the class. Google breached its duty to disclose by the aforementioned conduct, leading to significant losses of developer time and resources.

137. Google's actions are unfair to the extent the developers invest substantial time, money, and resources to bring competitive services to consumers, but are squelched and (de)indexed or suppressed in Google Search. Similarly, Google's failure to implement transparent quality metrics, where developers could fairly compete and improve their work products, is unfair, especially given Google's two-decade timeframe to implement such metrics that are customary in other high volume disbursement allocations. Developer transparency would avoid wasted resources, and benefit consumers greatly, and therefore a monopolist like Google with 90% of the search market should provide such an offering.

138. In fact, many users widely report to news media, reddit, and other industry forums that Google SERPs have gone steadily downhill, since the PageRank days of transparency, and are now near-unusable for many queries. Therefore, there exists evidence that higher transparency in previous days benefited users and publishers, because they were findable

in SERPs. Google has substantial internal research concerning this subject and is requested to provide it on expedited basis should it file any dispositive motion on the UCL claim, which would be frivolous without providing such data.

139. Google's actions are unfair and illegal to the extent the company retaliates against antitrust advocates, such as Plaintiffs. Beyond being unfair and un-American, the conduct violates federal witness protection statutes, including 18 USC 1512, and therefore is protected conduct under UCL. Plaintiff asserts elements of retaliation occurred, including a protected act – their previous federal antitrust advocacy, the aforementioned adverse events, and temporal proximity between these events. Plaintiffs seeks expedited production by Google of evidence surrounding the termination of OkCaller. Plaintiffs, as alleged, submit that Google has stonewalled reasonable requests for over one year, effecting a DARVO campaign to blame Plaintiffs for simple inquiry into antitrust matters.

140. Google's undue influence and conduct towards VSPs, directory services, and internet content access methods violates the spirit of State Competition Laws like UCL, even if Defendant is not found guilty of directly monopolizing the relevant Sherman markets. UCL considers incipient monopolies, including the duopoly claims, and leverage of realistic market conditions beyond traditional Sherman relevant market theory.

141. As a direct and proximate result of Google's deceptive and unfair trade practices, Plaintiffs and the members of the proposed class have suffered economic injury, including loss of revenue, diminished market presence, and increased operational costs.

142. This California State Competition Law is invoked extra-jurisdictionally. Google's headquarters is situated in Mountain View, California. Many of the decisions to violate

Sherman Act, and engage in anticompetitive conduct, are executed in California. Therefore UCL should apply to redress such conduct.

143.    As a direct and proximate result of Google's unlawful, unfair, and fraudulent business practices, Plaintiffs and the members of the proposed class have suffered economic injury, including loss of revenue, diminished market presence, and increased operational costs.

144.    Plaintiffs, on behalf of themselves and the proposed class, seek restitution, disgorgement of profits, and injunctive relief, and implementation of reasonable transparency measures and/or arbitration rights to challenge SERPs, to prevent Google from continuing its unlawful, unfair, and fraudulent practices, as well as any other relief deemed just and proper by the Court.

**FIFTH CLAIM FOR RELIEF: ILLEGAL DUOPOLY CONTROL OF U.S. INTERNET CONTENT ACCESS IN VIOLATION OF SECTION 2 OF THE SHERMAN ACT**

145.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

146.    In addition to holding monopoly power in the general search engine (GSE) market, Google exercises control over U.S. internet content access in concert with Apple, forming a duopoly that effectively dominates all meaningful channels by which consumers access online information. Apple controls the lion's share—approximately 80%—of user attention and engagement through its near-total control over smartphone app distribution, while Google, with its dominance in general web search, commands the remaining 20%. Although this division might initially appear to reduce Google's relative share, the reality is that the two firms together foreclose nearly 100% of practical avenues for content

discovery, leaving content developers, publishers, and specialized service providers with no viable alternatives.

147.    Despite holding the smaller share of this duopoly, Google cannot escape liability under Section 2 of the Sherman Act. Its 20% slice of the entire U.S. internet content access market is no modest piece—it represents the entirety of web-based content referral for the vast majority of consumers. This 20% sector, controlled by Google, remains subject to Google's established 90% share of the GSE market. Google's entrenched monopoly power in GSE thus informs and reinforces its critical role within the duopoly. In other words, Google's arguments that Apple's dominance in app distribution somehow absolves Google of accountability would be misplaced. The existence of a duopoly does not immunize a participant from scrutiny; rather, it underscores the joint stranglehold the two firms have on the essential pathways for content distribution and audience reach.

148.    The harm to Plaintiffs and the class members is substantial. With Google and Apple controlling all major "on-ramps" to online content, independent developers and specialized service providers cannot reach consumers at scale without bending to the terms set by these two giants. Google, as gatekeeper to web-based discovery, decides which sites merit visibility and which remain obscure, effectively determining winners and losers. Without competitive pressure from new entrants or meaningful substitutes, Plaintiffs and similarly situated developers face suppressed innovation, limited revenue opportunities, and diminished consumer choice. The SSNDQ analysis applies here as well: even if Google and Apple were to degrade quality—by introducing more restrictive conditions, reducing transparency, or further self-preferencing their own offerings—users, developers, and

publishers would remain effectively "locked in" due to the absence of alternate large-scale distribution platforms.

149. Google's integral role in this duopoly, combined with its acknowledged monopoly power in GSE, means Google cannot disclaim responsibility by pointing to Apple's complementary control over app-based content. Both firms' actions—and Google's in particular—serve to exclude competition at critical nodes of discovery, maintain artificially high barriers to entry, and enforce conditions that stifle innovation and consumer welfare. This stable two-firm environment, in which Google is an essential partner, replicates the economic harms characteristic of single-firm monopolies. By jointly foreclosing competitive channels and reinforcing each other's entrenched market positions, the duopoly has created a scenario where anticompetitive conduct thrives, preventing Plaintiffs and the class from participating fairly in the digital marketplace.

150. The presence of two coordinated or interdependent firms controlling the entire content access ecosystem does not excuse or attenuate Google's antitrust liability. Rather, it highlights how Google's longstanding exclusionary conduct and competitive abuses fit neatly into a broader environment designed to deny rivals any meaningful route to consumers. As a direct and proximate result of these conditions, Plaintiffs and class members have suffered economic harm, restricted opportunities, and diminished returns on investment and innovation, all of which the Sherman Act exists to prevent.

151. Therefore, Google's active participation and central role within this duopolistic structure, combined with its already recognized monopoly power in GSE, constitute an illegal maintenance of market power and a violation of Section 2 of the Sherman Act. Plaintiffs and the class members are entitled to all available remedies under law, including

injunctive relief and treble damages, to restore competition, encourage innovation, and safeguard the fundamental principles of a competitive digital economy.

## V.    <u>REQUEST FOR RELIEF</u>

WHEREFORE, to remedy these illegal acts The Plaintiffs and class members respectfully request that this Honorable Court:

A. Certify this case as a web developer and publisher class action lawsuit and that it certify the proposed federal law classes on a nationwide basis for all content products that were improperly (de)indexed, or subject to SERP ranking suppression, between today's filing date and four years prior.

B. Adjudge and decree that Google has acted unlawfully to monopolize the general search engine market in the United States in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2; and leveraged this monopoly to injure competition in the VSP, directory services, and single-brand organic traffic markets.

C. Enjoin Google from continuing to engage in the anticompetitive practices described herein, including duopoly conduct in the internet content access markets, and from engaging in any other practices with same purpose or effect as the challenged practices, including but not limited to:

   a. Failing to offer transparent evaluation metrics of VSPs and web developer work products; or failing to rank and index these work products on objective and transparent evaluation standards.

   b. preventing Google from leveraging its GSE monopoly to exploit web developers, business partners, consumers, or others to obtain, maintain, extend, or entrench a monopoly.

D. Order treble damages compensating the Class Members through a "Developer Compensation Fund" based on developer submission of damages computed by project expenditures, dedicated person-hours, and other metrics, estimated in the billions[3] USD; and to Lead Plaintiffs:

   a. Plaintiff Greenflight Venture Corporation and its owners, which suffered actual losses of no less than $80 million in goodwill, revenue, and loss of investment opportunity for its software app portfolio including OkCaller, FactMed, and other VSPs, directory services, or internet content.

E. Permit trial by jury for all claims herein.

F. Award each Plaintiff, as applicable, an amount equal to its costs, including reasonable attorneys' fees, incurred in bringing this action.

G. Grant any further relief as may be fair and just, including applicable California UCL redress and permanent injunctive orders.

Respectfully submitted, this 9th day of December 2024.

/s/ Ayelet Faerman
Ayelet Faerman, Esq.
Faerman Law P.A.
3859 NW 124 Ave
Coral Springs, FL 33065
954-271-8484
ayelet@faerman.law
Counsel for Greenflight Venture Corporation

/s/ Jeffrey Isaacs
Jeffrey D. Isaacs, M.D.
11482 Key Deer Circle
Wellington, FL 33449
212-257-0737
jeffreydi@gmail.com

**DEMAND FOR JURY TRIAL**

---

[3] By creating an inefficient bottleneck on the entire US VSP market, Google put itself in a precarious liability position for lost value creation. Take for example a competitive VSP, never ranked in Google SERPs due to Defendants' preferencing of its own or strategic partners' VSP. If Google blocked just one single web SVP app from succeeding at the $1 billion valuation, it would be liable for $3 billion (3x) under Sherman act. Our estimate assumes at least three hundred SVP apps were suppressed or improperly (de)indexed, which would have been competitive in a transparent GSE service, each with an average valuation of $10million. Given these conservative estimates, it is evident Google's conduct causes a sizeable antitrust injury to the US economy and warrants a considerable Developer Compensation Fund.

In accordance with FRCP 38, Plaintiff and Class Members hereby request a trial by jury.

Executed on this 9th day of December 2024.

/s/ Ayelet Faerman                                    /s/ Jeffrey Isaacs                  
Ayelet Faerman, Esq.                                  Jeffrey D. Isaacs, M.D.

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

**Case No. 9:24-cv-80395-RLR-BER**


GREENFLIGHT VENTURE CORPORATION,

    Plaintiff,

v.

GOOGLE LLC,

    Defendant.

---

**DEFENDANT GOOGLE LLC'S MOTION TO DISMISS**
**THE SECOND AMENDED COMPLAINT**
<u>**FOR FAILURE TO STATE A CLAIM**</u>

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................... ii

BACKGROUND ................................................................................................................... 1

ARGUMENT ........................................................................................................................ 2

I.      Count 1 Fails to State a Section 2 Claim. ......................................................... 2

II.     Count 2 Fails to State a Section 1 Claim. ......................................................... 4

        A.      Count 2 Fails for All Alleged Markets Because It Fails to Allege an Agreement.. 4

        B.      Count 2 Fails for Additional Reasons. .................................................... 7

III.    Count 3 Fails to State a Section 2 Claim. .......................................................... 9

IV.     Count 4 Fails to State a Claim Under California's Unfair Competition Law.................... 11

        A.      The "Unlawful Business Practices" Prong. ............................................. 11

        B.      The "Unfair" Prong. .................................................................................. 13

        C.      The "Fraudulent" Prong. .......................................................................... 16

V.      Count 5 Fails to State a Section 2 Claim. ......................................................... 17

CONCLUSION .................................................................................................................... 18

## TABLE OF AUTHORITIES

*Cases* **Pages**

*Apple Inc. v. Psystar Corp.*,
　　586 F. Supp. 2d 1190 (N.D. Cal. 2008) ..................................................................8

*Ashcroft v. Iqbal*,
　　556 U.S. 662 (2009)..............................................................................................11

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
　　472 U.S. 585 (1985)................................................................................................6

*Bailey v. Allgas, Inc.*,
　　284 F.3d 1237 (11th Cir. 2002) ..............................................................................4

*Bell Atlantic Corp. v. Twombly*,
　　550 U.S. 544 (2007)..............................................................................................3, 5

*Blue Shield of Va. v. McCready*,
　　457 U.S. 465 (1982)................................................................................................4

*Coronavirus Reporter v. Apple Inc.*,
　　85 F.4th 948 (9th Cir. 2023) ...................................................................................2

*Casault v. Fed. Nat. Mortg. Ass'n*,
　　915 F. Supp. 2d 1113 (C.D. Cal. 2012) ...............................................................16

*Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*,
　　20 Cal. 4th 163 (1999) ...............................................................................11, 13, 15

*City of San Jose v. Off. of the Com'r of Baseball*,
　　776 F.3d 686 (9th Cir. 2015) ................................................................................14

*Daugherty v. Am. Honda Motor Co.*,
　　144 Cal. App. 4th 824 (2006) ...............................................................................16

*Dreamstime.com, LLC v. Google LLC*,
　　No. 20-16472, 2022 WL 17427039 (9th Cir. Dec. 12, 2022)...............................15

*Duty Free Americas, Inc. v. Estee Lauder Cos., Inc.*,
　　797 F.3d 1248 (11th Cir. 2015) ..............................................................................9

*Fed. Trade Comm'n v. Qualcomm Inc.*,
　　969 F.3d 974 (9th Cir. 2020) ..................................................................................3

*Feldman v. Jackson Mem'l Hosp.*,
　　571 F. Supp. 1000 (S.D. Fla. 1983) .....................................................................17

ii

# TABLE OF AUTHORITIES
*(continued)*

*Cases*                                                     **Pages**

*Feldman v. Palmetto Gen. Hosp., Inc.*,
980 F. Supp. 467 (S.D. Fla. 1997) ...............................................................................7

*Fla. Seed Co. v. Monsanto Co.*,
105 F.3d 1372 (11th Cir. 1997) ................................................................................4, 9

*Green Country Food Market, Inc. v. Bottling Group*,
371 F.3d 1275 (10th Cir. 2004) ...............................................................................8, 9

*Hadley v. Kellogg Sales Co.*,
243 F. Supp. 3d 1074 (N.D. Cal. 2017) ....................................................................15

*Hicks v. PGA Tour, Inc.*,
897 F.3d 1109 (9th Cir. 2018) ..................................................................................14

*In re Brinker Data Incident Litig.*,
No. 18-686, 2020 WL 691848 (M.D. Fla. Jan. 27, 2020).........................................12

*In re Flat Glass Antitrust Litig.*,
385 F.3d 350, 360 (3d Cir. 2004)................................................................................6

*JES Properties, Inc. v. USA Equestrian, Inc.*,
No. 802CV1585T24MAP, 2005 WL 1126665 (M.D. Fla. May 9, 2005) ........................17

*Kendall v. Visa U.S.A., Inc.*,
518 F.3d 1042 (9th Cir. 2008) ..................................................................................6

*Levine v. Cent. Fla. Med. Affiliates, Inc.*,
72 F.3d 1538 (11th Cir. 1996) ..................................................................................4

*Lombard's Inc. v. Prince Mfg. Inc.*,
583 F. Supp. 1572 (S.D. Fla. 1984) ...........................................................................5

*Lozano v. AT&T Wireless Servs., Inc.*,
504 F.3d 718 (9th Cir. 2007) ...................................................................................11

*Midwest Gas Servs., Inc. v. Indiana Gas Co.*,
317 F.3d 703 (7th Cir. 2003)  ...................................................................................17

*Midwestern Waffles, Inc. v. Waffle House, Inc.*,
734 F.2d 705 (11th Cir.1984)) ...................................................................................5

# TABLE OF AUTHORITIES
*(continued)*

|  *Cases* | **Pages** |
|---|---|

*Nat'l Indep. Theatre Exhibitors, Inc. v. Buena Vista Distrib. Co.*,
 748 F.2d 602 (11th Cir. 1984) ........................................................................................5

*Pacific Bell Tel. Co. v. Linkline Commc'ns, Inc.*,
 555 U.S. 438 (2009)........................................................................................................6

*Park-Kim v. Daikin Applied Americas, Inc.*,
 747 F. App'x 639 (9th Cir. 2019) .................................................................................12

*Sinaltrainal v. Coca-Cola Co.*,
 578 F.3d 1252 (11th Cir. 2009) ...............................................................................3, 5, 6

*Tarrant Serv. Agency, Inc. v. Am. Standard, Inc.*,
 12 F.3d 609 (6th Cir. 1993) ...........................................................................................9

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*,
 540 U.S. 398 (2004)........................................................................................................6

*Watson Lab'ys, Inc. v. Rhone-Poulenc Rorer, Inc.*,
 178 F. Supp. 2d 1099 (C.D. Cal. 2001) ......................................................................16

**TABLE OF AUTHORITIES**
*(continued)*

| *Other Authorities* | **Pages** |
|---|---|
| Cal. Bus. & Prof. Code § 17200 | 11, 13, 16 |
| 18 U.S.C. § 1512 | 13 |

This Court granted Defendant Google LLC's Motion to Dismiss the federal antitrust and patent claims of the First Amended Complaint ("FAC") (DE 24).  *See* DE 53 (Order of November 8, 2024); DE 58 (Order of November 19, 2024).  Judgment was reserved on Plaintiffs' state law claims and leave to amend permitted.  DE 53; DE 60 (Order of December 16, 2024).  Plaintiffs now have filed a Second Amended Complaint ("SAC") that has abandoned the patent and Florida Unfair Trade Practices claims.  DE 61; *see also* DE 59.  In what remains, the SAC pays lip service to the deficiencies the Court previously identified, but the new allegations do not rectify the fundamental flaws in the Plaintiffs' claims that this Court previously identified.  Google respectfully requests the Court dismiss the Second Amended Complaint with prejudice.

