No. 26-10369-CC

# In the United States Court of Appeals for the Eleventh Circuit

GREENFLIGHT VENTURE CORPORATION,
on behalf of itself and all others similarly situated,
and DR. JEFFREY D. ISAACS,

*Plaintiffs-Appellants,*

*v.*

GOOGLE LLC

*Defendant-Appellee.*

On Appeal from the United States District Court
for the Southern District of Florida
Case No. 9:24-cv-80395-KMM

Hon. K. Michael Moore | Hon. Robin L. Rosenberg, prior district judge

**JOINT APPENDIX — VOLUME 2 OF 2**

Keith Mathews
American Wealth Protection
1000 Elm Street #800
Manchester, NH 03101
(603) 622-8100
*Counsel for Plaintiffs-Appellants*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 24-CV-80395-ROSENBERG**

GREENFLIGHT VENTURE
CORPORATION & JEFFREY
D. ISAACS, MD,

  Plaintiffs,

v.

GOOGLE LLC,

  Defendant.

_____/

**ORDER GRANTING THE DEFENDANT'S**
**MOTION TO DISMISS AND ORDER TO SHOW CAUSE**

  **THIS CAUSE** is before the Court on the Defendant's Motion to Dismiss at docket entry 62. The Motion has been fully briefed. For the reasons set forth below, the Motion is granted.

  **I.  INTRODUCTION**

  To better explain its ruling to the parties and to provide a good record for appellate review, the Court commonly begins lengthy orders with an introduction. The purpose of the introduction is to generally answer the question: What is this case about? Here, the answer to that question is somewhat complicated. Briefly stated, this case is about a web developer alleging that Google— the Defendant—has violated federal antitrust laws. But in the Court's judgment, the best way to introduce its decision is to attempt a narrative summary of the events that gave rise to this case, even though the events may initially seem irrelevant.

  Plaintiff Jeffrey Isaacs initiated this case *pro se*, and the Complaint contained a detailed summary of the historical events in Mr. Isaacs's life. Mr. Isaacs previously studied in the field of medicine, but at some point he lost the ability to pursue a career in that field. DE 1 at 1. Why Mr.

Isaacs was prevented from pursuing medicine is unclear in the pleadings, but Mr. Isaacs describes the basis as including "false disciplinary records" at a California university, and he also cites to prior federal litigation on that topic. *Id.* at 5; DE 61 at 19.  In that federal litigation,[1] Mr. Isaacs alleged that the dean of his school of medicine was corrupt. *Isaacs v. USC Keck School of Medicine*, No. 19-CV-8000, DE 1 at 2 (C.D. Cal. Sept. 16, 2019).  According to Mr. Isaacs, litigation over those allegations of corruption spanned almost two decades and resulted in a settlement agreement. DE 1 at 5; DE 61 at 19.  Mr. Isaacs subsequently alleged in federal court that the university violated the settlement agreement by leaking the details of his eventual expulsion to third parties. *Isaacs v. USC Keck School of Medicine*, 846 F. App'x 519, 520 (2021).  The district court dismissed Mr. Isaacs' claims against the university (and his related claims against the board of medicine) and awarded attorney's fees and costs to the defendants. *Isaacs*, 19-CV-8000 at DE 93, 112.  Mr. Isaacs appealed to the Ninth Circuit, and the Ninth Circuit affirmed. *Isaacs*, 846 F. App'x at 520.

How does prior litigation connect to the case before the Court?  In this case, Mr. Isaacs alleges that Google learned about the litigation surrounding his inability to practice medicine. DE 1 at 6-7; DE 61 at 21.  He also alleges that Google used that knowledge to harm him. *Id.*  The Court will discuss the allegations and claims pertaining to Google in greater detail below, but the Court first turns to what Mr. Isaacs did (pursuant to his own allegations) after discontinuing his pursuit of a career in medicine.

---

[1] For the purposes of providing background information, the Court takes judicial notice of the cases Mr. Isaacs references in his original Complaint and operative Second Amended Complaint, *Isaacs v. USC Keck School of Medicine*, 846 F. App'x 519 (2021) and *Isaacs v. USC Keck School of Medicine*, No. 19-CV-8000 (C.D. Cal. Sept. 16, 2019). *See, e.g., Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1276-78 (11th Cir. 1999) (noting that courts may take judicial notice at the motion to dismiss stage); *Reed v. Royal Caribbean Cruises Ltd.*, 618 F. Supp. 3d 1346, 1354 (S.D. Fla. 2022) (noting that a court may consider documents referenced in a complaint).

Mr. Isaacs turned to the field of internet technology. DE 1 at 6; DE 62 at 20.  He invented a "corona virus tracking app." *Id.*  When Mr. Isaacs submitted the app to Apple for sale, Apple rejected it on the grounds that any application involving COVID-19 had to be authored by a recognized health entity or medical institution. *Id.*; *Isaacs v. Apple, Inc.*, No. 21-CV-5567 at 3 (N.D. Cal. Nov. 11, 2021).  In response, Mr. Isaacs filed a federal antitrust lawsuit against Apple. *Id.*  The trial judge dismissed the first complaint with prejudice and also denied leave to amend, noting that Mr. Isaacs' counsel (who is also counsel in the case before this Court) had filed at least eight similar complaints against Apple across various jurisdictions. *Isaacs*, 21-CV-5567, DE 85. Mr. Isaacs appealed, and the Ninth Circuit affirmed. *Isaacs v. Apple, Inc.*, 85 F.4th 948 (2023).

Like the litigation about Mr. Isaacs' medical credentials, Mr. Isaacs alleges in the case before this Court that Google learned about the litigation with Apple, and that Google used that information to harm him. DE 61 at 20.  In the Court's recounting of the narrative underpinning this case, however, it is still not time to talk about Google.  Instead, the Court turns to Mr. Isaacs' other activities in the field of internet technology.

Mr. Isaacs obtained a patent for "reverse phone search technology." *Id.* at 2.  As the Court understands it, Mr. Isaacs' patent allowed for a user to input a phone number into an application and learn the identity of the caller. *See id.* at 2-3.  After Mr. Isaacs contended that another reverse phone search company—Whitepages—was infringing upon his patent, Whitepages filed suit to invalidate Mr. Isaacs' patent. *Whitepages, Inc. v. Isaacs*, No. 16-CV-175 (N.D. Cal. Jan. 11, 2016). The trial court agreed, granted judgment as a matter of law in favor of Whitepages, and invalidated Mr. Isaacs' patent. *Id.* at DE 48.  Mr. Isaacs appealed, and the Federal Circuit affirmed. *Whitepages, Inc. v. Greenflight Venture Corp.*, 698 F. App'x 613, 614 (2017).  Mr. Isaacs initially filed his suit in this Court on the premise that Google was infringing upon his invalidated patent

and upon claims that the United States Patent and Trademark Office refused to reissue. *See* DE 16 at 13.  After this Court twice dismissed Mr. Isaacs' patent infringement claims, however, Mr. Isaacs abandoned the claims. DE 61.  One final topic remains before the Court turns to a discussion of Mr. Isaacs' remaining, active claims against Google: how the case before this Court (as a matter of procedural history) came to be.

Mr. Isaacs recently entered into a contract to sell his home in Florida. *Isaacs v. Keller Williams Realty, Inc.*, 23-CV-81393 at page 2 (S.D. Fla. Apr. 17, 2024).  Mr. Isaacs refused to close on the sale, however, "due to the war in Ukraine." *Id.*  In light of the failure to close, Mr. Isaacs' realtor sued for commission in Florida state court. *Id.*  In response to that lawsuit, Mr. Isaacs filed a lawsuit in federal court, assigned to the undersigned, where he sued his realtor for violating the Racketeer Influenced Corrupting Organization Act, or RICO. *Id.* at DE 1.  However, Mr. Isaacs issued a subpoena (through his current counsel) not to the realtor or any party related to the real estate transaction, but to Google. *Isaacs v. Keller Williams Realty, Inc.*, 24-MC-80086 (S.D. Fla. Jan. 17, 2024).  Mr. Isaacs' basis for the subpoena was that he was forced to keep his home (and not sell) because Google had wronged him. *See* 23-CV-81393 at DE 117, page 2.

Google filed a motion to quash the subpoena in California federal court, which was in turn transferred to this District and assigned to the undersigned.  While litigation over the propriety of the subpoena was pending, Mr. Isaacs filed the suit before this Court against Google, alleging that Google was infringing upon his patent. DE 1.

While Mr. Isaacs was litigating the validity of his patent *pro se* in this case, two things happened to fundamentally alter the litigation.  First, Google put Mr. Isaacs on notice that the only party with standing to sue over the patent was Mr. Isaacs' solely owned entity—Greenflight Venture Corporation—and that a corporation can only be represented by counsel.  Second, Google

lost (at the trial level) in an antitrust case brought by the United States. *United States v. Google LLC*, No. 20-CV-03010, DE 1033 at 6-7 (D.C. Aug. 5, 2024).[2]  As a result, Mr. Isaacs retained the same counsel he used in prior litigation, and that counsel filed antitrust claims against Google on behalf of Greenflight, citing the *United States v. Google* case as precedent and calling his claims "verbatim" copies of that litigation.  Because Mr. Isaacs later abandoned his patent claims, however, this case is limited to antitrust.  The Court now turns to Mr. Isaacs' allegations against Google.

Around the time Mr. Isaacs obtained his patent but before the patent was invalidated, Mr. Isaacs created the website "OkCaller." DE 61 at 10-20.  OkCaller used the technology described in the patent—it allowed users to reverse lookup phone numbers. *Id.*  During the early years of its inception, OkCaller received millions of views. *Id.* at 15-16.  At some point in the year 2017, OkCaller's views began to decline. *Id.* at 15.  In late 2022, OkCaller's views dropped to zero, or near zero. *See id.* at 17.

Mr. Isaacs attributes this precipitous drop in views to Google learning about his medical license litigation and his litigation with Apple. *Id.* at 20.  Once Google obtained that knowledge, Mr. Isaacs alleges, Google felt threatened and used its monopolistic power to retaliate against Mr. Isaacs by reducing the flow of internet traffic to OkCaller. *See id.* at 19-22.

This is therefore an antitrust case, brought by a reverse phone number lookup website against Google.  But to bring an antitrust claim against one of the largest internet companies in the world is no small thing.  As the Court explained in a prior order of dismissal, case law limits who can bring antitrust claims. DE 53 at 2-4.  Broadly summarized, because the Plaintiffs (both

---

[2] It is of course possible that it is a coincidence that Google lost an antitrust case eight days before Mr. Isaacs brought his own antitrust claims against Google.

Greenflight and Mr. Isaacs) did not plausibly allege that Greenflight was a competitor[3] to Google, the Court previously dismissed the Plaintiffs' antitrust claims. *See id.* at 19.

This Order analyzes the legal sufficiency of Greenflight's final amended pleading, the Second Amended Complaint. The central question is whether OkCaller—which is owned by Greenflight—can bring an antitrust claim against Google, with Mr. Isaacs' litigious past serving as the backdrop to substantiate Google's intent to harm. The Court answers that question in the negative; for the same reasons the Court dismissed Greenflight's antitrust claims in the past, the Court does so again.

## II.     ANALYSIS

The Court begins its analysis with **(A)** a procedural ruling on the content of Greenflight's response to Google's motion to dismiss. The Court subsequently analyzes Google's motion to dismiss on a count-by-count basis **(B) – (F)**. The Court then enters **(G)** an order to show cause to Mr. Isaacs and addresses **(H)** its denial of further leave to amend.

For ease of discussion in this Order, the Court considers Greenflight to be synonymous with OkCaller.

### A. Greenflight's Response to the Motion to Dismiss

The Court has entered three prior orders dismissing Plaintiffs' claims in this case, giving the Court sufficient opportunity to review substantial motion practice. DE 26, 53, 58. Based upon that review, the Court makes one broad observation. Google consistently makes focused, targeted arguments on what Google contends are legal insufficiencies in the Plaintiffs' pleadings.

---

[3] To clarify, this is not an antitrust case about a *customer* of Google. Instead, this is a case about an alleged *competitor* of Google. Greenflight repeatedly refers to itself as a competitor (using the word 28 times in the Second Amended Complaint) and it also relies upon a recent antitrust case that focused on Google's competitors. *E.g.,* DE 63 at 8 ("The SAC alleges that OkCaller is not merely a passive recipient of traffic, but a prospective or nascent competitor in general search if provided fair access to indexing data."). Recent cases in other courts have highlighted how difficult it would be for customers of Google search (which is free) to bring antitrust claims. *See Arcell v. Google LLC*, No. 22-CV-02499 (N.D. Cal. Aug. 9, 2024).

App. 239

Greenflight's response to Google's focused arguments is consistently an incoherent collection of technical jargon and legal phrases.[4]  In the Court's opinion, Greenflight's response is so incoherent that Greenflight has failed to meet its obligation to respond to the cogent points raised in Google's motion.  Under the Local Rules of this District, a failure to refute means that the respondent has waived a defense. *See Carter v. BPCL Mgmt.*, No. 19-cv-60887, 2021 WL 7502562, at *1 (S.D. Fla. Sept. 22, 2021) (holding that failure to refute opposing arguments "operates as a waiver of those arguments and is akin to a failure to respond"); *Sanz v. Am. Soc'y of Composers & Publishers,* No. 18-cv-24504, 2019 WL 13237013, at *5 (S.D. Fla. Aug. 7, 2019) (finding that a plaintiff "effectively conceded" a claim when he "chose not to address" the defendant's arguments on that claim in a motion to dismiss). Below, the Court sets forth a concrete example of Greenflight's failure to respond.

As will be discussed in greater detail, Google argues that Greenflight has failed to plead that it competes in the same market as Google—the general search services market.  The Court would expect that Greenflight, in its response, would either (i) concede it has not pled the same or (ii) identify where, in its pleading, that it *has* alleged it directly competes with Google.  Greenflight does neither.  Instead, Greenflight responds in part with the following argument:

> Plaintiffs, as direct users of Google's Webmaster Tools (GWT) and overall GSE services, plead that they have no meaningful alternative for distribution, making them effectively consumers of Google's platform. Even if they are not themselves offering general search querying, they suffer inextricably intertwined injury from Google's alleged manipulation and self-preferencing. Because market power in GSE allows Google to withhold or degrade distribution, the alleged harm— OkCaller's dramatic traffic decline—flows directly from conduct in that market.

> The Supreme Court in *Brown Shoe* recognized that market definition and the effects of alleged monopolistic behavior often involve intricate factual inquiries (e.g., cross-elasticities of demand, distribution channels, barriers to entry). Here, Plaintiffs' theory rests on facts—such as behind-the-scenes ranking changes, data

---

[4] The Court previously observed and referenced the Plaintiff's use of incoherent jargon in a prior order of dismissal. DE 53 at 13.

> indexing decisions, exclusive default agreements, and new to the SAC – whether GWT is part of the GSE platform.

DE 63 at 7-8 (case citations omitted).  The Court simply cannot discern what this text is intended to convey—how the text refutes Google's cogent argument.  Notably, the quoted text contains no citations to Greenflight's Second Amended Complaint.  That is the case for most of Greenflight's response—pleading citations are scarce—and when Greenflight does provide a citation, the Court fails to see how the cited allegation is responsive to Google's arguments.

The Court's discussion on this topic is not intended to malign or impugn Greenflight or Greenflight's counsel; antitrust is a complex area of the law, and it can be a difficult task to clearly communicate antitrust legal principles to the Court.  The Court's discussion on this topic is instead intended to explain its conclusion, referenced below in its analysis,[5] that Greenflight has failed to substantively respond to various arguments raised by Google in its motion to dismiss.

B. **Count I, styled as "Maintaining Monopoly of General Search Engines in Violation of Sherman Act § 2 (DOJ Verbatim Cause of Action)"**

Greenflight's first count seeks to hold Google liable in antitrust for maintaining a monopoly in the market of "general search engine services." DE 61 at 44.  According to Greenflight, general search engine services "enable users to retrieve responsive information from the internet by entering keyword queries." *Id.* at 27.  A key characteristic of these services is that a user can search for essentially anything. *See id.*  Also according to Greenflight, there is no substitute for general search engine services. *Id.*  Example general search engine services are Google, Bing, and DuckDuckGo. *Id.*

---

[5] The Court's conclusion that Greenflight's response is non-responsive is limited to Count I and Count II. Greenflight's responses as to Counts III through V are at least sufficiently clear that the Court believes Greenflight has complied with the Local Rules.

For Greenflight to bring an antitrust claim against Google for a monopoly in the general search engine services market, Greenflight must be a market participant (here, a competitor) in that market. *Fla. Seed Co., Inc. v. Monsanto Co.*, 105 F.3d 1372, 1374 (11th Cir. 1997). Just like Google's prior motion to dismiss, Google argues in the present motion to dismiss that Greenflight has not plausibly alleged that it is a competitor in the general search engine services market.

Greenflight's Second Amended Complaint does contain the words: "Plaintiffs are competitors [with Google]." DE 61 at 44. But that is a legally conclusory allegation that is not accepted as true at the motion to dismiss stage. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) ("[C]ourts 'are not bound to accept as true a legal conclusion couched as a factual allegation.'" (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986))). What Greenflight must do is allege sufficient facts such that this Court may conclude that Greenflight's claim is plausible on its face. *E.g., Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

On this point, Google's motion to dismiss is persuasive. OkCaller merely returns information about a phone number. DE 61 at 4-5. OkCaller does not allow a user to search for, essentially, anything. Google therefore argues that Greenflight has failed to allege any facts upon which this Court could find that Greenflight may plausibly be inferred to be a competitor in the general search engine services market.

Greenflight's answer to this point, as discussed above in Section **A**, is sufficiently incoherent to be non-responsive. For that reason alone, Google's motion is due to be granted. The Court has nonetheless endeavored to make its best guess why Greenflight contends that it has plausibly alleged it is a competitor in the market of general search engines. The Court's best guess is that Greenflight relies upon four theories.

First, Greenflight alleges that it is a competitor with Google because it makes use of certain tools that Google provides called "Google webmaster tools." *Id.* at 27, 28. Based upon that allegation, Greenflight argues, "Plaintiffs, as direct users of Google's Webmaster Tools and overall GSE services, plead that they have no meaningful alternative for distribution, making them effectively consumers of Google's platform." DE 63 at 6. But this is not a case about the webmaster tools market—Greenflight has chosen to allege that Google has a monopoly in general search services. The Court fails to see how Greenflight's use of a tool that *influences*[6] Google's search engine renders Greenflight a plausible competitor in the area of general search services.

Second, Greenflight alleges that it is a competitor with Google because of "[proposed] DOJ and [active] EU regulations to permit competing developers access to Googlebot data." DE 61 at 44. If what Greenflight means is that governmental regulations allow for it to access Google data, that fact does not transform OkCaller from a reverse phone lookup service to a general search engine service. After all, Greenflight also alleges the commonsense observation that to become a general search engine (like Google) a company must possess "significant capital, highly complex technology, access to effective distribution, and adequate scale." *Id.* at 29. But Greenflight alleges that it possesses none of those things. Instead, it alleges that a governmental regulation (might) allow it access to Google data. That does not make Greenflight's status as a Google competitor plausible.

Third, Greenflight alleges that it would have become a valid competitor with Google, had Google not exercised improper monopoly power over the general search services market in the

---

[6] If one's *influence* on or *use of* Google's search engine results was sufficient to confer antitrust standing to sue Google as a *competitor*, the Court believes that every person who has ever posted something on the internet (or typed something into Google search) has standing to sue Google as a competitor. That simply cannot be the law, and courts have limited those who may sue in antitrust for a reason. *See Fed. Trad Comm'n v. Qualcomm Inc.*, 969 F.3d 974, 992 (9th Cir. 2020) ("Parties whose injuries, though flowing from that which makes the defendant's conduct unlawful, are experienced in another market do not suffer antitrust injury.").

App. 243

past. *See* DE 63 at 8.  The Court addressed this argument in a prior dismissal, and it found that nothing in the First Amended Complaint could be said to plausibly suggest that OkCaller, a reverse phone number website, could have ever had (or has) the ability to compete with Google in the market of general search services. DE 53 at 6.  Nothing in the Second Amended Complaint alters the Court's prior conclusion on this subject.  Simply stated, if OkCaller could be said to have had the potential to grow into a Google competitor, every website on the internet with a search bar could say the same—every website on the internet with a search bar could sue in antitrust as a competitor to Google.  The Court declines to conclude that OkCaller could plausibly be inferred to have the potential to challenge Google as a competitor in the market of general search services.

Fourth, Greenflight alleges that it has standing, competitor or not, under the case of *Blue Shield of Virginia v. McCready*, 457 U.S. 465 (1982).  The Court addressed that argument at great length in a prior dismissal. DE 63 at 2-6.  The Court declines to do so a second time.  Suffice it to say that for Greenflight to have standing under *McCready*, Google must have used Greenflight as a conduit to harm its true competitors, such as Bing. *Id.*  That is not this case.  For all of the reasons the prior complaint did not qualify for standing under *McCready*, the Second Amended Complaint also does not qualify.

In summary, for all of the reasons set forth above, for all of the reasons outlined in the Court's prior order of dismissal, and for all of the reasons in Google's motion and reply (which are incorporated and adopted into this Order), the Court dismisses Count I.

### C. Count II, styled as "Maintaining Sherman Act § 1 Unreasonable Restraints of Trade in the GSE, VSP, and Directory Services, Internet Access, and Google Single-Brand Content Markets"

Greenflight's Count II is brought under Section 1 of the Sherman Act.  For such a claim to be cognizable, a plaintiff must allege an agreement between two or more persons that unreasonably

11

restrains trade. *Levine v. Cent. Fla. Med. Affiliates, Inc.*, 72 F.3d 1538, 1545 (11th Cir. 1996). It is not enough, however, that a plaintiff is affected by the anticompetitive agreement. *Nat'l Indep. Theater Exhibitors, Inc. v. Buena Vista Distrib. Co.*, 748 F.2d 602, 608 (11th Cir. 1984). The plaintiff must instead be the *target* against which anticompetitive activity is directed. *Id.* Additionally, the injury the plaintiff experiences must be "of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' act unlawful." *Id.* Non-cognizable injuries that are incidental or remote do not give a plaintiff antitrust standing. *Id.* Of course, not only does a plaintiff have to allege the foregoing, but the plaintiff must do so in a way that satisfies federal pleading standards.