## BACKGROUND

Plaintiff GFVC operates websites, including one named OkCaller.com that provides what the SAC calls "reverse phone search" capability.  SAC ¶ 20.[1]  Google operates the world's most widely used general search engine.  SAC ¶ 6.  The SAC defines a "general search engine" as a platform that allows consumers to find responsive information on the internet by entering keyword queries.  SAC ¶ 60.  The SAC asserts that a general search engine ("GSE") such as that operated by Google is "distinct[]" from platforms offered by Vertical Search Providers ("VSPs") such as OkCaller.com because of the breadth of types of information that can be accessed using a general search engine versus VSPs that provide "depth and domain specificity" that general search services cannot replicate.  SAC ¶¶ 60, 68, 69.

---

[1] The SAC makes passing reference to another website owned by GFVC, FactMed.com, but largely ignores it when attempting to articulate a claim.  To the extent Plaintiffs contend that the SAC asserts a claim based on alleged harm to FactMed.com, any such claim fails, at a minimum, for the reasons explained below as to OkCaller.com.

According to the SAC, beginning in 2015, OkCaller.com had over 200,000 users per day. SAC p. 15 (chart).  Plaintiffs attribute OkCaller.com's volume of usage, in part, to how the site was displayed and ranked on Google's search engine results pages in response to user search queries.  SAC ¶ 54.  Over time, other websites began to emulate OkCaller.com and its share of traffic fell.  SAC ¶¶ 55, 59; *see also* SAC p. 15 (chart).  In late 2022, OkCaller.com's traffic allegedly fell to near zero.  SAC p. 15 (chart).  The SAC speculates that OkCaller.com's decline is connected in some fashion to actions that it claims Google took in response to the filing of an appellate brief by plaintiff Dr. Isaacs in a case he had brought against Apple Inc., although this allegation is coupled with statements such as "as best as Plaintiffs' [sic] can ascertain prior to discovery."  SAC ¶¶ 35–38.[2]

## ARGUMENT

### I.    Count 1 Fails to State a Section 2 Claim.

Count 1 of the SAC repeats Count 1 of the FAC in alleging a "general search services" relevant antitrust market (FAC ¶ 99, SAC ¶ 104), and that Google has "maintained and abused its monopoly power in [GSEs]" (FAC ¶ 100, SAC ¶ 105) through exclusionary conduct that has "foreclosed a substantial share of the general search services market" (FAC ¶ 101, SAC ¶ 106). Like the FAC, the SAC alleges that GSEs are "unique" platforms that "enable users to retrieve responsive information from the internet by entering keyword queries."  SAC ¶ 60.

The Court dismissed Count 1 of the FAC for a lack of antitrust standing because "[t]he Plaintiff has not sufficiently alleged that it is a market participant in the general search services

---

[2] The appeal in Dr. Isaacs's case against Apple described in these paragraphs of the SAC is *Coronavirus Reporter v. Apple Inc.*, 85 F.4th 948 (9th Cir. 2023) (affirming district court's dismissal with prejudice of all claims of Jeffrey Isaacs and related parties against Apple, including alleged antitrust violations).

market." DE 53 at 5–6 & n.3; *Fed. Trade Comm'n v. Qualcomm Inc.*, 969 F.3d 974, 992 (9th Cir. 2020) ("Parties whose injuries, though flowing from that which makes the defendant's conduct unlawful, are experienced in another market do not suffer antitrust injury." (citation and quotation marks omitted)); DE 41 at 2–4.  The revised allegations of Count 1 of the SAC fail for the same reason; the SAC continues to fail to adequately plead facts that would give rise to antitrust standing.

The SAC again claims that Plaintiffs are "competitors," and makes the new (and inscrutable) allegation that "Plaintiffs are competitors under [proposed] DOJ and [active] EU regulations to permit competing developers access to Googlebot data."  SAC ¶ 107 (brackets in original).  If by that Plaintiffs mean such regulations would administratively define OkCaller.com as a "competitor" for purposes of permitting access to certain data, that still does not make the allegation that OkCaller.com would become a general search engine, SAC ¶ 4, any less implausible.  *See* DE 53 at 6 n.3 (rejecting GFVC's contention that it could have evolved into a GSE).  The allegation also is contradicted by other portions of the SAC.  *See* SAC ¶ 66 ("The creation, maintenance, and growth of a general search engine requires significant capital investment, highly complex technology, access to effective distribution, and adequate scale.").  The Court thus need not credit it.  *Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252, 1268 (11th Cir. 2009) ("The vague and conclusory nature of these allegations is insufficient to state a claim for relief, and 'will not do.'" (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007))), *abrogated on other grounds by Mohamad v. Palestinian Auth.*, 566 U.S. 449 (2012).

Plaintiffs now argue that they are market participants in the general search engine market by virtue of being users of "GWT" (Google's Webmaster Tools), which developers can use to "present, monitor, and improve their sites' visibility."  SAC ¶¶ 62, 107.  But the SAC does not

allege a market for webmaster tools. Google Search and GWT are different, non-interchangeable products serving different groups of users, *see* SAC ¶¶ 60, 62, and there is no well-pleaded allegation to the contrary. The two cannot be a part of the same antitrust market. *See Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1246 (11th Cir. 2002) (explaining that a determination of the boundaries of the relevant product market requires an examination reasonable substitutes (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962)). Plaintiffs therefore have not suffered antitrust injury from the fact that they purportedly are consumers of Google Webmaster Tools. *Fla. Seed Co. v. Monsanto Co.*, 105 F.3d 1372, 1374 (11th Cir. 1997) ("Basically, a plaintiff must show that it is a customer or competitor in the *relevant* antitrust market." (emphasis added)).

Plaintiffs' other revised allegations relevant to Count 1 all founder on this Court's rejection of the Plaintiffs' *McCready* argument. *See* DE 53 at 2–6 (analyzing *Blue Shield of Va. v. McCready*, 457 U.S. 465 (1982)). That is, however one characterizes the role of website owners in the general search market, there is no allegation (nor could there be) that Google's actions as to OkCaller.com were "a conduit for the Defendant to harm competing search engines, such as Bing." DE 53 at 5.

## II.     Count 2 Fails to State a Section 1 Claim.

### A.     Count 2 Fails for All Alleged Markets Because It Fails to Allege an Agreement.

Count 2 of the SAC repeats Count 2 of the FAC in alleging a Sherman Act Section 1 claim across multiple markets. A Section 1 claim requires "an agreement between two or more persons to restrain trade, because unilateral conduct is not illegal under section 1." *Levine v. Cent. Fla. Med. Affiliates, Inc.*, 72 F.3d 1538, 1545 (11th Cir. 1996). The Court dismissed Count 2 of the FAC because it failed to contain more than a conclusory allegation of an agreement. DE

53 at 10.  The SAC makes little effort to remedy this deficiency.  Like the FAC, the SAC relies on vague references to alleged agreements.  *E.g.*, SAC ¶ 115 (referring to non-specific "explicit and implicit understandings, arrangements, and contractual obligations").  Such conclusory allegations do not plead facts that actually establish the existence of any agreement between Google and a third party to restrain trade, much less how any such agreement harmed Plaintiffs.  As such, they do not satisfy Rule 12(b)(6).  *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Sinaltrainal*, 578 F.3d at 1268; *Lombard's Inc. v. Prince Mfg. Inc.*, 583 F. Supp. 1572, 1573–74 (S.D. Fla. 1984), *aff'd*, 753 F.2d 974 (11th Cir. 1985) (dismissing Section 1 claim because although plaintiff identified a purchase agreement, the "plaintiff's conclusory allegation of a conspiracy to restrain trade will not survive a motion to dismiss").

While the SAC adds allegations not found in the FAC, these allegations relate to arguments that this Court has already considered and rejected.  For example, the SAC now makes explicit that it is relying on an agreement between Google and Apple to make Google the default search engine on the Safari browser for its Section 1 claim.  *See* SAC ¶ 113.  But this Court previously found that agreement did not support a Section 1 claim because "Plaintiff has not alleged, and it certainly has not plausibly alleged, how it has suffered some direct effect from this agreement."  DE 53 at 10–11; *see also* DE 48 at 5–6.  The SAC contains no additional allegations or explanations as to how this agreement directly harms Plaintiffs, which is fatal to the Section 1 claim.  *Nat'l Indep. Theatre Exhibitors, Inc. v. Buena Vista Distrib. Co.*, 748 F.2d 602, 608 (11th Cir. 1984) (holding that a "plaintiff must be the target against which anticompetitive activity is directed. . . . [i]ncidental or consequential injury . . . does not give a plaintiff standing . . ." (quoting *Midwestern Waffles, Inc. v. Waffle House, Inc.*, 734 F.2d 705, 710 (11th Cir. 1984))).

The SAC also avers that Google preferences high-spend advertisers, SAC ¶ 114, an argument that the Court already has considered and rejected, *see* DE 53 at 10, n.7 (citing *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1049 (9th Cir. 2008)).  But even taking as true (and it is not) that Google preferences high-spend advertisers in its search results, this is at most an allegation that Google deals with entities that provide it more revenue differently than those that provide less.  This is not anticompetitive conduct prohibited by the Sherman Act.  *See Pacific Bell Tel. Co. v. Linkline Commc'ns, Inc.*, 555 U.S. 438, 448 (2009) ("[A]s a general rule, businesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing.").  Google is under no duty to treat all entities equally; to the contrary, as this Court has recognized, Google has no duty to deal with GFVC at all.  *See* DE 53 at 11–12 (citing *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985) and *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004)).

Moreover, the SAC fails to plausibly allege that this purported practice is the result of an agreement[3] and not merely Google's business judgment as to what search results are best to serve.  In the absence of allegations of direct evidence that Google and unnamed advertisers agreed on advertising spend in return for better organic search placement, Plaintiffs are required to plead certain "plus factors," such as evidence that Google had a motive to enter into this conspiracy and evidence that Google acted contrary to its independent economic interests.  *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 360 (3d Cir. 2004).  The SAC fails to plead any of those plus factors.

---

[3] The SAC alleges that "[t]his conduct amounts to more than mere unilateral self-preferencing; it arises from explicit and implicit understandings, arrangements, and contractual obligations that preserve Google's supremacy." SAC ¶ 115.  The Court need not credit such a conclusory allegation. *Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252, 1268 (11th Cir. 2009).

**B.      Count 2 Fails for Additional Reasons.**

Count 2 alleges five relevant markets: general search services, VSP services, directory information services market, internet content access, and single-brand Google-referred traffic market.  SAC ¶ 112.  The allegations in the SAC are deficient for these markets for the following reasons.

*General Search Services*:  The antitrust standing issues identified in Section I, *supra*, similarly require the dismissal of Count 2 as it relates to an alleged general search services market.  *See Feldman v. Palmetto Gen. Hosp., Inc*., 980 F. Supp. 467, 470 (S.D. Fla. 1997) (dismissing both Section 1 and Section 2 claims because "plaintiff lacks antitrust standing").

*Vertical Search Provider Services*:  The Court previously observed that the FAC's alleged vertical search provider market was so broad as to preclude any plausible claim of monopolization by Google.  DE 53 at 7.  While there has been some shifting of the proverbial deck chairs in SAC ¶¶ 68–70, Plaintiffs continue to define the alleged market to include any "specialized online platform" that provides results for a specific "category of data or services." The SAC expressly identifies Expedia and Yelp as examples of such providers and the definition, on its face, reaches entities such as Amazon and Walmart (which are specialized as to shopping).  SAC ¶ 68.  In sum, the claim fails for the same reason as the FAC did.[4]

*Directory Information Services*:  The Court previously observed that the allegations of the "reverse phone number lookup" market were much the same as the VSP market.  DE 53 at 7. In the SAC, Plaintiffs have renamed that market to "directory information services," but the Court's conclusion remains applicable for two principal reasons.  First, the SAC itself admits to

---

[4] The market definition further fails in that the allegation that Plaintiffs' product, OkCaller.com, is a substitute for, say, Expedia, is implausible.

the *many* competitors to OkCaller.com.  SAC ¶ 55 (alleging it was "emulated literally around the web" by "dozens of phone websites").  Second, and critically, if the market is large enough to also include Google (which it must if there were to be a plausible claim) it must include all manner of substitutes, whether "other general search engines, social media platforms, online directories, etc."  DE 53 at 8.  As this Court held, there can be no plausible allegation of monopolization of such a market.  *Id.*

     ***Internet Content Access*:**  This alleged market appears for the first time in the SAC, which defines it as "[g]eneral search engines and smartphone application distribution platforms, taken together."  SAC ¶ 82.[5]  Among other flaws, the claims as to this market fail because OkCaller.com is not a market participant.  Tacking "smartphone application distribution platforms" onto general search engines cannot cure the same standing issues that doom Count 1.

     ***Single-Brand Market for Google Referred Traffic*:**  This alleged market also appears for the first time in the SAC.  This, again, is a variant on the general search engine market claims.  Instead of adding smartphone application distribution platforms (as in the purported Internet Content Access market addressed above), it subtracts all general search engines other than Google.  And fails, again, because it cannot cure the same standing issues as Count 1.

     The allegation of such a market fails for additional reasons.  "Single-brand markets are, at a minimum, extremely rare."  *Apple Inc. v. Psystar Corp.*, 586 F. Supp. 2d 1190, 1198 (N.D. Cal. 2008).  This rarity stems from the fact that "[i]n general, a manufacturer's own products do not themselves comprise a relevant product market.  . . . [A] company does not violate the Sherman Act by virtue of the natural monopoly it holds over its own product."  *Green Country Food*

---

[5] The SAC names Apple's "App Store" as an example of a smartphone application distribution platform.  SAC ¶ 82.

*Market, Inc. v. Bottling Group*, 371 F.3d 1275, 1282 (10th Cir. 2004) (quotation marks and citation omitted).

The SAC does not even come close to plausibly alleging that this is one of those extremely rare cases.  In order to plausibly plead a single brand market, the product must be "unique" and "no reasonable substitutes [can] exist."  *Tarrant Serv. Agency, Inc. v. Am. Standard, Inc.*, 12 F.3d 609, 614 (6th Cir. 1993).  Here, the SAC recognizes that "alternative search engines like Bing or Yahoo exist."  SAC ¶ 78.  The SAC also alleges that "[c]onsumers inherently trust Google's search results due to the company's reputation for delivering relevant and authoritative information.  This trust bestows upon Google-referred websites a perceived quality and legitimacy that is not easily replicated through other channels."  SAC ¶ 77.  But "trust" in Google Search's results is not enough to create a single brand market.  *Green Country Food Market*, 371 F.3d at 1282 ("Even where brand loyalty is intense, courts reject the argument that a single branded product constitutes a relevant market.").

### III.   Count 3 Fails to State a Section 2 Claim.

Count 3 of the SAC—an *Aspen Skiing*-type refusal to deal claim—is a retread of Count 3 of the FAC.  *Compare* FAC ¶¶ 116–124 *with* SAC ¶¶ 119–128.  Claim 3 of the SAC is deficient for all the same reasons as Count 3 of the FAC.  *See* DE 41 at 7–10; DE 48 at 6–7.

As the Court correctly found, to maintain its refusal to deal claim, the SAC must contain well-pleaded allegations of relevant market and monopoly power in that market, antitrust standing, and anticompetitive conduct.  DE 53 at 11; *see also Duty Free Americas, Inc. v. Estee Lauder Cos., Inc.*, 797 F.3d 1248, 1263 (11th Cir. 2015); *Fla. Seed Co., Inc.*, 105 F.3d at 1374.  The failure of the SAC to meet the requirements of relevant market, monopoly power, and antitrust standing are addressed in Sections I & II, *supra.*  As to the alleged general search engine market, Plaintiffs lack antitrust standing because they are not participants in that market.  *See*

Section I, *supra.* As to the other alleged markets, Plaintiffs' allegations of a properly defined market fail. *See* Section II, *supra.*

The SAC adds very little to the refusal to deal allegations that the Court previously found insufficient to maintain the claim. The allegations remain "far removed" from those of *Aspen Skiing*, which themselves were "at or near the outer boundary" of antitrust liability. DE 53 at 11–12; *see generally* DE 41 at 8–10. There continues to be no allegation of an agreement between Google and OkCaller.com for OkCaller.com to appear in Google's search results. The fact remains that Plaintiffs "[do] not even adequately allege that the Defendant has refused to deal." DE 53 at 12. The SAC does allege that "Google now shows -zero- pages for OkCaller (or perhaps one page) which represents an effective termination of the critical volume necessary for a directory services site to function and operate." SAC ¶ 124. But that allegation is premised on a screenshot contained in the SAC that returns zero results for the query "**site:**www.okcaller.com." *See* SAC ¶ 27. As the Court itself observed previously, Plaintiffs' domain is easily locatable using Google search, DE 53 at 12, n.9. If one searches "www.okcaller.com" (www.google.com/search?q=www.okcaller.com), Plaintiffs' website is the first result. Further, the allegation that Google shows "zero" results for OkCaller.com is inconsistent with Plaintiffs' admission that OkCaller.com has not been removed from Google and that reverse phone queries continue to emanate from Google to the website, albeit at a lesser rate. *See* DE 34-4 (referring to a reduction in the number of reverse phone queries to OkCaller.com and acknowledging that there has not been a "domain removal").[6]

---

[6] The Court may consider this document for the reasons articulated at DE 53 at 12, n.9, and DE 41 at 9, n.4.