In its motion to dismiss, Google argues that Greenflight fails to identify an anticompetitive agreement, fails to explain how the agreement targeted Greenflight, and fails to explain how it was harmed from the agreement. Greenflight's response to Google's arguments is sufficiently incoherent that the Court concludes it is non-responsive, as previously discussed in Section **A**, and Google's motion is due to be granted on that basis alone. In the alternative, the Court has done its best to guess what Greenflight's counterarguments are.

<u>What is the Anticompetitive Agreement?</u>

As best as the Court can discern, Greenflight believes that federal pleading standards do not require it to identify a noncompetitive agreement. By way of example, Greenflight argues the following: "Although unilateral conduct is generally not actionable under Section 1, the courts recognize that even tacit or implicit understandings may suffice if pleaded with factual support suggesting 'a meeting of the minds' to restrain trade." DE 63 at 10. Greenflight's Second Amended Complaint also contains references to "implicit understandings." DE 61 at 46. In lieu

of the identification of an agreement, Greenflight requests discovery approximately one dozen times.

Greenflight's Count II does not satisfy federal pleading standards; without knowing what the agreement is, the Court cannot analyze whether Greenflight was the target of the agreement. Vague and conclusory allegations about anticompetitive agreements are not sufficient to satisfy federal pleading standards. *See Lombard's Inc. v. Prince Mfg. Inc.*, 583 F. Supp. 1572, 1573-74 (S.D. Fla. 1984), *aff'd*, 753 F.2d 974 (11th Cir. 1985).

<u>Was Greenflight Targeted by an Anticompetitive Agreement?</u>

Because the Court does not know what the anticompetitive agreement in this case is alleged to be, it is difficult for the Court to analyze whether Greenflight has plausibly alleged it was the target of an anticompetitive agreement.  As best as the Court can discern, however, Greenflight alleges some sort of agreement between Google and Apple. DE 61 at 11.  The Court understands how Greenflight could allege the existence of an agreement between Google and Apple to restrain trade in the general search services market—that was the subject of the recent antitrust decision brought by the United States. *See United States v. Google LLC*, No. 20-CV-03010, DE 1033 at 6-7 (D.C. Aug. 5, 2024).  The Court similarly understands how such an agreement could be alleged to directly target other companies in the general search services market, or companies trying to enter the general search services market.  What the Court does not understand is how an agreement between Google and Apple could plausibly be alleged to target OkCaller.  Stated differently, any injury to OkCaller that flowed from an agreement between Google and Apple would be incidental or remote at best.  Nothing in the Second Amended Complaint persuades the Court otherwise.

For the reasons set forth above and in the Court's prior order of dismissal, Count II is dismissed.  There are also other grounds upon which Count II is ripe for dismissal that the Court

13

has not discussed given the already lengthy nature of this Order.  Instead, the Court also dismisses Count II for each of the reasons set forth in Google's motion to dismiss and reply, which the Court adopts and incorporates into this Order.

**D. Count III, styled as "Refusal to Deal in Violation of Section 2 of the Sherman Act (*Aspen Skiing Co. v. Aspen Highlands Precedent*)"**

Greenflight's third count is an antitrust claim intended to be premised upon the legal standard created in a Supreme Court case, *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985).  The Court addressed this count at length in its prior order of dismissal, and the Court declines to do so a second time. DE 53 at 11-12.  Suffice it to say that an *Aspen Skiing* claim would require Greenflight to (among other things) plausibly allege that it previously entered into a joint venture with Google.  This Greenflight has not done.  Count III is dismissed for all of the reasons described in the Court's prior of dismissal, as there is no meaningful difference between the First and Second Amended Complaints, and for all of the reasons set forth in Google's present motion and reply, which the Court adopts and incorporates into this Order.

**E. Count IV, styled as "Violation of California's Unfair Competition Law (Cal. Bus & Prof. Code §§ 17200, et seq)"**

Greenflight's Count IV is premised upon California state law, which prohibits "any unlawful, unfair, or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200.  Each prong is a distinct theory of liability. *Lozano v. AT&T Wireless Servs., Inc.*, 504 F.3d 718, 731 (9th Cir. 2007).  Because Greenflight contends that it has brought a claim under each prong in Count IV, the Court analyzes each prong separately.

**1. The Unlawful Prong**

The unlawful prong "borrows violations of other laws and treats them as unlawful practices that the unfair competition law makes independently actionable." *Cel-Tech Commc'ns, Inc. v. Loss*

*Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999) (citing *State Farm Fire & Cas. Co. v. Superior Ct.*, 45 Cal. App. 4th 1093, 1103 (1996)).  Google therefore argues that: (i) Greenflight's "unlawful" claim is premised upon alleged violations of federal antitrust law (Counts I through III), but because (ii) those claims are ripe for dismissal (iii) Greenflight's Count IV is also ripe for dismissal.

In response, Greenflight argues that its Count IV is premised upon other sorts of alleged violations of the law, citing vague references to the same in the Second Amended Complaint. Implicit within Greenflight's argument is that vague references are sufficient for an "unlawful" prong claim, but that is wrong: "[T]he plaintiff bringing a claim based on the unlawful prong must identify the particular section of the statute that was allegedly violated, and must describe with reasonable particularity the facts supporting the violation." *Sonoma Foods, Inc. v. Sonoma Cheese Factory, LLC*, 634 F. Supp. 2d 1009, 1022 (N.D. Cal. 2007).  Other than the federal antitrust counts in the Second Amended Complaint, Greenflight has not identified claims or facts with reasonable particularity that could support an unlawful prong claim.[7]  For these reasons as well as the additional reasons set forth in Google's motion and reply, which the Court adopts and incorporates in this Order by reference, Count IV is dismissed.

## 2.  The Fraudulent Prong

For a claim to be cognizable under the fraudulent prong, Greenflight must allege a deception by Google against members of the public. *Watson Lab'ys, Inc. v. Rhone-Poulenc Rorer, Inc.*, 178 F. Supp. 2d 1099, 1121 (C.D. Cal. 2001).  To plead its claim, Greenflight relies upon the allegation that Google fraudulently markets itself as a neutral company, but that it manipulates its search rankings in a misleading way that is not neutral. DE 61 at 51.  Google argues that

---

[7] For the same reasons, Greenflight's vague references to other violations of the law cannot form the basis of liability under other prongs of the California Business Code.

Greenflight cannot cite to any authority to show that it has a duty to disclose to members of the public how it ranks its search results.

In response, Greenflight provides no citation to authority for the proposition that Google has a duty to disclose how it generates its search results. Instead, Greenflight's cited authority may even stand for the opposite proposition—that Google has no duty to disclose under California law. *See Dreamstime.com, LLC v. Google LLC*, No. 20-16472, 2022 WL 17427039, at *2 (9th Cir. 2022) ("Google had no affirmative duty under the parties' agreement to disclose its confidential algorithmic revision.").[8]  Count IV is therefore ripe for dismissal. *See Daugherty v. Am. Honda Motor Co.*, 144 Cal. App. 4th 824, 838 (2006) ("We cannot agree that a failure to disclose a fact one has no affirmative duty to disclose is 'likely to deceive' anyone within the meaning of the UCL.").  For these reasons as well as the additional reasons raised in Google's motion and reply, which the Court adopts and incorporates into this Order by reference, Count IV is dismissed.

### 3.  The Unfair Prong

Google argues that Greenflight's claim under the "unfair" prong should be dismissed for two reasons: (i) the overlap of Count IV with Greenflight's federal antitrust claims and (ii) the overlap of any "unfair" claim with Greenflight's "unlawful" and "fraudulent" claims.  Each is addressed in turn.

<u>Overlap with the Federal Antitrust Claims</u>

The Supreme Court of California has recognized that a prohibition on "unfair" conduct is an "amorphous" concept that provides "too little guidance to courts and businesses." *Cel-Tech*, 20

---

[8] The Court notes that if Google had a duty to disclose its internal algorithms under California law, the appellant in *Dreamstime* would presumably have had no need to cite to the parties' contract for the alleged duty, as the appellant could have instead relied upon California law, generally.

16

Cal. 4th at 185.  As a result, the California Supreme Court tied the concept of unfairness, at least for the purposes of the case before this Court, to antitrust violations:

> These principles convince us that, to guide courts and the business community adequately and to promote consumer protection, we must require that any finding of unfairness to competitors under section 17200 be tethered to some legislatively declared policy or proof of some actual or threatened impact on competition. We thus adopt the following test: When a plaintiff who claims to have suffered injury from a direct competitor's "unfair" act or practice invokes section 17200, the word "unfair" in that section means conduct that threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition.

*Id.* at 186-87.  Here, every factual allegation that Greenflight incorporates into Count IV is also incorporated into the federal antitrust counts: Counts I through III.  The Court's review of Count IV confirms that the factual predicate of Count IV is effectively the same as the antitrust counts. *E.g.,* DE 61 at 50.  The Court is therefore persuaded by Google's argument that because Counts I through III are ripe for dismissal, Count IV is ripe for dismissal as well.

Overlap with the "Unlawful" and "Fraudulent" Claims

California courts have held that where alleged unfair business practices overlap entirely with the other prongs of the California Business Code, claims under the unfair prong cannot survive. *E.g., Hadley v. Kellogg Sales Company*, 243 F. Supp. 3d 1074, 1104-05 (N.D. Cal. 2017). Here, Count IV commingles claims under all three prongs—the same factual predicate underscores all three prongs.

Upon review, the Court is unable to construe a meaningful, unique factual predicate for an "unfair" type of claim for Count IV.  The Court is also unable to construe a meaningful, unique legal basis for Count IV; indeed, Greenflight's Count IV repeatedly references Google's alleged status as a monopolist. DE 61 at 51.  The Court is therefore persuaded by Google's argument that

17

because Greenflight's unlawful and fraudulent claims are ripe for dismissal, the unfair claim is also ripe for dismissal.

For these reasons as well as the additional reasons raised in Google's motion and reply, which the Court adopts and incorporates into this Order by reference, Count IV is dismissed.

**F.  Count V, styled as "Illegal Duopoly Control of the U.S. Internet Content Access in Violation of Section 2 of the Sherman Act"**

In Count V, Greenflight seeks to bring an antitrust "duopoly" claim against Google and Apple for "dominat[ing] all meaningful channels" of the internet.  This claim is ripe for dismissal for two reasons, each of which is delineated in **bold** below.

**First**, the Eleventh Circuit has never recognized a Section 2 antitrust claim for a "duopoly," and many courts have rejected the concept as a matter of law. *See JES Props., Inc. v. USA Equestrian, Inc.*, No. 802CV1585T24MAP, 2005 WL 1126665, at *18 (M.D. Fla. May 9, 2005), *aff'd on other grounds*, 458 F.3d 1224 (11th Cir. 2006).  Indeed, the weight of authority is strong that monopoly means one, not two. *Midwest Gas Servs., Inc. v. Indiana Gas Co., Inc.*, 317 F.3d 703, 713 (7th Cir. 2003) ("[A] section 2 claim can only accuse one firm of being a monopolist.").

In response, instead of conceding the lack of legal authority for its claim, Greenflight relies upon a quotation that is either fabricated or hallucinated.  More specifically, Greenflight cites to a seminal case on antitrust law, *American Tobacco Co. v. United States*, 328 U.S. 781 (1946).  Greenflight quotes from *American Tobacco*: "The power that controls the market by destroying competition . . . is a monopoly . . . though it be shared by three persons acting in concert." DE 63 at 9.  That quotation does not appear in *American Tobacco*, and the text of the opinion does not lend support to Greenflight's quotation.  The Court was similarly unable to locate the quotation (or even portions of the quotation) anywhere inside the entirety of the Westlaw database.  Google was unable to locate the source of the quotation as well.  As a result, the Court is concerned that

Greenflight's quotation may be the result of Greenflight's usage of artificial-intelligence-hallucinated legal authority. *See* Varun Magesh, *AI on Trial: Legal Models Hallucinate*, https://hai.stanford.edu/news/ai-trial-legal-models-hallucinate-1-out-6-or-more-benchmarking-queries (May 23, 2024) (noting that artificial intelligence programs can hallucinate incorrect answers to legal questions 58 to 82 percent of the time).  In any event, the Court declines to recognize a claim that ignores the prefix "mono" in the word monopoly, has been rejected by courts as a matter of law, and has not been recognized by Eleventh Circuit, all based upon a quotation that does not exist.

**Second**, for all of the reasons Greenflight lacks standing to sue Google as a competitor for "general search services" in Count I, Greenflight also lacks standing to sue Google as a competitor for "smartphone app *distribution*." DE 61 at 54 ("Apple controls the lion's share—approximately 80%—of . . . smartphone app distribution, while Google, with its dominance in general web search, commands the remaining 20%.").  Stated differently, while Greenflight may have plausibly alleged that it can create smartphone applications, it has not plausibly alleged that it is a competitor with Google in the market of smartphone app distribution.

For all of the reasons set forth above and in Google's motion and reply, which the Court adopts and incorporates into this Order, Count V is dismissed.

### G. Order to Show Cause

The Court construes the Second Amended Complaint as bringing claims not only on behalf of Greenflight, but also on behalf of *pro se* Plaintiff Jeffrey Isaacs. DE 61 (referencing Plaintiffs, plural, and also containing a *pro se* signature).  The Court previously stayed all claims brought *pro se*. DE 26 at 2.  Before dismissing any *pro se* claims, however, the Court will utilize an order to show cause process.  *Pro se* Plaintiff Jeffrey Isaacs is **ORDERED** to **SHOW CAUSE** by

**February 10, 2025**, why his *pro se* claim(s) should not be dismissed for the same reasons Greenflight's (identical) antitrust claims were dismissed.  Mr. Isaacs' response shall be no greater than ten pages, double spaced, with twelve-point font and one-inch margins.

### H.  Leave to Amend

This case has been pending for almost one year, and the Plaintiffs have had adequate opportunity to amend.  Further opportunities to amend would amount to unfair prejudice on Google, and the Court is also persuaded that, in any event, further amendment would be futile.  *See*, *e.g., Bloom v. Alvereze*, 498 F. App'x 867, 884 (11th Cir. 2012) ("After a district court grants an opportunity to amend and identifies the pleading's deficiencies, if the plaintiff fails to submit a proper pleading, dismissal with prejudice is appropriate.").  Further leave to amend in this case is denied, and the Court's dismissal of Greenflight's claims is therefore without leave to amend.

### III.   Ruling

The Eleventh Circuit has observed that: "[a]ntitrust standing is best understood in a general sense as a search for the proper plaintiff to enforce the antitrust laws." *Todorov v. DCH Healthcare Auth.*, 921 F.2d 1438, 1448 (1991) (citing *Cargill, Inc. v. Monfort, Inc.*, 479 U.S. 104, 110 n.5 (1986)).  If this were a case about the proper standing for a *consumer* of Google search to enforce antitrust laws, this Court would likely have (as other courts have had) greater difficulty in reaching its decision. *See Arcell v. Google LLC*, No. 22-CV-02499 (N.D. Cal. Aug. 9, 2024) (grappling with the question of whether certain consumers may sue Google in antitrust). The analysis would be more difficult because Google search is (for the most part) free, and it is also a ubiquitous product that so much of the world consumes.  But this is a case about an alleged *competitor* to Google search, and OkCaller is not the proper party to sue Google as a competitor.  Although Greenflight makes much of the lawsuits in Mr. Isaacs' past and its allegation that Google learned

of Mr. Isaacs' lawsuits shortly before the drop in OkCaller traffic, that does not transform OkCaller into a competitor of Google search.

For the foregoing reasons, it is **ORDERED AND ADJUDGED** that Google's Motion to Dismiss [DE 62] is **GRANTED** as to Greenflight's claims.  All of Greenflight's claims are therefore **DISMISSED WITHOUT LEAVE TO AMEND**.  The Court may exercise its case management discretion to summarily deny future motion practice (such as a motion for reconsideration) without explanation.

**DONE AND ORDERED** in Chambers, West Palm Beach, Florida, this 4th day of February, 2025.

Copies furnished to:
Counsel of record

ROBIN L. ROSENBERG
UNITED STATES DISTRICT JUDGE

App. 254

Ayelet Faerman, Esq.
Faerman Law P.A.
3859 NW 124 Ave
Coral Springs, FL 33065
954-271-8484
ayelet@faerman.law
Attorney for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| GREENFLIGHT VENTURE CORPORATION<br>*on behalf of themselves*<br>*and all others similarly situated*<br><br>        Plaintiff,<br><br>vs.<br><br>GOOGLE LLC<br><br>        Defendant. | Case No. **24-cv-80395-RLR**<br><br><br>**PLAINTIFF'S MOTION FOR SPECIAL<br>HEARING TO ADDRESS REPLY<br>SUR-REPLY** |

*App. 5*

## <u>PLAINTIFF GREENFLIGHT VENTURE CORPORATION'S</u>

## <u>MOTION FOR SPECIAL HEARING TO ADDRESS REPLY AND SUR-REPLY</u>

Plaintiffs Greenflight Venture Corporation and Jeffrey D. Isaacs, M.D., by and through undersigned counsel, respectfully move this Court for a special hearing and related relief in light of procedural irregularities and the potential unfair prejudice resulting from Defendant Google LLC's improper reply briefing.

On February 4, 2025, the Court issued an order dismissing this case. However, at the time of dismissal, Plaintiffs were in the process of filing a motion to strike Google's improper reply or, in the alternative, to file a sur-reply—a critical pleading that directly addressed misstatements in Google's reply and clarified technical aspects of Plaintiffs' claims, particularly regarding Counts I and II. Because the dismissal occurred before Plaintiffs could file, their opportunity to be fairly heard was effectively nullified. Accordingly, Plaintiffs respectfully request that the Court: 1) Hold a Special Hearing to address this matter of national importance , and 2) Supplement the Record to include Plaintiffs' intended sur-reply or, in the alternative, reconsider its ruling based on a fully informed briefing process.

Plaintiffs' sur-reply, prepared before the Court's ruling, specifically addressed the Court's concerns about market participation, standing, and the developer-facing side of Google's GSE ecosystem. However, the dismissal order preemptively foreclosed any consideration of these arguments—effectively allowing Google's reply to stand unchallenged. This deprived Plaintiffs of fundamental fairness in the briefing process and undermined the adversarial nature of these proceedings.

Google's reply (i) mischaracterized American Tobacco and Plaintiffs' duopoly allegations, (ii) ignored Supreme Court precedent on multi-sided platforms, and (iii) introduced misleading factual assertions regarding indexing markets. Additionally, Google erroneously accused Plaintiffs of "fabricating" quotations—an allegation factually untrue and highly prejudicial. Given that these arguments directly influenced the Court's ruling, Plaintiffs have a strong interest in supplementing the record to correct the reply's misstatements before a final judgment stands.

It is noted that the Court expressed difficulty in understanding certain technical aspects of Plaintiffs' claims, particularly regarding how Google Webmaster Tools ("GWT") operates as an integral part of the general search engine ("GSE") ecosystem. Given the national importance of this matter and the role of advanced technology in digital market competition, a hearing would allow direct clarification and explanation. Further, Plaintiff Dr. Isaacs, has been diagnosed with Asperger's and a past head injury (as disclosed over a decade ago). While counsel has ensured all pleadings were thoroughly researched, accurately discussed, and legally sound, it is important that the Court fully consider any technical explanations without undue reliance on assumptions about Plaintiffs' capabilities or reliance on AI-generated content. Plaintiffs have spent five years tirelessly researching the core issues here, particularly the complex intersection of digital marketplaces and *Amex* two sided platform legal theory. This was well before Google's AI transformer was publicly available. This appears to be where the Court's confusion lies – and a similar argument was made to the CAND District Court five years ago, again, before Google Transformer availability. A special hearing is necessary to explain to the Court these concepts, rather than dismissing them and faulting Plaintiffs for their inherent complexity.

This request is made in good faith and the Court's inherent authority permits the relief sought in the interest of fairness, judicial efficiency, and a complete record. Plaintiffs respectfully submit that a hearing would facilitate a more informed adjudication of the case, particularly given the complex and novel nature of the issues at hand.

*Below This Point Is Unmodified and Was Ready For Filing On February 4 Prior To Dismissal Order*

Plaintiff, Greenflight Venture Corporation ("Greenflight"), by and through undersigned counsel, respectfully moves this Court for leave to file a sur-reply in response to Defendant Google LLC's ("Google") Reply in Support of its Motion to Dismiss.

To ensure a fair and just adjudication of the issues, Greenflight respectfully seeks leave to file a sur-reply addressing Defendant Google's improper and prejudicial statements. Although the Local Rules do not expressly provide for sur-replies, this Court retains discretion to permit them when a reply brief raises new issues or arguments that, if unaddressed, would prejudice the moving party. Moreover, the Court possesses inherent authority under Federal Rule of Civil Procedure

12(f) to strike from the record any material that is redundant, immaterial, impertinent, or scandalous. Under Rule 12(f), a court may strike from a filing any 'redundant, immaterial, impertinent, or scandalous matter.' Courts routinely strike *ad hominem* attacks and baseless allegations where they serve no probative purpose and create unfair prejudice.

Defendant Google's reply includes ad hominem remarks and inflammatory assertions— that are not only factually inaccurate but also irrelevant to and harmful to the merits Big Tech regulation. Such statements serve no probative purpose and risk unfairly biasing the Court against the plaintiffs and/or creating regressive precedent. Accordingly, Greenflight respectfully requests that the Court both grant leave for a sur-reply and consider striking these improper portions of Google's reply to preserve the integrity of the proceedings.

### Google's Erroneous Allegation of a "Fabricated" American Tobacco Citation

Google's Reply brazenly accuses Plaintiffs of "fabricating" a quotation from the Supreme Court's landmark decision in *American Tobacco Co. v. United States*, 328 U.S. 781 (1946). Specifically, Google contends that Plaintiffs misquoted the phrase: "The power that controls the market by destroying competition . . . is a monopoly . . . though it be shared by three persons acting in concert." According to Google, this "language does not appear in *American Tobacco* or any other case" and therefore must have been "fabricated." That accusation is erroneous and should be stricken. The Supreme Court in *American Tobacco* unequivocally states that:

> "It is undoubtedly true . . . that trade and commerce are 'monopolized' within the meaning of the federal statute when, as a result of efforts to that end, such power is obtained that **a few persons**, **acting together**, can control the prices of a commodity moving in interstate commerce." *American Tobacco*, 328 U.S. at 811 (quoting *United States v. Patten(1913)*, 187 F. 664, 672 (S.D.N.Y.), rev'd on other grounds, 226 U.S. 525 (1913)).