The SAC adds a conclusory statement that "[a]s described in preceding sections, OkCaller.com had a formidable and significant preexisting, profitable relationship with Google." SAC ¶ 124. But the factual allegations contained in the SAC are not meaningfully changed from the FAC. The central premise of the allegations related to the relationship between the parties is that Google listed Plaintiffs' website in relevant search results and that Plaintiffs received ad revenue from visits to its website. New allegations related to the exact amount of ad revenue generated by OkCaller.com, SAC ¶ 23, or Google's alleged profits from thousands of other websites, SAC ¶ 24, do not change the analysis or the Court's conclusion that Plaintiffs have failed to state a claim, *see* DE 53 at 11–12.[7]

## IV.     Count 4 Fails to State a Claim Under California's Unfair Competition Law.

Count 4 alleges that Google has violated California's Unfair Competition Law prohibition of "unlawful, unfair or fraudulent business act[s] or practice[s]." Cal. Bus. & Prof. Code § 17200. Each prong of the UCL is a "separate and distinct theory of liability" and "an independent basis for relief." *Lozano v. AT&T Wireless Servs., Inc.*, 504 F.3d 718, 731 (9th Cir. 2007) (citation omitted). The SAC purports to allege a cause of action under each prong, but nevertheless fails to set forth sufficient factual matter to state a facially plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

### A.     The "Unlawful Business Practices" Prong.

Under the UCL's unlawful business act or practice prong, the statute "'borrows' violations of other laws and treats them as unlawful practices that the unfair competition law makes independently actionable." *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20

---

[7] The "essential facilities doctrine" allegations remain unchanged, *compare* FAC ¶ 123 *with* SAC ¶ 127, and cannot save the failure to deal claim. *See* DE 53 at 12, n.9.

Cal. 4th 163, 180 (1999) (citing *State Farm Fire & Cas. Co. v. Superior Ct.*, 45 Cal. App. 4th

1093, 1103 (1996)); *see also In re Brinker Data Incident Litig.*, No. 18-686, 2020 WL 691848, at

*16 (M.D. Fla. Jan. 27, 2020) ("To state a cause of action based on an unlawful business act or

practice under the UCL, a plaintiff must sufficiently allege a violation of some underlying law.").

In two paragraphs of Count 4, Plaintiff identifies Google's purportedly unlawful business

practices:

> **131.**   Google's conduct, as detailed in the preceding counts, constitutes unlawful business practices in violation of the UCL because it violates the Sherman Act, as well as other federal and state laws.
>
> * * *
>
> **136.**   Google's actions are unfair and illegal to the extent the company retaliates against antitrust advocates, such as Plaintiffs. Beyond being unfair and un-American, the conduct violates federal witness protection statutes, including 18 USC 1512, and therefore is protected conduct under UCL. Plaintiff asserts elements of retaliation occurred, including a protected act – their previous federal antitrust advocacy, the aforementioned adverse events, and temporal proximity between these events. Plaintiffs seeks expedited production by Google of evidence surrounding the termination of OkCaller. Plaintiffs, as alleged, submit that Google has stonewalled reasonable requests for over one year, effecting a DARVO campaign to blame Plaintiffs for simple inquiry into antitrust matters.

SAC ¶¶ 131, 136.  For all of the reasons discussed in Sections I–III, *supra*, and in this Court's

prior orders, the pleading requirements of the alleged Sherman Act violations have not been met.

This conduct accordingly cannot serve as a predicate violation that can be addressed by the

unlawful prong of California's UCL.  *See Park-Kim v. Daikin Applied Americas, Inc.*, 747 F.

App'x 639, 640 (9th Cir. 2019) (nonprecedential) ("Plaintiffs cannot state a claim under the

unlawful prong of the California UCL because that claim is derivative of the plaintiffs' other

claims, and plaintiffs have failed to adequately plead a violation of any other law."); *see also*

DE 55 at 3 (GFVC noting that the UCL claim is "closely related to the federal claims previously analyzed by the Court").

As to the allegation of purported "witness retaliation," the SAC is wholly insufficient. The SAC speculates that OkCaller.com's decline is connected in some fashion to actions allegedly Google took after Dr. Isaacs filed an appellate brief in a case he had brought against Apple, although the allegation is hedged with statements such as "as best as Plaintiffs' [sic] can ascertain prior to discovery" and "*to the extent* the company retaliates against antitrust advocates." SAC ¶¶ 35–38, 136 (emphasis added). That speculation does not suffice. Finally, the allegation is non-specific, alleging violation of multiple "federal witness protection statutes." SAC ¶ 136. And while the SAC does identify 18 U.S.C. § 1512, it fails to plausibly plead which of the multiple witness tampering offenses contained in that section (each with distinct elements and *mens rea* requirements) Google allegedly violated. *See* 18 U.S.C. § 1512(b)–(d).

## B.    The "Unfair" Prong.

The California Supreme Court has explained that any finding of unfairness to competitors under section 17200 must "be tethered to some legislatively declared policy or proof of some actual or threatened impact on competition." *Cel-Tech*, 20 Cal. 4th at 186–87. "When a plaintiff who claims to have suffered injury from a direct competitor's 'unfair' act or practice invokes section 17200, the word 'unfair' in that section means conduct that threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition." *Id.* at 187.

The SAC falls short here as well, again tying its UCL claim to its failed federal antitrust claims and non-pleaded witness retaliation allegation:

133.    Google's practices are also unfair within the meaning of the UCL because they offend established public policy, are immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers, web developers, and specialized content providers. Google's conduct has had the effect of stifling competition, reducing innovation, and causing significant financial harm to Plaintiffs and the class.    Google breached its duty to disclose by the aforementioned conduct, leading to significant losses of developer time and resources.

134.    Google's actions are unfair to the extent the developers invest substantial time, money, and resources to bring competitive services to consumers, but are squelched and (de)indexed or suppressed in Google Search. Similarly, Google's failure to implement transparent quality metrics, where developers could fairly compete and improve their work products, is unfair, especially given Google's two-decade timeframe to implement such metrics that are customary in other high volume disbursement allocations. Developer transparency would avoid wasted resources, and benefit consumers greatly, and therefore a monopolist like Google with 90% of the search market should provide such an offering.

\* \* \*

136.    Google's actions are unfair and illegal to the extent the company retaliates against antitrust advocates, such as Plaintiffs.  . . .

SAC ¶¶ 133, 134, 136.  Paragraph 133, when read together with paragraphs 131 and 132, refers to the conduct underlying Plaintiffs' failed and inadequately pleaded federal antitrust claims. Thus, these allegations are insufficient to survive a motion to dismiss.  *See City of San Jose v. Off. of the Com'r of Baseball*, 776 F.3d 686, 691 (9th Cir. 2015) ("[I]f the same conduct is alleged to be both an antitrust violation and an 'unfair' business act or practice for the same reason . . . the determination that the conduct is not an unreasonable restraint of trade necessarily implies that the conduct is not 'unfair' toward consumers." (quoting *Chavez v. Whirlpool Corp.*, 93 Cal. App. 4th 363, 375 (2001))); *see also Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1124 (9th Cir. 2018).  Plaintiffs' inadequately alleged witness retaliation theories also thus cannot amount

to "unfair" conduct. *See Hadley v. Kellogg Sales Co.*, 243 F. Supp. 3d 1074, 1105 (N.D. Cal. 2017) (holding that claims for unfair conduct under the UCL cannot survive a motion to dismiss if they "overlap entirely with the business practices addressed in the . . . unlawful prong[] of the UCL[.]").

As to paragraph 134, there are no well-pleaded allegations that developers who invest resources into developing their services and do not receive their desired Google Search rankings is contrary to any legislatively declared policy or that it "significantly" impacts competition, as required to state a violation of UCL. *Cel-Tech*, 20 Cal. 4th at 187. Similarly, there are no well-pleaded allegations that Google's business decision not to implement so called "transparent quality metrics" violates a legislatively declared policy or threatens to significantly impact competition. Contrary to Plaintiffs' unfounded assertions (*see* SAC ¶ 133), Google does not have a duty to disclose its algorithms. Indeed, the *Dreamstime* litigation on which Plaintiffs rely, SAC ¶¶ 18, 114, affirmed summary judgment of no UCL violation because there was no obligation to disclose a revision to its algorithm. *Dreamstime.com, LLC v. Google LLC*, No. 20-16472, 2022 WL 17427039, at *2 (9th Cir. Dec. 12, 2022) ("Google had no affirmative duty under the parties' agreement to disclose its confidential algorithmic revision.").[8] Furthermore, this argument rests on the implausible premise that disclosure of the algorithm by which Google ranks search results will lead to an improvement in the quality of websites. Equally if not more plausible is that disclosure of Google's ranking criteria would encourage websites to manipulate content solely to achieve a higher ranking, diminishing overall quality and user experience.

---

[8] The court in *Dreamstime* also dismissed the claim of unfairness under the UCL because plaintiff "ha[d] not shown an antitrust violation" and therefore "fail[ed] the *Cel-Tech* test[.]" *Dreamstime.com*, 2022 WL 17427039, at *2.

## C.     The "Fraudulent" Prong.

Where a competitor is suing for fraud under the UCL, it must "show deception to some members of the public[.]" *Watson Lab'ys, Inc. v. Rhone-Poulenc Rorer, Inc.*, 178 F. Supp. 2d 1099, 1121 (C.D. Cal. 2001) (explaining there is "no case under the 'fraudulent' prong of § 17200 allowing one competitor to proceed against another on the basis that the defendant deceived him").  "Although a UCL claim need not plead the elements of common law fraudulent deception, *it must allege the existence of a duty to disclose, as well as reliance*[.]  Violations that sound in fraud must meet the pleading requirements under Federal Rule of Civil Procedure 9(b), which require the 'who, what, when, where, and how' of the fraudulent misrepresentation." *Casault v. Fed. Nat. Mortg. Ass'n*, 915 F. Supp. 2d 1113, 1129 (C.D. Cal. 2012) (emphasis added) (citation omitted), *aff'd*, 658 F. App'x 872 (9th Cir. 2016).

The SAC contains only a single paragraph devoted to Google's alleged "fraud":

> **132.**     Google's actions have misled and deceived consumers, publishers, and developer competitors regarding the nature and operation of its search engine, including the manipulation of search rankings to favor its own products and those of its strategic partners while disadvantaging independent developers and specialized content providers, such as Plaintiffs. In short, consumers and developers believe their Google queries result in a reasonably fair and competitive SERP result, but this is often untrue. Google does not disclose when it provides unfair or self-preferencing SERP results, which violates UCL. Transparency metrics are needed to comply with UCL.

SAC ¶ 132.  This impermissibly vague paragraph does not come close to a plausible allegation of fraud, let alone an allegation of fraud pleaded with particularity.  Plaintiffs merely invoke, in sweeping terms, a supposed deception of consumers and competitors with regards to how Google ranks search results.  And, as explained above, Google is not under any obligation or duty to disclose how it ranks search results, the lack of which is fatal to Plaintiffs' fraud claim. *Daugherty v. Am. Honda Motor Co.*, 144 Cal. App. 4th 824, 838 (2006), as modified (Nov. 8,

2006) ("We cannot agree that a failure to disclose a fact one has no affirmative duty to disclose is 'likely to deceive' anyone within the meaning of the UCL."). Moreover, the SAC makes clear that Plaintiffs' dispute with Google is not about a misrepresentation made to the public (without which there can be no fraud claim under the UCL), but really about Google's refusal to disclose to Plaintiff the reasons for the purported change in traffic to Okcaller.com. *E.g.*, SAC ¶¶ 33–36.

## V.       Count 5 Fails to State a Section 2 Claim.

The SAC's final count is new, contending that Google and Apple constitute a duopoly that "effectively dominates all meaningful channels by which consumers access online information," SAC ¶ 143, and "create[s] a scenario where anticompetitive conduct thrives, preventing Plaintiffs and the class from participating fairly in the digital marketplace," SAC ¶ 146. This claim essentially takes Count I and adds "smartphone app distribution" to the alleged market. SAC ¶ 143. Among other flaws, the claims as to this alleged market fail because OkCaller.com is not a market participant. Tacking "smartphone app distribution" onto general search engines cannot cure the standing issues discussed as to Count 1.

The duopoly claim fails for an additional, independent reason. The Eleventh Circuit has never recognized a claim under the Sherman Act for a duopoly or "shared monopoly." *See JES Properties, Inc. v. USA Equestrian, Inc.*, No. 802CV1585T24MAP, 2005 WL 1126665, at *18 (M.D. Fla. May 9, 2005), *aff'd on other grounds*, 458 F.3d 1224 (11th Cir. 2006). And many other courts have rejected the concept as a matter of law. *See Midwest Gas Servs., Inc. v. Indiana Gas Co.*, 317 F.3d 703, 713 (7th Cir. 2003) ("[A] § 2 claim can only accuse one firm of being a monopolist."); *Feldman v. Jackson Mem'l Hosp.*, 571 F. Supp. 1000, 1011 (S.D. Fla. 1983) ("[A] shared monopoly, even if proven, would not necessarily violate § 2."), *aff'd*, 752 F.2d 647 (11th Cir. 1985).

## CONCLUSION

For the reasons discussed above, the SAC should be dismissed with prejudice.

Date:  January 6, 2025

Kenneth C. Smurzynski (*pro hac vice*)
Aaron P. Maurer (*pro hac vice*)
WILLIAMS & CONNOLLY LLP
680 Maine Avenue, SW
Washington, DC 20024
+1 (202) 434-5000
ksmurzynski@wc.com
amaurer@wc.com

Matthew S. Warren (*pro hac vice*)
Erika H. Warren (*pro hac vice*)
Madeline A. Woodall (*pro hac vice*)
WARREN KASH WARREN LLP
2261 Market Street, No. 606
San Francisco, California, 94114
+1 (415) 895-2940
+1 (415) 895-2964 facsimile
24-80395@cases.warrenlex.com

Respectfully submitted,

/s/ *Edward M. Mullins*
Edward M. Mullins (Florida Bar No. 863920)
Ana M. Barton (Florida Bar No. 85721)
Sujey S. Herrera (Florida Bar No. 92445)
REED SMITH LLP
200 South Biscayne Boulevard, Suite 2600
Miami, Florida, 33131
+1 (786) 747-0200
+1 (786) 747-0299 facsimile
emullins@reedsmith.com
abarton@reedsmith.com
sherrera@reedsmith.com

*Attorneys for Defendant Google LLC*

Ayelet Faerman, Esq.
Faerman Law P.A.
3859 NW 124 Ave
Coral Springs, FL 33065
954-271-8484
ayelet@faerman.law
Attorney for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| GREENFLIGHT VENTURE CORPORATION *on behalf of themselves and all others similarly situated* | Case No. **24-cv-80395-RLR** |
| Plaintiff, | **PLAINTIFF'S OBJECTION TO GOOGLE'S MOTION TO DISMISS** |
| vs. | |
| GOOGLE LLC | |
| Defendant. | |

TABLE OF AUTHORITIES------------------------------------------------------------------------------------ii

INTRODUCTION------------------------------------------------------------------------------------------------1

LEGAL STANDARD--------------------------------------------------------------------------------------------2

ARGUMENT -----------------------------------------------------------------------------------------------------2

     I.     Greenflight Venture Corporation Has Antitrust Standing-----------------------------------2

     II.    Count II Adequately Alleges Relevant Sherman Markets and Agreements -------------------6

     III.   Count III States a Claim for Refusal to Deal Under The *Aspen* Exception ----------------12

     IV.   Count IV States a Claim Under California Unfair Competition Law --------------------14

       A.   "Unlawful" Prong --------------------------------------------------------------------------15

       B.   "Unfair" Prong-----------------------------------------------------------------------------16

       C.   "Fraudulent" Prong------------------------------------------------------------------------17

     V.    Duopoly Control of U.S. Internet Content Access Violates Sherman Act § 2 --------------18

CONCLUSION --------------------------------------------------------------------------------------------------20

CERTIFICATE OF SERVICE ------------------------------------------------------------------------------22

# TABLE OF AUTHORITIES

### CASES

*Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1057 (9th Cir. 1999) .................................................... 9