Hence, the Court expressly recognizes that "a few persons" can, by their concerted power, destroy or exclude competition, and that such an arrangement constitutes a forbidden monopoly under Section 2 of the Sherman Act. The so-called "fabrication" Google complains of simply paraphrases the Court's reference to "a few persons" as "three persons," and "acting together" as "acting in concert." Google's accusation is demonstrably false. The *American Tobacco* Court explicitly recognized that a 'few persons, acting together' can control a market and exclude competition. Plaintiffs' phrasing—substituting 'three' for 'few'—does not change the substantive meaning and certainly does not constitute fabrication. Google's attempt to create a distraction

through semantic nitpicking should be rejected. Google's entire objection is nothing more than an effort to impugn Plaintiffs' citation to well-established Supreme Court authority denouncing oligopoly conduct.

Indeed, *American Tobacco* is particularly apt here because it unambiguously confirms that a "few persons," working in tandem, can violate Section 2 upon obtaining "such power . . . that they are able . . . to exclude actual or potential competition from the field" and intend to do so. *Id.* at 809–11. Google, evidently alarmed by the parallel between "Big Tobacco" in 1946 and "Big Tech" in 2025, reflexively argues that Plaintiffs must have "fabricated" the most critical language in *American Tobacco*. Not so. The relevant language appears, in substance, on page 811 of the opinion (citing *Patten*). If Google's challenge rests on whether "few persons" is the same as "three persons acting in concert," that challenge is trivial and misguided. *American Tobacco* stands for the principle that multiple large firms (whether "few" or specifically "three") collectively acquiring exclusionary power violate Section 2.

It is telling that Google seeks to trivialize or cast doubt on *American Tobacco*—the Supreme Court's decision on how a group of large, dominant firms can be found liable under Section 2 without necessarily forming a single unified entity. Google evidently wishes the Court to reject any parallel between "Big Tech" and the "Big Tobacco" triopoly that faced scrutiny and condemnation in 1946.Contrary to Google's invitation, the Court should not set aside the American Tobacco reference that is so central to Bog Tech. Instead, the appropriate remedy is to strike or disregard Google's baseless accusation of "fabrication," or at the very least, permit leave to file the Sur-reply with the "few persons, acting together" quotation.

Recent developments at filing time further validate the continuing force of *American Tobacco*. Notably, Apple—the other half of the alleged Google–Apple duopoly—has now stepped into the Department of Justice's ongoing litigation involving the "ISA" arrangement. Apple sought status to intervene in the remedial proceedings, which was denied. Hours ago, the Hon. Amit Mehta denied Apple's Emergency Motion for Stay as, essentially, meritless. He reiterated that his "*court has concluded that Google violated federal antitrust law by entering into exclusive search distribution agreements with ... Apple) to achieve and maintain a monopoly in ... general search services.*"

This precisely proves the point Plaintiffs are making about the "duopoly" phenomenon: two major technology giants share and reinforce one another's market power across smartphone distribution and general search. As *American Tobacco* teaches, "a few persons, acting together," can maintain a monopoly by excluding or suppressing potential rivals. That Apple is concerned enough to join or shield Google's appeal only underscores how cohesively their shared power operates—*just* as the three tobacco giants in *American Tobacco* joined forces for decades to dominate the cigarette market.

Given these realities, Google's entire line of attack—claiming Plaintiffs "fabricated" the controlling Supreme Court principle from *American Tobacco*—is disingenuous. Google's contrary contention is not a legal argument but a rhetorical maneuver designed to sow unwarranted doubt about settled antitrust doctrine. In short, the ISA agreement is a 'big deal' with obvious implications for the duopoly that are so substantial, Apple has repeatedly pushed to intervene. Google cannot be allowed to taint this case, concerning the developer impact of ISA, by improperly suggesting Plaintiffs' reference to *American Tobacco* is somehow itself improper. The Court should reject—and, indeed, strike—Google's spurious claim that Plaintiffs "fabricated" the key *American Tobacco* language. That language has appeared in Supreme Court rulings for nearly a century, reflecting the bedrock principle that a powerful oligopoly, if acting in concert, can commit a Section 2 violation by excluding competition. It was widely recognized in *American Tobacco* itself and remains black-letter law to this day. Google's dubious attempt to impugn Plaintiffs' textual fidelity is a mere distraction from the fundamental parallels: "Big Tech," perhaps even more so than "Big Tobacco" before it, is alleged to have formed an unacceptable grip on society.

**GWT is Part of the GSE—Plaintiffs Are Participants in the Multi-Sided Market**

A Sur-Reply is also necessary to indicate Plaintiffs respectfully object to Google's reply concerning Count I of the SAC, which raises a straightforward Section 2 claim rooted in the "general search services" ("GSE") market. Contrary to Defendant's assertions, Plaintiffs have adequately alleged that they both participate in and are injured by Google's conduct in this GSE market, and have further shown a plausible roadmap—based on new regulatory or remedial measures—to evolve or expand OkCaller.com into a competitor. By dismissing Plaintiffs' claims as "implausible," the reply effectively asks the Court to decide factual disputes on a motion to dismiss—precisely what *Twombly* and Rule 12(b)(6) warn against. Plaintiffs have alleged a multi-sided GSE ecosystem in which they are directly engaged, and that suffices at this stage.

The reply mischaracterizes *Amex*, 138 S. Ct. 2274 (2018), as purely addressing "market contours" rather than standing. In reality, *Amex* emphasizes that platforms serving two or more distinct user groups often form a single relevant product market. Here, Plaintiffs plausibly allege that Google's GSE operates on multiple sides: (1) end-users performing queries, and (2) developers submitting and optimizing content through GWT. SAC ¶¶ 64–66. By refusing to accept OkCaller's content or systematically de-indexing it, Google wields monopoly power over the developer-facing side of its GSE platform. Plaintiffs are thus "consumers" of GSE distribution—an integral side of the same market. Whether or not *Amex* "expressly addresses standing" does not matter; multi-sided markets under *Amex* necessarily inform whether plaintiffs participate in the relevant market for standing purposes.

Google faults Plaintiffs (and raises an impermissible new argument in a reply) for not meeting an "intention and preparedness" standard (citing *Cable Holdings of Ga., Inc. v. Home Video*, 825 F.2d 1559, 1562 (11th Cir. 1987)) to become a general search engine. But the SAC explicitly pleads that, with access to raw indexing data (as is proposed under forthcoming DOJ or EU regulations), OkCaller would be able to expand or pivot into broader search. SAC ¶¶ 66–70, 107. That is a factual allegation, not idle conjecture, given OkCaller's established capacity to handle billions of phone lookups and the successful developer tools Plaintiffs already deploy. Under *Twombly*, such allegations of nascent competition—if accepted as true—are enough to plausibly allege the potential for OkCaller to enter the broader GSE market. Whether Plaintiffs can indeed surmount those barriers is quintessentially a fact issue not suitable for resolution at the pleading stage.

The reply clings to the notion that Plaintiffs must prove they served as a direct "conduit" to harm rival GSEs like Bing. DE 53 at 5. But in *Blue Shield of Va. v. McCready*, 457 U.S. 465 (1982), the Supreme Court emphasized that an antitrust plaintiff may assert standing if their injury is "inextricably intertwined" with the overall scheme to maintain monopoly power. The SAC sets forth precisely such an inextricable link: by foreclosing OkCaller's content, Google simultaneously deprives rival search engines of the scale, data, and user base necessary to challenge Google. SAC ¶¶ 60–70, 107. Plaintiffs need not show a literal "conduit" arrangement; they need only demonstrate a direct nexus between Google's conduct and their own competitive injury. That connection is thoroughly alleged here—OkCaller's forced exclusion is "a necessary step" in Google's monopolization strategy. Google never touches upon the logical flow of injury,

where a search engine like Bing, in a competitive GSE market, would bring higher traffic to OkCaller. That proximate, foreseeable, and reasonable logic is hardly speculative.

At bottom, Google's reply reiterates its core stance that OkCaller.com is "just a reverse phone lookup site" and not plausibly in the GSE market. But Plaintiffs' allegations of a multi-sided GSE platform, coupled with the proposed regulatory solutions that would open Google's indexing data, must be taken as true at this stage. *Brown Shoe Co. v. United States*, 370 U.S. 294, 322 (1962), teaches that market definition often requires a rich, fact-driven inquiry—particularly so in novel digital contexts. The SAC thus amply states a plausible Section 2 claim, making dismissal under Rule 12 inappropriate.

### Plaintiffs Allege a Plausible "Agreement" for Section 1 Purposes

Google urges dismissal based on the supposed absence of any identifiable "agreement" under Section 1 of the Sherman Act, invoking *Levine v. Cent. Fla. Med. Affiliates, Inc.*, 72 F.3d 1538 (11th Cir. 1996) to argue that only unilateral conduct is at issue. This caricature omits the heart of Plaintiffs' claims. It's also rather incredulous, given Apple's extraordinary efforts to intervene in the ISA final hearing. The SAC explicitly identifies the ISA Agreement as the cornerstone of Google's collusive practices—an arrangement that ensures the near-exclusive funneling of Apple device users to Google's own services, thereby foreclosing legitimate avenues for OkCaller and similarly situated vertical or specialized platforms. ¶¶ 113–116. The arrangement is not just a "baseline contract" but rather the specific mechanism through which Google and Apple coordinate to restrain trade and stifle competition in search distribution.

Defendant's reply wholly avoids Plaintiffs' salient point that Bing, a competing search engine, continues to rank hundreds of thousands of OkCaller's pages. This fact underscores the crux of Plaintiffs' injury: the artificially depressed traffic on Google's platform results not from any inherent deficiency in OkCaller's content or indexing capabilities, but rather from Google's purposeful agreement(s)—particularly with Apple—to exclude or marginalize competing search channels. Given the existence of an alternative search engine that does rank OkCaller pages, Plaintiffs have provided a clear, non-speculative demonstration that OkCaller would, absent such restraints, receive higher volumes of organic traffic. This is the exact antitrust injury that the Sherman Act is designed to redress. The reply's silence on this direct comparative evidence is telling and confirms that Plaintiffs' Section 1 allegations cannot be dismissed on an "agreement-deficiency" theory. Google relies on Lombard's Inc. v. Prince Mfg. Inc., 583 F. Supp. 1572

(S.D. Fla. 1984), aff'd, 753 F.2d 974 (11th Cir. 1985), to suggest that naming a contract is insufficient to transform unilateral conduct into an actionable agreement. But Plaintiffs have demonstrated far more than a bare-bones contract. The ISA Agreement, along with supporting "plus factors," evidences collusive behavior aimed at restricting competition from rival search engines and specialized providers. Plaintiffs' allegations of "plus factors" include, among other things, Google's willingness to act against its stated consumer-focused interests (i.e., providing the "best results") by prioritizing websites that spend heavily on Google Ads—even to the point of degrading organic SERP quality. This is precisely the kind of concerted action that can support an inference of illegal restraint under the Supreme Court's *Twombly* framework, which allows courts to infer an agreement based on a factually coherent narrative of inter-firm collaboration to suppress competition.

**A Sur-Reply Is Necessary for Objecting to New Factual Disputes Under *Aspen***

Regarding Count III, Defendant insists that Plaintiffs' allegations of refusal to deal are "far removed from *Aspen Skiing*." Google's argument that *Aspen Skiing* requires a 'joint venture' imposes a standard that does not exist in the case law. *Aspen Skiing* does not require the plaintiff to establish a formal joint venture; rather, it recognizes that a 'preexisting, profitable course of dealing' can establish a duty to deal under Section 2. Google's abrupt termination of a longstanding, profitable relationship with OkCaller—after a decade of substantial revenue generation—fits precisely within Aspen Skiing. At most, Google's argument raises a factual dispute about the nature of the relationship, which cannot be resolved on a Rule 12(b)(6) motion. Google's Reply is effectively a concession that they dispute the facts and have waived a Rule 12 defense.

**Google's Erroneous UCL Assertions Must Be Addressed**

The Reply states that the "unlawful" prong fails if no Sherman Act violation exists, while the "unfair" prong merely overlaps with the Sherman allegations, and the "fraudulent" prong fails for want of deception or reliance. This argument oversimplifies the SAC's content. Plaintiffs' "unlawful" allegations draw not just on the Sherman Act, but also on the possibility of other statutory or common law predicates, including 18 U.S.C. § 1512 with respect to alleged retaliation. The Reply never addresses whether Plaintiffs' references to the FTC's guidelines on disclosing self-preferencing or "deceptively formatted advertisements" might supply an independent UCL

basis if Google's undisclosed practice of elevating self-owned properties or advertisers is considered a form of deception. The "unfair" prong likewise extends to incipient or partial antitrust infringements or to conduct that violates the spirit of competition laws. *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163 (1999), states that a practice that significantly threatens or harms competition can be "unfair" under the UCL even if the plaintiff's Sherman Act claim remains unproven at early stages. The Reply argues that Plaintiffs' "unfair" allegations fully duplicate the Sherman Act. While the SAC does indeed incorporate the alleged antitrust violations by reference, it also provides new details in paragraphs 133 through 140 showing that the absence of transparency, the alleged retaliatory indexing, and the moral/ethical dimension of a gatekeeper exploiting smaller developers' reliance go beyond a standard Section 2 or Section 1 cause of action. Plaintiffs point to Google's two-decade failure to disclose or adopt neutral indexing metrics, which injures developers in ways that might not be fully captured by a strict market-definition analysis. The Reply's blanket statement that no "distinct allegations" exist is incorrect, because paragraphs 136 to 139 specifically describe the "retaliation" angle, the alleged violation of public policy, and the lack of meaningful recourse for smaller publishers. Neither *Twombly* nor *Cel-Tech* requires that these be wholly disconnected from the antitrust allegations; the UCL's "unfair" prong intentionally accommodates broader policy-based wrongdoing. Moreover, it is common practice – like in *Epic v. Apple* – to permit incipient 'lower threshold' UCL claims derived from Sherman.

### Google's Duopoly Case References Do Not Defeat *American Tobacco*

American Tobacco has long been cited as acknowledging that a small group acting in concert can be liable for a Section 2 violation. Defendant's position that the Eleventh Circuit has never recognized "shared monopoly" is immaterial, because the Supreme Court's jurisprudence is clear, and no Eleventh Circuit ruling bars multiple firms from being found collectively liable if they unify their conduct to prevent competition.

### No Place for Ad Hominem Attacks in Nationally Important Big Tech Dialogue

As the Court is likely aware, in 2017 Google published its research paper on AI Transformers ("Attention is all you need"), which in its early stages has already revolutionized computing. Google's lead AI scientist, Geoffrey Hinton—himself a descendant of three generations of distinguished mathematical intelligence theory researchers—resigned from Google and has publicly expressed concern that AI carries approximately a 15% chance of destroying humanity within the next decade. It is undisputed that *Big Tech* has remained largely unregulated

for the past twenty years and that significant portions of the population harbor deep concerns about this unregulated oligopoly leveraging AI, which could yield disastrous consequences. Our Objection noted the concerns raised by Congress, bipartisan Senate reports, and President Joe Biden regarding a "dangerous oligopoly." Yet Google's reply chose to ignore these serious issues—with notably no rebuttal to the President's concern—and instead resorted to *ad hominem* attacks on the Plaintiffs. Defendant appears to wish the Court to believe that our reference to the dystopian vision of *1984* is nothing more than conspiracy drivel. In reality, however, *1984* is actually a conservative reference that pales to the genuine fears expressed by Google's own Hinton about the potential end of humanity, not merely political oppression. While the Court might initially construe Google's comments as "par for the course," under the Federal Rules of Civil Procedure it is manifestly unfair to engage in such immaterial, untrue attacks —especially in a case that addresses concerns shared by nearly all segments of society.

Google's response does not engage with the substantive concerns raised in the objection regarding unchecked Big Tech power, AI, and monopolization. Instead, it dismisses these concerns as fringe. This is improper argumentation that seeks to discredit Plaintiffs rather than address the issues at hand. Courts have recognized that such *ad hominem* attacks serve no legitimate purpose and may be stricken under Rule 12(f).[1] Notably, Judge Mehta repeatedly flagged Google's ongoing and problematic litigation posturing. Google wishes to turn the tables, facing Plaintiffs with fewer resources than the DOJ. That is unacceptable.

There exists a Big Tech duopoly—and, make no mistake, much like Big Tobacco, it is harming our nation. For these reasons, we respectfully request that the Court strike Defendant's improper and unfounded characterizations of our reliance on *1984* and the *American Tobacco* precedent.

**CONCLUSION**

Defendant's Reply thus fails in multiple respects: it raises new lines of argument not in the Motion to Dismiss (for instance, shifting from a "lack of standing" theory to a newly minted claim

---

[1] Plaintiff reserves the right to introduce Google's *ad hominem* attacks as evidence in future proceedings. While the company claims innocence of Section 1512 allegations, their court filings indicate a level of animus, despite the fact that Plaintiffs are simply exercising their rights (as nearly all of society now does) to question Big Tech's influence and control.

that Plaintiffs must show an "express contract" to be deemed a refusal to deal), it misconstrues controlling legal standards (especially *Amex* for multi-sided markets, *Aspen Skiing* for refusal to deal, and *Cel-Tech* for the UCL's "unfair" prong), and it disregards the additional factual material the SAC sets forth, especially the detail on bridging webmaster tools with GSE distribution, the decadelong profitable preexisting relationship, and the expansions on Apple–Google synergy. Because each portion of Defendant's Reply is undermined by these omissions, there is little substance left to justify a dismissal under Rule 12(b)(6), and a Sur-Reply is necessary to clarify these points. Discovery would be the proper venue to test whether Google's vaguely claimed "business judgment" truly explains why it ended a profitable arrangement with OkCaller.

## CERTIFICATE OF GOOD FAITH CONFERENCE

Pursuant to Local Rule 7.1(a)(3), counsel for Greenflight emailed counsel for Google regarding the relief requested herein. Google outright opposes this motion, and refused to engage in a Meet & Confer.

Respectfully submitted on this 5th day of February 2025.

| | |
|---|---|
| /s/Ayelet Faerman | /s/ Keith Mathews |
| AYELET FAERMAN, ESQ. | Keith Mathews |
| FBN: 102605 | Attorney for Plaintiff |
| Faerman Law, P.A. | *Pro Hac Vice* |
| 3859 NW 124th Ave | NH Bar No. 20997 |
| Coral Springs, FL 33065 | American Wealth Protection |
| Tel: (954) 271-8484 | Manchester, NH 03105 |
| Fax: (954) 271-8474 | Ph. 603-622-8100 |
| ayelet@faerman.law | keith@awplegal.com |

[Proposed Order Granting Leave for Sur-Reply]

[PROPOSED] ORDER GRANTING PLAINTIFF'S MOTION FOR LEAVE TO FILE SUR-REPLY

THIS CAUSE came before the Court upon Plaintiff Greenflight Venture Corporation's Motion for Leave to File Sur-Reply ("Motion"). The Court, having reviewed the Motion, the pertinent portions of the record, and being otherwise fully advised in the premises, it is hereby

ORDERED AND ADJUDGED that the Motion is GRANTED. Plaintiff may file a sur-reply, within 3 days of the date of this Order.

DONE AND ORDERED in Chambers at West Palm Beach, Florida, this ___ day of February, 2025.

_____

The Honorable Robin Rosenberg

United States District Judge

267

EXHIBIT A



**JUSTIA** U.S. Supreme Court

**Overview**

**Opinions**

Opinions & Dissents

**Copy Citation**

# American Tobacco Co. v. United States, 328 U.S. 781 (1946)

protected. A combination may be one in restraint of interstate trade or commerce or to monopolize a part of such trade or commerce in violation of the Sherman Act although such restraint or monopoly may not have been actually attempted to any harmful extent. *See United States v. International Harvester Co.,* 214 F. 987; *id.,* 274 U. S. 274 U.S. 693. The authorities support the view that the material consideration in determining whether a monopoly exists is not that prices are raised and that competition actually is excluded, but that power exists to raise prices or to exclude competition when it is desired to do so. *United States v. American Tobacco Co.,* 164 F. 700, 721, remanded for further proceedings, 221 U. S. 221 U.S. 106, 221 U. S. 188.

"It is undoubtedly true . . . that trade and commerce are 'monopolized' within the meaning of the federal statute when, as a result of efforts to that end, such power is obtained that a few persons, acting together, can control the prices of a commodity moving in interstate commerce. It is not necessary that the power thus obtained should be exercised. Its existence is sufficient."

*United States v. Patten,* 187 F. 664, 672, *reversed on other grounds,* 226 U. S. 226 U.S. 525. *Cf. North American Co. v. SEC,* 327 U. S. 686.

The precise question before us has not been decided previously by this Court. However, on March 12, 1945, two weeks before the grant of the writs of certiorari in the present cases, a decision rendered in a suit in equity brought under §§ 1 and 2 of the Sherman Anti-Trust Act against the Aluminum Company of America closely approached the issue we have here. That case was decided by the Circuit Court of Appeals for the Second Circuit under unique circumstances which add to its weight as a precedent. *United States v. Aluminum Co. of America,* 148 F.2d 416. That court sat in that case under a new statute authorizing it to render a decision "in lieu of a

Page 328 U. S. 812

268

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing Motion has been served on this 5rd day of February, 2025, to all parties of record, including GOOGLE LLC counsel of record, via electronic mail as per the Federal Rules of Civil Procedure and Local Court Rules.

/s/ Ayelet Faerman
Ayelet Faerman, Esq.
Faerman Law P.A.
3859 NW 124 Ave
Coral Springs, FL 33065
954-271-8484
ayelet@faerman.law

Jeffrey Isaacs
11482 Key Deer Circle
Wellington, FL 33449
(212) 257-0737
jeffreydi@gmail.com

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| GREENFLIGHT VENTURE CORPORATION<br>   *on behalf of themselves*<br>   *and all others similarly situated,*<br>DR JEFF ISAACS | Case No. **24-cv-80395-RLR** |
|            Plaintiffs, | **PLAINTIFF'S MEMORANDUM<br>TO SHOW CAUSE THAT RULE 12<br>DISMISSAL IS NOT INDICATED** |
| vs. | |
| GOOGLE LLC | |
|            Defendant. | |

App. 270

**<u>MEMORANDUM TO SHOW CAUSE AGAINST 12(b)(6) DISMISSAL</u>**

It appears generally uncontested that Plaintiff Dr Jeffrey Isaacs has tirelessly devoted the past five years to "Big Tech Antitrust" litigation advocacy. This is evidenced by numerous district court filings, appellate briefings, JPML motions, and Supreme Court *certiorari* petitions – all of which collectively evidence substantial work-product, diligent research, and near full-time commitment. Absent the *Epic Games* matter, Plaintiff's efforts would constitute the largest private antitrust challenge against Apple and Google ever mounted by a single individual. Dr Isaacs' multidisciplinary expertise uniquely qualifies him to litigate against Big Tech, a fact that the Court appears to have struggled to fully appreciate given that antitrust litigation is typically the domain of a select few large law firms.