*American Tobacco Co. v. United States*, 328 U.S. 781 (1946) ............................................................................ 19

*Apple Inc. v. Psystar Corp.*, 586 F. Supp. 2d 1190, 1198 (N.D. Cal. 2008) ........................................................ 9

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ...................................................................................................... 2

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985) ........................................................ 12

*Associated Press v. United States*, 326 U.S. 1, 12 (1945) ................................................................................ 8

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 553 (2007) ................................................................................ 2

*Blue Shield of Va. v. McCready*, 457 U.S. 465 (1982) .................................................................................3, 5, 7

*Brown Shoe Co. v. United States*, 370 U.S. 294, 322 (1962) .......................................................................... 3

*Camacho v. Auto. Club of S. Cal.*, 142 Cal. App. 4th 1394, 1403 (2006) ...................................................... 16

*Comm. on Children's Television, Inc. v. Gen. Foods Corp.*, 35 Cal. 3d 197, 214 (1983) ...................................... 18

*Dreamstime.com, LLC v. Google LLC*, 470 F.Supp.3d 1082 (2020) ................................................................ 17

*Drum v. San Fernando Valley Bar Ass'n*, 182 Cal. App. 4th 247, 257 (2010) ........................................16, 17

*Duty Free Americas, Inc. v. Estee Lauder Cos.*, 797 F.3d 1248, 1262 (11th Cir. 2015) ...................................... 2

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 482 (1992) .................................................... 9

*FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 460–61 (1986) .................................................................... 6

*In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 361 (3d Cir. 2004) ................................................................ 11

*In re High-Tech Employee Antitrust Litig.*, 856 F. Supp. 2d 1103, 1117 (N.D. Cal. 2012) .................................... 16

*In re Tobacco II Cases*, 46 Cal. 4th 298, 312–13 (2009) .................................................................................. 18

*Interstate Circuit*, 306 U.S. 208, 226–27 (1939) .......................................................................................... 20

*Levine v. Cent. Fla. Med. Affiliates, Inc.*, 72 F.3d 1538, 1545 (11th Cir. 1996) .................................................. 10

*Lozano v. AT&T Wireless Servs., Inc.*, 504 F.3d 718, 731 (9th Cir. 2007) ...................................................... 15

*Mayor & City Council of Baltimore v. Citigroup, Inc.*, 709 F.3d 129, 135 (2d Cir. 2013) ...................................... 16

*Midwest Gas Servs., Inc. v. Indiana Gas Co.*, 317 F.3d 703 (7th Cir. 2003) ................................................ 19

*Nat'l Indep. Theatre Exhibitors, Inc. v. Buena Vista Distrib. Co.*, 748 F.2d 602, 608 (11th Cir. 1984).................... 11

*Newcal Indus., Inc. v. IKON Office Solution*, 513 F.3d 1038, 1045 (9th Cir. 2008) ...................................... 10

*Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1073 (10th Cir. 2013)............................................................ 13

*Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2285 (2018) ................................................................................ 3

*Pacific Bell Tel. Co. v. Linkline Commc'ns, Inc.*, 555 U.S. 438, 448 (2009) .................................................. 12

*Palmyra Park Hosp. Inc. v. Phoebe Putney Mem'l Hosp.*, 604 F.3d 1291, 1299 (11th Cir. 2010)........................ 4, 9

*Realcomp II, Ltd. v. FTC*, 635 F.3d 815, 827–28 (6th Cir. 2011) .................................................................... 8

*South Bay Chevrolet v. Gen. Motors Acceptance Corp.*, 72 Cal. App. 4th 861, 886 (1999) .................................. 17

*Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*, 875 F.2d 1369, 1374 (9th Cir. 1989) ........................................ 8

*Todd v. Exxon Corp.*, 275 F.3d 191, 199–200 (2d Cir. 2001).......................................................................... 6, 10

*United States v. Kottwitz*, 614 F.3d 1241, 1261 (11th Cir. 2010) ................................................................ 15

*United States v. Microsoft Corp.*, 253 F.3d 34, 70 (D.C. Cir. 2001) ................................................................ 11

*US Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43, 63–64 (2d Cir. 2019)................................................ 19

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 408–09 (2004) .............................. 12

*Westchester Day School v. Vill. of Mamaroneck*, 504 F.3d 338, 356 (2d Cir. 2007) ........................................ 7, 14

### STATUTES

18 U.S.C. § 1512................................................................................................................................................ 15

Cal. Bus. & Prof. Code § 17200 ........................................................................................................................ 15

### OTHER AUTHORITIES

C. Scott Hemphill & Tim Wu, "Parallel Exclusion," 122 Yale L.J. 1182 (2013) ...................................................... 20

## Treatises

Richard Posner, *Antitrust Law* 33 (2001). ...................................................................................................... 1

## Regulations

Fed. Trade Comm'n, "Enforcement Policy Statement on Deceptively Formatted Advertisements" (2015).................. 15

## GREENFLIGHT'S OBJECTION TO GOOGLE LLC'S MOTION TO DISMISS

### INTRODUCTION

In opposing Google LLC's Motion to Dismiss, it is important to summarize the current Big Tech antitrust backdrop to the Court. The Sherman Antitrust Act was enacted in 1890 "against a background of perceived cartelization and monopolization of the American economy." Richard Posner, *Antitrust Law* 33 (2001). Though often referred to colloquially as "Big Tech," the cartelization presently facing Americans surpasses even the worst nightmares of the 19th-century drafters of the Sherman Act. Not only are the modern monopolies larger by orders of magnitude (even when adjusted for inflation) than the classic textbook antitrust example of the British East India Company, but they have embedded themselves deeply into cultural control and possess surveillance capabilities previously confined to the realm of science fiction or Orwell's *1984*.

The near-unanimous consensus that these powerful technology monopolies require imminent action illustrates the severity of the crisis. Yet massive lobbying and censorship efforts by Big Tech itself have complicated reform. Congress, for instance, issued a comprehensive subcommittee report several years ago urging district courts not to underenforce the Sherman Act. Bipartisan Senate efforts to regulate Big Tech enjoyed over 70% public approval—yet they were blocked from a floor vote under the weight of intense joint lobbying by Google and Apple. Both major political parties' executive branches have, for much of the past five years, openly acknowledged the dangers of Big Tech's grip. Last week, President Joe Biden warned "an oligarchy is taking shape in America, of extreme wealth, power, and influence that literally threatens our entire democracy, our basic rights and freedoms and a fair shot for everyone to get ahead."[1]

Despite these high-level acknowledgments, Big Tech systemically squelches legitimate antitrust inquiries at an early stage. Their success at doing so is facilitated by general assumption that because of these companies' large market valuations, they represent "American success stories" that must be safeguarded. That logic is misguided and inherently false. As undersigned counsel has contended for nearly five years, Big Tech stifles new value creation by smaller competitors—innovators who collectively could yield American success and broader equity creation dwarfing the present oligopoly market cap. Even Facebook's Mark Zuckerberg recently concurred, disclosing that Meta would "easily double" in value if not for duopolistic control by two major tech companies. He also made an allegation that resonates powerfully with the Second Amended Complaint: Apple, he

---

[1] In addition to domestic concerns, some forty other countries have determined that the Google-Apple duopoly engages in anticompetitive conduct that harms their citizens.

claimed, has not substantially innovated in twenty years and instead simply wields unilateral control for profit. The SAC makes a similar argument: Google has, in effect, *worsened* its core GSE product to gain even more control, while reaping larger profits within the growing duopoly. These entities are not the GE and Boeing of yesteryear, commanding profits from world-class innovation[2] and leadership. Instead, they increasingly demand profits.

From a forest and trees perspective, the present MTD aims to thwart legitimate Sherman Act scrutiny by appealing primarily to technical distinctions regarding the definition of relevant markets. Google cannot dispute President Biden's statement that the tech oligopoly threatens democracy—if it cannot do so in its reply, the Court should deny this MTD at the outset. Indeed, *none* of the MTD's technical reasons for dismissal appear in the plain text of the Sherman Act, which spans only a paragraph and plainly covers egregious monopolization such as modern tech monopolies. The *Brown Shoe* line of cases and other derivative precedents were developed in the context of century-old industrial pricing formulas, whereas today's "free" digital products require scrutiny under the Act's *original* broad mandate to prohibit anti-competitive restraints on trade. The rising threats of cartelization have evolved, but the statute's text remains sufficient to address them.

Nonetheless, in the following sections, Plaintiffs demonstrate that even under the *Brown Shoe* standards—misapplied here by Google—the SAC adequately alleges antitrust violations. The MTD's technical contentions fail, both legally and factually, when tested against Supreme Court and Eleventh Circuit case law. Google's arguments regarding market definitions, standing, and multi-sided platforms amount to disingenuous knit-picking to shield itself from scrutiny, disregarding the fundamental policy imperative underlying the Sherman Act.

## LEGAL STANDARD

When evaluating a motion to dismiss under Rule 12(b)(6), the Court must accept all factual allegations in the complaint as true and construe them in the light most favorable to the plaintiff. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint must contain sufficient factual matter to state a claim that is plausible on its face. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Antitrust claims are subject to the same pleading standards. *Duty Free Americas, Inc. v. Estee Lauder Cos.*, 797 F.3d 1248, 1262 (11th Cir. 2015).

## ARGUMENT

### I.   Greenflight Venture Corporation Has Antitrust Standing

---

[2] Apple's competitive advantage, which ushered in the smartphone era, stemmed from Mac OS, the result of three decades of R&D with Xerox Palo Alto Research Center. Mr. Zuckerberg's comments apparently reference the contrast with recent failed R&D in Apple Car & Vision.

Antitrust cases involving complex market definitions are frequently ill-suited for resolution at the pleading stage, given the Supreme Court's admonitions to allow discovery in complicated factual disputes. *Brown Shoe Co. v. United States*, 370 U.S. 294, 322 (1962) (noting that market definition is a factual inquiry turning on "commercial realities" and "practical indicia"). Google's argument that Plaintiffs do not participate in the "general search services" market misconstrues both the *Amex* multi-sided platform framework and precedent on determining market contours by trial.

Plaintiffs, as direct users of Google's Webmaster Tools (GWT) and overall GSE services, plead that they have no meaningful alternative for distribution, making them effectively consumers of Google's platform. *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2285 (2018). Even if they are not themselves offering general search querying, they suffer inextricably intertwined injury from Google's alleged manipulation and self-preferencing. *Blue Shield of Va. v. McCready*, 457 U.S. 465 (1982). Because market power in GSE allows Google to withhold or degrade distribution, the alleged harm—OkCaller's dramatic traffic decline—flows directly from conduct in that market.

The Supreme Court in *Brown Shoe* recognized that market definition and the effects of alleged monopolistic behavior often involve intricate factual inquiries (e.g., cross-elasticities of demand, distribution channels, barriers to entry). 370 U.S. at 325–26. Here, Plaintiffs' theory rests on facts— such as behind-the-scenes ranking changes, data indexing decisions, exclusive default agreements, and new to the SAC – whether GWT is part of the GSE platform. Early dismissal would deny Plaintiffs any opportunity to substantiate these allegations. As recognized by *Twombly*, 550 U.S. at 556, plausible factual allegations – e.g. specialized markets – should be tested in discovery.

Nor can Google dismiss Plaintiffs' standing argument by insisting that GSE services and Google's Webmaster Tools (GWT) are categorically separate product markets. The GWT component is integral for content providers seeking visibility in that same platform. This is not simply "another market" for GWT. Rather, GWT is part of the multi-sided GSE ecosystem: *end-users* rely on Google to retrieve information, while *web developers* rely on Google for indexing and distribution. As such, Plaintiffs participate on the developer-facing side of the same GSE platform. The *Amex* decision unambiguously recognizes that certain platform markets involve two or more distinct user groups, and participants who provide content or specialized results can be deemed direct participants in that platform market. Plaintiffs use Google's platform to procure indexing and visibility (in exchange for content, search breadth, and ad revenue). In so doing, Plaintiffs effectively purchase distribution services in the GSE market; that is part and parcel of the "search ecosystem." Thus, they partake in the platform at the developer/content-provider side, even if end-user search queries are "free." The

Supreme Court in *Amex* held that platforms connecting multiple groups often comprise a single relevant market when each side depends on the other. 138 S. Ct. at 2285. Plaintiffs suffer immediate, direct harm when they are systematically excluded from the GSE's distribution side or forced to accept inferior ranking. Hence, they are "participants" in the GSE market in the sense recognized by multi-sided market jurisprudence.

 Google disputes that GWT and Google Search are "submarkets" or "separate products," but this is a factual question under *Brown Shoe*, and cannot be resolved at the Rule 12(b)(6) stage by Google's mere assertion. GWT represents the core interface through which content providers interact with, submit content, and optimize their presence in the Google Search results. For a multi-sided market, each side's participation is integral to the overall market's functioning. See *Amex*, 138 S. Ct. at 2286 (recognizing that each side of a multi-sided platform may rely on the other for the entire product to function effectively).

Google also fundamentally misrepresents and improperly dismisses Plaintiffs' allegations and standing arguments under the Sherman Act. Specifically, it misconstrues Plaintiffs' references to proposed Department of Justice (DOJ) and European Union (EU) regulations that seek to open Google's index data to potential entrants, including Plaintiffs—thus lowering the barriers to becoming a GSE competitor. Contrary to the MTD's assertion, there is no contradiction in Plaintiffs' stance. Merely because the SAC recognizes that creating a GSE historically required massive capital and scale (SAC ¶ 66) does not negate the possibility that new regulatory or remedial measures (SAC ¶ 107) could alter these economics. Reforms or forced data-sharing remedies would *reduce* entry barriers and enable developers to evolve their specialized search sites into more robust or broader GSE capabilities. That is entirely consistent with the notion that *absent* such measures, Google's monopoly power in indexing and distribution is insurmountable, leaving Plaintiffs and others foreclosed from the GSE market. Nothing in the law or logic prohibits Plaintiffs from alleging that Google's raw indexing data, if made available, would meaningfully reduce these hurdles and make OkCaller a plausible competitor to Defendant. Indeed, that is the point of the enforcement action.

The SAC alleges that OkCaller is not merely a passive recipient of traffic, but a prospective or nascent competitor in general search if provided fair access to indexing data. (SAC ¶ 107). Courts have recognized that a "nascent competitor" can have standing if the defendant's exclusionary conduct blocks that firm from entering or expanding in the relevant market. See *Palmyra Park Hosp. Inc. v. Phoebe Putney Mem'l Hosp.*, 604 F.3d 1291, 1299 (11th Cir. 2010) (acknowledging antitrust standing for potential entrants foreclosed from a market). The Eleventh Circuit in *U.S. Anchor Mfg.*,

*Inc. v. Rule Indus., Inc.* also applied the principle that potential competitors have standing to challenge a monopolist's exclusionary tactics. 7 F.3d 986, 995 (11th Cir. 1993). Because Plaintiffs allege that "[w]ith access to Googlebot's indexing raw data, [they] could, and would, develop competing GSE products" (SAC ¶ 7), the requisite "intent and preparedness" standard for potential competition is at least plausibly alleged at the pleading stage. *U.S. Anchor Mfg.*, 7 F.3d at 995. It is thus premature to dismiss for supposed lack of standing; discovery could reveal evidence supporting these nascent-competitor allegations. Google's conclusory remarks of "implausibility" fly in the face of the proposed DOJ remedy's intent.

Finally, Google's MTD incorrectly claims that Plaintiffs cannot rely on *Blue Shield of Virginia v. McCready*, 457 U.S. 465 (1982), because OkCaller's de-indexing allegedly was not a "conduit" for harming rival GSEs:

> "There is no allegation (nor could there be) that Google's actions as to OkCaller.com were 'a conduit for the Defendant to harm competing search engines, such as Bing.'" (DE 53 at 5, analyzing *Blue Shield of Va. v. McCready*, 457 U.S. 465 (1982)).

But the Supreme Court in *Blue Shield of Va. v. McCready*, 457 U.S. 465 (1982), did not impose a rigid requirement that a plaintiff must act as a literal "conduit" for harm to a competitor in order to establish antitrust standing. Rather, the *McCready* Court's key holding is that a plaintiff may have standing if her injury is "inextricably intertwined" with the injury the defendant seeks to inflict on the broader market or on a particular competitor. Id. at 479–80. By fixating on "conduit," Google misreads the crux of *McCready*, which is about whether the plaintiff's harm flows directly from the anticompetitive conduct that sustains the defendant's monopoly. The Supreme Court explicitly stated that a plaintiff can recover if her injury is a "necessary step" in effecting the defendant's illegal scheme. Id. at 479. Even if one assumed McCready requires a "conduit" showing, Plaintiffs' allegations satisfy that test. The SAC pleads that by foreclosing OkCaller and similarly situated vertical or specialized sites, Google deprives potential or nascent rival GSEs—and the broader online ecosystem—of the scale, data, and user base needed to challenge Google's market dominance. (SAC ¶¶ 60–70, 107.) In effect, Plaintiffs are part of the critical pipeline of content that Google must either index or exclude. Suppressing independent content (i.e. slowly replacing OkCaller and Yelp) and funneling traffic to Google's own services is a "necessary step" in harming potential GSE entrants. This is precisely the "inextricable intertwinement" recognized in *McCready*. The SAC expands discussion of how sites like OkCaller indeed helped to build out Google's success.