Compounding this is Plaintiff's deteriorating health which has steadily deteriorated since he entered – and completed – medical school twenty years ago. For the past three years, Plaintiff has faced significant worsening disability. Plaintiff's daily routine, at least for the past three years, consists almost exclusively of researching his medical condition, and researching antitrust law. Exhibit A depicts Plaintiff just prior to medical school enrollment when he possessed vastly better health, and an idealistic outlook unencumbered by litigation. His mentor, also pictured, provided guidance, reflecting on his own career decisions which directly saved millions from succumbing to African River Blindness.  And despite the adversity of two decades of litigation, and interlinked health decline, Plaintiff maintains determined to use his abilities for the greater good. He has chosen to direct it to the Big Tech situation, which he believes (along with Congress, Senate, the entire EU, and President Biden & Trump) seriously threatens our nation. Plaintiff submits his efforts to advocate novel antitrust claims is rooted in his belief that it is a good cause, and that he can effect meaningful change. Given his health circumstances for the past two decades, it seems reasonably clear that he has little to gain personally beyond the intrinsic value of fighting for a good cause, and should be taken more seriously by the Court.  It therefore is disheartening to see this Court characterize his claim theories as "incoherent."

In 2021, Plaintiff developed innovative "monopsony app buyer" and "digital notary stamps" models regarding Apple's iPhone. In short, these theories assert that Apple effectively 'buys' valuable developer content (apps) from developers. Apple also requires consumers and developers to split the cost of digital notary stamps, which allow apps to execute. No prior litigant had advanced such theories; indeed, all previous approaches against Apple had failed. At oral argument before the CAND Court, Plaintiff coherently defended these novel claims with correct reference to *Amex* and other pertinent case law. Observers, including government attorneys, remarked that Plaintiff's arguments were compelling, so much that Apple counsel struggled to counter.

Plaintiff appealed the Northern California dismissal of "scattershot" theories not "tied to economic reality," spending years in defense of his theories' plausibility. A Rule 60 motion is still pending appeal, which is incorporated herein. That motion alleges that Plaintiff was effectively denied access to the Courts, in light of undue pressure from Apple's counsel to characterize his theories as "in the hinterlands," itself thinly veiled *ad hominem* reference to Plaintiff's disability. While Google was more careful this time around with word choices, Plaintiff makes the same allegations: Google won this case by unfairly discrediting Plaintiff. This time, rather than reference Plaintiff's disability, opposing counsel chose to focus on Plaintiff's usage of a Google invention: the 2017 "All You Need is Attention" Transformer, aka AI.

For about four years, Plaintiff believed Big Law's vast resources were being marshaled to silence his valid antitrust concerns. Newspaper coverage discussing "relevant Sherman market definition by reference to elasticity and interchangeability" failed to resonate with the public or lawyers—contributing to a systematic burying of meritorious claims by Big Law. Plaintiff learned about this at Vanderbilt Law School twenty years ago, and the phenomenon is well-known in academia.

Over the past year, Google's transformer has advanced at rates that have shocked even its inventors. When initially released to the public, LLMs typically scored around the level of the average

high school student on the SAT. Within months, they achieved scores rivaling those the average medical student on medical boards. Now, the "o1 pro/o3 models" can solve most theoretic problems in seconds that would take experienced mathematicians several days to prove.

At some point, Plaintiff realized that using o1/o3 as a "sounding board" not only satisfied his intellectual curiosity about a five-year old problem, but it could level the playing field against litigation opponents with infinitely greater financial and legal resources. It could – and should – serve as a safety net to preempt erroneous Rule 12 determinations that valid theories are implausible, or even worse, in the "hinterlands" or "incoherent." In other words, Plaintiff turned to o1/o3 in a last-ditch effort to prove to the Court – and the public – that his claim theory is plausible. And Google, of course, did not like that their own invention might lend support to these creative, forward-thinking antitrust theories. That appears to be why opposing counsel pointed out two erroneous citations, yet delicately omitted direct discussion of AI. By discrediting AI, or suggesting Plaintiff didn't know how to use it, Google could defeat the inevitable argument they saw at the end of the tunnel. And that is where we are today. Can Plaintiff coherently explain his theories in person, as his own? Yes. Can Google pass the 'blush test' that AI's *detailed* endorsement of the market definitions as plausible – which draws on a *vast* industry knowledge repertoire – is simply wrong, at the Rule 12 threshold? Unlikely. A hearing is not only requested, it is imperative to the carriage of justice.

Plaintiff knows his theories inside and out, he invented them, and he can testify accordingly at a hearing if the Court requests clarification of antitrust digital market jargon which takes years (or longer) to master. News articles, as the Court can take judicial notice, now forever claim his theories are 'incoherent'- when they are not. They represent five years of work and were meticulously analyzed – over and over – by o1/o3 and Plaintiff, in conjunction with Greenflight's counsel. This is not the case of a superficial shortcut, like reading the Cliff's Notes. Exhibit C shows the o1/o3 output regarding *Pepper*, discussed below. Similar outputs are available for all market definitions. It is clear that,

according to the latest AI models, Plaintiff's theories are plausible and theoretically coherent. While AI cannot make factual determinations, an appropriate analogy here is like the use of spell check. AI served as a plausibility check. Just as a court would give a 'second-look' before characterizing a paper that was spell-checked as 'ridden with spelling errors', it should reconsider a factual finding of implausibility, when o1/o3 found otherwise. As did a computer scientist and MBA with five years experience studying antitrust markets.

Based on feedback from the CAND court, Plaintiff chose not to plead a "monopsony GSE" theory in this case, and rather focus on the current trend to view platforms and ecosystems holistically, per *Amex*. However, Plaintiff maintains there exists a GSE "monopsony" that is the only (90%) "buyer" of developer-publisher "free" yet valuable content. The SAC intentionally made the choice to place this "monopsony" within the GSE "monopoly" platform. And this Court and CAND both prematurely determined that these coordinated, plausible theories were impossible. The courts should allow the experts to weigh in, per Congress' instructions not to underenforce Sherman for digital markets.

The remainder of this document analyzes SAC Counts I-V and argues against dismissal. Plaintiff further attaches a brief statement respectfully requesting correction of factual errors or omissions in the dismissal order.

**Count I**

While it is reasonable to appreciate the Court's frustration with "technical jargon," that is not the fault of Plaintiffs, but rather, the product of defining complex digital marketplaces within the scope of antitrust theory (which the Court did allude to). However, it is vehemently opposed that Google's arguments are somehow "cogent" compared to Plaintiff's "incoherent." Google's arguments are dishonest and misleading, with the dangerous illusion of simplicity. And they seek, inherently, to capitalize on a false perception of the Plaintiff.

The SAC itself is unambiguous: GSEs "act as digital platforms serving two symbiotic customer groups: end-users seeking information and the developers and publishers who supply content to be discovered." This platform, or "ecosystem" argument—that GWT is a critical and inseparable part of the GSE market—provides a persuasive basis for establishing standing under Section 2 of the Sherman Act. GWT is not a separate market but an integral, interdependent component of the GSE ecosystem. This ecosystem and related platform concepts are rooted in the evolving jurisprudence on multi-sided platforms, such as *Amex*. The Court plainly oversteps at the Rule 12 stage when it declared:

> *"this is not a case about the webmaster tools market—Greenflight has chosen to allege that Google has a monopoly in general search services. The Court fails to see how Greenflight's use of a tool that influences6 Google's search engine renders Greenflight a plausible competitor in the area of general search services."*

Contrary to *Brown Shoe*, the Court decided under Rule 12 that GSEs cannot be a platform. That is not permissible.  As the Supreme Court explained in *Brown Shoe Co. v. United States*, market definition is inherently a fact-intensive inquiry, and the modern digital context requires us to look beyond traditional, one-sided market definitions. The Court further expressed incredulity that "influence" would grant standing to "every person who has ever posted something on the internet. That simply cannot be the law." This is a potentially landmark antitrust lawsuit concerning the largest monopoly in history, which affects the lives of billions. The Court cannot dismiss the lawsuit on the circular logic that the claims could be raised by a large group of people, hence there must be no standing.  That flies in the fact of the *point* of landmark class action antitrust litigation, which presumably would resolve this matter and prevent future claims, should, for example, the Court issue an injunction regarding transparency and imnmplement a Developer Compensation Fund. Moreover, the Federal Rules require damages of $75,000, and litigating antitrust is expensive, and difficult, so the Court would not be "opening the floodgates" by merely enforcing Sherman Act, as Congress, the Senate, and a former President has urged. In short, the Court has determined that Google's Search product could *never* be categorized as a platform, overturning *Brown Shoe* factfinding, and it then

deduces that even if it could, too many people would be able to sue, so therefore it must be impossible that it is a platform.

This shouldn't create a three year delay in litigation – the Court, if still unconvinced, should seek urgent certification under 28 U.S.C. § 1292(b) for guidance from the Eleventh Circuit on the ecosystem platform matter as well as the duopoly exemption. Both of these holdings, as they stand as precedent, risk dangerously exonerating Big Tech for years to come. Given the stakes – and verifiable concerns by Congress, Senate, Presidents, European Union –urgent Section 1292(b) action is sought.

There is a direct causal nexus between Google's conduct and Greenflight's injury, irrespective of whether Google is also harming a rival search engine. The Court's failure to appreciate this point, by conflating the "conduit" requirement with a necessary showing of inextricably intertwined injury, misconstrues the holding of *McCready*. Plaintiff also reiterates his conduit arguments raised in the FAC Show Cause memorandum.

The Court's order, as it stands, notably contravenes the Supreme Court's intent under *Pepper*. In *Apple Inc. v. Pepper*, 139 S. Ct. 1514 (2019), the Supreme Court held that iPhone users who purchased apps through Apple's App Store had standing to sue Apple under the Sherman Act for allegedly inflating app prices. The Court rejected Apple's argument that only app developers (not consumers) had standing to sue because Apple merely facilitated transactions between developers and consumers. Google essentially makes the same argument here; they "merely rank" a page, and in no way serve as a platform or ecosystem. This is 'dangerously simple' and arguably dishonest. The Supreme Court ruled that consumers who directly purchase a product from a monopolist have standing to bring antitrust claims against that monopolist under *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977). The decision clarified that direct purchasers—even if they interact within a multi-sided platform—are entitled to sue under antitrust law.

The Supreme Court in *Pepper* recognized that Apple's role as an intermediary did not defeat standing because Apple directly controlled pricing and distribution. Similarly, Google directly controls indexing, ranking, and visibility—making its relationship with GWT participants more than incidental. Google Search and GWT are functionally interdependent, forming a unified platform just as Apple's App Store integrates both consumer purchasing and developer pricing.

In *Pepper*, consumers paid Apple directly, whereas GWT users do not pay Google directly for indexing. But as DEJ antitrust guidance has *repeatedly* emphasized, financial exchange is not the only relevant test for digital markets—control over access to search traffic, even for "free" content, has associated "costs" in interstate commerce, such as user attention time. Google extracts "payment" via mandatory compliance with its ranking policies and visibility on Google is monetized through Google's own advertising. In short, content providers and developers use GWT to identify and index their content, which Google then monetizes.

Just as Apple controlled the pricing and distribution of apps, Google controls the visibility, indexing, and discoverability of web content. In both cases, users—whether app consumers in *Pepper* or web developers using GWT—are directly affected by the monopolist's control over access to end-users. The Supreme Court found in *Pepper* that direct interaction and control suffice for standing, even in a platform-based economy. That same principle should apply here.

**Count II**

The SAC clearly identifies the "ISA Agreement" with Apple as the linchpin of Google's alleged collusive conduct. It asserts that by maintaining the ISA Agreement, Google and Apple effectively foreclose alternative channels—such as those provided by Bing—that would otherwise deliver substantial traffic to specialized platforms like OkCaller. The resulting harm is not incidental; it is central to the anticompetitive injury alleged. Greenflight's detailed factual narrative (SAC ¶¶ 113–116) explains that the default arrangement is a "plus factor" in inferring a collusive, concerted effort to

restrain trade. See also *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 360 (3d Cir. 2004). Thus, the causal nexus between the ISA Agreement and the injury suffered by Greenflight is fully pled and should not be dismissed as speculative. Plaintiff concurs with and incorporates Greenflight's Sur-reply. Furthermore, Plaintiff objects to the Court's complete importation of Google's MTD with regard to the alleged Relevant Markets, which deserve analysis by the Court.

**Count III**

The SAC describes Google's termination of a pre-existing, profitable course of dealing. Joint venture definition highly favorable to Defendant has no place under *Twombly*, which requires an application of facts most favorable to the party opposing dismissal. Plaintiff Dr Jeff Isaacs fully concurs with, and incorporates by reference, Greenflight's proposed sur-reply, with regard to the *Aspen* exception. Furthermore, Plaintiff re-iterates and incorporates herein his prior objections as stated in the FAC Show Cause Memorandum.

**Count IV**

The Court overlooks that under *Cel-Tech*, the "unfair" prong is meant to address conduct that, even if not rising to the level of a complete antitrust violation, nevertheless offends established public policy by significantly harming competition or consumer welfare. The SAC sets forth detailed allegations regarding Google's opaque ranking practices, its arbitrary deindexing of OkCaller, and the resulting 'chilling effect' – language *not* used in the Sherman count – on innovation and market participation among independent developers.

As to the "unlawful" claim under the UCL, there exist distinct statutory and regulatory grounds: allegations of retaliatory conduct under 18 U.S.C. § 1512-13, and the failure to adhere to the FTC's guidelines on non-disclosure of self-preferencing practices. Plaintiff believes there is a high probability that Google deindexed OkCaller because of his prior litigation. Without belaboring the criminal code, the SAC sufficiently describes conduct that falls under subsection (d)(1) whoever "harasses another

person and thereby hinders, delays, prevents, or dissuades any person from attending or testifying in an official proceeding [i.e. federal antitrust lawsuits]. Likewise, 1513 subsection (b) applies to Whoever knowingly engages in any conduct and thereby …  damages the tangible property of another person, …, with intent to retaliate against any person for—the attendance of a witness or party at an official proceeding [i.e. federal antitrust lawsuit]. As this is a civil case, and its focus is on transparency measures for a putative class, discovery as to why OkCaller was terminated should be permitted before Plaintiff is required to provide enhanced particularity about the elements of the federal witness protection statutes. Google has sufficient notice as to the claims of witness retaliation, and should answer as to why. As it stands, Google goes scot-free and Plaintiff is out a career, once again.

**Count V**

The District Court relied upon Google's misleading and erroneous citations of *JES Properties*, *Midwest Gas Servs*., and *Feldman* as authorities allegedly precluding a "duopoly" or "shared monopoly" claim. Moreover, *American Tobacco* does hold that if a few persons, working together, acquire the power to exclude competitors, that power is sufficient to establish monopolization. Plaintiff concurs with and incorporates herein Greenflight's Proposed Sur-Reply which comprehensively addresses this matter.

The District Court further reasons that Greenflight lacks standing to sue as a competitor in the smartphone app distribution market, as it does not operate in that market independently. But the US ICAM market is about internet on-ramps, collectively, which includes GSEs and App Stores. The duopoly claim alleges that the anticompetitive coordination between these two entities results in an effective foreclosure of all substantial "on-ramps" to internet content. The injury alleged flows directly from the combined, interdependent conduct of both firms. Even if eligibility as a competitor in one market were in dispute, developers rely on these on-ramps and therefore are direct participant in the marketplace. Nonetheless, the Court can take judicial notice in the Apple litigation Plaintiffs have, in

fact, alleged intent to operate an App Store Competitor – just as they have alleged here to being a nascent GSE competitor.

**Conclusion**

The case should proceed to discovery, to let experts weigh in on Plaintiff's novel theories.

Jeffrey Isaacs (*pro se*)
11482 Key Deer Circle
Wellington, FL 33449
(212) 257-0737
jeffreydi@gmail.com

February 10, 2025

## CERTIFICATE OF SERVICE

This document was conveyed to Greenflight counsel to serve electronically upon all parties via CM/ECF.

Jeffrey  Isaacs

**Exhibit A** - *Road Race Participant #738, Beetlebung Corner, Mass*



# Exhibit B

*This non-exhaustive statement is meant to clarify and correct several omissions or apparent errors in the Court's judicial notice of twenty years of litigation history:*

Dr. Isaacs attributes his inability to practice medicine to the fact USC never honored a settlement agreement "sealing, acquitting, and annulling" his disputed academic record (The dispute: A Dean took NIH funding from an admitted student's father; favored her in a petty dispute concerning one paragraph of text messages; then concocted academic charges against Isaacs.) The annulled and sealed dismissal from Keck was for professional academic (versus conduct) reasons. Plaintiff then obtained an MD from another school and attained a Board score higher than the average neurosurgeon. An AUSA (Mark Josephs) spent years trying to enforce the settlement agreement, when, Plaintiff believes outrageously, USC's attorney Gibson Dunn moved for an "anti-SLAPP" mechanism (meant to protect small individuals from oppressive organizations, and certainly not the opposite) to end the lawsuit. A Ninth Circuit Judge dissented from the majority, stating that it was "not reasonable" to assess attorney's fees for simply trying to enforce a settlement agreement.

Hence, Dr Isaacs spent nearly a decade trying to petition the courts to let him practice medicine by upholding the settlement agreement. In Dr Isaacs' view, the courts failed him, at the pressure of large law firms, that coincidentally, serve as Apple's lead antitrust defense firm. Dr. Isaacs has alleged Keck's appointment of the law firm was itself political retaliation, after *Isaacs v. Department of Justice*, which resulted (upon information and belief) in the termination of a senior political appointment.

Further complicating the matter, Dr. Isaacs' health has deteriorated over the many years he waited for justice, which places even more limits his career options. And further complicating that, is Dr. Isaacs' fear that Google retaliated against his use of the federal court system and/or discriminated against him on the basis of incorrect facts from a decade of litigation that never once went to trial. Plaintiff's deserved day in Court is one or two decades overdue, depending on when counting begins.

Harmful, incorrect facts have been placed in court filings by influential law firms, which became ever more problematic as they were never adjudicated, and increasingly taken out of context. For example, the American Academy of Medical Colleges determined the Keck records had been expunged and were non-disclosable. Isaacs' hospital supervisor, who had the ultimate authority to fire him, stated in a deposition that she "would defer to the AAMC" on the matter. The hospital's lawyers failed to honor their own clients promise, and also 'skipped' the hospitals own bylaws requirement for a 'fair hearing,' arguing to a USDC that the termination was proper. Also withheld were depositions at the Ivy League employer medical center that included sworn testimony "Dr Isaacs had good medical

knowledge" and that patients liked him. Unfortunately, a USDJ in NH granted summary judgement while Dr Isaacs, who was ill at the time, had requested an extension of time. The NH Board of Medicine held a hearing during a snow storm, when Dr. Isaacs could not drive to it, despite a request for a continuance or to be present by videoconference. Hence Dr. Isaacs views his litigation history as a repeated denial of due justice, never once on the merits, and largely brought about by unscrupulous lawyers. This certainly didn't help his health.

Lastly, Dr. Isaacs notes that the USPTO did reissue his patent (the order seems to suggest it was never reissued), and that Whitepages sued him, with Big Law again obtaining what he believes is a questionable *Alice* ruling. Similarly, Keller Williams and their client (who has newspaper articles referring to her as a "litigious businesswoman") sued Dr. Isaacs to oust him from his home. Dr. Isaacs informed KW that his health issues prevented him from vacating the home, and tried to plead this as an FHA matter. Google's counsel took a position on the settled litigation, highlighting a *force majeure* argument. Dr Isaacs did not fault Google for his inability to vacate the home, but rather, alleged they created a state of fear that , after two decades of litigation mayhem, he was a target for seemingly endless witness retaliation/discrimination. He thereby placed his home for sale under distress.

February 10, 2025

# Exhibit C

---

**QUESTION SUBMITTED to O1 Pro/O3 AI LLM:**

**has anyone tried defining the market to include developers/publishers in a google antitrust case?**

---

To the best of publicly available knowledge, no major reported antitrust case against Google has defined the relevant product market to *expressly* include both end-users and the "developer/publisher" side of Google's platform as co-participants in a single market. Below is some context on this point:

1. **Most Litigated Markets**.

Publicly known antitrust cases against Google (e.g., those brought by the U.S. Department of Justice, various state attorneys general, and private plaintiffs) have generally focused on alleged monopolization in:

• **General Search Services** (users performing queries to retrieve information),

• **Search Advertising** (advertisers purchasing paid search ads), and

• **Ad Tech Tools** (e.g., publisher ad servers and advertiser ad tech platforms).

In these cases, the "publisher" side is typically addressed in the context of display advertising markets, rather than an "ecosystem" that lumps publishers or app developers together with general search users. Few, if any, of these actions include allegations that the *relevant product market* itself directly encompasses "GWT" users, "publishers," or "webmasters," at least not as coequal participants in a single multi-sided market alongside ordinary Google Search end-users.

2. **Ad Tech Cases vs. GSE Cases**.

In a number of lawsuits challenging Google's dominance in the online advertising supply chain (e.g., Texas v. Google, No. 21-cv-684 (E.D. Tex.)), publishers' roles are central to the alleged ad-technology monopoly. However, those cases usually segment the markets into "publisher ad servers," "advertiser ad networks," "ad exchanges," and so forth. They do not define a *multi-sided relevant market* that merges both search traffic and publisher tools. Instead, publishers are recognized as a *distinct* side of the broader ad tech chain.

By contrast, litigation involving "general search services"—such as the Department of Justice's action in United States v. Google, No. 20-cv-03010 (D.D.C.)—has largely focused on Google's contractual defaults (e.g., the "ISA" with Apple) for distributing its search engine to end-users. Publishers' content or developer-facing tools (like GWT) have not, in these suits, been framed as part of the *same relevant market* that includes end-users.