Because Plaintiffs redefined the GSE market to include developer-facing tools, they no longer rely on being a mere "conduit." They are now direct participants (or "consumers") in that market, so

McCready's "inextricable intertwinement" flows naturally: blocking or downgrading OkCaller injures Plaintiffs as participants in GSE distribution. Moreover, the House Subcommittee's findings on "proliferating verticals" confirm Google's fear that specialized services could bypass or undermine general search. By foreclosing Plaintiff's vertical site, Google not only eliminates a potential GSE threat but also hinders rival GSEs that rely on robust third-party competition. *McCready*, 457 U.S. at 479–80. Thus, OkCaller's injury is still "inextricably intertwined" with Google's maintenance of monopoly power—even absent an explicit "conduit" characterization.

In sum, Google seeks a narrow reading under *McCready's* conduit requirement, but the addition of GWT to the GSE market, combined with recent developments (Googlebot access) substantiating the 'proliferating vertical' as actual GSE competitors, squarely places OkCaller's harm in the 'inextricably intertwined' category.

## II.    Count II Adequately Alleges Relevant Sherman Markets and Agreements

The SAC contains five alleged markets: (1) general search services, (2) vertical search provider (VSP) services, (3) directory information services, (4) internet content access, and (5) single-brand Google traffic. Google asserts that the Court has already dismissed or discredited these definitions, and thus any Section 1 claim based thereon must fail. However, this argument is misplaced for two principal reasons: Google's critiques often conflate the analysis required for monopolization/attempted monopolization under Section 2 with that required for an agreement in restraint of trade under Section 1. While market definition is relevant in both contexts, the inquiry under Section 1 focuses on whether multiple parties conspired to impose an unlawful restraint that injured Plaintiffs. *Levine v. Cent. Fla. Med. Affiliates, Inc.*, 72 F.3d 1538, 1551 (11th Cir. 1996) (distinguishing between the requirements for § 1 collusion and § 2 monopolization). Even if a market definition is not sufficiently precise for establishing monopoly power, Plaintiffs may still show that Google and partners conspired in a way that harms competition in a broader sense. *FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 460–61 (1986).

Plaintiffs have alleged specific reasons for defining markets such as "internet content access" (where Apple's App Store and Google's search engine operate as complementary on-ramps) and "vertical search services" (specialized engines and directories). The MTD's contention that these definitions are duplicative or contradictory is better resolved after discovery clarifies the economic realities. *Todd v. Exxon Corp.*, 275 F.3d 191, 199–200 (2d Cir. 2001) (reversing Rule 12 dismissal of an antitrust complaint because market definition issues typically require factual development, citing *Brown Shoe*). Below is a concise rejoinder to each market-specific argument.

### General Search Services

Google repeats its standing and market arguments from Count I, asserting that Plaintiffs "lack antitrust standing" and have not shown direct harm in the GSE market. Yet for Section 1, a plaintiff can maintain a claim if they plausibly allege that an agreement among two or more parties (such as Google and Apple or Google and advertisers) restrains trade in a way that injures Plaintiffs—even if Plaintiffs are not themselves direct rivals to Google in the strict sense. This again turns on Google's erroneous interpretation of *Blue Shield of Va. v. McCready*, 457 U.S. 465 (1982).

### Vertical Search Provider (VSP) Services

In its original motion to dismiss, Google argued that the VSP definition (and others) were flawed because they did not address core antitrust concepts such as cross-elasticity of demand and product interchangeability. Plaintiffs have since remedied these issues by alleging the *SSNDQ* test. Despite these substantive amendments, Google's *new* MTD largely recycles the same arguments from its *old* MTD, insisting that "Count 2 fails for the same reason as the FAC did." This approach is problematic for several reasons. The new MTD does not meaningfully acknowledge the SAC's revisions addressing cross-elasticity and the SSNDQ test. For instance, while Expedia and OkCaller serve radically different user needs from a *consumer* perspective, the SAC now clarifies they nonetheless compete for visibility *from the angle of the GSE's search results.* In other words, VSPs are interchangeable to Google's GSE, which makes it a relevant market in this case, as Google pits VSPs against each other on indexing quality, curation, and technical engagement metrics.

The MTD again contends that OkCaller cannot plausibly compete with Expedia or Amazon simply because "phone lookups" and "travel bookings" or "online retail" serve different consumer end goals. But that misrepresents the SAC's market definition. Plaintiffs do *not* allege that phone lookups and travel searches are identical from a consumer-facing standpoint. Rather, they allege that from the *GSE vantage* (the gatekeeper controlling SERP visibility), all these vertical services must vie for ranking within the same specialized "downstream" category—namely, "vertical search." A bookstore analogy is apt: from a *consumer's* perspective, a mystery novel is not an interchangeable substitute for a math textbook, yet from the *bookstore's* perspective, both are "inventory" that must be bought, stocked, and sold. Similarly, from Google's vantage, OkCaller and Expedia are "downstream specialized services" that each rely on indexing, ranking, and distribution controlled by the GSE. The Court should therefore not credit the MTD's blanket assertion that these revised claims are duplicative. *Westchester Day School v. Vill. of Mamaroneck*, 504 F.3d 338, 356 (2d Cir. 2007) (rejecting motions that ignore or fail to address key amendments). Plaintiffs have expanded upon how

cross-elasticity is minimal and how the SAC's newly spelled-out SSNDQ approach directly addresses concerns the prior Rule 12 briefings raised about interchangeability amongst VSP genres.

The MTD states that this Court "previously observed" that VSP is overly broad, citing DE 53 at 7. The fact that VSPs exist spanning a large number of specialties does not defeat the notion that an agreement or arrangement (e.g., with Apple or advertisers) restrains these specialized providers' ability to compete on fair terms. *Realcomp II, Ltd. v. FTC*, 635 F.3d 815, 827–28 (6th Cir. 2011) (condemning an MLS board's collective agreement restricting certain real-estate brokers, even though no single entity "monopolized" the broker market).

### *Directory Information Services*

Similarly, Google contends that directory services, which now includes "reverse phone lookup," remains too broad or too competitive to be monopolized, despite Yelp alleging an identical claim. (DE 53 at 7–8.) Yet the question for Section 1 is not whether Google could "monopolize" directories, but whether Google has entered into agreements or collusive practices that unreasonably restrain competition for directory services or foreclose new directory providers from scaling. If Google systematically excludes or deprioritizes directory sites to favor its own directory products, bolstered by the Apple-ISA arrangement, that plausibly states a § 1 claim. *Associated Press v. United States*, 326 U.S. 1, 12 (1945) (under Section 1, the focus is on whether multiple parties conspired to exclude or disadvantage rivals or entrants).

Whether the directory-services market is too broad or sufficiently cohesive to constitute a single relevant market "is a question of fact." *Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*, 875 F.2d 1369, 1374 (9th Cir. 1989). A jury (or the Court at summary judgment) might conclude that Whitepages, Yelp, and OkCaller do indeed compete in a directory market that is distinct from purely general search or from narrower vertical searches. Plaintiffs should have the opportunity to present evidence—e.g., consumer usage data, cross-elasticity analyses—to validate this. Google errs when it claims the VSP market must include GSEs. Google's products (Google Maps, clickless searches) can be VSPs, regardless of the fact Google also operates a GSE.

The MTD posits that because there exist "dozens of phone lookup" sites (SAC ¶ 55), directory services cannot be monopolized. This is plainly incorrect. There could be hundreds of small sites, yet Google's own services (Google Maps business listings, clickless searches) certainly have market power at this point. The existence of multiple players does not necessarily preclude a relevant market or a Section 1 restraint; an agreement among a dominant GSE or a subset of directory providers (or distributors) can unreasonably restrain the overall directory market. *Palmyra Park Hosp. Inc. v.*

*Phoebe Putney Mem'l Hosp.*, 604 F.3d 1291, 1299 (11th Cir. 2010) ("[T]he presence of some competition is not incompatible with the possibility of foreclosure.").

### Internet Content Access

The SAC's new "internet content access" market—which includes both smartphone app distribution and general search engines—reflects Plaintiffs' factual theory that Apple and Google together dominate how consumers find online content. Google repeats the argument that "OkCaller.com is not a market participant," but that is neither dispositive nor entirely correct for a Section 1 claim: so long as Plaintiffs show that an agreement among Apple, Google, or other co-conspirators restrains distribution in a way that injures them. *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1057 (9th Cir. 1999) ("[A] plaintiff who is forced to pay artificially high prices or receive artificially low compensation as a result of a defendant's anticompetitive conduct in the relevant market still has standing to bring a Section 1 claim.").

### Single-Brand Google Traffic

Lastly, Google points out that single-brand markets are "extremely rare," citing *Apple Inc. v. Psystar Corp.*, 586 F. Supp. 2d 1190, 1198 (N.D. Cal. 2008). While that is typically relevant to Section 2 claims, a single-brand scenario can, under certain circumstances, be recognized for a Section 1 analysis if a defendant and its strategic partners collusively foreclose or lock in users. *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 482 (1992). The SAC alleges that Google effectively exerts gatekeeper control over its own brand ecosystem, forcing developers to accept its rules or be excluded. Whether that is legally cognizable under Section 1 is a factual question left to discovery, and the "rarity" of single-brand markets is not an automatic basis for dismissal. While courts do treat single-brand markets skeptically, it is not accurate to suggest they are *per se* barred at the motion-to-dismiss stage. Instead, the Supreme Court and lower courts have recognized certain fact patterns in which a single-brand (or quasi-single-brand) product can function as a relevant market when no adequate economic substitutes exist. Google might analogize *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451 (1992), to the camera or copier repair market, but it overlooks the point that, even though Kodak faced competition in general camera equipment, the Supreme Court still allowed a "Kodak-specific repair and parts" market to proceed because of high switching costs, locked-in consumers, and unique service needs. Id. at 483–84. Similarly, in the SAC's single-brand Google scenario, users and developers may be "locked in" to Google traffic because 90+% of all general-search-based referrals flow through Google, leaving no practical alternatives.

Courts require a fact-intensive exploration of whether brand loyalty, technical lock-in, or de facto exclusivity deprives consumers (or in this case, content providers) of feasible substitutes. *Newcal Indus., Inc. v. IKON Office Solution*, 513 F.3d 1038, 1045 (9th Cir. 2008). Even if single-brand claims are ultimately difficult to prove, Plaintiffs need only allege enough facts at this stage to make the theory plausible. *Todd v. Exxon Corp.*, 275 F.3d 191, 199–200 (2d Cir. 2001). Here, the SAC explains that reliance on "Google traffic" is so entrenched, and other search engines so relatively small, that developers effectively have no substitute. (SAC ¶¶ 75–85.) Whether these allegations suffice is a question of economic reality—exactly the kind of issue the Court should leave to discovery under *Brown Shoe*. Thus, while single-brand markets are *less common*, they are not categorically off-limits to Section 1 or Section 2 claims. *Kodak* itself stands as a reminder that "rarity" does not equate to "impossibility." *See* 504 U.S. at 482–83 ("The relevant market for antitrust purposes is determined by the choices available to [the consumer]."). Consequently, dismissing the single-brand market allegations outright would prematurely foreclose legitimate factual inquiries.

Under Section 1 of the Sherman Act, a plaintiff must allege "an agreement or concerted action between two or more entities that unreasonably restrains trade." *Levine v. Cent. Fla. Med. Affiliates, Inc.*, 72 F.3d 1538, 1545 (11th Cir. 1996). Although unilateral conduct is generally not actionable under Section 1, the courts recognize that even tacit or implicit understandings may suffice if pleaded with factual support suggesting "a meeting of the minds" to restrain trade. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007). A complaint need not produce the "smoking gun" at the pleading stage, so long as the factual allegations "raise a reasonable expectation that discovery will reveal evidence of an illegal agreement." Id. at 556–57.

Google cites this Court's prior ruling (DE 53 at 10–11) that Apple's Safari default arrangement did not plausibly cause Plaintiffs' direct injury. Yet the operative complaint takes the additional step of explaining how the Apple–Google agreement not only excludes competing general search engines, but also channels search traffic in ways that diminish or penalize independent websites reliant on open distribution. (SAC ¶ 113.) If the ISA blocked a competing search engine (like Bing, where site:www.okcaller.com is 149,000) from obtaining market share, it reasonably contributed to OkCaller's injury. The SAC clarifies that by paying Apple billions of dollars to keep Google as the default search engine, Google ensures that even potential *vertical search* or *directory* services must funnel traffic through Google's ecosystem on Apple devices. (SAC ¶¶ 115, 116.) Plaintiffs or other specialized providers, who might otherwise benefit from alternative default search engines, are forced to remain within Google's "controlled environment," thereby increasing their

dependence on Google and any penalizing ranking policies. That dependence can (and does) directly injure Plaintiffs when Google manipulates or excludes their content for self-serving reasons. *Nat'l Indep. Theatre Exhibitors, Inc. v. Buena Vista Distrib. Co.*, 748 F.2d 602, 608 (11th Cir. 1984) (recognizing standing if plaintiff is a "target" against which anticompetitive behavior is directed).

This Apple–Google agreement also secures a near-complete lock on GSE mobile distribution, enabling Google to glean massive user data while denying scale to any emergent competitor or alternative aggregator. That, in turn, cements Google's gatekeeping power over specialized search sites like Plaintiffs, which must rely on Google's ranking and indexing. *United States v. Microsoft Corp.*, 253 F.3d 34, 70 (D.C. Cir. 2001) (exclusionary deals that preserve monopoly leverage and harm related markets can be cognizable under antitrust laws). Hence, contrary to Google's argument, the SAC does more than simply name the Apple–Google agreement; it spells out the direct, *logical chain* of injury from that arrangement to Plaintiffs' loss of visibility and user traffic. Whether these new allegations suffice is a *fact-bound* inquiry not suited for resolution under Rule 12(b)(6), given Plaintiffs' plausible assertion of direct, not merely incidental, harm.

The MTD dismisses the SAC's assertion that Google enters into "explicit and implicit understandings" to favor high-spend advertisers (SAC ¶¶ 114–15) as mere unilateral "business judgment." However, the Eleventh Circuit allows plaintiffs to plead "plus factors" from which one can infer a conspiracy or agreement. The SAC points to "explicit and implicit understandings" that Google systematically ranks or demotes organic results based on the advertiser's arrangement with Google, surpassing normal preference. (SAC ¶ 115.) Although the MTD suggests *Twombly* demands more detail, Plaintiffs are not required to produce internal communications at this stage. Antitrust jurisprudence recognizes that key evidence of collusion is often within the defendant's control.

The SAC contends that by artificially boosting big advertisers' organic placements—even where user relevance is lacking—Google sacrifices short-term user satisfaction (and thus its own stated brand proposition) to maintain a network of large spenders (or its own inferior products, which is the subject of the Yelp lawsuit) who might otherwise shift to potential rival platforms. This is at least one plausible "plus factor." While "preferences for big advertisers" might be plausible unilateral strategy, Plaintiffs allege more: Google compromised its own hallmark—high-quality, relevant organic search—in favor of lucrative partnerships, thereby acting against its *short-term* interest in consumer satisfaction. *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 361 (3d Cir. 2004) (plus factors include conduct against independent self-interest). By steering prime organic positions to advertisers or inferior verticals, Google effectively enters a tacit or explicit agreement that diminishes SERP

quality, alienates end-users, and artificially forecloses smaller publishers. This willingness to degrade core search results (a potential self-inflicted wound) and the elaborate financial ties with advertisers suffice to allege a "plus factor" indicating more than mere unilateral "self-preferencing."

Taken as a whole, these allegations are not mere "conclusory" statements but a coherent factual scenario in which Google and key advertisers have arrived at implicit or explicit deals to manipulate search results. While the MTD asserts that "businesses are free to choose their dealing partners" (*Pacific Bell Tel. Co. v. Linkline Commc'ns, Inc.*, 555 U.S. 438, 448 (2009)), that principle does not immunize concerted action in restraint of trade.

### III.   Count III States an *Aspen Exception* Refusal to Deal Claim

Google's motion contends that the SAC has not cured any of the deficiencies the Court previously identified regarding Plaintiffs' refusal-to-deal claim under *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985). In reality, the SAC both (1) adds evidence of a *profitable, preexisting relationship* between OkCaller and Google that generated substantial revenues for both parties, and (2) clarifies that the near-complete delisting ("site count" effectively going to zero) demonstrates far more than a mere ranking fluctuation—indeed, it is an *effective termination* of a critical revenue-sharing venture. By disregarding these new allegations and largely relying on arguments from its previous MTD, Google fails to address the SAC on its own terms.