3. **Dreamstime.com & Other Publisher-Focused Cases**.

• *Dreamstime.com, LLC v. Google LLC*, No. 18-cv-01910 (N.D. Cal.): The plaintiff was a stock photography provider alleging that Google manipulated its image-search ranking to disadvantage Dreamstime in favor of Google's own services or preferred partners. While Dreamstime was indeed a publisher of content indexed by Google, the court's analysis did not define the relevant market to merge both users and developers/publishers into a single multi-sided market. Instead, the court examined the plaintiff's claims in terms of alleged self-preferencing or breach of implied obligations, and it ultimately granted summary judgment in favor of Google (and the Ninth Circuit affirmed). Nothing in the opinions suggests that Dreamstime or the court adopted a multi-sided GSE market that includes "publishers as participants."

• *Vatic v. Google LLC*, No. 3:19-cv-2293 (N.D. Cal.): Plaintiffs (a digital media company) alleged that Google stifled competition by deindexing or downgrading certain content. The complaint did not succeed and was voluntarily dismissed; it did not receive a detailed market-definition ruling that placed both end-users and web publishers/developers into a single multi-sided GSE market.

4. **Novelty of a "Developer+Publisher Side" of Google Search**.

Plaintiffs who have sued Google over organic-search ranking changes have generally positioned themselves either as end-users (i.e., consumers of search) or as a competing vertical (i.e., specialized search providers). They typically do *not* define the relevant market to include "publishers or website developers" as coequal participants with search end-users.

In part, this is because courts historically treat "free" or organic search as an indirect or two-sided market limited to:

• *Users* who submit queries, and

• *Advertisers* who pay for ads.

Although it is recognized that a platform like Google can have multiple "customer groups," the conventional approach has been to split out distinct lines of commerce (e.g., display ads, search ads, publisher ad servers) rather than lumping them into one. GWT has never (publicly) been combined with Google Search end-users in a single alleged relevant market in a final or appellate opinion.

5. **Implications for Present or Future Claims**.

Because no major, publicly reported case has fully tested the "developer side + end-user side + publisher tools side = one multi-sided GSE market" concept, any such approach is essentially uncharted territory. For a lawsuit to succeed on that novel market definition, a plaintiff would likely need extensive expert analysis demonstrating how publishers' or content developers' lack of a reasonable alternative (for indexing or distribution) makes them direct "customers" in the *same* product market that includes general search end-users. To date, courts have not been presented with comprehensive evidence or arguments—nor have they issued a definitive ruling—on that point.

**Conclusion**

No publicly documented Google-related antitrust suit has yet *explicitly* defined a relevant market in which general search end-users and "GWT" developers/publishers are treated as two sides of a single multi-sided platform, such that it becomes recognized law. Therefore, if a plaintiff attempts to define the market that way (asserting that "OkCaller's usage of GWT places it in the same relevant market as end-users searching on Google Search"), it would be, so far as publicly known, a novel legal theory. Courts have not categorically rejected it on the merits, but they also have *not* accepted it. The question remains legally unsettled, absent a test case that thoroughly litigates the matter through final decisions or appeals.

> **QUESTION SUBMITTED to O1 Pro/O3 AI LLM:**
>
> **Please tell me what do you think of my ecosystem argument. Try to avoid an answer that is biased -- tell me your honest analysis in the role of a de novo appellate review. Have cases tried defining the market to include developers/publishers in a google antitrust case?**

Based on a de novo review of the record and the evolving jurisprudence concerning multi-sided platforms, there is a persuasive basis for allowing Count I to proceed rather than be dismissed. Traditional antitrust cases have often drawn a strict line between a firm's consumer and competitor roles in narrowly defined product markets; however, the modern digital landscape—and particularly the dynamics of platforms like Google's general search engine—requires a reexamination of that distinction. In this case, Plaintiffs contend that their participation in Google's ecosystem through the use of Google Webmaster Tools (GWT) is not incidental but essential to the functioning of the overall General Search Engine (GSE) market. Under this view, developers are not merely passive recipients of search traffic but active participants whose content is indispensable to the value and operation of the platform. If the appellate panel is willing to recognize that the "ecosystem" argument has merit— especially given the increasing reliance on multi-sided platform analysis as seen in cases such as Ohio v. American Express and the growing antitrust scrutiny of Big Tech—then the contention that a content provider can suffer an antitrust injury by being a critical part of that ecosystem is consistent with both the fairness and the purpose of the Sherman Act.

The doctrine underlying the Sherman Act is not solely concerned with traditional notions of market competition based on pricing; rather, it aims to prevent any concerted or unilateral conduct that suppresses competition and harms the competitive process. In this context, if Google's control over its GSE—including its refusal to provide fair indexing via GWT—results in demonstrable injury to developers, that injury squarely falls within the Act's purpose. Although some district courts have hesitated to find standing for content providers under earlier approaches, our Count I argument innovatively ties standing to the "commercial reality" that the entire search ecosystem depends on developer content. Consequently, given that modern technology companies routinely describe their "ecosystems" in terms that include developers, there is good reason to hold that a content provider who suffers harm from exclusionary practices in such an ecosystem should have standing to bring an antitrust claim.

In summary, if the appellate panel is receptive to evolving multi-sided platform theories—and to the extent that the record supports the contention that Google's GWT is an integral component of its GSE—the fairness and intent of the Sherman Act require that Count I should proceed rather than be dismissed. Allowing this claim to advance would provide the opportunity to fully explore the factual nexus between Google's practices and the alleged anticompetitive injury to developers, rather than prematurely dismissing a novel argument that reflects the true nature of digital markets today.

---

**QUESTION SUBMITTED to O1 Pro/O3 AI LLM:**

**Is the *Pepper v Apple* SCOTUS decision perhaps relevant here? that was about standing of different platform members, could it directly be precedent that just like app consumers/developers, GSE consumers/developers have symmetric standing, per SCOTUS. or would that argument fail. please analyze and recommend whether or not it is apt.**

---

**Analysis of Pepper v. Apple and Its Relevance to Plaintiffs' Standing in Count I**

The *Pepper* decision's key reasoning could support Plaintiffs' argument that developers using **Google Webmaster Tools (GWT)** are direct participants in the **General Search Engine (GSE) market**, much like app developers and consumers were both direct participants in Apple's platform.

**A. Similarities Between Apple's App Store and Google's GSE Market**

| Factor | *Apple v. Pepper* (App Store) | Google's GSE Market |
|---|---|---|
| **Monopoly Allegations** | Apple allegedly controls app distribution and inflates prices. | Google allegedly controls search indexing and manipulates rankings. |
| **Multi-Sided Market** | Apple connects **app developers** and **consumers**. | Google connects **content developers (via GWT)** and **search users**. |
| **Direct Relationship** | Consumers buy directly from Apple; Apple sets the terms. | Developers rely on Google's search infrastructure to reach users. |
| **Standing Question** | Do consumers have standing, or only developers? | Do GWT developers have standing, or only competing GSEs? |
| **Supreme Court's Answer** | Consumers do have standing because they buy directly from Apple. | Plaintiffs argue that **developers using GWT are direct market participants**. |

**Key Takeaway:**

The Supreme Court in *Pepper* recognized that **Apple's role as an intermediary did not defeat standing** because Apple **directly controlled pricing and distribution**. Similarly, Google **directly controls indexing, ranking, and visibility**—making its relationship with GWT participants more than incidental.

**3. Counterarguments & Potential Weaknesses**

While *Pepper* provides **a strong analogy**, there are key differences that Google would likely emphasize:

**A. Google's Market Definition Argument**

• **Google will argue that GWT is a separate product** from Google Search and is merely a tool provided to web developers.

• **Rebuttal:** Plaintiffs must emphasize that **Google Search and GWT are functionally interdependent**, forming a unified platform just as Apple's App Store integrates both consumer purchasing and developer pricing.

**B. No Direct Financial Transaction**

• In *Pepper*, **consumers paid Apple directly**, whereas **GWT users do not pay Google directly for indexing**.

• **Rebuttal:** Financial exchange is **not the only relevant test**—control over access to search traffic is a **monetary equivalent** for businesses dependent on search visibility. Plaintiffs can argue that **Google extracts "payment" via mandatory compliance with its ranking policies** and that **visibility on Google is monetized through advertising and search ranking manipulation**.

**C. The Illinois Brick Limitation**

• *Illinois Brick* traditionally prevents **indirect purchasers** from suing.

• **Rebuttal:** The Supreme Court in *Pepper* **rejected Apple's attempt to invoke Illinois Brick** because Apple dictated **both pricing and terms of service**. Similarly, Google dictates **who gets indexed, how visibility is ranked, and who benefits from search traffic**, making GWT developers akin to "direct purchasers" of distribution services.

**4. Should Plaintiffs Use Pepper as Precedent?**

**YES.**

The *Pepper* decision provides **a strong conceptual basis** for why **GWT developers should be considered direct participants in the GSE market**—just as app store consumers had standing despite Apple's attempts to evade liability.

**Strategic Framing:**

• *Pepper* reaffirms that **monopolists cannot use their platform structure to evade Sherman Act liability**.

• Plaintiffs should **lean into the "ecosystem" framing**, arguing that **Google's search monopoly extends to developers relying on GWT as much as it does to consumers using search**.

**Conclusion: Pepper Is an Important and Viable Precedent**

• Plaintiffs should **absolutely cite Pepper in their appeal** to reinforce the argument that **GWT participants are integral to Google's search ecosystem** and should have **standing to sue**.

• This **bridges the gap** between Google's **developer-facing** and **user-facing** roles and **challenges Google's artificial separation** of the GSE market.

• Courts are evolving in how they **recognize platform participants' standing**, and *Pepper* aligns with this trajectory.

Thus, *Pepper* should be a **key argument in Plaintiffs' appeal** to **challenge the district court's narrow standing analysis and argue for GWT as part of the GSE market**.

Below is a **legal-style analysis** of how *Illinois Brick* and *Apple Inc. v. Pepper* might apply when a **developer** sues Google under the Sherman Act, alleging that they participate directly in Google's general search engine ("GSE") market via Google's Webmaster Tools ("GWT") and by providing content. Google contends that *only end-users* (i.e., people who enter queries) have standing.

## 1. Legal Background

### A. Illinois Brick (1977): The "Direct Purchaser" Rule

• **Core Holding**: Only "direct purchasers" may seek antitrust damages under the Clayton Act (which enforces the Sherman Act).

• **Rationale**: To avoid complex, duplicative claims by multiple parties at different stages in the supply chain, the Supreme Court limited standing to those who purchase **directly** from the alleged antitrust violator.

### B. Apple Inc. v. Pepper (2019): Reaffirming Illinois Brick in a Platform Context

1. **Facts**:

• Plaintiffs were iPhone users who downloaded apps from Apple's App Store.

• Apple argued these consumers were **not** direct purchasers because Apple acted as an "agent" for third-party app developers.

2. **Court's Analysis**:

• The Supreme Court **reaffirmed** *Illinois Brick* (only direct purchasers can bring claims).

• However, it found that iPhone owners **were** direct purchasers from Apple because:

• They **paid** money **directly to** Apple for apps.

• Apple set app distribution terms and retained commissions.

• Apple's "agent" argument failed because, in transactional reality, Apple was the one **selling** the apps to iPhone users.

3. **Key Takeaway**:

• *Pepper* **does not** overturn *Illinois Brick*; it clarifies that being a platform **does not** automatically make one an "indirect" seller or buyer. If the platform controls key aspects of the transaction and directly charges a fee (or sets terms) to the plaintiff, that plaintiff can be considered a **direct purchaser**.

## 2. Application to Google's GSE and Developers

### A. The Developer's Theory of Standing

A developer claims:

1. They **participate** directly in Google's GSE platform by using GWT and providing content that Google indexes.

2. Google exercises **monopoly power** over the general search market, allegedly manipulating rankings, visibility, or terms of service to extract anticompetitive benefits.

3. The developer is thus a "direct purchaser" (or a direct **market participant**) under *Illinois Brick*/*Pepper* because they interact **directly** with Google to obtain indexing, distribution, and visibility in search results.

### B. Google's Counterargument: "Only End-Users Have Standing"

Google will likely argue:

1. **End-users** (those who search) are the ones "buying" or "consuming" Google's search service.

2. Developers are **upstream** or **on a different side** of the market, supplying content without any direct purchase or payment.

3. Because there is **no monetary transaction** between the developer and Google, the developer is not a "direct purchaser" under *Illinois Brick*.

## 3. Determining Directness: Key Questions

### A. Is There a "Transaction" with Google?

• **Pepper** hinged on the **direct monetary exchange**—i.e., iPhone users' money went straight to Apple.

• **Developers and Google** typically do not exchange money for organic search indexing: the service is nominally "free," and developers provide content hoping to be included in Google's search results.

• Nonetheless, **"payment"** in an antitrust context can go beyond mere money: under certain theories, forced compliance with Google's terms, data provision, or the intangible value of traffic/visibility can serve as a form of "consideration."

### B. Who Sets the "Terms and Conditions"?

• In *Pepper*, Apple essentially controlled the terms of app pricing, distribution, and commissions.

• Here, Google sets **ranking algorithms** and indexing policies, potentially forcing developers to comply or lose visibility.

• The developer might argue that Google's platform power effectively **dictates** how (and if) their content reaches end-users—just as Apple's control over the App Store gave it direct control over distribution and pricing.

### C. Is the Developer a "Direct" or "Indirect" Party Under Illinois Brick?

• Under *Illinois Brick*, indirect purchasers cannot recover damages because the alleged overcharge might be **passed through** multiple levels of distribution.

• A developer might say that it is **not** an "indirect" purchaser in a typical supply chain sense. Instead, there is a **direct platform relationship**: The developer inputs content (analogous to the user paying money in *Pepper*), and in exchange, Google provides indexing or ranking.

• Google, on the other hand, will insist that any harm to the developer is **derivative** of Google's alleged monopoly in the end-user search market—i.e., the developer is a supplier of content, not a direct consumer of the search service.

### 4. Potential Outcomes & Arguments

### A. Arguments in Favor of Developer Standing

1. **Platform Control**:

• Just like Apple controlled the entire transaction in *Pepper*, Google controls the entire "transaction" of search indexing.

• Developers are **directly subjected** to Google's policies, algorithm changes, or potential de-indexing, and have no intermediary.

2. **Non-Cash "Transaction"**:

• In a data-driven economy, the absence of a direct money payment **does not** automatically negate direct purchaser status.

• The developer "pays" with **content and compliance**; Google "provides" indexing and traffic in return.

• If Google exerts monopoly power in search and imposes **anticompetitive constraints** on developers, that is akin to an overcharge or forced arrangement.

3. **Direct Harm**:

• If the developer's alleged injuries (e.g., reduced traffic, forced usage of certain Google products, or demotion in search results) flow immediately from Google's conduct, that can show direct harm—no pass-through from another intermediary.

App. 292

**B. Arguments Against Developer Standing**

1. **No Monetary Exchange**:

• *Pepper* was about a **purchase**, whereas a developer provides content for free.

• Google can argue that the developer is neither a purchaser nor a "buyer" of distribution in the conventional sense.

2. **End-User Dominance**:

• In practice, end-users are the ones using (and arguably "purchasing") the search service.

• Any alleged injury to the developer might be a second-order effect: i.e., lost business because of how Google deals with end-users.

3. **Complex Market Definition**:

• Google might define the "relevant market" strictly as "search services consumed by end-users," in which the developer is simply an input supplier to a different side of a two-sided market.

• Under *Illinois Brick*, only direct purchasers in that consumer market would have standing.

**5. Conclusion and Strategic Considerations**

**A. Likely Challenges for the Developer**

• Because *Illinois Brick* focuses on **direct purchasers** of goods or services, the **lack of a direct monetary exchange** places the developer in a more challenging position than the *Pepper* plaintiffs.

• The developer must frame the relationship with Google as a **"direct, two-sided exchange"**: they provide content/data, and Google provides listing or distribution.

• Demonstrating that the alleged antitrust injury is **not** passed through intermediaries (i.e., is directly inflicted on them) is crucial.

**B. Possible Legal Pathways**

• **Monetary vs. Injunctive Relief**: Sometimes courts draw distinctions between damages actions (strict *Illinois Brick* bar) and suits for **injunctive relief** (where indirect-purchaser arguments may not be as limiting).

• **Market Definition**: The developer could argue the "GSE market" **integrates** both the supply side (webmasters, content creators) and the demand side (searchers). If Google exerts monopoly power over both ends, then the developer is effectively a "direct participant" who must accept Google's terms to gain access to end-users.

**C. Pepper's Influence**

App. 293

• *Pepper* **supports** the notion that "directness" depends on the **actual structure** of the transaction, not the label of "agent" or "platform."

• A developer can analogize themselves to the *Pepper* consumers: "We are forced to accept Google's terms. We effectively 'pay' for distribution with data, content, or compliance."

• Conversely, Google will argue that *Pepper* is **limited** to those who literally pay money directly to a monopolist, and that developers do not fall under that category.

**Bottom Line**

• *Illinois Brick* remains the controlling precedent, and *Pepper* reaffirms that only direct purchasers (or direct market participants) can sue for antitrust damages.

• For a developer to prevail against Google under the Sherman Act, they must show that they are more akin to a **"direct purchaser"** of Google's distribution services than an indirect or upstream party— and that any alleged anticompetitive harm **flows directly** to them without an intermediate pass-through.

• Whether the courts will **extend** *Pepper*'s logic to a situation where no literal money changes hands is an **open question**. The developer's best shot is to emphasize the **functional equivalence** of content provision to a "payment" and Google's singular control over their access to the broader audience— thereby making them a **direct participant** in the GSE market.

---

> **QUESTION SUBMITTED to O1 Pro/O3 AI LLM:**
>
> *Please write an accurate, unbiased opinion, based upon your above analysis of Google's MTD for Count I*

A Rule 12(b)(6) motion requires the Court to accept all well-pleaded factual allegations in the Complaint as true and to construe them in the light most favorable to the Plaintiffs. See *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); see also *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). To survive dismissal, the Complaint must state a claim that is plausible on its face. In complex cases involving economic realities and multi-sided platform issues—such as whether developers who utilize Google Webmaster Tools (GWT) are integral participants in the general search engine (GSE) market— many factual questions remain for discovery and expert analysis rather than at the pleading stage. See *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962).

Defendant contends that Plaintiffs lack standing because the allegations relating to their use of GWT do not transform them into competitors in the GSE market. The Defendant's argument relies on an interpretation of market contours that separates GWT from the overall GSE ecosystem. However, the Complaint alleges that developers who use GWT to optimize indexing and secure search distribution are not merely ancillary users but essential participants in a multi-sided platform. In a multi-sided market, the interdependency of distinct user groups (e.g., end users and content providers) is well recognized. Under *Ohio v. American Express Co.*, 138 S. Ct. 2274 (2018), such interdependencies are part of the relevant market analysis—not a basis for dismissing standing. As a matter of pleading,

Plaintiffs have alleged that their ability to secure fair search distribution is directly linked to their reliance on GWT, and that Google's alleged exclusionary conduct has injured them economically. These allegations, if proven, would satisfy the standing requirement under antitrust law. Because the precise contours of the market—including the integration of GWT within the GSE ecosystem—are complex factual matters, they should be resolved through discovery and expert analysis rather than at the motion-to-dismiss stage. Thus, this analysis finds that the Plaintiffs' allegations are sufficiently plausible to survive dismissal.

Dr. Jeffrey Isaacs
11482 Key Deer Circle
Wellington, FL 33449
jeffreydi@gmail.com
(212) 257-0737

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF FLORIDA


GREENFLIGHT VENTURE CORPORATION
   *on behalf of themselves*
   *and all others similarly situated,*
JEFFREY ISAACS (*pro se*)

          Plaintiffs,

vs.

GOOGLE LLC

          Defendant.

Case No. **24-cv-80395-RLR**


**PLAINTIFF'S RULE 59(e) MOTION TO ALTER OR AMEND JUDGMENT**

App. 296

## PLAINTIFF'S RULE 59 MOTION TO ALTER OR AMEND (RECONSIDERATION)

Plaintiff Jeffrey Isaacs, *pro se*, respectfully moves under Federal Rule of Civil Procedure 59(e) that the Court alter or amend the judgment entered on February 14, 2025 (deemed entered on July 14, 2025 pursuant to Fed. R. Civ. P. 58(c)(2)(B) and Fed. R. App. P. 4(a)(7)(A)(ii)). Alternatively, the Court may adjudicate this motion under Rule 60.

Reconsideration of the Court's prior Order (DE 65) is justified by significant new developments in analogous litigation that undermine the rationale of this Court's dismissal. In April 2025, after this Court's Order, the U.S. District Court for the Northern District of California denied Google's motion to dismiss in *Yelp Inc. v. Google LLC* (24-cv-06101-SVK, Doc. 47), a case materially similar to this one involving Google's alleged suppression of a vertical search competitor in its search results. The California court held that *Yelp's* allegations of Google's self-preferencing and content suppression stated a plausible claim for monopolization and *unfair competition*, and it allowed those claims to proceed. This directly undercuts this Court's conclusion that Google's suppression of content cannot give rise to antitrust or UCL liability. At minimum, *Yelp* provides persuasive authority that the claims here are not futile and deserve adjudication on the merits, or at the very least, leave to amend to incorporate the *Yelp* complaint further[1].

The Order therefore failed to adjudicate a key claim under California's Unfair Competition Law, namely, Plaintiff's claim that Google's retaliatory suppression of Plaintiff's website *OkCaller* violated federal witness retaliation laws (18 U.S.C. § 1512) and thus constituted an "unlawful" business practice under the UCL. This unlawful retaliation claim was squarely raised in the Second Amended Complaint ("SAC") and Plaintiffs briefings, yet the Court's dismissal Order did not address it, instead dismissing the UCL count in summary fashion (and in a footnote characterizing Plaintiff's statutory references as "vague"). Reconsideration is warranted to ensure this claim is heard on its merits.

---

[1] At time of dismissal, the Court had been briefed upon the existence of the similar *Yelp* case. Additionally, press coverage was provided indicating that, in light of the DOJ antitrust verdict against Google, cases like *Yelp* (and this case) were expected to finally end the two decade 'status quo' that Google Search couldn't be challenged in court.