The Supreme Court in *Aspen Skiing* set forth a narrow but significant precedent under which a monopolist's abrupt refusal to deal with a prior partner can constitute exclusionary conduct in violation of Section 2 of the Sherman Act—especially where the refusal does not serve a legitimate business purpose and sacrifices short-term profits to maintain or extend monopoly power. *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 608 (1985); *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 408–09 (2004).

Google's MTD dismisses Plaintiffs' newly added facts detailing (1) OkCaller's substantial earnings generation and (2) the substantial share of profits that Google also enjoyed from this relationship. According to Google, these revelations do not change the outcome, alleging that "the central premise has not changed: Google simply ranked OkCaller for search results." But the SAC— particularly SAC ¶¶ 23–24—tells a more compelling story. OkCaller's "ad revenue from visits" consistently yielded millions of dollars for Google, signifying that their arrangement was more akin to a joint venture than a passive index listing. (SAC ¶¶ 23–24.) Over a relationship spanning a decade, Google invited Plaintiffs to their Miami headquarters to coach them how to increase the profitability of the partnership. If this was mere "listing a website," millions of publishers would have been invited

to these one-on-one meetings. They were not. At most, hundreds were invited, in a joint venture quantified by the SAC as "around 1/1000 of profits". Google does not dispute this, or even address this allegation, which alone is fatal to their MTD.

More importantly, the SAC's discussion of revenues rebuts Google's false narrative of a "gradual decline" by showing that the joint venture's earnings actually grew through 2022 (SAC ¶¶ 22–23). Thus, ending the relationship (i.e., refusing to list millions of OkCaller pages) meant Google was willingly sacrificing short-term profitability. Google improperly dismisses this information as irrelevant financial data. Because Google's prior emphasis on a "slow decline" has been refuted by explicit data in the SAC, the MTD cannot credibly maintain that "no profitable course of dealing existed." To the contrary, the abrupt and near-complete removal of OkCaller content from Google's index is starkly analogous to *Aspen Skiing*'s refusal to continue a successful joint ticketing program— an arrangement that had also been profitable for both parties. *Aspen Skiing*, 472 U.S. at 593.

The SAC also tackles Google's claim that because "www.okcaller.com" occasionally appears in a direct navigational search (i.e., searching the literal URL "www.okcaller.com"), Google has not fully "removed" OkCaller. It explains that removing a critical mass of phone listings ended OkCaller's viability. Millions of OkCaller-specific pages previously generated user traffic and ad revenue for OkCaller and for Google through relevant keyword queries (SAC ¶¶ 27–28). By ignoring or de-indexing these millions of specific directory pages, Google effectively deprives OkCaller of 99.9% of its former distribution, terminating its function as a phone directory.

In *Aspen Skiing*, the monopolist operator attempted to rationalize severing the Highlands partnership by offering Highlands-only tickets. The Supreme Court was unmoved, noting that token or partial cooperation that fails to preserve the prior profitable collaboration can amount to a constructive refusal to deal. *Aspen Skiing*, 472 U.S. at 603–06. Hence, Google's partial indexing (just zero or one references if someone literally types the domain, rather than a phone number as hundreds of millions previously did) does not cure the refusal to deal. "Zero or near-zero pages" for practical keyword queries remains tantamount to severing the prior arrangement. If *Aspen* had allowed zero or one legacy lift ticket sales each day, rather than thousands, the outcome of the case would not change.

The SAC indicates Google provided no plausible pro-competitive reason for eliminating millions of OkCaller pages from its search index—especially considering their prior "profitable, preexisting partnership." (SAC ¶ 124.) *See also Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1073 (10th Cir. 2013) (noting refusal to deal is suspect if done "without a valid business reason" and with knowledge that "cooperation had been profitable"). Disabling the entire directory function thus

appears less like normal ranking and more like a "sacrifice of short-term profits" in order to punish or exclude OkCaller from the general search distribution ecosystem. Google again portrays a misleading version of facts that OkCaller's decline was caused by "copycats," ignoring the SAC's explicit data showing that *despite* some emulation around 2016, OkCaller's profitability and user reach stabilized and grew—right up until Google's abrupt delisting. Accordingly, the causal chain leading to OkCaller's collapse hinges on the deindexing event, not mere entry of low-level copycats.

While *Trinko* affirms that a firm generally may choose its business partners, the SAC's allegations surpass the routine exercise of "unilateral business judgment." The SAC specifically pleads that Google, in pursuit of greater profits from a handful of partners, is systematically compromising SERP quality and indexing fairness—an irrational short-term sacrifice of user satisfaction and developer goodwill to entrench its monopoly. Such conduct falls within *Aspen Skiing's* narrow exception, as Google is not merely refusing to deal but exploiting its gatekeeper role to exclude a longtime partner and degrade overall GSE results. That short-term profit sacrifice in favor of exclusionary aims is precisely what *Trinko* itself identified as the "outer boundary" of liability under *Aspen*. Hence, the refusal-to-deal claim is not foreclosed by *Trinko* because Plaintiffs plausibly allege conduct that "makes no economic sense" other than preserving monopoly power.

Rather than grappling with Plaintiffs' expanded evidence of revenue, traffic, and near-complete deindexing, Google simply repeats that "The SAC is no different from the FAC," and conclusory statements like "OkCaller was never actually removed." But these statements improperly rely on the old MTD. Merely citing "DE 41 at 7–10; DE 48 at 6–7" and concluding "nothing has changed" fails to inform the Court how the new data about ad revenue and near-total removal of directory pages is insufficient. As such, Google effectively forfeits a direct rebuttal of these revised allegations. *Westchester Day School v. Vill. of Mamaroneck*, 504 F.3d 338, 356 (2d Cir. 2007) (a motion relying on out-of-date arguments without addressing new allegations is inadequate).

Plaintiffs specifically plead that "Google parted with millions of dollars of OkCaller-based ad revenue," (SAC ¶¶ 23–24), which parallels the *Aspen Skiing* scenario wherein the defendant refused joint ski-lift tickets that were profitable. If Google's delisting was truly "no big deal," it would not have systematically ended a reliable revenue stream—an action supporting the "refusal to deal" theory that it acted contrary to its immediate economic self-interest to maintain monopoly control.

### IV.       Count IV States a California Unfair Competition Law Claim

The UCL prohibits "any unlawful, unfair, or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200. Each prong—unlawful, unfair, and fraudulent—constitutes "a separate and

distinct theory of liability." *Lozano v. AT&T Wireless Servs., Inc.*, 504 F.3d 718, 731 (9th Cir. 2007). Google dismisses all concerns about its conduct as frivolous, which should raise an eyebrow given the recent DOJ verdict. Google recycles the argument that if the Sherman Act claims fail, the UCL claim necessarily fails too. This oversimplifies Plaintiffs' allegations, however, because (a) the UCL "unlawful" prong can be grounded in *any* borrowed law—not merely antitrust law, (b) the SAC alleges other bases for "unfair" conduct beyond the Sherman Act, including retaliatory or unethical practices, and (c) the "fraudulent" prong can apply when consumers or developers are misled, irrespective of whether a Sherman violation is proven.

### A.  "Unlawful" Prong

Contrary to Google's MTD, Plaintiffs do not exclusively rely on the Sherman Act as the predicate violation. The UCL's "unlawful" prong can incorporate any federal or California statutory or regulatory violation. California courts do not require a UCL plaintiff to enumerate every possible statutory violation with specificity. As long as the defendant is on notice that the plaintiff alleges "unlawful" practices under § 17200 and references facts supporting that theory, courts routinely allow the plaintiff to borrow additional statutes that may apply to the pleaded conduct.

Even setting aside the SAC's valid Sherman Act claims, other statutory laws cover GSEs. The Federal Trade Commission has issued guidance that search engines must clearly and prominently disclose paid placements or self-preferencing to avoid misleading users. Failure to comply with these guidelines may constitute an "unlawful" practice under the UCL. Fed. Trade Comm'n, "Enforcement Policy Statement on Deceptively Formatted Advertisements" (2015). If Google's results intermix paid or self-promotional placements with purportedly organic rankings without conspicuous disclosure, that can violate these FTC principles (even if not a *per se* Sherman Act violation).

The SAC points to additional wrongful conduct and specifically references 18 U.S.C. § 1512, among other statutes, alleging that Google retaliated against Plaintiffs (removing or demoting OkCaller) soon after Plaintiffs engaged in protected legal advocacy against Big Tech. (SAC ¶ 136). While Google dismisses these allegations as "speculative," nothing in the MTD refutes that such retaliatory conduct, if true, could violate 18 U.S.C. § 1512(b)–(d), or at minimum, reflect unlawful intimidation contrary to public policy. Under California law, evidence of a violation of a federal criminal statute can serve as a predicate for the UCL. The Eleventh Circuit, too, acknowledges the seriousness of alleged retaliation under 18 U.S.C. § 1512. *United States v. Kottwitz*, 614 F.3d 1241, 1261 (11th Cir. 2010) (recognizing broad scope of witness-tampering offenses). The SAC submits that temporal proximity evidences retaliation; this goes beyond 'mere speculation,' the SAC advances

well established elemental analysis of timing events. To the extent Google complains about lack of smoking gun evidence, antitrust scholars have observed that defendants frequently hold all of the relevant knowledge about their own decision-making. *Mayor & City Council of Baltimore v. Citigroup, Inc.*, 709 F.3d 129, 135 (2d Cir. 2013) (highlighting that "defendants' possession of sensitive internal documents supports the need for discovery" where allegations are at least plausible). In complex litigation—especially involving algorithms, search rankings, or corporate intent—courts routinely permit discovery because the relevant evidence (internal emails, indexing protocols, communications about retaliatory motives) is not publicly available. *In re High-Tech Employee Antitrust Litig.*, 856 F. Supp. 2d 1103, 1117 (N.D. Cal. 2012) (acknowledging that key evidence of agreement or motive often lies in a defendant's internal files). Were courts to require plaintiffs to present conclusive proof of wrongdoing pre-discovery, *any bad actor* could cloak misconduct behind trade-secret or internal procedures and move to dismiss for "speculation."

Lastly, the SAC also alludes to Apple–Google "ISA" dealings or duopoly control which may implicate *incipient* antitrust or competition policy in California. (SAC ¶¶ 139–40). Even if the Court dismissed the Sherman Act claims for want of standing, the UCL can still attach to practices that violate the "policy or spirit" of antitrust laws. *Cel-Tech*, 20 Cal. 4th at 187.

### B.   "Unfair" Prong

In California, the concept of "incipient violation" likewise appears under the UCL's "unfair" prong, where a practice violates the policy or spirit of antitrust laws even if it has not yet consummated a full monopoly. *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 187 (1999) ("When a plaintiff who claims to have suffered injury from a direct competitor's 'unfair' act or practice invokes section 17200, the word 'unfair' in that section means conduct that threatens an incipient violation of an antitrust law."). The SAC contends that Google quietly steers queries to its own or favored properties, depriving users of neutral, comprehensive results. Even if not an antitrust violation under *Microsoft* or *Trinko* standards, such conduct can be "unfair" if it subverts user and developer expectations of a "neutral search engine." This parallels how courts address moral fairness: if consumers believe they are receiving objective info, while Google systemically privileges itself, that mismatch can be "substantially injurious" under the UCL. *Camacho v. Auto. Club of S. Cal.*, 142 Cal. App. 4th 1394, 1403 (2006).

The "unfair" prong forbids business practices that "offend an established public policy," or are "immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." *Cel-Tech*, 20 Cal. 4th at 186–87; *Drum v. San Fernando Valley Bar Ass'n*, 182 Cal. App. 4th 247, 257 (2010).

Courts have allowed "unfair" UCL claims to proceed where a dominant platform's opaque policies injure smaller businesses. *See Dreamstime.com, LLC v. Google LLC*, 470 F.Supp.3d 1082 (2020) (noting that while the plaintiff in that case failed on summary judgment, the fundamental theory that Google's ranking changes could be "unfair" was not foreclosed as a matter of law). Hence, "unfairness" under UCL is broader than Sherman Act legality; it can capture unethical conduct that undermines free access to courts, fostering open competition, etc.

The MTD quotes SAC ¶¶ 133–34, which describes, generally, the unfairness of opaque and non-transparent rankings on developers, and the harms and losses it causes. Through sleight of hand, Google concludes that these alleged non-transparency practices equate to "failed and inadequately pleaded federal antitrust claims." Google knows better. The UCL is not bound by antitrust thresholds, and the SAC's claims about transparency are hardly novel concerns. It becomes clear Google has no Rule 12 defense to this claim, hence it attempts to equate and bury it with Sherman claims. It tries to salvage its argument by arguing that lack of transparency couldn't "significantly impact competition." But that is inherently flawed, if not incredulous. Logically if developers invest time in creating superior products, and non-transparent rankings fail to reward them, over time competition will be harmed as fewer developers will participate in the GSE system. The SAC makes the point, and Google's efforts to deflect plain truth should not be endorsed by the Court.

Even if Plaintiffs do not prove a fully defined Sherman Act market, the notion that Google unilaterally and oppressively removes or suppresses certain websites without notice or legitimate justification can still be deemed "unfair." *South Bay Chevrolet v. Gen. Motors Acceptance Corp.*, 72 Cal. App. 4th 861, 886 (1999) ("Unfair" includes business practices that offend public policy or are unethical and injurious to competition or consumers). Courts sometimes consider fairness from the standpoint of whether the practice is "immoral, unethical, oppressive, unscrupulous or substantially injurious," *Cel-Tech*, 20 Cal. 4th at 182–83. Instantly yanking a developer's visibility—despite years of cooperation—could qualify. Similarly, Plaintiffs allege that Google's dominance effectively forces developers to rely on its "webmaster tools," but that usage is subject to hidden or arbitrary indexing standards. *See* SAC ¶¶ 132–34. ] Imposing obscure guidelines while reaping data and ad revenue from developers arguably subverts public policy favoring open and transparent competition. *Drum v. San Fernando Valley Bar Ass'n*, 182 Cal. App. 4th 247, 257 (2010) (recognizing the "unfair" prong can apply where a stronger party exploits weaker parties by withholding crucial information or imposing unreasonable constraints).

**C. "Fraudulent" Prong**

Under the UCL, "fraudulent" merely requires likely deception of consumers or other targeted groups. Plaintiffs allege Google publicly markets itself as a neutral search engine—"organizing the world's information"—while secretly self-preferencing or penalizing certain sites for non-technical reasons, including retaliation or strategic advantage. (SAC ¶¶ 132, 135). Unlike common law fraud, the UCL "fraudulent" prong does *not* require proving actual reliance by each consumer in the classical sense, so long as the misleading conduct is likely to deceive members of the public. *In re Tobacco II Cases*, 46 Cal. 4th 298, 312–13 (2009). Google's MTD fails to rebut Plaintiffs' basic allegation that the entire "Google is neutral" representation is belied by hidden manipulative or retaliatory practices. The UCL "fraudulent" prong simply requires that Google's conduct is likely to deceive members of the public—not that Google necessarily violates an antitrust law.

If Google, for instance, places self-promotional links or paid partner links in positions typically reserved for "organic" results but fails to disclose that distinction, a consumer could be misled. *Comm. on Children's Television, Inc. v. Gen. Foods Corp.*, 35 Cal. 3d 197, 214 (1983) ("Likely to mislead" suffices to show fraudulent conduct under the UCL). Even absent a relevant antitrust market, knowingly misrepresenting search results as purely merit-based could be deemed a fraudulent practice—"likely to deceive" the public. The SAC references Google's public branding (e.g., "We're a neutral platform," "don't be evil"). If these statements lead consumers or developers to believe they will be treated fairly, while in reality Google engages in arbitrary or self-beneficial ranking manipulation, that is plausibly "fraudulent" under the UCL.

## V.    Duopoly Control of U.S. Internet Content Access Violates Sherman Act § 2

Count V alleges that Google, in concert with Apple, constitutes a "duopoly" over the U.S. Internet Content Access Market—defined as the major channels by which American consumers discover and utilize online content. Plaintiffs assert that Google's 20% share of consumer time (via its general search engine monopoly) combines with Apple's 80% share of consumer attention (via smartphone app distribution) to corner virtually 100% of content "on-ramps." Google's MTD argues that "shared monopolies" or "duopolies" are not cognizable under Section 2 and that Plaintiffs lack standing.

The SAC alleges a concerted, interdependent arrangement between Google and Apple that plausibly maintains exclusionary power across virtually all forms of internet distribution. Case law does not categorically immunize "duopoly" arrangements under Section 2, particularly if the two firms act in concert to protect a mutual monopoly or otherwise ensure no third party can enter. Rule 12(b)(6) standards counsel that complex factual disputes about market structure, barriers to entry, and alleged Apple–Google collaboration be tested in discovery rather than disposed of prematurely.