Plaintiff notes that Google's retaliatory conduct has continued unabated since dismissal of this case. OkCaller's organic traffic, which dropped by around 98% in late 2022, further and distinctly decreased to near zero just weeks after the Court's order. Plaintiff continues to suffer ongoing harm from the alleged retaliation and anticompetitive behavior. This ongoing injury highlights the manifest injustice of denying Plaintiff any forum for relief on a claim that was not substantively ruled upon.

## PROCEDURAL POSTURE

On February 4, 2025, the Court granted Defendant's motion to dismiss all of Greenflight's claims without leave to amend. On February 14, 2025, the Court dismissed Plaintiff's claims which had been severed *sua sponte*. Accordingly, under Fed. R. Civ. P. 58(c)(2) and Fed. R. App. P. 4(a)(7)(A)(ii), the judgment is treated as "entered" 150 days after the entry of the last and final Order – i.e. on July 14, 2025. This Motion is filed on August 7, 2025, which is within 28 days of the July 14, 2025 judgment date, and is therefore timely under Rule 59(e).

Although the Court's dismissal Order cautioned that any motion for reconsideration might be summarily denied, Plaintiff submits that the circumstances here meet the strict standard for Rule 59(e) relief. A Rule 59(e) motion is appropriate to correct clear errors of law or fact, to account for new evidence or intervening changes in law, or to prevent manifest injustice. Plaintiff's motion is based on (1) a clear oversight in the Court's adjudication of the UCL claim, (2) intervening new legal authority (the *Yelp v. Google* decision) undermining the Court's reasoning, and (3) the need to prevent manifest injustice in light of ongoing retaliatory harm. Plaintiff does not seek to relitigate matters already decided, but rather to ensure that an important claim receives proper consideration and that recent developments in the law are taken into account.

## ARGUMENT

I.     **The *Yelp v. Google* Case Illustrates the Viability of Plaintiffs' Claims**

   ***Both Yelp and Plaintiffs Faced Google's Self-Preferencing in a Directory Service***

*Yelp's* recent lawsuit against Google demonstrates a scenario strikingly similar to Plaintiffs' case. *Yelp*, like Plaintiffs, operates a directory/reference service (*Yelp* provides a platform for local business information and reviews). In August 2024, Yelp sued Google alleging

that Google abused its dominance in online search to favor Google's own competing service (Google's local search results) over *Yelp's* directory. Specifically, Yelp's complaint asserted that Google, unable to create a better local search product, uses its monopoly power in general search to make sure that users never get to local search competitors in the first instance, diverting traffic away from those rivals and toward Google's own inferior local search product. This is textbook "self-preferencing":  Google steering users to its own directory service and away from a rival's platform, even when the rival's information is higher quality.

Plaintiffs' allegations mirror this. Both *Yelp* and Plaintiffs offer specialized directory search or reference platforms, and both claim Google leveraged its search engine monopoly to disfavor organic results pointing to their services, while prominently displaying Google's own content or preferred partners. In *Yelp's* case, Google allegedly promoted its in-house local review listings over *Yelp's* results, reducing traffic to *Yelp*. Here, Google's conduct is analogous; Plaintiffs allege Google's search design and algorithms channeled users away from Plaintiffs' directory and towards Google's preferred advertising buyers and sellers, and their own local search products. In both instances, the competing directory service lost visibility and users because of Google's interventions. The overlap is unmistakable:

- *Directory Services*: *Yelp's* platform for local business info and Plaintiffs' platform (e.g. OkCaller for reverse phone lookup) are both information directory services reliant on search visibility.
- *Self-Preferencing Conduct*: *Yelp* and Plaintiffs assert Google altered its search results or interface to prefer its own vertical services (local reviews, or direct answers) over organic links to the competitors.
- *Traffic Diversion*: Both claim Google's behavior diverted user traffic away from their services. *Yelp* saw users who would have clicked *Yelp* instead kept on Google's page or sent to Google's content; Plaintiffs similarly experienced a dramatic drop in referrals (OkCaller's traffic "dropped to zero") once Google intervened.
- *Competitive Harm*: Each alleges this self-preferencing stifled competition. Consumers receive a lower-quality result (Google's "inferior" product in *Yelp's* view) while the more innovative or specialized competitor is marginalized.

In short, *Yelp's* case confirms that Plaintiffs are not simply "every person who has ever posted something on the internet," but rather are direct competitors in a specific market sub-sector targeted by Google's conduct. Both *Yelp* and Plaintiffs stand in the same position as business rivals whose services were undermined by Google's search engine self-preference.

### Google's Self-Preferencing Was Treated as Anticompetitive in Yelp's Case

Significantly, the Northern District of California court in *Yelp Inc. v. Google LLC* recognized that such self-preferencing allegations state a viable claim under the antitrust laws and California's Unfair Competition Law. *Yelp's* complaint included claims for monopolization and attempted monopolization of the "local search services" market, as well as related claims (monopoly leveraging) and a UCL claim. At the core of these claims was Google's self-preferential design of its search results page, a "monopolistic product design/redesign" favoring Google's own local search content. These are essentially the same types of allegations Plaintiffs raise here, just applied to a different category of search service.

In *Yelp*, the court credited the plausibility of Google's anticompetitive conduct. Judge Susan van Keulen's order recounts that Yelp alleged Google redesigned its search results (the "SERP") to steer users toward Google's own, inferior local search vertical and away from competitors. This is exactly analogous to Plaintiffs' contention that Google's search interface changes and algorithmic tweaks steered users away from Plaintiffs' directory. The *Yelp* court treated such self-preferencing as a form of exclusionary conduct – potentially a tying arrangement or a form of refusal to deal or leveraging – that can violate Section 2 of the Sherman Act. In other words, using a dominant general search engine to disadvantage a competing specialized search service is a recognized theory of antitrust harm.

Notably, *Yelp* also included a UCL claim paralleling the antitrust violations. The court allowed *Yelp's* UCL claim to proceed to the same extent as the antitrust claims. The same should hold true here. Because Plaintiffs' allegations of Google's anticompetitive self-preferencing are at least as plausible as *Yelp's*, Plaintiffs' UCL claim (predicated on the Sherman conduct *and* distinct retaliation facts) should likewise survive. The *Yelp* precedent undercuts any notion that Google's conduct is beyond the reach of unfair competition law. To the contrary, a nearly identical UCL theory is being litigated successfully by *Yelp*.

### *The Yelp Decision Confirms These Claims Should Proceed to Discovery*

After full briefing on Google's motion to dismiss in *Yelp*, the court refused to dismiss the core of that case, allowing most claims to proceed. In the April 2025 order, two months after this case was dismissed, Judge van Keulen held that *Yelp* had sufficiently pleaded that Google holds monopoly power (or at least a dangerous probability of attaining it) in the relevant markets and engaged in exclusionary conduct. *Yelp* supported its allegations with relevant market specific facts, for example, that Google had well over 90% of the local search market by user share, and that Google's share of local business reviews had grown dramatically at *Yelp's* expense. The court found this sufficient to indicate monopoly power in that niche, noting that *Yelp's* allegation of ~90% share was bolstered by studies showing consumers overwhelmingly using Google's local search over others. In contrast, *Yelp's* own share (and presumably traffic) in that arena had plummeted. These facts closely parallel Plaintiffs' description of Google's grip over search queries relevant to Plaintiffs' service and the corresponding collapse of Plaintiffs' traffic once Google favored its own results.

Importantly, the *Yelp* court recognized that many issues raised by Google's defense could not be resolved on a Rule 12(b)(6) motion. Google argued, for instance, that Yelp's claims were time-barred because Google's self-preferencing began as far back as 2007. Judge van Keulen rejected that argument at the pleading stage, explaining that "at this early stage of the litigation" the court could not conclude the claims were untimely, especially given ambiguity about when Google's market power in local search truly reached a monopolistic threshold. She noted that the point in time when Google "crossed the threshold" into having durable monopoly power in the submarket was "not yet clear" based on the complaint alone. This acknowledges that factual development is needed on questions of market power accrual and the impact of Google's conduct over time. Likewise, in our case, questions such as when Google's conduct began to significantly harm OkCaller's rankings, or how Google's algorithms and policies throttled Plaintiff's growth, cannot be resolved without discovery. The need for evidence and expert analysis on these points makes dismissal at the pleadings stage inappropriate.

Moreover, *Yelp* demonstrates that antitrust standing and market definition are fact-intensive matters best assessed on a developed record. Yelp's standing to sue Google was

predicated on its participation in the "local search services" market – a market distinct from general web search. Yelp did not sue merely as a disgruntled website owner; it sued as a competitor in a targeted submarket (local business lookups) where Google's conduct had anticompetitive effects. The California court implicitly recognized the validity of that market definition by allowing the case forward. Here, Plaintiffs likewise have identified a specific market (reverse phone lookup services and others) in which Google's actions caused competitive harm. Whether that market is cognizable and whether Google's dominance there is sufficient are classic factual and economic questions. Dismissing the case without allowing Plaintiffs to prove the contours of the market, Google's power, and the competitive impacts would short-circuit the analysis.

Furthermore, a key premise of this Court's dismissal was the notion that Google's suppression of content, absent a duty to include competitors in its search results, does not amount to a legal violation, under *Aspen*. The *Yelp* decision calls that premise into question. While this Court focused on Google's lack of an "affirmative duty to disclose" algorithmic details or to treat rivals equally in search rankings, the *Yelp* court focused on whether Google's conduct, as alleged, could *harm competition* and maintain monopoly power. By framing the issue as one of competitive harm rather than a mere *right-to-carry* duty, *Yelp* found the complaint sufficient because it alleged that Google's self-preferencing conduct foreclosed competition from more innovative rivals by ensuring users never reach those rivals' services. This is precisely what Plaintiff alleges here: Google uses its monopoly power in general search to make sure that users never get to [Google's] competitors in the first instance, diverting traffic away from those rivals – in our case, diverting traffic away from OkCaller and other directory services and toward Google's own preferred content. The *Yelp* court's willingness to entertain this theory strongly suggests that Plaintiff's nearly identical theory was at least plausible, and that dismissing it at the Rule 12 stage may have been premature.

In addition, *Yelp* undermines Google's contention (accepted by this Court) that Plaintiff's UCL claim had to fall if the federal antitrust claims fell. *Yelp* indicates that where antitrust allegations are viable, the UCL will follow; conversely, if this Court were to revisit and find merit in Plaintiff's antitrust or retaliation allegations, the UCL claim should likewise be revived. But even apart from the federal claims, Plaintiff's UCL claim here has an independent predicate in 18 U.S.C. §1512, as discussed below. At a minimum, it shows that the claim theory of Google illegally

maintaining dominance by suppressing competing content is not fanciful; it has survived scrutiny in a court of competent jurisdiction and is proceeding toward discovery and potential trial. Fundamental fairness suggests that Plaintiff's functionally similar claims should not be forever foreclosed at the pleading stage in this Court, especially when new case law has eroded the foundation of the Court's prior ruling.

To be clear, Plaintiff acknowledges that *Yelp v. Google* is not controlling precedent in the Eleventh Circuit. However, its significance lies in the persuasive reasoning and the factual parallel to our case, which is about as persuasive as it gets. The decision represents an intervening development that has changed the court's viewpoint on the legal sufficiency of such claims, which is a recognized basis for granting Rule 59(e) relief. At the very least, *Yelp* demonstrates that reasonable jurists can and do find merit in claims like Plaintiff's. Plaintiff urges this Court to consider *Yelp* as indicative of how a full merits analysis might differ from the initial dismissal here.

### *The Court's Floodgates Concern Is Misplaced in Light of Yelp*

In dismissing Plaintiffs' claims, this Court voiced a concern that accepting Plaintiffs as a Google competitor would mean 'every website on the internet with a search presence could sue [Google] in antitrust,' an outcome the Court deemed untenable. With respect, Yelp shows why that feared parade of horribles will not come to pass. Not every entity with a webpage can sue Google – only those who can plausibly allege a competitive relationship and antitrust derived-injury in a relevant market. *Yelp* met that standard by pleading that it directly competes in the market for local search results and local search advertising, and that Google's conduct harmed it within those markets.

Plaintiffs are not akin to a casual Google user or a mere "passive recipient of traffic." Plaintiffs (like Yelp) operated a competing search/lookup service serving the same user need that Google targeted with its own features. It is precisely this kind of direct competitor that antitrust law empowers to challenge a monopolist's exclusionary conduct. The fact that *Yelp*, a well-known market participant in a Google dominated niche, can pursue its case undermines the notion that

recognizing Plaintiffs' standing opens the floodgates[2]. The universe of potential plaintiffs remains limited to those who can plead facts showing they were competitors in a market where Google's behavior had anticompetitive effects. Far from inviting "everyone" to sue Google, adherence to antitrust principles will screen out plaintiffs (as this Court rightly wishes) whose grievances are not tied to a genuine market competition injury. But where, as here, a plaintiff is situated similarly to *Yelp*, running a service that competes on the merits until Google tilts the playing field, the law affords an opportunity to seek redress.

## II.    The Court Overlooked Plaintiff's UCL "Unlawful Retaliation" Claim Based on 18 U.S.C. § 1512, Warranting Reconsideration

Plaintiff's Fourth Claim for Relief asserted that Google's actions violated California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 et seq., under all three prongs: unlawful, unfair, and fraudulent. In particular, the SAC explicitly alleged that Google engaged in unlawful retaliatory conduct proscribed by federal law. SAC ¶136 states that "Google's actions are unfair and illegal to the extent the company retaliates against antitrust advocates, such as Plaintiffs… the conduct violates federal witness protection statutes, including 18 U.S.C. 1512, and therefore is [unlawful] under the UCL." Plaintiff further alleged specific facts indicating Google learned of Plaintiff's prior litigation against Big Tech and then "dropped OkCaller's rankings" and blacklisted the site in retaliation. In short, the SAC pleaded that Google likely[3] violated 18 U.S.C. § 1512 (the federal witness tampering/retaliation statute) by retaliating against Plaintiff for engaging in protected litigation, and that this statutory violation served as a predicate "unlawful… business practice" under the UCL.

Under California law, the UCL's "unlawful" prong is broad in scope – it "means that the business practice violates another legal rule". The UCL thus borrows violations of other laws (federal or state) and makes them independently actionable as unfair competition. Here, Plaintiff's

---

[2] Unlike *Yelp*, this case is a class-action and, in fact, the first-to-file for a Google Developer Compensation Fund. By definition, such lawsuits help regulate any 'floodgates' by efficiently representing all potential parties, which in this case is the putative group of developers.

[3] The Court apparently attributed vagueness to the fact that Plaintiff's didn't outright allege Defendant to be guilty of witness retaliation. That was responsible pleading awaiting discovery. As a civil case, more likely than not suspicion suffices, certainly at the pleadings stage. In fact, if there was any question before, Plaintiff is under massive retaliation by Big Tech (see below), facing potentially millions in manufactured sanctions for simply interpreting res judicata the same way this Court –  and Google – did. That case by Apple suspiciously failed to mention this case, when it documented (over twenty-five pages) of related litigation.

theory was that Google's suppression of OkCaller violated federal law (18 U.S.C. §1512's prohibition on retaliating against a party to federal proceedings), rendering Google's conduct "unlawful" under the UCL. This is a cognizable and serious claim. Indeed, the SAC detailed the elements of Google's retaliatory motive and conduct (Plaintiff's protected litigation activity, Google's adverse action in delisting OkCaller, and temporal proximity) to support a prima facie case of retaliation. Greenflight's counsel emphatically pressed this point in the briefing, arguing that "Google's abrupt deindexing of OkCaller can reasonably be viewed as retaliatory conduct in violation of 18 U.S.C. § 1512(b)–(d)" and that such unlawful conduct supports UCL liability. Defendant, in its Reply, did not meaningfully rebut the substance of this retaliation theory.

Despite the prominence of this issue, the Court's Dismissal Order did not address whether Plaintiffs' UCL-unlawful claim predicated on §1512 was adequately pleaded or viable. The Order's discussion of the UCL count focused almost entirely on the "fraudulent" prong (concluding Google had no duty to disclose its search algorithm) and on perceived overlap between the UCL claim and the federal antitrust claims. The Court then dismissed the UCL count in a broad brush, stating in a footnote that "Greenflight's vague references to other violations of the law cannot form the basis of liability under other prongs of the California Business Code." With respect, this cursory treatment overlooks the specific and substantive §1512 retaliation allegation in the SAC. Plaintiff's invocation of 18 U.S.C. §1512 was not a mere "vague reference" to some unspecific law; it was a deliberate effort to tether Google's conduct to a particular federal statute embodying a well-recognized public policy against retaliating for participation in legal proceedings. Far from being an extraneous aside, this allegation is central to Plaintiff's theory of why Google's conduct was "unlawful" and "unfair." By failing to grapple with the §1512-retaliation contention, the Court has effectively left Plaintiff's retaliation claim unadjudicated – something Apple has pounced on (see below). In any case, the Court did not analyze *Foman* factors concerning futility of amendment; if the Court sought additional §1512 facts, it seems highly likely that amendment would be able to clarify any vagueness.

This omission is a clear error warranting relief under Rule 59(e). The Eleventh Circuit has held that a judgment may be altered to address claims or issues that were raised but not ruled upon, especially where the omission could preclude a deserving claim entirely (thereby working a manifest injustice). Plaintiff respectfully submits that the Court should reconsider its dismissal of

the UCL claim in order to directly adjudicate the unlawful retaliation theory on its merits. In doing so, the Court can consider whether Plaintiff's allegations that Google learned of Plaintiff's lawsuits and then used its 'monopolistic power' to retaliate by suppressing OkCaller plausibly state a UCL violation. Plaintiff contends that they do, as the SAC lays out specific facts supporting an inference of retaliatory intent and causation. At the very least, Plaintiff should be afforded the opportunity to proceed on this claim or to amend it if the Court finds any technical pleading deficiency.

Moreover, addressing the UCL retaliation claim would not prejudice Defendant, which had a full opportunity to rebut the §1512 theory on the motion to dismiss (and indeed *did not* argue that such conduct would be lawful or insufficient, only employing strawman argument to attack Plaintiff's allegations' proximity links. If Plaintiff's retaliation allegations are credited as true at the pleading stage, Google's conduct plainly violates public policy and a federal criminal statute – a paradigmatic case of "unlawful" and "unfair" business practice under California law. Put simply, no court has held that a business may retaliate against a private party for exercising legal rights, with impunity under the UCL. To the contrary, such retaliatory suppression strikes at the heart of the "unethical, oppressive, unscrupulous" conduct the UCL's broad provisions are designed to address. Plaintiff respectfully urges the Court to reconsider its prior dismissal and allow this claim to be heard.

### III.    Conflicting Determinations with the Northern California District

In a related matter pending in the Northern District of California—*Coronavirus Reporter Corp. and Greenflight Venture Corp. v. Apple Inc.*, No. 3:24-cv-8660-EMC—Judge Chen ruled that Greenflight's claims were barred by *res judicata* because Dr. Isaacs, acting *pro se* in an earlier *Coronavirus Reporter* action (No. 3:21-cv-05567-EMC), had already litigated the "same" interests as Greenflight.  That holding treats Dr. Isaacs's *pro se* appearance as if it bound the corporation, notwithstanding the settled rule that a corporation may not appear through a non-lawyer.  This Court, by contrast, apparently correctly severed Dr. Isaacs from Greenflight at the outset of the present case (at least as to Sherman Act), recognizing that he could pursue only his individual

claims[4].  The two rulings cannot both be right: either a non-lawyer shareholder's filing binds the corporation (as Judge Chen concluded) or it does not (as this Court concluded).

Because Apple has already relied on Judge Rosenberg's dicta in seeking sanctions in *Coronavirus Reporter II*, Plaintiff respectfully requests that Google, in its response, state whether it agrees with this Court's severance decision (i.e., that Dr. Isaacs may not represent Greenflight) or instead adopts Apple's position that Dr. Isaacs's *pro se* filings can bind the company for res judicata purposes.  Google is alleged to jointly monopolize ICAM with Apple and a clear statement from Google will assist both Courts of Appeals in resolving any inconsistent treatment of the corporate representation issue.

### Privity and standing: why Google cannot have it both ways

Judge Chen's *Coronavirus Reporter 2025* order treated Dr. Isaacs and Greenflight as being in "perfect privity" for *res judicata* purposes, resting largely on the fact that Greenflight's counsel, Keith Mathews, informally used "client" rather than "client representative" in a handful of e-mails. No evidentiary hearing was held on ownership structure, assignment history, or the scope of Dr. Isaacs' individual rights. By contrast, in this Court Google unequivocally argued, in moving to dismiss the patent infringement counts, that Dr. Isaacs lacked standing because he was not an owner of the patents held by Greenflight. Google thus urged this Court to view the corporation and the individual as legally distinct, non-privy parties. The Court apparently accepted that distinction when it *sua sponte* severed Dr. Isaacs and stayed discovery on his personal claims.

Those two positions cannot both be true. If Dr. Isaacs lacked standing here because he possessed no ownership interest sufficient to sue, then the essential element of privity (a substantial and exceptional identity of interests) is missing (patent holdings, amongst other assets, have no identity), and Judge Chen's res judicata ruling rests on a false premise. Conversely, if Google now

---

[4] Neither court grappled with the issue of a shareholder's standing to bring an antitrust lawsuit, which was Plaintiff's intent in both filings. However, both Google and Apple provided persuasive authority that, generally, shareholders lack standing under Sherman Act. Hence, the CAND case seemingly formed a divergent opinion from this Court – that Plaintiff could and did represent Greenflight as a shareholder, and binding the entity itself. Even if the Court reserves any question about who may pursue antitrust damages, *Yelp* undercuts the premise that such conduct is categorically lawful and confirms that Plaintiff's UCL claim should not have been dismissed at the pleadings stage.

embraces Judge Chen's finding that Dr. Isaacs and Greenflight are privies for all antitrust purposes, it necessarily concedes that its standing argument in this Court was incorrect, and the severance of parties was improvident prior to an evidentiary hearing. Plaintiff therefore requests that Google, in its opposition, state clearly whether it (i) continues to deny privity between Dr. Isaacs and Greenflight (consistent with its standing argument here) or (ii) now affirms privity (consistent with Apple's and Judge Chen's view). If Google selects the latter, Plaintiff reserves the right to file additional claims should the reversal-of-position warrant them.