Google's MTD contends that, as a matter of law, two firms cannot be liable under Section 2 absent a "single firm" possessing 100% share in a given market. This argument oversimplifies the case law and overlooks the possibility of multiple firms acting together to maintain a quasi-monopoly or effective duopoly. Although most Section 2 cases concern single-firm monopolies, courts have recognized that coordinated or collaborative conduct by a small number of dominant firms can effectively replicate the exclusionary effects of a single-firm monopoly. *American Tobacco Co. v. United States*, 328 U.S. 781 (1946) recognized that a small group of dominant firms could violate Section 2 if they combine or coordinate to restrain competition. That is precisely what Google and Apple have done, lobbying together against antitrust regulation, and locking in their market power through ISA. A "duopoly" can unlawfully maintain market power if there is evidence of an agreement or parallel exclusion. *US Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43, 63–64 (2d Cir. 2019) (discussing coordinated conduct among concentrated platforms).

While some opinions (e.g., *Midwest Gas Servs., Inc. v. Indiana Gas Co.,* 317 F.3d 703 (7th Cir. 2003)) have used the shorthand that Section 2 "is about a single firm's conduct," those statements typically arise where no agreement or joint strategy was plausibly alleged. Here, Plaintiffs specifically allege a purposeful, exclusionary arrangement between Apple and Google—i.e., "two hands working together" to dominate 100% of practical internet content access. Even if two firms do not literally merge, their combined market conduct can replicate a monopoly's effects—especially if they have structural or contractual agreements to foreclose entry by potential rivals. The SAC details how the "ISA Agreement" between Apple and Google effectively cements Google as the default (and sometimes exclusive) search option on Apple's massive iOS ecosystem, ensuring no competitor can meaningfully challenge Google's control over web search. (SAC ¶¶ 85–90, 146–49). Accordingly, the fact that two firms share market power does not automatically insulate them from Section 2 liability. If a small group of players enforce artificial barriers to maintain their lock on distribution, the resultant harm to competition can be every bit as severe as a single-firm monopoly. *American Tobacco*, 328 U.S. at 810 ("The power that controls the market by destroying competition . . . is a monopoly . . . though it be shared by three persons acting in concert."). That court expressly recognized that a "combination or conspiracy to monopolize a market" can be reached under Section 2. In short, it is an oversimplification to treat Section 2 as applying only to single-firm conduct. Apple and Google, working together, wield monopoly power in the "U.S. Internet Content Access Market." (SAC ¶ 85.) That is a cognizable theory at the Rule 12(b)(6) stage.

At the heart of Count V is the assertion that Google and Apple's "ISA Agreement" (allegedly paying Apple $15–$20 billion annually to keep Google Search as the default) is not merely a vertical distribution deal but a strategic alliance ensuring the two "duopolists" remain entrenched. (SAC ¶ 9, referencing the "ISA" or "Default Search" arrangement). Unlike a purely unilateral act—where each firm acts on its own—this agreement signals a mutual commitment to lock out potential challengers to either platform. The fact that Apple could have permitted or facilitated other search engines by default (e.g., Bing, DuckDuckGo, or a new entrant) but instead cements Google's place strongly suggests more than "independent parallel behavior." *Interstate Circuit*, 306 U.S. at 226–27.

Plaintiffs argue that Apple's gating of iPhone and iOS app distribution meets Google's gating of web-based distribution, combining to exclude would-be rivals who might need to operate effectively across both channels. (SAC ¶¶ 85–88). Apple excluded OkCaller from the app store, and Google excluded it from SERPs. This "parallel exclusion" concept has gained traction in antitrust scholarship, wherein a few dominant firms in adjacent markets coordinate or reinforce each other's blocking strategies to the same end: preventing new entry of tech competitors. See C. Scott Hemphill & Tim Wu, "Parallel Exclusion," 122 Yale L.J. 1182 (2013). At the very least, such factual questions about the synergy between Apple's and Google's exclusionary practices warrant discovery. Under Rule 12(b)(6), the complaint need only "plausibly" state that Apple and Google act in ways that go beyond happenstance or purely independent business judgments.

Google of course insists that "app distribution" and "web search" are separate[3], but the SAC alleges a single integrated function: how the vast majority of U.S. consumers discover and utilize internet content. (SAC ¶¶ 85–89.) Combining these channels is not baseless. *Brown Shoe* instructs that market definition depends on "practical indicia" of substitutability and real-world conditions. Today's consumer environment often requires both an app-based route and a web-based route to distribute content effectively. The Court should allow fact development on whether these two distribution channels are so interrelated that no third party can effectively bypass them.

### CONCLUSION

The Court should deny the motion in its entirety.

---

[3] They shouldn't be, under recognized computer science precedent. Web applications and smartphone apps are both computer software applications. Apple locks SDK access of web applications, preventing them from accessing native smartphone functionality, thereby artificially differentiating apps from web applications. Beyond the scope of this motion, it is nonetheless widely alleged anticompetitive conduct. Together they form the US Internet Content Access Market.

DATED this 21st day of JANUARY 2025.

Respectfully submitted,

/s/Ayelet Faerman                          /s/ Keith Mathews
AYELET FAERMAN, ESQ.                       Keith Mathews
FBN: 102605                                Attorney for Plaintiff
Faerman Law, P.A.                          *Pro Hac Vice*
3859 NW 124th Ave                          NH Bar No. 20997
Coral Springs, FL 33065                    American Wealth Protection
Tel: (954) 271-8484                        Manchester, NH 03105
Fax: (954) 271-8474                        Ph. 603-622-8100
ayelet@faerman.law                         keith@awplegal.com

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing Objection to Motion to Dismiss has been served on this 21st day of January, 2025, to all parties of record, including GOOGLE LLC counsel of record, via electronic mail as per the Federal Rules of Civil Procedure and Local Court Rules.

| | |
|---|---|
| /s/Ayelet Faerman | /s/ Keith Mathews |
| AYELET FAERMAN, ESQ. | Keith Mathews |
| FBN: 102605 | Attorney for Plaintiff |
| Faerman Law, P.A. | *Pro Hac Vice* |
| 3859 NW 124th Ave | NH Bar No. 20997 |
| Coral Springs, FL 33065 | American Wealth Protection |
| Tel: (954) 271-8484 | Manchester, NH 03105 |
| Fax: (954) 271-8474 | Ph. 603-622-8100 |
| ayelet@faerman.law | keith@awplegal.com |

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

**Case No. 9:24-cv-80395-RLR-BER**


GREENFLIGHT VENTURE CORPORATION,

    Plaintiff,

v.

GOOGLE LLC,

    Defendant.

_____


**DEFENDANT GOOGLE'S REPLY**
**IN SUPPORT OF ITS MOTION TO DISMISS**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................... ii

ARGUMENT ......................................................................................................................1

I.      Count 1 Fails to State a Section 2 Claim. .................................................... 1

II.     Count 2 Fails to State a Section 1 Claim. ..................................................... 2

        A.      Plaintiffs Fail to Show that SAC Plausibly Alleges an Agreement. ..................... 2

        B.      Count 2 Fails for Additional Reasons. .................................................. 3

III.    Count 3 Fails to State a Section 2 Claim. ..................................................... 5

IV.     Count 4 Fails to State a Claim Under California's Unfair Competition Law..................... 5

        A.      The "Unlawful Business Practices" Prong. ............................................... 5

        B.      The "Unfair Business Practices" Prong. ................................................. 7

        C.      The "Fraudulent Business Practices" Prong.............................................. 8

V.      Count 5 Fails to State a Section 2 Claim. ..................................................... 9

CONCLUSION.................................................................................................................10

**App. 219**

## TABLE OF AUTHORITIES

| *Cases* | **Pages** |
|---|---|

*American Tobacco Co. v. United States*,
 328 U.S. 781 (1946)......................................................................................................9

*Beasley v. Tootsie Roll Indus., Inc.*,
 85 Cal. App. 5th 901 (1st Dist. 2022)..........................................................................5

*Bell Atlantic Corp. v. Twombly*,
 550 U.S. 544 (2007)......................................................................................................1

*Bloom v. Alvereze*,
 498 Fed. App'x 867 (11th Cir. 2012) .........................................................................10

*Cable Holdings of Ga., Inc. v. Home Video, Inc.*,
 825 F.2d 1559 (11th Cir. 1987) ...................................................................................1

*Camacho v. Auto. Club of S. Cal.*,
 142 Cal. App. 4th 1398 (2d Dist. 2006).......................................................................8

*Car Carriers, Inc. v. Ford Motor Co.*,
 745 F.2d 1101 (7th Cir. 1984) .....................................................................................1

*Casault v. Fed. Nat. Mortg. Ass'n*,
 915 F. Supp. 2d 1113 (C.D. Cal. 2012) .......................................................................9

*Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*,
 20 Cal. 4th 163 (1999) ........................................................................................5, 7, 8

*Central Va. Community College v. Katz*,
 546 U.S. 356 (2006)......................................................................................................9

*Dreamstime.com, LLC v. Google LLC*,
 470 F.Supp.3d 1082 (N.D. Cal. 2020) .........................................................................8

*Dreamstime.com, LLC v. Google LLC*,
 54 F.4th 1130 (9th Cir. 2022) ......................................................................................8

*Drum v. San Fernando Valley Bar Assn.*,
 182 Cal. App. 4th 247 (2d Dist. 2010).........................................................................7

*Feldman v. Palmetto Gen. Hosp., Inc.*,
 980 F. Supp. 467 (S.D. Fla. 1997) ...........................................................................3, 4

*Fla. Seed Co. v. Monsanto Co.*,
 105 F.3d 1372 (11th Cir. 1997) ...................................................................................1

ii

## TABLE OF AUTHORITIES
*(continued)*

|                    *Cases* |                                                             **Pages** |

*Hadley v. Kellogg Sales Co.*,
        243 F. Supp. 3d 1074 (N.D. Cal. 2017) ...............................................................7

*Hicks v. PGA Tour, Inc.*,
        897 F.3d 1109 (9th Cir. 2018) .............................................................................7

*Huls v. Llabona*,
        437 F. App'x. 830 (11th Cir. 2011) .....................................................................6

*I.B. ex rel. Fife v. Facebook, Inc.*,
        905 F. Supp. 2d 989 (N.D. Cal. 2012) .................................................................9

*In re Flat Glass Antitrust Litig.*,
        385 F.3d 350, 360 (3d Cir. 2004)..........................................................................3

*In re Tobacco II Cases*,
        46 Cal. 4th 298 (2009) .........................................................................................9

*Jacobs v. Tempur-Pedic Int'l, Inc.*,
        626 F.3d 1327 (11th Cir. 2010)  ...........................................................................4

*JES Prop., Inc. v. USA Equestrian, Inc.*,
        253 F. Supp. 2d 1273 (M.D. Fla. 2003)................................................................3

*Levine v. Cent. Fla. Med. Affiliates, Inc.*,
        72 F.3d 1538 (11th Cir. 1996) .............................................................................2

*Lombard's Inc. v. Prince Mfg. Inc.*,
        583 F. Supp. 1572 (S.D. Fla. 1984) .....................................................................3

*Ohio v. Am. Express Co.*,
        585 U.S. 529 (2018).............................................................................................2

*People v. Casa Blanca Convalescent Homes, Inc.*,
        59 Cal. App.3d 509 (4th Dist. 1984).....................................................................8

*Sidibe v. Sutter Health*,
        4 F. Supp. 3d 1160 (N.D. Cal. 2013).....................................................................7

*Sinaltrainal v. Coca-Cola Co.*,
        578 F.3d 1252 (11th Cir. 2009)  ...........................................................................4

## TABLE OF AUTHORITIES
*(continued)*

|  | *Cases* | **Pages** |
|---|---|---|

*Sonoma Foods, Inc. v. Sonoma Cheese Factory, LLC*,
    634 F. Supp. 2d 1009 (N.D. Cal. 2007) ..............................................6

*South Bay Chevrolet v. Gen. Motors Acceptance Corp.*,
    72 Cal. App. 4th 861 (4th Dist. 1999)...................................................8

*St. George v. Pinellas County*,
    285 F.3d 1334 (11th Cir. 2002) ...........................................................3

*Tarrant Serv. Agency, Inc. v. Am. Standard, Inc.*,
    12 F.3d 609 (6th Cir. 1993) .................................................................4

*Williams v. Obstfeld*,
    314 F.3d 1270 (11th Cir. 2002) ...........................................................5

|  | *Statute* | **Pages** |
|---|---|---|

18 U.S.C. § 1512....................................................................................6

The nature of Plaintiffs' purported claims is revealed in the opening paragraph of the Opposition brief, which analogizes "Big Tech" to George Orwell's *1984*.  DE 63 at 1.  Plaintiffs' animus towards Google cannot replace applicable law, which they scorn as "technical distinctions."  DE 63 at 2.  Beyond its rhetorical embellishments, Plaintiffs—once again—take liberties with the law, including fabricating case quotations.  DE 63 at 19 (purporting to quote *American Tobacco*, 328 U.S. at 810); *see also* DE 48 at 3, and 8 n.3.  Most fundamentally, Plaintiffs seem to believe that they should be excused from pleading adequate facts now and can await discovery.  *E.g.*, DE 63 at 8.  That is not the law.  *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 558 (2007) (courts should not "send[] the parties into discovery when there is no reasonable likelihood that the plaintiffs can construct a claim from the events related in the complaint" (citing *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1106 (7th Cir. 1984))).  The Court has previously dismissed similar, if not identical, claims of the FAC.  DE 53.  Google respectfully requests that the Court do the same with the claims of the SAC and with prejudice.

## ARGUMENT

### I.    Count 1 Fails to State a Section 2 Claim.

GFVC fails to show "that it is a customer or competitor in the relevant antitrust market" and therefore cannot prove antitrust injury and lacks antitrust standing as to Count 1.  *Fla. Seed Co. v. Monsanto Co.*, 105 F.3d 1372, 1374 (11th Cir. 1997); *see* DE 62 at 2–4.

GFVC persists in its implausible claim that it could become a GSE.  The new "facts" alleged are simply more speculation that a website that, since its founding, has been limited to performing reverse telephone number look-ups by accessing Caller Name ID systems, SAC ¶ 47, could morph into a website that could respond to any query, no matter the subject matter.  And even if GFVC's allegations were plausible (and they are not) it would still need to allege "(1) an intention to enter the business and (2) a showing of preparedness to enter the business." *Cable*

1

*Holdings of Ga., Inc. v. Home Video, Inc.*, 825 F.2d 1559, 1562 (11th Cir. 1987) (cleaned up).

Plaintiffs have alleged neither.

Likewise, the Court previously and correctly held that the fact that a link to GFVC's

website can be included in the SERP which Google creates in response to a user's query does not

give GFVC antitrust standing.  DE 53 at 8.  In response, GFVC has pleaded additional facts

about the *mechanism* by which its website might become visible to Google Search (*i.e.*, the use

of Google Webmaster Tools ("GWT")), but none of that changes the fundamental dynamics the

Court reviewed and rejected previously.  Nor does GFVC's invocation of *Ohio v. Am. Express*

*Co.*, 138 S. Ct. 2274, 2285 (2018), DE 63 at 3, advance its cause.  That case does not address

antitrust standing, which is the issue on which GFVC's Count 1 fails.

In sum, Plaintiffs continue to have no answer to what the Court identified as the germane

question: "how was the Plaintiff in the instant case used as a conduit for the Defendant to harm

competing search engines, such as Bing?"  DE 53 at 5.  Plaintiffs new allegations do not even

attempt to answer that question.  And merging together two insufficient arguments does not

render a valid one.  DE 63 at 6 ("[T]the addition of GWT to the GSE market, combined with

recent developments (Googlebot access) substantiating the 'proliferating vertical' as actual GSE

competitors, squarely places OkCaller's harm in the 'inextricably intertwined' category.").

## II.       Count 2 Fails to State a Section 1 Claim.

### A.       Plaintiffs Fail to Show that SAC Plausibly Alleges an Agreement.

A Section 1 claim requires "an agreement between two or more persons to restrain trade,

because unilateral conduct is not illegal under section 1."  *Levine v. Cent. Fla. Med. Affiliates,*

*Inc.*, 72 F.3d 1538, 1545 (11th Cir. 1996).  Plaintiffs do not so much as attempt to identify such

an agreement, with the exception of references to the "ISA Agreement" with Apple, for which

they fail to allege any facts to show that it is an agreement "to restrain trade."  *See* DE 62 at 4–6.

Merely alleging a company has an agreement with a third party is insufficient to state an antitrust claim.  As explained in Google's opening brief, the Eleventh Circuit has held dismissal proper where a plaintiff identified an agreement, but otherwise made "conclusory allegation[s] of a conspiracy to restrain trade."  DE 62 at 5 (citing *Lombard's Inc. v. Prince Mfg. Inc.*, 583 F. Supp. 1572, 1573–74 (S.D. Fla. 1984), *aff'd*, 753 F.2d 974 (11th Cir. 1985)).