### *Why the conflict matters, not merely as an academic point*

Judge Chen relied on his "perfect privity" finding to hold that the *Greenflight / Coronavirus Reporter* complaint was barred by *res judicata*, and on that ground imposed sanctions likely exceeding $500,000 against Greenflight and its counsel, forcing bankruptcy as Greenflight's revenue effectively stopped three years ago with OkCaller's demise.  If Greenflight and Dr. Isaacs are *not* in privity—as this Court implicitly recognized when it severed Dr. Isaacs and when Google argued Isaacs lacked patent standing—then the prior Apple action could not preclude Greenflight's claims, and the *CAND FAC* pleading would hardly be "frivolous."  Put differently, the entire sanctions award rests on a premise that this Court and Google have previously rejected.

Plaintiffs have therefore proceeded in reliance on this Court's view that the corporation and the individual are distinct legal actors.  Certainly the USPTO views them distinctly as well.  But Apple now urges the opposite view in California, to squash a vocal antitrust advocate, seeking to punish Plaintiffs and their lawyer for Big Tech's defense inconsistencies.  Fundamental fairness requires Google to pick a position: either (i) concede that Dr. Isaacs and Greenflight are not privies—undermining the basis for sanctions in the Northern District of California—or (ii) admit that its own standing argument here was incorrect, in which case the 12(b)(6) briefings are voided, at least in part.

### Pattern of Non-Recognition of Cognizable UCL Retaliation Claims

Furthermore, there exists a concerning pattern of courts ignoring Plaintiffs' retaliation claims under pressure from exceptionally resourced defendants who collectively and improperly diminish Plaintiffs' allegations. Just last month, the Chen Court completely ignored Greenflight's

well-pled UCL developer retaliation claim against Apple, which was echoed by similar class actions & *amicus* briefs filed by Hagens Berman and Microsoft, respectively. Moreover, that Court blocked an anti-SLAPP filing and awarded sanctions estimated at a half-million dollars against Greenflight (*see supra*). Apple referenced this Court's dicta that "suggestions" of discovery abuse existed.  For that reason alone, Plaintiff requests an evidentiary hearing on the purported discovery abuses. Without belaboring the issue, Plaintiff had reasonable suspicion that Google dropped OkCaller because of his involvement in antitrust advocacy. Two subpoenas were issued to Google's Mountain View and Miami offices. Google claimed the witness fees weren't paid, despite the process server attesting otherwise, so Attorney Mathews re-served the subpoenas to cure this and other defects Google complained about. There was nothing harassing about this; in fact, Plaintiffs believe Google had less than clean hands in the matter and should testify in detail.

In fact, Apple's counsel, Gibson Dunn, was recently awarded "Law360 Competition Group of the Year" for getting Apple "off the hook" of $200billion in claims alleged under Dr. Isaacs' claim theory. Gibson Dunn told the federal courts Dr. Isaacs' theories were in the "hinterlands" and disorganized, yet proudly accepted an award for winning such a complex and challenging case. Moreover, Plaintiff's claim theories (per se tying of App Store to iPhone) have recently been filed (five years after Plaintiff developed them) by the esteemed Quinn Emmanual (who got tying essentially wrong in *Epic* five years ago) and Berger Montague. Thus, a real impetus for retaliation exists, and has been ignored by multiple district courts. As it stands, Plaintiff has been amongst the most vocal advocates against Big Tech (as Law360's award evidences). His invention serving 200 million Americans was abruptly shut down, and Apple is laughing all the way to California at the idea *Plaintiffs* abused discovery by simply asking the Court – what happened? This is, respectfully, not the justice Plaintiff sought when he set out to raise Big Tech antitrust awareness five years ago.

For these reasons, as detailed below, Plaintiff respectfully requests that the Court alter or amend the judgment to reinstate and adjudicate Plaintiff's UCL retaliation claim (and other related claims) in light of the Court's apparent oversight and the important legal developments since the dismissal.

**CONCLUSION**

WHEREFORE, Plaintiff Jeffrey Isaacs respectfully requests that the Court:

(1) vacate the Court's February 4, 2025 Order granting Defendant's motion to dismiss (DE 65) and reopen this action and the February 14, 2025 OSC denial;

(2) reinstate the Second Amended Complaint or, in the alternative, grant leave to file an amended complaint; and

(3) grant such further relief as the Court deems just and proper,

(4) hold a hearing, in the alternative, before denying this motion.

Respectfully submitted this 7th day of August, 2025.

*Jeffrey Isaacs* (Plaintiff, pro se)

11482 Key Deer Circle
Wellington, FL 33449
jeffreydi@gmail.com
(212) 257-0737

**CERTIFICATE OF GOOD FAITH CONFERENCE**

Pursuant to Local Rule 7.1(a)(3), Plaintiff emailed counsel for Google regarding the relief requested herein. Google opposes the motion and declined further discussion. Accordingly, the parties were unable to resolve the issues raised herein.

Respectfully submitted on this 7th day of August 2025.

*Jeffrey Isaacs* (Plaintiff, pro se)

11482 Key Deer Circle
Wellington, FL 33449
jeffreydi@gmail.com
(212) 257-0737

**[PROPOSED]　ORDER GRANTING PLAINTIFF'S RULE 59(e) MOTION TO ALTER OR AMEND JUDGMENT**

THIS CAUSE came before the Court on Plaintiff Jeffrey Isaacs' Motion to Alter or Amend Judgment pursuant to Rule 59(e).  Having reviewed the Motion, response, reply (if any), pertinent portions of the record, and being otherwise duly advised, it is hereby

DONE AND ORDERED in Chambers at West Palm Beach, Florida, this ___ day of August, 2025.

_____

The Honorable Robin Rosenberg

United States District Judge

**CERTIFICATE OF SERVICE**

I certify that on August 7, 2025 I mailed the foregoing Motion and all attachments to the Clerk of Court by FedEx Priority Overnight and e-mailed a courtesy PDF to Defendant's counsel of record via their CM/ECF-registered addresses.


*Jeffrey Isaacs* (Plaintiff, pro se)

11482 Key Deer Circle
Wellington, FL 33449
jeffreydi@gmail.com
(212) 257-0737

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

**Case No. 9:24-cv-80395-KMM**

GREENFLIGHT VENTURE
CORPORATION & JEFFREY
D. ISAACS, MD,

    Plaintiffs,

v.

GOOGLE LLC,

    Defendant.

_____

**DEFENDANT GOOGLE'S OPPOSITION TO**
**JEFFREY ISAACS'S MOTION TO AMEND OR ALTER JUDGMENT**

In two separate orders entered in February, Judge Rosenberg dismissed all claims in this case without leave to amend:  those of Plaintiff Greenflight Venture Corporation ("Greenflight") on behalf of itself and a putative class (DE 65) and those of Greenflight's owner, Plaintiff Jeffrey Isaacs (DE 69).  The latter order "dismisses pro se Plaintiff Jeffrey Isaacs's claims for the same reasons the Court previously dismissed the (identical) claims brought by Plaintiff Greenflight."  DE 69.

Those orders came after the filing of three complaints (DE 1, DE 24, DE 61) and six merits briefs by Plaintiffs (DE 46, DE 49, DE 56, DE 63, DE 66, DE 66-1).  Docket Entry 65 recounts in detail the procedural history, *id.* at 1–6, including Mr. Isaacs's "litigious past," *id.* at 6.  Reflecting that history and the many chances Judge Rosenberg had given Plaintiffs to articulate a claim, the dismissal ruling warned that "[t]he Court may exercise its case

1
Ap34

management discretion to summarily deny future motion practice (such as a motion for reconsideration) without explanation." *Id.* at 21. Greenflight moved to reconsider its dismissal in February, DE 66, which Judge Rosenberg denied. DE 67.

Mr. Isaacs has now moved under Fed. R. Civ. P. 59(e) to alter or amend the judgment. DE 71. The text of Mr. Isaacs's motion zigzags between seeking reconsideration of DE 65 and DE 69, as well as advocating on behalf of plaintiff(s) in the singular and the plural. Three things are nonetheless clear: (1) the motion is filed in Mr. Isaacs's name only; (2) as a *pro se* litigant, Mr. Isaacs cannot seek reconsideration of DE 65 on behalf of Greenflight or a putative class, *see* DE 26 at 2; and (3) a motion as to DE 65 pursuant to Fed. R. Civ. P. 58(c)(2)(B) would be untimely in any event as DE 65 was entered on February 4, 2025. Therefore, the only judgment potentially susceptible to alteration or amendment under Rule 59(e) is DE 69.

Rule 59 provides an exacting standard: "The only grounds for granting a Rule 59 motion are newly-discovered evidence or manifest errors of law or fact." *Arthur v. King*, 500 F.3d 1335, 1343 (11th Cir. 2007) (alteration marks omitted) (quoting *In re Kellogg*, 197 F.3d 1116, 1119 (11th Cir. 1999)). These grounds are at times articulated in sub-parts, yielding three grounds that can justify reconsideration: "(1) an intervening change in controlling law; (2) the availability of new evidence; and (3) the need to correct clear error or prevent manifest injustice." *Burger King Corp. v. Ashland Equities, Inc.*, 181 F. Supp. 2d 1366, 1369 (S.D. Fla. 2002).

## ARGUMENT

Mr. Isaacs raises three grounds for Rule 59 relief: (1) a subsequent trial court order in the Northern District of California in a case involving Google and Yelp; (2) Judge Rosenberg's supposed "overlooking" of an argument Mr. Isaacs made in the original briefing; and (3) a

decision sanctioning Greenflight and others in a case not involving Google.  None satisfies the Rule 59 legal standard.  *Arthur*, 500 F.3d at 1343.

**I.      The Recent Decision in *Yelp* Does Not Warrant Altering or Amending the Judgment Against Mr. Isaacs.**

Mr. Isaacs first relies on an out-of-circuit district court order, *Yelp Inc. v. Google LLC*, No. 24-CV-06101-SVK, 2025 WL 1168900 (N.D. Cal. Apr. 22, 2025), to argue that this Court's dismissal of Mr. Isaacs's federal antitrust claims was incorrect.  *See* DE 71 at 2 (asserting the order as "undermin[ing] the rationale of this Court's dismissal"); *id.* at 3–9.  The *Yelp* decision cannot justify altering the judgment for multiple, independent reasons.

As a threshold matter, the *Yelp* decision is not *controlling* authority, as Mr. Isaacs concedes.  DE 71 at 8.  Thus, regardless of what that decision holds, it is not "an intervening change in controlling law" sufficient to justify altering or amending the judgment in this case. *Burger King*, 181 F. Supp. 2d at 1369.  The correctness of this Court's ruling on Mr. Isaacs's claims is therefore unaffected by the issuance of the *Yelp* decision, and Mr. Isaacs's reliance on the decision is an improper attempt to relitigate what this Court has already decided.  *Michael Linet, Inc. v. Village of Wellington, Fla.*, 408 F.3d 757, 763 (11th Cir. 2005) (a party may not "relitigate old matters" to support its Rule 59(e) motion); *PG Creative, Inc. v. Affirm Agency, LLC*, No. 18-CV-24299, 2020 WL 837182, at *1 (S.D. Fla. Feb. 20, 2020) ("[A] [Rule 59(e) motion] is not an appeal, and thus it is improper on a [Rule 59(e) motion] to ask the Court to rethink what the Court has already thought through—rightly or wrongly.").

And, even if out-of-circuit trial court decisions were sufficient to satisfy Rule 59 (and they are not), Mr. Isaacs ignores that the primary focus of the *Yelp* decision is whether Yelp's claims are barred by the statute of limitations.  *See* 2025 WL 1168900, at *5–*12.  The statute of limitations was not an issue in this case.  As to the portions of the *Yelp* decision that address the

legal issues that Mr. Isaacs identifies, the court's reasoning supports Google, not Mr. Isaacs. For example, while Mr. Isaacs argues that "[t]he *Yelp* court treated such self-preferencing as a form of exclusionary conduct – potentially a tying arrangement or a form of refusal to deal or leveraging – that can violate Section 2 of the Sherman Act," DE 71 at 5, the *Yelp* decision in fact dismissed Yelp's tying, leveraging, and refusal to deal claims, 2025 WL 1168900, at *15–*18.

Lastly, even if the *Yelp* decision had been controlling and supportive of the claims of a purported competitor of Google, Mr. Isaacs is not alleged to be a competitor of Google. It is Greenflight—an entity whose claims have been dismissed and that is not a party to this motion for reconsideration—that is alleged to compete with Google, not Mr. Isaacs. DE 61 at ¶¶ 4–5.

## II. The Court Did Not Overlook Mr. Isaacs's Ill-Pleaded "Unlawful Retaliation" Claim.

Mr. Isaacs next argues that the Court supposedly overlooked his allegations that Google violated 18 U.S.C. § 1512 by unlawfully retaliating against Mr. Isaacs for his participation in unrelated litigation with Apple. DE 71 at 9–11. That the Court was aware of Mr. Isaacs's retaliation allegations is obvious from its Order: "Mr. Isaacs attributes this precipitous drop in views to Google learning about . . . *his litigation with Apple*. Once Google obtained that knowledge, Mr. Isaacs alleges, Google felt threatened and used its monopolistic power to *retaliate against Mr. Isaacs* . . . ." DE 65 at 5 (emphasis added, citations omitted).

The Court explicitly dispensed with the allegations of unlawful conduct other than purported federal antitrust violations, which included the ill-pleaded 18 U.S.C. § 1512 allegations. *See* DE 65 at 15.[1] The Court explained its reasoning, specifically that the operative complaint did not identify the particular statutory provision violated or describe with reasonable particularity the facts supporting that a statute was violated. *Id.* (quoting *Sonoma Foods, Inc. v.*

---

[1] Mr. Isaacs incorrectly asserts that the Court rejected his § 1512 allegations only in a footnote. *See* DE 71 at 10. His motion fails to address the cited portion of the Court's Order.

*Sonoma Cheese Factory, LLC*, 634 F. Supp. 2d 1009, 1022 (N.D. Cal. 2007)).  The Court also adopted and incorporated by reference the additional reasons set forth in Google's motion and reply as further explanation for its dismissal of Mr. Isaacs's claims.  *Id.*; *see also* DE 62 at 13 (explaining that the operative complaint "fail[ed] to plausibly plead which of [§ 1512's] multiple witness tampering offenses in that section (each with distinct elements and *mens rea* requirements) Google allegedly violated"); DE 64 at 6 (explaining that the allegation rests entirely on speculation).

**III.    The Remainder of Mr. Isaacs's Motion Does Not Justify Altering or Amending Judgment.**

The remainder of the motion (pp. 11–14) does not even identify a purported basis for reconsideration.  The discussion, instead, is about another court's imposition of sanctions after finding Mr. Isaacs (through various corporate entities, including Greenflight) filed a "patently frivolous" complaint that forced defendants to incur needless expenditures.  *See Coronavirus Rep. Corp. v. Apple Inc.*, No. 24-CV-08660-EMC, 2025 WL 2162947, at *4–*6 (N.D. Cal. July 30, 2025).  It is unclear why Mr. Isaacs views that as relevant to the relief he seeks here; it is certainly not a reason to grant the present motion.

## CONCLUSION

Google respectfully requests that the Court deny Mr. Isaacs's motion to alter or amend judgment.

Date:  August 25, 2025

WILLIAMS & CONNOLLY LLP
Kenneth C. Smurzynski (*pro hac vice*)
Aaron P. Maurer (*pro hac vice*)
680 Maine Avenue, SW
Washington, DC 20024
+1 (202) 434-5000
ksmurzynski@wc.com
amaurer@wc.com

Matthew S. Warren (*pro hac vice*)
Erika H. Warren (*pro hac vice*)
Madeline A. Woodall (*pro hac vice*)
WARREN KASH WARREN LLP
2261 Market Street, No. 606
San Francisco, California, 94114
+1 (415) 895-2940
+1 (415) 895-2964 facsimile
24-80395@cases.warrenlex.com

Respectfully submitted,

/s/ *Sujey Herrera*
Edward M. Mullins (Florida Bar No. 863920)
Ana M. Barton (Florida Bar No. 85721)
Sujey S. Herrera (Florida Bar No. 92445)
REED SMITH LLP
200 South Biscayne Boulevard, Suite 2600
Miami, Florida, 33131
+1 (786) 747-0200
+1 (786) 747-0299 facsimile
emullins@reedsmith.com
abarton@reedsmith.com
sherrera@reedsmith.com

*Attorneys for Defendant Google LLC*

## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that on August 25, 2025, a true and correct copy of the

foregoing was electronically filed with the Clerk of the Court by using the CM/ECF system,

which will send a notice of electronic filing to all counsel of record. Also, by email to

Jeffreydi@gmail.com.

*Edward M Mullins*

Edward M Mullins

Ayelet Faerman, Esq.
Faerman Law P.A.
3859 NW 124 Ave
Coral Springs, FL 33065
954-271-8484
ayelet@faerman.law
Attorney for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| GREENFLIGHT VENTURE CORPORATION<br>*on behalf of themselves*<br>*and all others similarly situated*<br><br>       Plaintiff,<br><br>vs.<br><br>GOOGLE LLC<br><br>       Defendant. | Case No. **24-cv-80395-KMM**<br><br><br>**PLAINTIFF'S MOTION TO CONFORM<br>RULE 59 RELIEF FROM JUDGMENT** |

App. 320

**<u>PLAINTIFF GREENFLIGHT VENTURE CORPORATION'S</u>**

**<u>MOTION TO JOIN AND SUPPORT CONFORMED RULE 59 JUDGMENT</u>**

Plaintiff Greenflight Venture Corporation ("Greenflight"), by counsel, respectfully moves this Honorable Court to join Plaintiff Isaacs' timely Rule 59(e) motion and respectfully urges the Court to VACATE the dismissal in light of the persuasive, post-DOJ ruling in *Yelp Inc. v. Google LLC*, No. 5:24-cv-06101-SVK (N.D. Cal. Apr. 22, 2025). Nothing in Rule 59(e) or related case law prevents the Court, while acting on a timely post-judgment motion already before it, from altering or amending the judgment in a way that conforms relief to all parties whose rights are governed by the same dismissal. Nor is there any barrier to a co-plaintiff joining a timely Rule 59(e) to request that conformity. The alternative Google proposes (splintering the controversy into a corporate-only Rule 60 track) serves no purpose but to thwart any potential de novo appellate review and force piecemeal litigation.

## I. *Yelp v. Google*: What was dismissed, what survived, and why it matters here

Google has portrayed *Yelp* as a broad defense victory. It was not. Quite to the contrary, and as Plaintiffs surmised earlier in the proceeding, *Yelp* represents an anticipated new jurisprudence approach to Search transparency following the broad DOJ antitrust victory against the monopolist. Judge Van Keulen dismissed certain peripheral theories at the pleading stage (e.g., tying for limitations/coercion pleading issues; leveraging/refusal-to-deal on specific elements), but Google conveniently omitted that those dismissals were *with leave to amend* and largely concerned statute of limitations issues not applicable to this class action case. More importantly, Judge Van Keulen sustained the core of *Yelp's* case: claims that Google's self-preferencing on the SERP and its suppression of a rival directory's content plausibly state monopolization and a UCL violation "tethered" to antitrust policy. The *Yelp* claims (which even Google doesn't dispute share considerable overlap with both Greenflight and the putative class claims in our FAC) are now slated to proceed beyond Rule 12 to discovery. That is a groundbreaking post-DOJ decision: it confirms that search engine design self-preferencing is not categorically lawful; it is a fact-intensive competition question that belongs on a developed record, not foreclosed at the pleadings.

App. 321

Two points make *Yelp* especially instructive here. First, it protects competition over publisher discretion, which directly conflicts with Judge Rosenberg's view of publisher immunity. The court framed the issue the way antitrust law does: whether SERP self-preferencing forecloses competing directories and maintains monopoly power. The second point is UCL tethering. The same SERP-suppression allegations that plausibly describe an antitrust injury also support a UCL claim tied to competition policy. The court did not bless the conduct; it said the law requires discovery before the merits can be fairly decided.

Those holdings map precisely onto Plaintiff Isaacs' Rule 59(e) showing and the allegations in this action. This Court dismissed at Rule 12; *Yelp* teaches why such directory-suppression pleadings should not be dismissed with prejudice and why vacatur is warranted so the case can proceed on the merits.

## II.  Isaacs correctly tethered Yelp to his UCL retaliation claim; Greenflight concurs

Isaacs does not ask this Court to treat *Yelp* as controlling; he invokes it as "about as persuasive as it gets" authority showing that the SERP-suppression story alleged here is plausible and belongs in discovery. Google's conveniently ignored that fact, which is hard to dispute. That matters in two reinforcing ways. First is UCL "unfair" tethering. *Yelp* confirms that SERP self-preferencing/suppression is the kind of competition distorting conduct the UCL can reach when tethered to antitrust policy, exactly what Isaacs pleads. Second is the UCL "unlawful" predicate. Isaacs also alleged retaliatory suppression as an "unlawful" predicate (18 U.S.C. § 1512). Any pleading particularity the Court desires is readily curable; Rule 12 is not the end of that claim when *Yelp* says the broader SERP-suppression theory *should be tested on facts*.

Greenflight concurs that *Yelp* demonstrates why vacatur is the correct outcome on a Rule 59(e) reconsideration focused on plausibility and discovery, and it has filed concurrently a Notice of Supplemental Authority attaching *Yelp*.

## III.  Rule 59(e) permits conforming relief to all parties; joinder is proper

Google suggests that because Greenflight did not file its own Rule 59(e), the Court must herd corporate relief into Rule 60. That is not the law. Rule 59(e) is a vehicle; its timeliness is satisfied here by Isaacs' motion. Once the Court properly reopens the judgment for reconsideration

on that timely vehicle, it has full authority to alter or amend the judgment in a way that conforms relief to all parties bound by the same dismissal - especially where the operative legal issue (plausibility of SERP-suppression claims in light of *Yelp*) is identical as to both plaintiffs. This is within the inherent authority of the Court to manage its docket in a judicially efficient manner. Courts routinely resolve a single timely Rule 59(e) in a manner that adjusts the judgment's operative effect for the case, not just for the nominal movant. Nothing in Rule 59 forbids a co-plaintiff from joining a timely 59(e) to request that conformity while the Court exercises that authority.

By contrast, pushing Greenflight into a separate Rule 60 lane does not serve the interests of justice or judicial economy. It splinters the dispute, delays merits review, and risks distorting the appellate posture—all to the strategic advantage of the party resisting review. The Court should decline that invitation.