Plaintiffs seek to avoid the requirement that they allege an agreement to restrain trade by arguing that "the Eleventh Circuit allows plaintiffs to plead 'plus factors' from which one can infer a conspiracy or agreement."  DE 63 at 11.  In response to Google's motion, Plaintiffs identify a single "plus factor," arguing that Google purportedly acts contrary to its self-interest by preferencing large advertising spend to the detriment of short-term user satisfaction, citing *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 360 (3d Cir. 2004).  *See* DE 63 at 11–12.  Plaintiffs include no citation to the SAC that has any discussion of Google's alleged undermining of short-term interests in consumer satisfaction, and Plaintiffs' brief is the first time this allegation appears.  It therefore carries no weight.  *See, e.g.*, *St. George v. Pinellas County*, 285 F.3d 1334, 1337 (11th Cir. 2002) (at the motion to dismiss stage, the scope of the Court's review is limited to the four corners of the complaint).  Even if the Court were to consider Plaintiffs' argument to supplement its pleading, preferencing high-spend advertisers is not plausibly contrary to Google's interest.  DE 62 at 6.

### B.    Count 2 Fails for Additional Reasons.

*General Search Services*:  As explained above, Plaintiffs lack antitrust standing as to this market.  *See Feldman v. Palmetto Gen. Hosp., Inc.*, 980 F. Supp. 467, 470 (S.D. Fla. 1997).

*Vertical Search Provider Services*:  Plaintiffs do not contest that its alleged VSP market contains products that are not substitutes.  DE 63 at 7.  That admission dooms the claim.  *JES Prop., Inc. v. USA Equestrian, Inc.*, 253 F. Supp. 2d 1273, 1282 (M.D. Fla. 2003).  Their

invocation of a so-called SSNDQ test, DE 63 at 7, does not save it.  Even if satisfaction of such a test could suffice (and no case is cited suggesting it would), merely citing a test and alleging facts that would satisfy it are two different matters.  The allegations related to a SSNDQ test in the SAC are conclusory and cannot satisfy *Iqbal*.  SAC ¶¶ 64, 70, 73, 81, 85; *Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252, 1268 (11th Cir. 2009) ("The vague and conclusory nature of these allegations is insufficient to state a claim for relief, and will not do." (cleaned up)).

*Directory Information Services*:  Plaintiffs do not attempt to address the deficiencies identified in Google's opening brief, instead insisting that they be allowed to develop their market definition as the case develops.  DE 63 at 8.  That is not the law.  *See Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1338–39 (11th Cir. 2010) (dismissal of Sherman Act claim because "the complaint's allegations of the relevant product market are legally insufficient").

*Internet Content Access*:  Plaintiffs are wrong to suggest that the antitrust standing is not a requirement for a Section 1 claim.  *See Feldman*, 980 F. Supp. at 470 (dismissing both Section 1 and Section 2 claims because "plaintiff lacks antitrust standing").  For the reasons discussed above and in Google's opening brief, DE 62 at 8, Plaintiffs lack standing to bring Section 1 claims in this (ill-defined) market.

*Single-Brand Market for Google Referred Traffic*:  Google's opening brief pointed out, *inter alia*, that (1) in order to maintain a single-brand market claim the product must be "unique" and "no reasonable substitutes [can] exist" and (2) the SAC admits that alternatives exist.  DE 62 at 9 (quoting *Tarrant Serv. Agency, Inc. v. Am. Standard, Inc.*, 12 F.3d 609, 614 (6th Cir. 1993); SAC ¶ 78).  Plaintiffs do not address this argument, instead rebutting the imagined argument that single-brand markets are *per se* forbidden.  DE 63 at 9 ("While courts do treat single-brand markets skeptically, it is not accurate to suggest they are *per se* barred at the motion-to-dismiss

4
226

stage."). Google never argued such, and Plaintiffs' response to a strawman argument does not save their flawed single-brand market theory.

### III.      Count 3 Fails to State a Section 2 Claim.

As explained in Google's opening brief, Count 3 suffers from multiple, independent fatal flaws that require its dismissal. *See* DE 62 at 9–11. In their opposition, Plaintiffs principally address one—suggesting that GFVC's prior relationship with Google was equivalent to the one described in *Aspen Skiing*. The SAC comes nowhere close. GFVC argues its relationship with Google was akin to a "joint venture." DE 63 at 12. But such a legal conclusion is entitled to no weight unless facts are alleged to support it. A joint venture requires the following elements: "(1) a common purpose; (2) a joint proprietary interest in the subject matter; (3) the right to share profits and duty to share losses, and (4) joint control or right of control." *Williams v. Obstfeld*, 314 F.3d 1270, 1275–76 (11th Cir. 2002) (cleaned up). The SAC does not allege such facts (nor could it).

### IV.      Count 4 Fails to State a Claim Under California's Unfair Competition Law.

#### A.      The "Unlawful Business Practices" Prong.

Under this prong of the UCL, the statute borrows violations of other law. *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999). Thus, if the Sherman Act allegations are dismissed, they cannot provide the basis to satisfy this prong (whether they remain relevant to the "unfair" prong is discussed in § IV.B., *infra*). *See Beasley v. Tootsie Roll Indus., Inc.*, 85 Cal. App. 5th 901, 912–16 (1st Dist. 2022) (affirming dismissal of UCL claims under "unlawful" prong for failure to allege violations of any law). The opposition argues that because the SAC references the Sherman Act, "as well as other federal and state laws," SAC ¶ 131, it can satisfy this prong because, supposedly, it need not state the "statutory violation with specificity." DE 63 at 15. Plaintiffs are wrong. It is well established that "the

5

plaintiff bringing a claim based on the unlawful prong must identify the particular section of the statute that was allegedly violated, and must describe with reasonable particularity the facts supporting the violation." *Sonoma Foods, Inc. v. Sonoma Cheese Factory, LLC*, 634 F. Supp. 2d 1009, 1022 (N.D. Cal. 2007) (citing cases) (granting a motion to dismiss an unlawful claim under the UCL because claimant did "not specify any statute that they allege was violated"). Plaintiffs argue that their invocation of 18 U.S.C. § 1512 elsewhere in the SAC satisfies this requirement. This is incorrect for three independent reasons. First, it is not clearly invoked in Count 4. Second, as previously explained, DE 62 at 13, Plaintiffs do not specify which offense under 18 U.S.C. § 1512 Google allegedly committed, and certainly do not state any of the distinct elements or *mens rea* requirements required for each offense. *Compare* SAC ¶ 136 *with Sonoma Foods, Inc.*, 634 F. Supp. 2d at 1022 (explaining that a plaintiff must specify the section of the statute allegedly violated, along with particular facts supporting the violation). Third, as described in Google's first motion to dismiss, the allegation rests entirely on speculation. DE 41 at 11 n.7; DE 48 at 8; *see also* DE 62 at 13.

Finally, the Opposition makes an entirely new allegation—that Google violated the FTC's "Enforcement Policy Statement on Deceptively Formatted Advertisements." DE 63 at 15. It is axiomatic that "[p]laintiffs cannot amend a complaint through an argument raised in opposition to a motion to dismiss." *Huls v. Llabona*, 437 F. App'x. 830, 832 n.5 (11th Cir. 2011) (per curiam). But even if this allegation had been made in the SAC, it would fail. Leaving aside whether a policy statement can satisfy this prong of the UCL in the first place, the FTC guidance concerns *advertisements*. There is no allegation in the SAC alleging that Google acted deceptively (or at all) with regard to advertisements.

**B.      The "Unfair Business Practices" Prong.**

In *Cel-Tech,* the California Supreme Court made clear that the UCL has "a more precise test for determining what is unfair" than "amorphous" tests that use "[v]ague references to 'public policy.'" 20 Cal. 4th at 185.  Plaintiffs ignore that, with repeated overtures to acts as "unfair" and violative of what they consider "public policy" should be.  Plaintiffs also attack straw men.  Google does *not* argue that the UCL is "bound by antitrust thresholds." DE 63 at 17. Instead, Google's argument is that Plaintiffs' "unfair" claim cannot survive because the factual allegations for that claim "overlap entirely with the business practices addressed in . . . the unlawful prong[] of the UCL."  *Hadley v. Kellogg Sales Co.*, 243 F. Supp. 3d 1074, 1105 (N.D. Cal. 2017); *see also Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1124 (9th Cir. 2018); *Sidibe v. Sutter Health*, 4 F. Supp. 3d 1160, 1181 (N.D. Cal. 2013).  Indeed, the allegations in Count 4 (that Google engages in "manipulation of search rankings to favor its own products," that there are "losses of developer time and resources," and lack of transparency, SAC ¶¶ 132–34) are the very same allegations Plaintiffs make for their antitrust claims.  *See* SAC ¶ 125 ("Google systematically favors its own products"); SAC ¶ 117 (developers have suffered "lost revenue streams [and] increased operational costs"); SAC ¶ 57 ("Google's methodologies lacked in transparency, resulting in antitrust losses"); SAC ¶ 73 ("reduce[d] transparency about how businesses are ranked").

The case that Plaintiffs rely on, DE 63 at 16, confirms that if "'the conduct is deemed reasonable and condoned under the antitrust laws,' there is no violation of the UCL" under the unfair prong.  *Drum v. San Fernando Valley Bar Assn.*, 182 Cal. App. 4th 247, 253–54 (2d Dist. 2010) (citation omitted) (holding that defendant's "unilateral refusal" to sell its membership list to plaintiff, even if to suppress price competition, did not violate any prong of the UCL because

7

**App. 229**

"'the right to refuse to deal remains sacrosanct' and 'the mere refusal to deal does not violate the spirit or policy of antitrust law.'" (collecting cases)).

Plaintiffs' other attempts to distinguish the case law fare no better. Plaintiffs claim that courts "have allowed 'unfair' UCL claims to proceed where a dominant platform's opaque policies injure smaller businesses[,]" DE 63 at 17, but cite only to *Dreamstime.com, LLC v. Google LLC*, where the court dismissed plaintiff's claims with prejudice. 470 F. Supp. 3d 1082 (N.D. Cal. 2020), *aff'd,* 54 F.4th 1130 (9th Cir. 2022). That the court muses, in a single sentence, whether a different claim could have satisfied Rule 12(b)(6)'s pleading requirements is pure dicta—it is not a holding that Google's ranking changes could be "unfair" as a matter of law. *Dreamstime*, 54 F.4th at 1142; *see also* DE 53 at 10 (rejecting Plaintiffs' reliance on dicta from *Dreamstime*). Plaintiffs' other case citations make it obvious that they are relying on rhetoric alone. They cite to *South Bay Chevrolet v. Gen. Motors Acceptance Corp.*, 72 Cal. App. 4th 861, 866 (4th Dist. 1999), DE 63 at 17, for an outdated standard of unfair conduct and omit that the internal citation for that standard comes from *People v. Casa Blanca Convalescent Homes, Inc.*, 159 Cal. App. 3d 509, 530 (4th Dist. 1984), which was expressly abrogated by *Cel-Tech.*, 20 Cal. 4th at 184–85. *See also* DE 63 at 16 *citing Camacho v. Auto. Club of S. Cal.*, 142 Cal. App. 4th 1398, 1405–06 (2d Dist. 2006) (holding no violation of the unfair prong for an insurance company to collect payment in a car accident from the uninsured plaintiff, even if the collection letter allegedly contained misrepresentations of the law). Because Plaintiffs fail to make any allegations unique to their unfair claim, it must fall together with the unlawful claim.

## C.    The "Fraudulent Business Practices" Prong.

As for the claim of fraudulent business practices, Plaintiffs are wrong on the law, and do not meet the heightened Rule 9(b) pleading requirements. DE 62 at 16. Plaintiffs concede that they do not and cannot plausibly plead any actual reliance from consumers as a result of

statements that Google is a "neutral search engine."  Instead, Plaintiffs claim that they do not have to prove actual reliance, citing *In re Tobacco II Cases*.  DE 63 at 18.  That case in fact holds the opposite: "a claim of misrepresentation as the basis of [a] UCL action must demonstrate actual reliance on the allegedly deceptive or misleading statements."  46 Cal. 4th 298, 306 (2009).  *See, e.g.*, *I.B. ex rel. Fife v. Facebook, Inc.*, 905 F. Supp. 2d 989, 1012 (N.D. Cal. 2012) (law "require[s] a UCL claim to allege actual reliance[.]"); *Casault v. Fed. Nat. Mortg. Ass'n*, 915 F. Supp. 2d 1113, 1129 (C.D. Cal. 2012) (a claim of fraudulent conduct under the UCL "must allege the existence of a duty to disclose, as well as reliance[.]") (citation omitted), *aff'd*, 658 F. App'x 872 (9th Cir. 2016).  Plaintiffs do not allege that Google has a duty to disclose its search ranking practices, nor do they allege that consumers actually rely on any alleged statements concerning how Google ranks search results.  Because Plaintiffs fail to plead either of the two necessary elements of a fraud claim under the UCL, this claim must be dismissed.

**V.      Count 5 Fails to State a Section 2 Claim.**

Plaintiffs spend the bulk of their opposition contending that duopoly or "shared monopoly" claims are not *per se* forbidden under Section 2.  DE 63 at 18–19.  In doing so, Plaintiffs primarily rely on *American Tobacco Co. v. United States*, 328 U.S. 781 (1946).  To begin with, Plaintiffs' analysis fabricates quotations.  Opposition at 19 quotes: "The power that controls the market by destroying competition . . . is a monopoly . . . though it be shared by three persons acting in concert."  This language does not appear in *American Tobacco* or any other case that undersigned counsel was able to locate.   In fact, the Court's review in *American Tobacco* was expressly limited to whether the exclusion of competitors is a necessary element of monopolizing under Section 2.  328 U.S. at 784.  The discreet question of who must combine to constitute a conspiracy under section 2 was not squarely addressed.  As such, Plaintiffs' reliance on the case is misplaced.  *Cf. Central Va. Community College v. Katz*, 546 U.S. 356, 363

(2006) ("[W]e are not bound to follow our dicta in a prior case in which the point now at issue was not fully debated").  It remains true that the Eleventh Circuit has never recognized a claim under the Sherman Act for a duopoly or "shared monopoly" claim.  *See* DE 62 at 17.

Regardless of its propriety as a legal theory generally, it is still the case that Plaintiffs have not plausibly pleaded that they have antitrust standing, *see* DE 62 § I, or any anticompetitive conduct on Google or Apple's part.  For the first time, Plaintiffs state that the Apple ISA Agreement "signals a mutual commitment to lock out potential challengers to either platform."  This allegation is nowhere made in the SAC, and Plaintiffs fail to provide an explanation (let alone a plausible one) as to how an agreement to make Google Search the default GSE on Apple devices indicates an intent to reinforce Apple's control over its App Store.  Plaintiffs also claim that the ISA Agreement is "at the heart of Count V," but the SAC does not relate that agreement to Plaintiffs' duopoly claims in any way.  *See* SAC ¶¶ 82–86 (definition of Internet Content Access market); ¶¶ 142–148 (Count 5).  To the contrary, the only market that the SAC relates to the ISA agreement is the GSE market.  SAC ¶ 12 ("Google has been found to control approximately 90% of the GSE market, which it has achieved and maintained through a series of exclusionary agreements and anticompetitive practices, such as the ISA Agreement with Apple.  These practices have effectively foreclosed competition in the GSE market[.]").

## CONCLUSION

For the reasons discussed above, the SAC should be dismissed with prejudice.  *See, e.g.*, *Bloom v. Alvereze*, 498 Fed. App'x 867, 884 (11th Cir. 2012) ("After a district court grants an opportunity to amend and identifies the pleading's deficiencies, if the plaintiff fails to submit a proper pleading, dismissal with prejudice is appropriate.").

Date:  January 28, 2025

Kenneth C. Smurzynski (*pro hac vice*)
Aaron P. Maurer (*pro hac vice*)
WILLIAMS & CONNOLLY LLP
680 Maine Avenue, SW
Washington, DC 20024
+1 (202) 434-5000
ksmurzynski@wc.com
amaurer@wc.com

Matthew S. Warren (*pro hac vice*)
Erika H. Warren (*pro hac vice*)
Madeline A. Woodall (*pro hac vice*)
WARREN KASH WARREN LLP
2261 Market Street, No. 606
San Francisco, California, 94114
+1 (415) 895-2940
+1 (415) 895-2964 facsimile
24-80395@cases.warrenlex.com

Respectfully submitted,

/s/ *Edward M. Mullins*
Edward M. Mullins (Florida Bar No. 863920)
Ana M. Barton (Florida Bar No. 85721)
Sujey S. Herrera (Florida Bar No. 92445)
REED SMITH LLP
200 South Biscayne Boulevard, Suite 2600
Miami, Florida, 33131
+1 (786) 747-0200
+1 (786) 747-0299 facsimile
emullins@reedsmith.com
abarton@reedsmith.com
sherrera@reedsmith.com

*Attorneys for Defendant Google LLC*

11

**App. 233**