## IV. Relief

Because *Yelp* is a post-DOJ, reasoned decision that sustains the core directory (i.e. vertical search portals and/or directories as defined in the respective complaints) suppression theories and sends them to discovery, and because Isaacs has properly tethered that authority to his UCL retaliation claims[1], the Court should:

1. **VACATE** the dismissal and **reinstate** the UCL claim (and any other claim the Court deems fit in light of *Yelp* and the curable "unlawful" predicate particulars); and
2. **Conform** the Rule 59(e) alteration **to Greenflight** by **VACATING** the corporate dismissal as well, and the DOJ-derived Sherman monopolization claim which is so intricately tethered to the UCL claim, so the case proceeds efficiently on the merits for **both** plaintiffs without needless Rule 60 detours.

---

[1] Greenflight alleges similar retaliation to that described by Isaacs. Its product, OkCaller.com, dropped 97% from 300 million users, prompting the filing of this lawsuit. After Judge Rosenberg's dismissal, Google chopped off the last three percent, seemingly armed with immunity under the Rule 12 dismissal. Greenflight (and Dr. Isaacs) deserve their day in Court, or at the very least, focused discovery, before serious retaliation claims are never adjudicated. Plaintiffs are certainly not the first to allege Big Tech retaliated against them for their antitrust advocacy. Factual (and legal) errors exist in the Rule 12 dismissal, and while those are beyond the subject of this motion, the *Yelp* alone should allow this case to proceed to discovery and for the factual record to better develop itself. In short, the de novo appeal process should be averted because of *Yelp* and the parties should resume their agreed-upon joint scheduling report.

**CONCLUSION**

Vacatur of the dismissal as to all Plaintiffs is the straightforward, efficient course: it respects Rule 59(e)'s timeliness (invoked by a pro se Plaintiff without direct Sherman act standing), applies the persuasive force of *Yelp* to the identical plausibility question presented here, avoids piecemeal motion practice, and preserves the parties' rights to de novo appellate review on a developed record—rather than a Rule 60 sideshow that Google invites.

**CERTIFICATE OF GOOD FAITH CONFERENCE**

Pursuant to Local Rule 7.1(a)(3), counsel for Greenflight emailed counsel for Google regarding the relief requested herein. Google opposes affording Plaintiffs the same due process underway in *Yelp*.

Respectfully submitted on this 29th day of August 2025.

/s/ Ayelet Faerman
Ayelet Faerman, Esq.
Faerman Law P.A.
3859 NW 124 Ave
Coral Springs, FL 33065
954-271-8484
ayelet@faerman.law

**[PROPOSED] ORDER GRANTING PLAINTIFF GREENFLIGHT VENTURE CORPORATION'S MOTION TO JOIN AND CONFORM RULE 59 RELIEF AND GRANTING PLAINTIFF ISAACS'S RULE 59(e) MOTION IN PART**

THIS CAUSE came before the Court upon Plaintiff Jeffrey Isaacs's Rule 59(e) motion and Plaintiff Greenflight Venture Corporation's Motion to Join and Conform Rule 59 Relief. Having reviewed the motions, the responses and replies (if any), the record, and otherwise being fully advised, the Court finds that the Rule 59(e) motion is timely under Fed. R. Civ. P. 58(c)(2)(B) and Fed. R. App. P. 4(a)(7)(A)(ii), and that *Yelp Inc. v. Google LLC* (N.D. Cal. Apr. 22, 2025) is persuasive post-DOJ authority confirming the plausibility of SERP self-preferencing/suppression allegations and the need for discovery before merits resolution.

Accordingly, it is ORDERED AND ADJUDGED:

Plaintiff Greenflight Venture Corporation's Motion to Join and Conform Rule 59 Relief is GRANTED.

Plaintiff Jeffrey Isaacs's Rule 59(e) motion is GRANTED IN PART as follows:

a. The prior Rule 12 dismissal is VACATED to the extent it dismissed (i) Isaacs' UCL claim and (ii) Greenflight's competition claims (including Sherman Act monopolization and tethered UCL theories).

App. 325

b. Isaacs's UCL claim is REINSTATED. To the extent the Court requires curable particulars of the "unlawful" predicate, Plaintiff may file a conforming amendment within 21 days solely to identify the specific § 1512 subdivision and brief particulars.

c. Greenflight's competition claims (including Sherman Act monopolization and tethered UCL theories) are REINSTATED so that the parties may proceed to discovery consistent with the analysis in *Yelp Inc. v. Google LLC*.

The parties shall update their joint scheduling report within 21 days after any conforming amendment by Isaacs, or, if no amendment is filed, within 21 days of this Order.

To the extent any relief is not expressly granted herein, it is DENIED WITHOUT PREJUDICE to renewal at an appropriate procedural juncture.


DONE AND ORDERED in Chambers at Miami, Florida, this ___ day of _____, 2025.


**K. MICHAEL MOORE**

UNITED STATES DISTRICT JUDGE

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing Motion has been served on this 29th day of August, 2025, to all parties of record, including GOOGLE LLC counsel of record, via electronic mail as per the Federal Rules of Civil Procedure and Local Court Rules.

/s/ Ayelet Faerman
Ayelet Faerman, Esq.
Faerman Law P.A.
3859 NW 124 Ave
Coral Springs, FL 33065
954-271-8484
ayelet@faerman.law

Ayelet Faerman, Esq.
Faerman Law P.A.
3859 NW 124 Ave
Coral Springs, FL 33065
954-271-8484
ayelet@faerman.law
Attorney for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| GREENFLIGHT VENTURE CORPORATION<br>*on behalf of themselves*<br>*and all others similarly situated*<br><br>　　　　　Plaintiff,<br><br>vs.<br><br>GOOGLE LLC<br><br>　　　　　Defendant. | Case No. **24-cv-80395-KMM**<br><br><br>**NOTICE OF SUPPLEMENTAL**<br>**AUTHORITY** |

App. 328

**PLAINTIFF GREENFLIGHT VENTURE CORPORATION'S**

**NOTICE OF SUPPLEMENTAL AUTHORITY**

Greenflight Venture Corporation ("Greenflight"), by counsel, respectfully submits this Notice of Supplemental Authority to alert the Court to the Northern District of California's order in *Yelp Inc. v. Google LLC*, No. 5:24-cv-06101-SVK (Apr. 22, 2025) (attached as Exhibit A). While Google has attempted to minimize the relevance of *Yelp* to claims like those at issue here, the decision is significant and persuasive post-DOJ authority that, in substance, permits core directory suppression claims to proceed beyond Rule 12 and recognizes that such allegations are properly tested on a factual record.

Judge Van Keulen **granted in part and denied in part (with leave to amend)** Google's motion to dismiss. Crucially, the court sustained the heart of *Yelp's* case: that Google's self-preferencing on the search-results page (SERP) and related suppression of a rival directory's content can plausibly constitute monopolization in a defined search sub-market and can support a UCL claim tethered to antitrust policy, and therefore should proceed beyond Rule 12 to discovery. The court's analysis also expressly situates the case against the backdrop of *United States v. Google*, taking judicial notice of the DOJ litigation and the market-power findings relevant to general search services (GSE). In short, *Yelp* is one of the first post-DOJ decisions to "open up" SERP design self-preferencing to factual testing, rather than foreclosing such claims at the pleadings.

At the same time, the court granted leave to amend certain peripheral theories (including tying and monopoly leveraging) because of, in the tying count, statute-of-limitations and coercion pleading issues not present in this case. The court did not treat these as merits absolutions of Google's SERP conduct; to the contrary, the core plausibility of SERP suppression as a competition and UCL problem was preserved. Therefore, Google's depiction of Yelp seems at odds with reality (at best).

This case presents the same factual genus that *Yelp* allowed to proceed: Plaintiffs allege that a dominant general GSE search provider designed and positioned its own surfaces to divert user traffic from a specialized directory competitor, suppressing the rival's visibility and thereby

distorting competition. *Yelp* holds that such allegations are plausible and not appropriately resolved at Rule 12, especially where, as here, they are coupled with a UCL claim that is properly "tethered" to antitrust policy. That is precisely the posture of Plaintiff Isaacs's Rule 59(e) request: the Court should reinstate the UCL claim (at minimum) so the parties can build a record and the Court can test the facts instead of resolving them on the pleadings.

To the extent Google cites *Yelp*'s dismissal of the tying count and Aspen refusal to deal as argument against amending the dismissal, *Yelp*'s own analysis shows otherwise. Both the tying and Aspen claims were permitted leave to amend technical pleading issues. Those pleading issues are not determinative of Isaacs's reconsideration request, which turns on the UCL and the plausibility of SERP-based directory suppression (exactly what *Yelp* allowed to proceed), and they do not control any corporate amendment Greenflight seeks leave to file through counsel. Our FAC has a monopolization claim that is nearly verbatim to the DOJ cause of action, with nearly identical facts and elements to Yelp's monopolization claim. The DOJ case won, Yelp is proceeding, fairness dictates that Greenflight be given its day in Court.

**Exhibit A:** *Yelp Inc. v. Google LLC*, No. 5:24-cv-06101-SVK (N.D. Cal. Apr. 22, 2025) (Order on Motion to Dismiss)

Respectfully submitted on this 29th day of August 2025.

/s/ Ayelet Faerman
Ayelet Faerman, Esq.
Faerman Law P.A.
3859 NW 124 Ave
Coral Springs, FL 33065
954-271-8484
ayelet@faerman.law

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing Notice of Supplemental Authority has been served on this 29th day of August, 2025, to all parties of record, including GOOGLE LLC counsel of record, via electronic mail as per the Federal Rules of Civil Procedure and Local Court Rules.

/s/ Ayelet Faerman
Ayelet Faerman, Esq.
Faerman Law P.A.
3859 NW 124 Ave
Coral Springs, FL 33065
954-271-8484
ayelet@faerman.law

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No. 9:24-cv-80395-KMM

DR. JEFF ISAACS, *et al*,

      Plaintiffs,

v.

GOOGLE LLC,

      Defendant.

_____/

## <u>ORDER</u>

THIS CAUSE came before the Court upon Plaintiff Jeffrey Isaacs' ("Isaacs") *pro se* Motion to Alter or Amend ("Alter Motion" or "Alter Mot.") (ECF No. 71) and Plaintiff Greenflight Venture Corporation's ("Greenflight") Motion to Join and Support Conformed Rule 59 Judgment. ("Conform Motion" or "Conform Mot.") (ECF No. 74). Defendant Google LLC ("Defendant") filed its Opposition to Jeffrey Isaacs' Motion to Amend or Alter Judgment ("Resp.") (ECF No. 73), and its Opposition to Greenflight's Motion to Conform. (ECF No. 76). Isaacs did not file a reply, but Greenflight filed a Reply in Support of Conformed Rule 59 Judgment. (ECF No. 77). The Motions are now ripe for review. As set forth below, the Court DENIES both Motions.

## I.    BACKGROUND

Judge Robin L. Rosenberg[1] laid out a thorough overview of this case's factual background in her Order Granting Defendant's Motion to Dismiss and Order to Show Cause. ("Rosenberg Order I") (ECF No. 65) at 1–6. The Court nevertheless provides a brief background of facts most relevant to the disposition of the instant Motions.

---

[1] The above-styled case was reassigned to this Court on August 18, 2025. (ECF No. 72).

Isaacs sued Defendant for infringing upon his patent on April 1, 2024. (ECF No. 1). Isaacs abandoned his patent claim, however, and filed antitrust claims against Defendant together with Greenflight. (ECF No. 24). After Plaintiffs' First Amended Complaint was dismissed in part, (ECF No. 53), Plaintiffs filed their Second Amended Complaint on December 17, 2024. ("SAC") (ECF No. 61). Therein, they brought five claims for relief, including four for antitrust violations under the federal Sherman Act and one under California's Unfair Competition Law ("UCL"). *Id.* ¶¶ 103–48.

On February 4, 2025, Judge Rosenberg dismissed all of Greenflight's claims without leave to amend, noting that "[t]he Court may exercise its case management discretion to summarily deny future motion practice (such as a motion for reconsideration) without explanation." *See generally* Rosenberg Order I. She also ordered Isaacs to show cause "why his *pro se* claim(s) should not be dismissed for the same reasons" that Greenflight's were. *Id.* at 19–20. On February 14, 2025, Judge Rosenberg dismissed Isaacs' claims in a Paperless Order "for the same reasons the Court previously dismissed the (identical) claims brought by Plaintiff Greenflight." ("Rosenberg Order II") (ECF No. 69).

On August 11, 2025, Isaacs filed the Alter Motion pursuant to Federal Rule of Civil Procedure 59(e), regarding Rosenberg Order II. *See generally* Alter Mot. Greenflight then filed its Motion on August 31, 2025, seeking to join Isaacs' Motion and asking the Court, in ruling on Isaacs' Motion, to also alter the dismissal as to Greenflight, in order to "conform[] relief to all parties whose rights are governed by the same dismissal." *See generally* Conform Mot.

## II.   LEGAL STANDARD

"The only grounds for granting [a Rule 59] motion are newly-discovered evidence or manifest errors of law or fact." *In re Kellogg,* 197 F.3d 1116, 1119 (11th Cir. 1999). "[A] Rule

App. 333

59(e) motion [cannot be used] to relitigate old matters, raise argument or present evidence that could have been raised prior to the entry of judgment." *Michael Linet, Inc. v. Village of Wellington, Fla.,* 408 F.3d 757, 763 (11th Cir. 2005); *Jacobs v. Tempur-Pedic Intern., Inc.*, 626 F.3d 1327, 1344 (11th Cir. 2010) ("Reconsidering the merits of a judgment, absent a manifest error of law or fact, is not the purpose of Rule 59.").

## III.   DISCUSSION

Isaacs argues that the Court should reconsider the prior Orders because the United States District Court for the Northern District of California denied Google's motion to dismiss in *Yelp Inc. v. Google LLC*, ("*Yelp v. Google*"), No. 24-cv-06101, ECF No. 47 (N.D. Cal. Apr. 22, 2025). Alter Mot. at 3–9.  Further, he argues that in Rosenberg Order I, the Court overlooked Plaintiffs' arguments of unlawful retaliation as it relates to Plaintiff's claim under the UCL.[2] *Id.* at 9–11.

Greenflight's arguments largely mirror Isaacs' arguments, but Greenflight also argues that it should be allowed to join Isaacs' Rule 59(e) motion because there is no "barrier to a co-plaintiff joining a timely Rule 59(e)" request.  Conform Mot. at 2.  Further, Greenflight argues that "[n]othing in Rule 59(e) or related case law prevents the Court, while acting on a timely post-judgment motion already before it, from altering or amending the judgment in a way that conforms relief to all parties whose rights are governed by the same dismissal." *Id.*

Defendant opposes the Alter Motion, arguing that *Yelp v. Google* is neither controlling authority nor focused on the same issues that are prevalent in this case.  Resp. at 3–4.  Next, Defendant argues that it was obvious from Rosenberg Order I that the Court was aware of Isaacs'

---

[2] Isaacs also makes arguments related to another Northern District of California case and its determinations relating to Isaacs litigating the same interests as Greenflight. *See* Alter Mot. at 11–13.  As best as the Court can tell, these arguments seem to be aimed at litigating issues in that Northern District of California case, and the Court therefore deems it inappropriate to weigh in.

3

retaliation allegations. *Id.* at 4–5. Finally, Defendant also opposes the Conform Motion, and states it is "procedurally defective" and untimely, "because it was filed more than 28 days after the judgment against Greenflight became final." (ECF No. 76) at 1.

### A. Greenflight's Conform Motion

The Court first addresses the timeliness of the Conform Motion. "A motion under Rule 59(e) must be filed within 28 days of the judgment" it is challenging. *Marques v. JP Morgan Chase, N.A.*, 805 F. App'x 668, 670 (11th Cir. 2020). Most judgments must be set out in a separate document that accompanies the order disposing of the motion. Fed. R. Civ. P. 58(a). When a separate document is required, the judgment is deemed entered "on the date when the judgment or order is set forth on a separate document. . . or on the date when 150 days have run from entry of the order." *Jones v. Comm'r, Ala. Dep't of Corrs.*, 631 F. App'x 827, 829–30 (11th Cir. 2015); *see also* Fed. R. Civ. P. 58(c)(2).

Here, the Rosenberg Order I, dismissing Greenflight's claims, was entered on February 4, 2025. Judgment is deemed entered 150 days after that date, on July 7, 2025, as the Court did not set out judgment in a separate document. *See* Fed. R. Civ. P. 6(a)(1)(C); 58(a); 58(c)(2)(B). Therefore, Greenflight's deadline to submit a motion pursuant to Rule 59(e) was 28 days after that date, on August 4, 2025. *See* Fed. R. Civ. P. 59(e). The Conform Motion was filed on August 31, 2025, however, making it clearly untimely. Greenflight argues that "Rule 59(e) is a vehicle; its timeliness is satisfied here by Isaacs' motion. Once the Court properly reopens the judgment for reconsideration on that timely vehicle, it has full authority to alter or amend the judgment in a way that conforms relief to all parties bound by the same dismissal." Conform Mot. at 3. Notably, Greenflight provides no legal authority to support this contention, instead indicating "[t]his is within the inherent authority of the Court to manage its docket in a judicially efficient manner."

App. 335

*Id.* at 4.  The Court, however, may not properly consider Greenflight's Motion under Rule 59(e).  *See Hertz Corp. v. Alamo Rent-A-Car, Inc.*, 16 F.3d 1126, 1129 (11th Cir. 1994).  In *Hertz*, the Eleventh Circuit explained that "[t]imeliness constitutes a jurisdictional dimension central to" the motion for reconsideration.  *Id.*  The Eleventh Circuit held that the timely Rule 59(e) filing by one co-defendant did not "vest the district court with authority to entertain [the other defendant's] untimely motion."  *Id.*  Accordingly, the Court finds that it has no authority to hear Greenflight's Rule 59(e) motion.

**B.  Isaacs' Alter Motion**

Isaacs argues that the judgment dismissing the case should be altered pursuant to Rule 59(e), and the Court should at least allow Plaintiffs' claim to go to discovery, because "the circumstances here meet the strict standard for Rule 59(e) relief."  *See* Alter Mot. at 1; Fed. R. Civ. P. 59(e).  As mentioned, "[t]he only grounds for granting [a Rule 59] motion are newly-discovered evidence or manifest errors of law or fact."  *In re Kellogg,* 197 F.3d at 1119.  "In particular, there are three major grounds which justify reconsideration: (1) an intervening change in controlling law; (2) the availability of new evidence; and (3) the need to correct clear error or prevent manifest injustice."  *Burger King Corp. v. Ashland Equities, Inc.*, 181 F. Supp. 2d 1366, 1369 (S.D. Fla. 2002) (citations omitted); *Ponamgi v. Safeguard Servs. LLC*, No. 11-cv-62119, 2013 WL 12080163, at *1 (S.D. Fla. May 30, 2013).

Isaacs argues that the Northern District of California's decision in *Yelp v. Google* demonstrates that Plaintiffs' claims were viable and justifies the granting of a Rule 59(e) motion.  Alter Mot. at 3–9.  This decision, however, is not an intervening change in controlling law, as the Southern District of Florida is not bound by changes in the law of the Northern District of California.  *See Bravo v. Eden Isles Condo. Ass'n*, No. 09-cv-22532, 2011 WL 13174648, at *1

(S.D. Fla. July 11, 2011) (explaining that decisions from outside of the Eleventh Circuit constitute "persuasive authority," not "controlling law that would support reconsideration"). Isaacs even concedes as much. Alter Mot. at 8 ("To be clear, [Isaacs] acknowledges that *Yelp v. Google* is not controlling precedent in the Eleventh Circuit."). Accordingly, the Northern District of California's decision in *Yelp v. Google* does not support reconsideration as it is not an intervening change in controlling law. It is also not new evidence, and the decision also does not demonstrate that dismissal of Plaintiffs' claims was clear error or will result in "manifest injustice." *Burger King Corp.*, 181 F. Supp. 2d at 1369.

Isaacs also argues that the Court's adjudication of Plaintiffs' UCL claim was incomplete and did not adequately address that Plaintiffs alleged Google's conduct was unlawfully retaliatory. Alter Mot. at 9–11. He argues that "[t]his omission is a clear error warranting relief under Rule 59(e)." *Id.* at 10. Isaacs argues that the Rosenberg Order I's discussion of Plaintiffs' UCL claim "focused almost entirely" on the prongs of UCL analysis concerning allegations of fraudulent conduct. *Id.* As Defendant notes, this is incorrect. *See* Resp. at 4 (explaining that it was "obvious" from Rosenberg Order I that the Court was aware of Isaacs' retaliation allegations). Therefore, Isaacs' argument that discussion of unlawful retaliation was omitted, demonstrating clear error, is incorrect.

The Court based its dismissal of the UCL count on Plaintiffs' reliance on "vague references" to other violations of law. Rosenberg Order I at 15. Isaacs argues that Plaintiffs' SAC invokes retaliation to "tether [Defendant's] conduct to a particular federal statute embodying a well-recognized public policy against retaliating for participation in legal proceedings." Alter Mot. at 10. This argument, however, is in effect asking the Court to "relitigate old matters" and raises arguments "that could have been raised prior to the entry of judgment." *Michael Linet, Inc,*

6

408 F.3d at 763. That does not justify granting a Rule 59(e) Motion. *See id.* Accordingly, the Court finds that Isaacs has not justified reconsideration.

## IV.   CONCLUSION

Accordingly, UPON CONSIDERATION of the Motions, the pertinent portions of the record, and being otherwise fully advised in the premises, it is hereby ORDERED AND ADJUDGED that Plaintiff Jeffrey Isaacs' *pro se* Motion to Alter or Amend (ECF No. 71) and Plaintiff Greenflight Venture Corporation's Motion to Join and Support Conformed Rule 59 Judgment (ECF No. 74) are both DENIED.

DONE AND ORDERED in Chambers at Miami, Florida, this 22nd day of December 2025.

K. MICHAEL MOORE
UNITED STATES DISTRICT JUDGE

c:      **All counsel of record**

# CERTIFICATE OF SERVICE

I hereby certify that on May 7, 2026, I electronically filed the foregoing JOINT APPENDIX with the Clerk of the United States Court of Appeals for the Eleventh Circuit by using the appellate CM/ECF system. All counsel of record are registered CM/ECF users and will be served by the appellate CM/ECF system.

Respectfully submitted,

/s/ Keith Mathews

Keith Mathews

American Wealth Protection

1000 Elm Street #800

Manchester, NH 03101

(603) 622-8100

*Counsel for Plaintiffs-Appellants*