Keith Mathews
*Pro Hac Vice*
American Wealth Protection
1000 Elm Street, Suite 800
Manchester, NH 03105
keith@awplegal.com
(603) 923-9855

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CORONAVIRUS REPORTER CORPORATION, CALID INC., GREENFLIGHT VENTURE CORPORATION<br><br>*on behalf of themselves and all others similarly situated*<br><br>Plaintiffs,<br><br>*vs.*<br><br>APPLE INC.<br>Defendant. | Case No. 3:24-cv-8660-EMC<br><br><br>**PLAINTIFFS' SHOW CAUSE MEMORANDUM**<br><br><br>The Honorable Edward M. Chen |

**MEMORANDUM OF POINTS AND AUTHORITIES IN RESPONSE TO
ORDER TO SHOW CAUSE**

### Introduction

Plaintiffs submit this memorandum in response to the Court's July 10, 2025 Order to Show Cause, explaining why their recent motions – including a motion for sanctions, a motion for anti-SLAPP relief, a motion to stay, and related administrative requests – were filed in good faith and not for any frivolous, harassing, or improper purpose under Federal Rule of Civil Procedure 11(b). Plaintiffs, a group of small app developers and scientists, earnestly pursued these filings as a sincere and reasoned response to Defendant Apple Inc.'s aggressive litigation tactics and underlying conduct that seeks to subvert Sherman Act enforcement. The motions aimed to vindicate legitimate grievances about Apple's behavior: its documented retaliation against developers including Plaintiffs during this litigation, anti-competitive enforcement of App Store policies, and even defiance of court orders (as evidenced in the *Epic* litigation). Plaintiffs acknowledge that the posture of this case has become, for lack of a better word, intense. This intensity, however, reflects the severity of harm they have experienced – including censorship of their software and baseless sanctions threats to destroy their livelihoods – rather than any improper animus toward Apple or its counsel. Treating such advocacy as sanctionable "frivolity" would chill the exercise of constitutional rights to petition and to speak out against perceived injustice. Plaintiffs respectfully urge the Court to consider the substance and context of their filings – as the work product of under-resourced individuals pushing back against one of the world's most powerful corporations – and to find that Rule 11(b) has not been violated. To impose severe sanctions (potentially exceeding $500,000) in these circumstances would raise profound fairness issues, exacerbate the power asymmetry at play, and risk undermining confidence in the neutrality of the forum.

Plaintiffs, related individuals, and/or Undersigned have been attempting for years to challenge Apple's alleged monopolization of the iOS app distribution market through exclusionary App Store practices. The initial CR I case and its progeny wound through several amended complaints (only out of necessity) and appeals, ultimately resulting in a dismissal on grounds that it had not stated an antitrust claim. Undersigned maintains that this outcome was driven by aggressive procedural tactics that repeatedly prevented a full merits hearing. Indeed, between 2020 and 2024, every time Undersigned challenged the monopoly, sometimes reformulating theories, Apple would argue some non-merits-based fatal defect or preclusion.

It is against this history of hard-fought, asymmetrical litigation that Plaintiffs' recent post-dismissal motions must be understood. After the Court's dismissal order (Dkt. 82), Plaintiffs swiftly filed several motions to protect Plaintiffs' continued efforts to petition and speak out against Apple from what they perceive as retaliatory legal tactics. A Motion to Stay the proceedings and for a status conference (Dkt. 85), in light of overwhelming new matters (loss of counsel, new SCOTUS law on injunctions, etc) was (and still is) desperately necessary to allow Undersigned to fully and diligently research remaining matters and, ideally, locate new conflict-free counsel. If anything, the flurry of filings proves that Undersigned is overwhelmed with the loss of an AUSA that (could have) provided substantial help on the remaining docket items (ie sanctions and reconsideration. Plaintiffs filed these motions not to vex or burden the Court, but to preserve their rights and spotlight Apple's behavior. Notably, Apple had signaled it will still seek a "global anti-suit injunction" which we interpret as flying in the face of new SCOTUS law. Faced with these threats, Plaintiffs reasonably felt it necessary to request sanctions against Apple for what they describe as five years of bad-faith litigation tactics, and invoking anti-SLAPP protections as a shield against what they view as Apple's attempt to punish and silence them as antitrust petitioners. (*See incorporated Declaration of Keith Mathews*).

Importantly, the evidence of Apple's conduct extends beyond this case alone. Plaintiffs' grievances align with broader concerns about Apple's treatment of developers and compliance with the law. Judge Yvonne Gonzalez Rogers sharply rebuked Apple's CEO Tim Cook and other executives and even referred Apple and one of its executives to the U.S. Department of Justice for possible criminal contempt. This Epic contempt ruling exemplifies the kind of brazen behavior by Apple that Plaintiffs have endured and decried. Likewise, Apple's pattern of retaliating against developers who challenge its rules is well documented. In the Epic case, the court explicitly prohibited Apple from 'Retaliating against developers who use external payment systems' as part of its injunction, implying that such retaliation was a real concern. In short, Plaintiffs' characterizations of Apple's conduct – whether describing developer "oppression," censorship, or abuse of monopoly power – are not fantasy or personal vendetta; they are grounded in well-publicized reality. Indeed, the U.S. Department of Justice, along with 16 states, has sued Apple for exactly such anti-competitive practices, alleging that Apple's "broad-based, exclusionary conduct" in the smartphone industry has "impose[d] extraordinary costs on developers" and "throttle[d] competitive alternatives," all to the detriment of innovation and consumers. As Assistant Attorney General Jonathan Kanter put it, Apple spent years

playing 'Whac-A-Mole' game of rules and restrictions; Deputy Attorney General Lisa Monaco remarked in that same case, no matter how powerful, no matter how prominent, no matter how popular — no company is above the law. This context vindicates Plaintiffs' sense of urgency and oppression at the hands of Apple.

### **Legal Standard Under Rule 11(b)**

Federal Rule of Civil Procedure 11(b) provides that when an attorney or unrepresented party presents a filing to the court, they certify that to the best of their knowledge, information, and belief, after an inquiry reasonable under the circumstances: (1) the filing "is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation"; (2) the legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing the law; (3) the factual contentions have or likely will have evidentiary support; and (4) any denials of factual contentions are warranted on the evidence or lack of information. The Rule is intended to prevent baseless filings and abuses of the judicial system, but it is not meant to deter zealous, good-faith advocacy – especially by those with legitimate grievances. Courts have cautioned that Rule 11 sanctions are a serious measure to be imposed only in the clearest of cases of misconduct, lest they chill creative advocacy or the assertion of novel but plausible legal theories. A filing is frivolous under Rule 11 if it is both baseless (i.e. without factual foundation or legal merit) and made without a reasonable and competent inquiry.

In evaluating Plaintiffs' motions, the Court should be mindful that Plaintiffs are exercising their First Amendment right "to petition the Government for a redress of grievances," which includes the right to seek relief in court. The Supreme Court has recognized that litigation is an important form of political expression and a means to seek justice, protected so long as the litigant's claims are not objectively baseless. The Noerr-Pennington doctrine embodies a similar principle: those who petition the government (including courts) for redress are generally immune from liability for that petitioning, unless their actions constitute a "sham." Here, Plaintiffs' filings were an extension of their petition for redress – efforts to ensure their antitrust theories are heard fully and fairly. They were not shams; they were earnest attempts to highlight wrongdoing and preserve rights. California's anti-SLAPP statute, which Plaintiffs invoked, likewise reflects the strong public policy of protecting individuals' participation in issues of public significance through the courts. The statute "is intended to protect against lawsuits filed for the purpose of chilling free speech…to encourage continued participation in matters of public significance." Plaintiffs here genuinely believe their cause –

SHOW CAUSE MEMORANDUM
CASE NO. 3:24-CV-8660-EMC

challenging Apple's alleged abuse of monopoly power in a marketplace that affects billions – is such a matter of public significance. This does not excuse disregard for procedural rules, but it counsels that the Court should interpret Plaintiffs' actions in light of their good-faith intent to advocate a cause, not as harassment.

<u>**Argument**</u>

Against this backdrop, we now provide general argument on the validity of the claims, then turn to how each motion had a proper purpose and a plausible foundation in fact and law. Plaintiffs also hereby note that the four day, ten page deadline imposed by the Court is simply unrealistic and that despite best efforts, they have not been able to fully address all of Apple's motion opposition documents in this limited time and space. If this generalized Show Cause memorandum leaves remaining issues for the Court, focused OSC items are requested, as is live evidentiary cross-examination of the parties' representatives.

**The FAC states an objectively colorable claim, because the law requires actual adjudication of a claim for res judicata (claim preclusion) to apply.**

It is well settled in the Ninth Circuit that claim preclusion (res judicata) bars only claims that were actually adjudicated or necessarily decided in prior litigation. See *Frank v. United Airlines, Inc*., 216 F.3d 845, 851 (9th Cir. 2000) (holding claim preclusion does not apply unless the claim was actually decided); *Hells Canyon Preservation Council v. U.S. Forest Serv*., 403 F.3d 683, 686-87 (9th Cir. 2005) (claim preclusion only applies to claims adjudicated explicitly or by direct implication). A claim cannot be considered adjudicated if neither the district court nor the appellate court addressed, analyzed, or even mentioned it. See *United States v. Cote*, 51 F.3d 178, 181 (9th Cir. 1995); *Snow-Erlin v. United States*,470 F.3d 804, 807 (9th Cir. 2006) (Res judicata does not bar claims that were not litigated and decided.)

**Plaintiffs' per se tying claim was never adjudicated in CR I at any level.** CR I explicitly pled that Apple's tying of its App Store (tied product) to ownership of Apple smartphones (tying product) was unlawful *per se* under Sherman Act § 1. This *per se* tying theory required no relevant market definition or independent antitrust injury pleading. See *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 9-15 (1984). However, Judge Chen's CR I dismissal rested exclusively on Plaintiffs' alleged failure to define relevant markets and antitrust injury under a rule-of-reason analysis. The CR I order does not mention tying claims at all—not even in passing. Similarly, the Ninth Circuit's summary affirmance in CR I addressed only the market definition and injury issues analyzed by Judge Chen; the Ninth Circuit also never referenced or adjudicated the *per se* tying claim. This complete absence of adjudication or analysis of Plaintiffs' explicitly

4

pleaded per se tying claim at both the district and appellate levels means no court has ever resolved it. Under Ninth Circuit precedent, claims never actually decided cannot be precluded by res judicata. See *Frank*, 216 F.3d at 851; *Snow-Erlin*, 470 F.3d at 807. **The absence of adjudication eliminates any possible basis for sanctions.** Because res judicata does not apply, there can be no sanctions for "frivolously" or refiling "harassing" claims that were never previously adjudicated.[1] Indeed, Ninth Circuit and Supreme Court precedent are unequivocal: Rule 11 sanctions cannot be imposed unless the filing is legally or factually frivolous under clearly established precedent. See *Townsend v. Holman Consulting Corp.*, 929 F.2d 1358, 1362-67 (9th Cir. 1991) (en banc). If no court ever addressed a properly pled *per se* tying claim, it cannot be frivolous or sanctionable to reassert it. See id. at 1362 (Rule 11 sanctions are reserved for exceptional circumstances; the mere fact that a party lost a prior related case does not render later litigation frivolous.)

Furthermore, the Ninth Circuit explicitly holds that where an appellate court has not addressed an issue, that issue is not governed by the law of the case or mandate doctrine. See *United States v. Kellington*, 217 F.3d 1084, 1092-93 (9th Cir. 2000) (law of the mandate doctrine is only as broad as the mandate itself); *Hall v. City of Los Angeles*, 697 F.3d 1059, 1067 (9th Cir. 2012) ("issues not decided previously do not become the law of the case"). Here, neither Judge Chen's CR I order nor the Ninth Circuit's mandate discussed the per se tying claims at all. Thus, no "law of the mandate" precludes re-asserting claims.

Similarly, Berger Montague, one of the leading antitrust firms representing *PhantomALERT* against Apple in related litigation, last Friday cited *Shields v. World Aquatics*, 92 F.4th ___, 2024 WL 4211477 (9th Cir. 2024), affirming that direct anticompetitive effects (such as the forced tie-in here) obviate detailed market definition pleading under the rule-of-reason analysis, let alone under the more lenient *per se* standard. The fact that leading antitrust counsel, including Quinn Emanuel representing *Proton AG v. Apple*, continue actively litigating these same tying claims against Apple demonstrates conclusively that Undersigned's claim theories have always been—and remain—non-frivolous, plausible, and consistent with governing law. Far from sanctionable, our tying theory is actively endorsed and litigated by major federal enforcers and prominent antitrust practitioners today. Finally, equity strongly disfavors imposing sanctions under these

[1] Undersigned recognizes the Court has halted filings of new motions, but respectfully requests leave to file a (routine) Rule 60 Reconsideration Motion fully addressing these bases for reconsideration of the dismissal. Given that the subject matter of sanctions is intricately tied to the reasonableness of the underlying lawsuit (i.e. res judicata & balance of equities), briefing on the balance of equities will better inform the Court on intent re sanctions, generally, and therefore is in the interest of judicial economy.

SHOW CAUSE MEMORANDUM
CASE NO. 3:24-CV-8660-EMC

circumstances. The CR I Plaintiffs pled per se tying claims that required no elaborate market definition. The CR I dismissal overlooked and ignored a clearly pled *per se* tying theory. The appellate courts similarly never addressed this claim. Therefore, CR I never received a fair adjudication of per se tying allegations, and res judicata cannot equitably bar their pursuit in *CR II* when many others are now litigating this landmark theory.

**Plaintiffs' Motions Had Substantive Merit or a Good-Faith Basis and Thus Were Not Frivolous**

Each of the challenged motions was grounded in legitimate factual and legal concerns, even if the Court ultimately disagrees with Plaintiffs' positions. The question under Rule 11 is not whether the motions will succeed, but whether they were so devoid of factual or legal support as to be objectively unreasonable. Here, far from being random or wanton, the motions responded directly to Apple's conduct in the litigation and to new developments, seeking relief that, while assertive, was reasonably supported by evidence.

First, the **Motion for Sanctions** (Dkt. 86): Plaintiffs moved for sanctions against Apple and its counsel under the Court's inherent powers, citing what they described as egregious litigation misconduct over five years. This motion was detailed and contained specific allegations: for example, that Apple (through counsel) made misrepresentations to the Court, such as flip-flopping on Roberts or Isaacs involvement and standing in CR I. This is a real concern; whether it was fraud on the court is to be decided, but it is a colorable issue anytime a party is blocked from participating in litigation, and therefore non-frivolous. Plaintiffs pointed to Apple's effort to obtain a "global anti-suit injunction" again barring them from participating in litigation – characterizing it as an abusive attempt to silence a critic from even *future* harms to *non-parties*. Plaintiffs argued that Apple's conduct warranted a thorough investigation – including discovery into Apple's litigation communications and an evidentiary hearing. While this is an aggressive stance, it is not frivolous. Plaintiffs' belief about Apple's conduct may be debatable, but it is sincerely held and backed by notable facts (e.g., Apple's counsel allegedly threatening Plaintiffs with personal ruin, repeated flip-flopping in violation of judicial estoppel law, constant references to neuropsychiatric issues, etc). Filing such a motion to call attention to perceived litigation abuses is consistent with Rule 11's allowance for vigorous advocacy. Furthermore, we take very seriously that Gibson Dunn prevented Dr. Isaacs from participating in CR I, but now want to preclude Greenflight based on his purported presence. This violates countless principles of fairness and statutory laws on witness intimidation. We are willing (and hereby request) to testify on the fear and harm such improper tactics caused Plaintiffs.

SHOW CAUSE MEMORANDUM
CASE NO. 3:24-CV-8660-EMC

**Motion for Anti-SLAPP Relief** (Dkt. 83): Plaintiffs also filed what amounts to a special motion to strike or for equivalent relief under California's anti-SLAPP statute (Cal. Code Civ. Proc. § 425.16). The deployment of anti-SLAPP in this context is novel or perhaps first impression. Here, Plaintiffs were the original claimants, so at first glance it may seem counter-intuitive for them to invoke anti-SLAPP. However, the substance of Plaintiffs' anti-SLAPP motion was to prevent Apple from using procedural motions (like the threatened anti-suit injunction and $400,000) to punish Plaintiffs for their protected advocacy. In effect, Plaintiffs argued that Apple's request was itself a form of Strategic Lawsuit Against Public Participation (SLAPP) tactic by a powerful entity to intimidate and silence a weaker opponent. The anti-SLAPP motion sought to strike or nullify Apple's attempts to obtain such punitive relief, and to recover attorney's fees for having to defend their right to continue litigating issues of public importance (App Store competition and free speech in app distribution). Plaintiffs anchored this request in the broad language of §425.16 and its purpose of protecting petitioning activity "in connection with a public issue". Given that Apple was effectively seeking to penalize Plaintiffs for bringing a lawsuit (by labeling it frivolous and asking for broad injunctions and fees), Plaintiffs had a reasonable argument that this situation fell within the spirit of anti-SLAPP protections, if not the letter. At minimum, Plaintiffs' anti-SLAPP filing served as a vehicle to force a focused discussion on whether Apple's aggressive counter-litigation moves were aimed at the issues or at the people raising them. That is a legitimate point of contention. Sanctioning Plaintiffs for this would send a message that litigants must never think outside the box or assert novel legal theories, even when motivated by legitimate (and serious) perceived free speech concerns. Rule 11 is not so draconian; it allows room for good-faith innovation in legal advocacy. Finally, case law is sparse on the underlying issue here – when can a motion qualify as an action under §425.16? Apple's opposition cites joinder motions and other narrow motions as nonqualifying. There is no case law saying a motion as wide ranging as Apple's nationwide injunction covering past JPML proceedings, SCOTUS petitions and future claims can't be considered an action. And that action, if it is one, clearly falls under state law (indeed, UCL is pled and invokes it) abuse of process claims. *See proposed reply[2]*. This is a colorable issue that could be ripe for first impression by the Ninth Circuit. Hence, it is not in violation of Rule 11 by any stretch.

---

[2] Due to the overwhelming posture of the case, Plaintiffs' sought a stay before the antiSLAPP reply was due. The stay was not granted, and it is unclear if the Courts' Order (Dkt. 92) on the briefings disallowed a Reply. In light of this, Plaintiffs' attach a proposed Reply, which the Court may recognize if it so wishes.

SHOW CAUSE MEMORANDUM
CASE NO. 3:24-CV-8660-EMC

Plaintiffs sought a **Motion to Stay** (Dkt. 85) for several reasons that were plainly articulated. For instance, Plaintiffs referenced the *Trump v. CASA decision*, which was issued by the Supreme Court on June 27, 2025, just days earlier. In *Trump v. CASA*, the Supreme Court addressed the scope of injunctive relief and curtailed lower courts' ability to issue nationwide injunctions absent class certification. While that case involved immigration policy (an executive order on birthright citizenship), the principle for which Plaintiffs cited it is that courts are moving toward more measured, party-specific remedies and away from sweeping orders like Apple seeks against unnamed non-parties ("associates" of Isaacs). Analogously, Plaintiffs suggested that any relief or sanctions in their case should be narrowly tailored and mindful of due process, and that a stay could ensure that any action taken does not overshoot (especially in light of high court guidance). Far from frivolous, this shows Plaintiffs' awareness of current Supreme Court doctrine and an attempt to align this Court's actions with emerging jurisprudence. The Court may or may not agree with granting a stay, but the motion's rationale is grounded in common litigation practice (stays pending related proceedings are not unusual) and certainly not filed to harass. It was an attempt to conserve judicial resources and avoid irreversible prejudice. It was also an attempt of a severely under-resourced solo practitioner to manage workflow accordingly.

Finally, the **Administrative and Miscellaneous Requests** (Dkts. 84, 87, 89): Frankly, the amicus motion was a call for help from Plaintiffs, which is quite distinct, really the polar opposite from harassment. Similarly, the motion to relate had objective basis: Plaintiffs are opt-outs of Cameron, like many other cases that were related. Moreover, Judge Gonzalez Rogers has deep expertise with Apple retaliation claims that exist here -- a second, objective basis for relation.   And while it is uncommon for a private litigant to ask a court to refer a matter to DOJ, it is neither unheard-of nor prohibited. If a litigant genuinely believes their opponent has violated criminal laws (e.g. obstruction in litigation, violation of criminal antitrust laws), bringing that to the court's attention is not sanctionable – the court can simply decline if it finds the request meritless. Finally, multiple requests for stay were in light of Undersigned being overwhelmed by the totality of events currently transpiring and seeking a status conference for orderly adjudication and guidance. How can that be sanctionable? It is not.

---

That Reply demonstrates colorable areas for debate, left unresolved by Apple's opposition, therefore proving that the antiSLAPP motion is, if not meritorious, certainly objectively reasonable.

SHOW CAUSE MEMORANDUM
CASE NO. 3:24-CV-8660-EMC

**Plaintiffs' Filings Were a Proportional and Reasonable Reaction to Apple's Litigation Tactics**

To evaluate improper purpose, context is key. As described in the background, Apple's approach to this litigation has been exceptionally aggressive. By the time of Plaintiffs' contested filings, Apple had: won dismissal of the case on procedural grounds and indicated it would seek to bar any further litigation by Plaintiffs on these issues. In other words, from Plaintiffs' perspective, Apple was attempting to shut them down entirely, not just in this case but in any forum, and to do so not by disproving the merits, but by wielding the sheer weight of its legal resources. Plaintiffs' cohort of motions was essentially an act of self-defense in the face of this [perceived] onslaught. Rather than an intent to harass Apple, the filings show an intent to level the playing field and obtain a fair opportunity to be heard.

**The Imposition of Severe Sanctions Here Would Raise Serious Questions of Fairness, Power Asymmetry, and the Appearance of Judicial Neutrality**

Finally, Plaintiffs urge the Court to consider the equities of the situation. Plaintiffs are ordinary individuals and tiny entities near or at bankruptcy; Defendant Apple is one of the most powerful and wealthy corporations in history. This lawsuit was an attempt to hold Apple accountable under laws (antitrust, etc.) that exist precisely to check concentrated power. Throughout the litigation, however, that power imbalance has loomed large. Apple is represented by a top-tier law firm, able to deploy virtually unlimited resources. Plaintiffs have proceeded without comparable means, sometimes officers appearing pro se or with minimal counsel assistance. Despite this, Plaintiffs persisted out of a belief that justice does not depend on one's bank account – that in an American court, even the lowliest can demand answers from the elite. This belief is now being tested. Apple has swung back with demands not only for dismissal but for hundreds of thousands of dollars in sanctions against Plaintiffs and their counsel. A sanctions award of that magnitude is ruinous, sending a stark warning to every other developer or small business: "Challenge us and risk annihilation."

**Undersigned and Plaintiffs have never been sanctioned before. Fairness dictates a warning before actual formal sanctions.**

A sister court recently contemplated–and rejected–the very misconduct narrative Apple now peddles. In *Greenflight Venture Corp. v. Google LLC*, (FLSD USDJ Rosenberg), Greenflight sued Google for monopolizing the "Internet Content Access Methods" ("ICAM") market and for retaliating against Greenflight. Apple was identified as a co-monopolist but was not a defendant. Judge Rosenberg dismissed

9

SHOW CAUSE MEMORANDUM
CASE NO. 3:24-CV-8660-EMC

under Rule 12(b)(6) because the market definition was insufficient. Yet she made a point that nothing in the record impugns counsel's candor or motive, but rather, relevant markets are simply a challenging obstacle.

Rule 11's "objective reasonableness" test (see Cooter & Gell v. Hartmarx, 496 U.S. 384, 399 (1990)) cannot be met where a contemporaneous district court analyzed the same lawyer's similar antitrust litigation approach and deemed it appropriate. That Court, and Google's highly qualified counsel at Williams & Connelly, had reviewed undersigned's antitrust and UCL theories, were fully aware of CR I, the JPML docket, and even this case, and still found no bad faith to request sanctions. Their fresh, on-the-merits assessments are powerful evidence that the positions Apple now brands a five year 'pattern' of 'multiplied' proceedings are, at minimum, debatable under existing law—which is all Rule 11 requires to defeat sanctions. See Christian v. Mattel, 286 F.3d 1118, 1127 (9th Cir. 2002) (court must deny sanctions where argument is "warranted by existing law or a nonfrivolous extension"). Apple's selective omission of the Google order is itself a reason to doubt its sanctions narrative. Apple asks this Court to scour five years of filings for "vexatiousness," yet fails to mention a four-month-old decision squarely the validity of counsel's antitrust filings, involving related, overlapping alleged antitrust markets and allegations, and issued with full knowledge of CR I and CR II. That omission undercuts Apple's claim of pervasive bad faith and suggests the present motion is tactical overkill, not a good-faith defense of judicial economy.

When evaluating whether an attorney has "unreasonably and vexatiously multiplied" proceedings, courts look to whether other tribunals confronting the same conduct found it sanctionable. The unbroken line of decisions declining to sanction Plaintiffs or counsel (*Greenflight v. Google*, a decade of Caller-ID Patent Litigation) is compelling, contemporaneous proof that counsel and Plaintiffs' strategies, while aggressive, and sometimes cringeworthy evidence that Undersigned is not a career antitrust lawyer, are not "in bad faith" nor "objectively baseless."

### **Conclusion**

Plaintiffs respectfully request that the Court discharge the Order to Show Cause and decline to impose Rule 11 sanctions. Plaintiffs' recent motions were not frivolous: they were tethered to real events and genuine legal arguments, aimed at protecting Plaintiffs' rights and calling out misconduct. As Justice Robert Jackson famously observed, courts are not "seminaries" of genteel understatement; they are arenas for dispute where feelings may run high, yet out of the clash of zeal and conviction, truth and justice can emerge.

SHOW CAUSE MEMORANDUM
CASE NO. 3:24-CV-8660-EMC

Submitted on this 14th day of July, 2025.

/s/ Keith Mathews
Keith Mathews
Attorney for Coronavirus Reporter Corporation et al
*Pro Hac Vice*
NH Bar No. 20997
American Wealth Protection
1000 Elm Street, Suite 800
Manchester, NH 03105

**CERTIFICATE OF SERVICE**

I, Keith Mathews, do declare as follows:

I certify that a copy of the foregoing SHOW CAUSE MEMORANDUM was delivered via ECF to all interested parties.

Executed on this 14th day of July, 2025.

/s/ Keith Mathews
Keith Mathews
Attorney for Coronavirus Reporter Corporation et al
*Pro Hac Vice*
NH Bar No. 20997
American Wealth Protection
1000 Elm Street, Suite 800
Manchester, NH 03105

11

SHOW CAUSE MEMORANDUM
CASE NO. 3:24-CV-8660-EMC

Keith Mathews
*Pro Hac Vice*
American Wealth Protection
1000 Elm Street, Suite 800
Manchester, NH 03105
keith@awplegal.com
(603) 923-9855

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CORONAVIRUS REPORTER CORPORATION, CALID INC., GREENFLIGHT VENTURE CORPORATION<br><br>*on behalf of themselves and all others similarly situated*<br><br>Plaintiffs,<br><br>*vs.*<br><br>APPLE INC.<br>Defendant. | Case No. 3:24-cv-8660-EMC<br><br><br>**DECLARATION OF KEITH A. MATHEWS IN SUPPORT OF SHOW CAUSE MEMORANDUM**<br><br><br>The Honorable Edward M. Chen |

**DECLARATION OF KEITH ALLEN MATHEWS IN SUPPORT OF MEMORANDUM IN RESPONSE TO ORDER TO SHOW CAUSE**

I, Keith Mathews, Esq., declare as follows:

1. I am an attorney licensed to practice law and counsel of record for Plaintiffs in *Coronavirus Reporter Corp., et al. v. Apple Inc.*, No. 3:24-cv-08660-EMC (N.D. Cal.). I make this sworn declaration in support of Plaintiffs' Memorandum response to the Order to Show Cause ("OSC"). The statements herein are based on my personal knowledge and a review of relevant documents, and are made to affirm the good faith, academic, and public interest motivations behind Plaintiffs' litigation against Apple. Certainly some matters herein constitute my legal opinion, which is made to the best of my ability.

2. ***Plaintiffs' Academic and Public Interest Motivation***: The Plaintiffs' lawsuit against Apple was never intended to harass, but was driven by academic curiosity, public interest concerns, and principled legal objectives. Dr. Robert Roberts (a distinguished cardiologist involved in NASA's John Glenn shuttle mission), and his co-founder Jeffrey Isaacs developed apparently the first COVID-19 contact-tracing application in early 2020. Their goal in filing antitrust claims against Apple, which was done with caution, reluctance, and hesitation initially, was to 'liberate the way smartphones are controlled and censored by Big Tech' – in other words, to challenge Apple's gatekeeping of the App Store in the interest of innovation, democratic flow of information, and public health. This motivation is inherently public minded and academic-theoretical in nature, focusing on the novel intersection of smartphone monopoly power and healthcare technology, in conjunction with challenging antitrust law, rather than any personal vendetta against Apple. From the outset, we approached the case as a serious scholarly challenge at the frontier of digital markets and medical innovation. Dr Isaacs stated early on he felt his unique interdisciplinary training and experience could provide useful insight into the ongoing challenges that, frankly, have stumped many governments for two decades.

3. ***LSAC Recommendation Letter (Evidence of scholarly focus)***: A true and correct copy of a law school recommendation letter I wrote on November 11, 2024 for Dr. Isaacs is attached hereto. In that letter (addressed to the Law School Admissions Committee), I documented Dr. Isaacs' learning centered, intellectual approach to our complex antitrust litigation against Apple. For example, I observed that when we embarked on the Apple case with limited antitrust experience, Dr. Isaacs' "relentless intellectual curiosity and analytical prowess quickly became invaluable," as we together "developed innovative case theories that were ultimately championed by the Department of Justice in their recent case against Apple [and now, directly by others like Quinn Emmanuel and Berger Montague]." As their client representative, Isaacs' approach to this matter reflects Plaintiffs' corporate intent of treating the litigation as a rigorous academic endeavor – studying market economics, antitrust law, digital product evolution, and constitutional principles – rather than as a vehicle for harassment. Indeed, Dr. Isaacs was so intellectually invested in the issues that he applied to law school to formally become an antitrust professor, and my recommendation letter (Exhibit A) chronicles his aptitude for legal analysis and genuine commitment to the rule of law. It highlights how he *"truly loves teaching and problem solving as rewarding goals in their own right,"* thriving on challenging subjects and reducing them to intuitive terms. Such qualities are incompatible with any intent to merely annoy or harass; instead they demonstrate a desire to learn, debate, and advance novel legal theories for the public good.

1

4. Plaintiffs – via representatives Dr. Roberts and his team– always viewed this case as a serious legal challenge with broad implications, including constitutional dimensions, rather than a private dispute. The founders come from professional and academic backgrounds (medicine, economics, and technology) that informed their approach. They saw Apple's exclusion of the Coronavirus Reporter app as raising fundamental questions about competition and innovation in a pandemic – effectively a test case on how far a dominant digital platform can go in controlling our everyday communications. In CR I, we early on indicated the different founders' projects were 'case studies' and joinder of the cases was meant to highlight these cases, like in an MBA or law teaching method. Apple has said the joinder of cases was in and of itself harassment, which, frankly, is absurd and at the very least, insulting. We likened the case to an academic project, examining whether such platform control could be checked by antitrust principles. Dr. Isaacs applied principles from his medical and MBA training, treating the litigation as an extension of his interdisciplinary research into market failures and public health. Likewise, Dr. Roberts lent his medical expertise to underscore the public interest stakes of the case (i.e. getting lifesaving technology to users). Far from being frivolous or harassing, the lawsuit was pursued as an earnest constitutional and economic experiment to clarify the law in a "novel intersection" of industries. This is evidenced by Plaintiffs' extensive legal briefing on issues like relevant market definition, and by their willingness to invest years in appeals and related proceedings to get answers to these cutting-edge questions. Put very, very simply, we thought we were smart problem-solvers tackling a major social issue; we can and will testify as to such intent and hereby request public evidentiary hearing to prove our innocence. We'd also (see below) like the Apple Antitrust Team to be cross-examined, in the interest of fairness.

5. ***Plaintiffs' Active Engagement and Long-Term Commitment***: Plaintiffs' (and their client representatives and counsel) conduct throughout the litigation confirms their good faith and long-term commitment to lawful petitioning and regulatory accountability. They did not simply file complaints and disappear (as true harassers with no underlying academic insight might); rather, they actively participated in hearings, oral arguments, conducted CNBC interviews, and multiple rounds of briefing over several years. I can attest that Dr. Isaacs and/or Dr. Roberts were present (either in person or via remote access) at every significant court hearing in *Coronavirus Reporter I* (Case No. 3:21-cv-05567-EMC) and subsequent proceedings and apprised of comprehensive updates. Dr. Isaacs even presented oral argument himself during a crucial federal court hearing on a preliminary injunction in 2021, when a technical issue cut off my audio feed. With the Court's permission, Dr. Isaacs "seamlessly stepped in" and "articulated our arguments with poise and clarity, engaging effectively with the court on the complex legal issues" at stake. His performance under pressure upheld our case and impressed observers (even a Department of Justice attorney contacted us to commend how confidently Dr. Isaacs debated Apple's counsel). This level of engaged, constructive participation is the opposite of harassment – it demonstrates respect for the judicial process and a desire to litigate properly on the merits. Dr Isaacs was proud of this accomplishment, speaking to this Court on a difficult and controversial subject such as the iPhone relevant market and *Amex* platforms. Apple counsel's attempt to diminish such admirable petitioning is part of a long, shameful campaign to deride and harm us. This Court refused to release the video of that hearing, when requested in 2021, and I hereby again request its release to the public, as it now forms critical evidence as to the Plaintiffs' intent and conduct.

6. Plaintiffs and I have shown persistent, good faith engagement with every aspect of this litigation, further belying any notion of a vexatious motive. Over the past five years, I have diligently pursued related claims through trial court dismissals and into the appellate courts. I personally argued our theories before the Ninth Circuit Court of Appeals and even petitioned the Judicial Panel on Multidistrict Litigation (JPML) in an effort to take a leadership role (for a proposed Developer track) with our case with similar app store antitrust cases – steps indicating a strategic, long-term effort to

DECLARATION IN SUPPORT OF SHOW CAUSE MEMORANDUM
CASE NO. 3:24-CV-8660-EMC

clarify the law. I worked overtime to secure the MDL Majority' Plaintiffs counsel lifting an objection to our joinder. There is no reason the JPML could not have added a developer track to that MDL, and I still believe it would have been in the public interest. It certainly wasn't 'harassment.' Quite to the contrary. Apple moved to discredit us to the JPML, who seemingly decided to 'stay out' of the mess *Defendant* has created.

7.   Dr. Isaacs in particular has devoted extraordinary time and effort to antitrust reform advocacy, as evidenced by the fact that "even his opponents recognize his tireless work ethic," noting his "maintained focus on antitrust reform spanning five years." Rather than abandoning the fight or resorting to out-of-court tactics, Plaintiffs and I consistently pressed our claims through proper legal channels – from motion practice, to discovery attempts, to appeals – demonstrating sincere commitment to addressing what we perceive as Apple's unlawful conduct. Such longterm, constructive engagement is a hallmark of lawful petitioning and is wholly inconsistent with any intent to merely harass Apple.

8.   **Validation of Plaintiffs' Theories by Subsequent Developments**: The substantive antitrust theories Plaintiffs advanced have been vindicated by events and other litigants, proving that Plaintiffs' case was neither frivolous nor malicious. In particular, Plaintiffs were early to allege that Apple's conduct constituted an illegal tying arrangement between two distinct products: (a) Apple's iPhone (and iOS operating system) in the foremarket, and (b) Apple's App Store (iOS app distribution services) in the aftermarket. Dr. Isaacs and I, in particular, spent literally years advocating this theory Isaacs refined, which to this date was never addressed by this Court or the Ninth Circuit. Apple, about a half dozen times, tried to steer the courts awry with a strawman shift of this theory to *Microsoft* platform tying, which the iPhone-App Store bundle simply is not. This is not a trivial validation. Again, years have been spent advocating this theory in particular. Nobody in their right mind could pursue such focused persistence, reading Hovenkamp on weekends and evenings, but for a sincere love for the intellectual scholarly challenge. We contended that Apple was using its dominance in smartphones to lock app developers and users into using the App Store, to the exclusion of any alternative distribution channels – a novel theory at the time we filed, and indeed, we stood alone for years. Today, multiple high-profile lawsuits and enforcement actions now echo this same tying theory. For example, in *Proton AG v. Apple Inc.*, filed June 2025, a prominent app developer and the esteemed Quinn Emmanuel allege that Apple leveraged its smartphone monopoly to monopolize the iOS app distribution and payment markets, designing the iPhone such that the App Store is *'the sole gateway for iOS users to obtain applications,'* foreclosing any rival app stores. Likewise, in *PhantomALERT v. Apple Inc.*, another developer's case focusing on Apple's COVID app policies, the plaintiff plainly alleges that "Apple unlawfully tied its devices to the App Store, making the App Store the exclusive means for users to obtain apps" (thereby barring alternative distribution channels). They did so after their seasoned team of antitrust lawyers engaged in hours long conferrals with Dr. Isaacs. Most significantly, the United States Department of Justice and over a dozen state Attorneys General have sued Apple in a massive antitrust action (filed 2024) on very similar grounds – challenging Apple's exclusionary control of iOS app distribution and other restraints. In that DOJ-led case, the court recently denied Apple's motion to dismiss, allowing the inherent claims to proceed. In other words, the core theories that we pioneered in Coronavirus Reporter – far from being crackpot or harassing – have now been adopted and validated by mainstream enforcers and credible plaintiffs. This trend powerfully corroborates the good faith basis of Plaintiffs' litigation: their claims were rooted in genuine legal and economic issues that are now front-and-center in global antitrust enforcement, not in any intent to harass. We should not be punished for being ahead of the curve on issues that are now widely recognized as serious and real.

DECLARATION IN SUPPORT OF SHOW CAUSE MEMORANDUM
CASE NO. 3:24-CV-8660-EMC

9. **Rebutting Apple's "Harassers" Label – Need for Evidentiary Review**: Apple's attempt to paint Plaintiffs as "harassers" or vexatious litigants is utterly incompatible with the documented record of Plaintiffs' conduct and intent. As detailed in my LSAC recommendation letter, Dr. Isaacs and his colleagues approached this litigation as principled, intellectually-driven litigants. In that letter, I described Dr. Isaacs as *"an unyielding advocate for justice"* guided by a *"strong ethical compass"* and *"motivated by a commitment to justice above all else,"* which led him to take on extraordinarily difficult cases as a matter of principle. This contemporary, candid assessment belies any notion that the lawsuit was a sham or harassment. Nothing in the extensive paper trail of this case suggests an intent to annoy or burden Apple without cause. To the contrary, the record shows Plaintiffs doggedly trying to litigate meritorious issues (often at personal expense and effort) in order to hold Apple accountable under the law. Apple's pejorative labeling of Plaintiffs as bad-faith actors is unsubstantiated and improper. In our legal system, if there is an allegation that a litigant acted with dubious intent, the proper course is to allow evidentiary development on that issue – not to summarily sanction the litigant based on the opponent's say-so. Here, determining Plaintiffs' litigation intent (i.e. whether their aim was legitimate enforcement of rights or mere harassment) requires a fact-driven inquiry into their actions, communications, and then testimony. Plaintiffs welcome such an inquiry, as we are confident it will confirm their good faith. But it would be unjust to impose OSC sanctions without first developing a full evidentiary record on intent. Apple's rhetoric cannot substitute for evidence. Given the stark contrast between Apple's accusations and the documented reality (Plaintiffs' academic approach, presence at hearings, persistence in courts, and even my own written impressions of their integrity), Plaintiffs respectfully submit that any decision about their motives should be reserved for after proper fact-finding – if it even remains an issue – rather than short-circuited by sanctions at this juncture.

10. From the outset, I have sincerely believed that our antitrust claims against Apple were meritorious and important. Our goal was never to harass Apple, but to vindicate the rights of developers and consumers affected by Apple's App Store practices. Over the past several years, time has proven that our concerns were valid. As detailed in a soon to be filed Motion for Reconsideration, numerous independent developments have echoed our core allegations. In addition to Proton, PhantomALERT, and the DOJ cases, a new developer class action (Pure Sweat Basketball) has emerged after Apple was held in contempt for trying to preserve its App Store fees despite a court injunction, with a claim we filed a year before, demonstrating our deep knowledge of the Apple Antitrust situation. In light of these developments, I know as fact our First Amended Complaint raised substantial issues of Apple's unlawful conduct. I approached this litigation with an *innocent intent*, aiming to address what we saw as a serious competition problem. The fact that government enforcers and other plaintiffs are now pursuing the same issues confirms that our claims were far from frivolous or fanciful – they were early. We simply sought a chance to prove them on the merits, and our advocacy was passionate but grounded in facts and law.

11. **Five Years of Hard-Fought Litigation and Personal Toll:** This case (and its prior iteration) has been a five-year struggle for us. We have fought hard through multiple courts and procedural hurdles since 2020, all in a good-faith effort to get a fair hearing, which to us means a jury trial. That fight has taken a significant toll on everyone involved. We perceive ourselves as *victims of Apple's oppressive litigation strategy*, as Apple has vast resources to wear down challengers. In our case, a key financial backer of our efforts – a Greenflight business named OkCaller – abruptly was shut down by Google exactly one year after I filed the first Coronavirus Reporter lawsuit, for reasons that remain unclear. We were alarmed enough by the timing that we even filed a civil complaint citing 18 U.S.C. § 1512 (witness tampering/obstruction) out of concern that there might have been interference, though that matter was never investigated, and dismissed on failure to state a relevant market in the

DECLARATION IN SUPPORT OF SHOW CAUSE MEMORANDUM
CASE NO. 3:24-CV-8660-EMC

FLSD. Regardless, the end of that funding source severely hampered our ability to continue. Despite these setbacks, we pressed on, motivated by the conviction that Apple's conduct was wrong. But there is no denying the personal and financial strain. Dr. Roberts is 85 years old; As CRC's Chief Legal Officer, I would not feel comfortable extending this case with any other new lawsuits, if the Court will not permit a prompt path forward. Likewise, another team member, Dr. Isaacs, plans to complete his legal studies he began at Vanderbilt (he intends to study antitrust law for two years) and he *hopes that by the time he graduates, someone else will have successfully tackled the "Apple problem."* In short, all Plaintiffs' representatives/founders and I have poured our hearts into this battle for half a decade, and we are proud of the work we've done. We believe we helped lay the factual and legal foundation – such as identifying Apple's tying of the iPhone to the App Store – that others are now building upon. However, we also recognize the realities of life and litigation. Apple is a formidable opponent with enormous resources, and we have already devoted five intense years to this cause. That is enough. Unless this case can *finally proceed swiftly to an actual trial on the merits*, we do not intend to spend further years on these issues. We have other endeavors and responsibilities to turn to. This hard decision comes from reflection on the toll it has taken on us, not from any belief that our cause was wrong. We still firmly believe in the justice of our claims, but we also value our wellbeing and the principle that litigation should not consume one's entire life.

12. **No Need for Sanctions or Injunctive Orders – Plaintiffs Will Not Refile and Have No Designs to Vex Apple:** In view of the above, I respectfully submit that sanctions against us are neither necessary nor appropriate. The Court's inherent power to sanction should be exercised only as needed to prevent abuse, and here there is nothing to prevent going forward. We have made our case; if the Court ultimately decides not to let it proceed after reconsideration, we will accept that outcome and move on once a mandate issues or cert is denied. We have no intent to file another lawsuit against Apple based on the COVID app rejection. (To clarify, we dispute Apple's characterization that this *second* suit was duplicative – we view it as a continuation with new facts and new parties, on unadjudicated tying claims – but either way, we will not file a third 'free app' censorship lawsuit.) Our focus is already shifting to other areas and projects. In other words, there is zero risk of "repeat offenses" by us that would warrant deterrent sanctions. Should anything come close to changing, we would agree to stipulate to asking the court for a pre-filing abbreviated review(for CAND matters), so long as it isn't viewed as a formal sanction. We want nothing further to do with Apple once this matter (whether one calls it CR I or CR II) is concluded. We simply sought our day in court; if that is ultimately denied, we will spend our time on what we perceive as more fair endeavors. Future scrutiny of Apple will be left to others (and indeed is already underway by Epic, the DOJ, Proton, Pure Sweat, and more). We are fairly confident that over time Apple's true practices will be exposed and checked by the proper authorities – but we do not need to be the ones driving that any longer, and indeed, our funding largely ran out for unexplained reasons.

13. Because we are deescalating voluntarily, punitive measures are unwarranted. In fact, imposing harsh sanctions would only compound the harm to the wrong parties. Any monetary sanction would be devastating to us: I personally do not have anywhere near $250,000 (the figure Apple seeks), after working over a decade as a small-town lawyer, and Plaintiff Greenflight Venture Corp. likewise has extremely limited resources and verges on insolvency after the shutdown of OkCaller. *Even a sanction of $50,000 would cause severe financial hardship* for us. Such a penalty would essentially bankrupt the very small companies and individuals who dared to challenge a trillion-dollar corporation. That outcome is not only unjust; it is unnecessary for any legitimate purpose. We have not acted in bad faith, and we are not continuing to burden the courts – so no sanction is needed to protect the Court or Apple going forward. Time will possibly show Apple as the aggressor, not us, it seems. We respectfully urge the Court to recognize our good faith and the extraordinary circumstances here. This case was brought with a proper motive and a belief in its merit, supported

DECLARATION IN SUPPORT OF SHOW CAUSE MEMORANDUM
CASE NO. 3:24-CV-8660-EMC

by significant parallel evidence and validation from external events. While the Court has found the case barred on technical grounds, our conduct in pursuing it was reasonable and done in the sincere interest of justice.

14. I note that the inherent power sanctions doctrine counsels restraint. Sanctions under the Court's inherent authority must be tailored to what is necessary to address the misconduct. Here, there is no ongoing misconduct to address; another judge closed a case four months ago involving Apple's monopolization and specifically exonerated me of any wrongdoing. Thus, any sanction would serve only as retroactive punishment, which is not warranted absent truly egregious or bad-faith behavior (and I humbly maintain we engaged in no bad faith). The dismissal of our case is punishment enough. We have lost after years of tireless effort, and that is a heavy blow for us. We think Apple and Gibson Dunn had unfair advantages, to say the least. In short, nationwide injunctions or monetary penalties are unnecessary to "correct" anything here – our First Amended Complaint was a meritorious filing made in good faith, and its termination effectively concludes the matter from our perspective. There is nothing left that requires deterrence.

15. On to another specific motion at issue in this OSC, I respectfully respond to Apple's Opposition (Dkt. 90), which argues that our Amended Administrative Motion (Dkt. 85) seeking limited public input and amicus participation was procedurally improper and unjustified. Apple fundamentally misunderstands the scope and purpose of administrative motions under Local Rule 7-11(a), and wrongly asserts that our efforts were unrelated to this litigation. Local Rule 7-11(a) permits administrative motions for miscellaneous relief "not otherwise governed" by federal rules or statutes. While Apple claims our motion exceeded the intended scope of Rule 7-11 by seeking limited public and amicus input, courts in this district commonly permit amicus participation, public comment, or other forms of input even after dismissal or in unique circumstances where important public issues are at stake. Apple's cited cases (e.g., *Morgenstein v. AT&T Mobility LLC, Omoregie v. Boardwalk Auto Ctr.*) address motions for full litigation stays or major substantive rulings, not limited amicus participation or narrow public-input procedures. Thus, those cases are clearly distinguishable and do not apply here. Given the unique nature of our proposed class action—which directly addresses broader concerns of antitrust harm affecting thousands of developers and millions of consumers— our request for limited public input is neither inappropriate nor unprecedented. It is precisely the type of miscellaneous relief appropriately sought under Rule 7-11. I did attempt a stipulation, and Apple declined to do so; I do not fully understand their argument that I somehow violated procedure. In any event, in a substance over form context, I complied with Rule 7-11's intent.

16. As proposed class representatives in antitrust litigation, Plaintiffs are empowered—and indeed encouraged—to gather input, assistance, and perspective from similarly situated individuals, third parties, and the public. Courts widely recognize the important role of amicus briefing and public input in antitrust litigation of significant public impact. Plaintiffs here are seeking precisely such input in what we have openly described as a state of extreme vulnerability and perceived oppression, having encountered extraordinary resistance and retaliatory behavior from Apple. Our request for public comment and amicus participation is entirely consistent with established norms in complex litigation addressing significant antitrust issues, especially where the defendant commands vastly disproportionate resources. I am able to provide legal authority for all of my above points, should the Court wish formal, extensive legal briefing on each motion's appropriateness. I assume given the ten-page limit the Court imposed, these statements into my intent and beliefs suffice.

17. Apple wrongly suggests that our petition raising CEO Tim Cook's resignation is unrelated to our lawsuit. Quite the contrary: this litigation explicitly alleges developer retaliation and anticompetitive conduct overseen or permitted by Apple's highest executives, including Mr. Cook. The FAC

6

specifically pleads that Apple retaliated against developers (such as Plaintiffs) for challenging Apple's monopoly practices—precisely the conduct Judge Gonzalez Rogers recently highlighted in the Epic Games litigation when she referred Apple's counsel and witnesses to the DOJ for possible criminal contempt, noting Tim Cook "chose poorly" in overseeing developer related conduct.

18. Accordingly, our request for limited public input on Apple management's conduct and Apple's developer retaliation practices is directly germane to our case and pled allegations. Apple's claim that seeking public comment on these relevant issues amounts to improper commandeering of this Court's processes misrepresents both our intent and the applicable law. It is entirely appropriate, and indeed common, for parties in class and antitrust actions to seek public input and amicus support on precisely such questions of broad public concern and corporate governance.

19. Indeed, Apple itself commonly welcomes amici and public input in other litigation contexts. Apple's citation to inapplicable cases (e.g., *Gill v. Whitford*) addresses situations in which litigants improperly invoke federal courts to address generalized grievances wholly disconnected from specific legal claims. Here, our requests for public input concern specific conduct and claims—developer retaliation and tying practices—that lie at the heart of this litigation, and that have been pleaded in the operative FAC.

20. Apple also argues incorrectly that our request for public input and amicus participation was improper because it came after the Court's dismissal of this case. (Apple Opp'n at 1-3.) But nothing in Local Rule 7-11 or the Federal Rules prohibits parties—especially proposed class representatives in antitrust litigation—from requesting amicus input or limited public comment, even following dismissal. Indeed, amicus participation frequently occurs at post-dismissal and appellate stages, precisely because important issues continue to have public interest implications even after an adverse ruling.

21. Moreover, I did not file their request for public input as a motion for reconsideration of the Court's dismissal order or to reopen the case. Rather, I sought limited amicus input and public comment to address developments regarding Apple's retaliatory practices—practices directly relevant to the sanctions motion that Apple itself initiated after the dismissal. Indeed, Apple has moved for extraordinary sanctions against counsel, placing these issues front and center before the Court, independently of the prior dismissal ruling. Plaintiffs filed their administrative motion to ensure that the Court receives a balanced perspective on these critical questions—not to circumvent or improperly reopen the dismissed case. Apple has not cited any authority holding that seeking amicus support or public input after dismissal is inappropriate, and I have located none. To remove any doubt about our intentions, Plaintiffs clarify unequivocally that their administrative motion requesting public and amicus input was not intended as a motion for reconsideration of the Court's dismissal order. I respectfully request leave to file an appropriate motion for reconsideration within the 28-day timeframe prescribed by Federal Rule of Civil Procedure 59(e).

DECLARATION IN SUPPORT OF SHOW CAUSE MEMORANDUM
CASE NO. 3:24-CV-8660-EMC

22. In this light, I respectfully bring to the Court's attention a troubling pattern I have witnessed consistently over the past five years litigating against Apple, exemplified once again in Apple's recent filing (Dkt. 90, page 4) opposing Plaintiffs' request for public input and amicus participation. Apple's opposition is indicative of its ongoing strategy to never concede even straightforward matters and, worse, to repeatedly reverse accusations against valid antitrust petitioners by labeling their legitimate advocacy as "improper." This tactic serves to chill and intimidate opponents who dare to question Apple's business practices.

23. Certainly, Apple never concedes core issues, like the fact our tying claim constitutes a properly pleaded per se violation under controlling Supreme Court precedent, such as *Northern Pacific Railway Co. v. United States*, 356 U.S. 1 (1958). But this refusal to concede even major legal questions is mirrored by Apple's approach to lesser matters as well. Apple's consistent litigation strategy reflects a pattern widely recognized as "DARVO" (Deny, Attack, Reverse Victim and Offender, or simply, 'blame the victim, always')—in seemingly every circumstance, Apple portrays itself as the victim, while the petitioner is depicted as engaging in improper conduct. This matters now, because I am facing $400,000 in bankrupting sanctions as a result of Apple's DARVO strategy, which by implication means Apple's "Antitrust Team" has disregard for the law and social norms, and for the well-being of innocent petitioners. I am not a doctor, but am told that is consistent with conditions that warrant forensic psychiatry evaluation. Indeed, before I am bankrupted by Apple's oppressive motion, I do request the Court allow forensic medical evaluation of the small team that Gonzelez Rogers identified as engaging in probable criminal contempt. That team mostly overlaps with the team overseeing this litigation, to the best of my knowledge.  Surely basic inquiry by a physician into matters like "Is Apple a monopoly? Do they violate Sherman Act?  Did you take measures to block valid petitioners or even retaliate against them? What impact do you think five years of aggressive litigation maneuvers took on the CR I team?" are fair game, given the circumstances here.

24. Specifically at issue here is Apple "reserving" all rights to respond later to a "manifesto" petition concerning Tim Cook's failure to oversee antitrust litigation. That Mr. Cook failed to prevent lies on the witness stand is now fact - not opinion. Our FAC broadly alleges developer retaliation and Apple's intention to subvert antitrust enforcement.  Given this scenario, and our belief that conduct applied in the dismissal of CR II, we sought help from the public. I also "approved for distribution" a Petition which Apple now seeks to strike. Apple calls the Petition "manifesto," consistent with their five year efforts to deride us. But the Court should be aware that no human ever authored the Petition for Tim Cook's resignation, nor did any human spend more than about fifteen minutes on it. I am quite weary of Artificial Intelligence, as I am weary of Big Tech, as the Court knows. We have never done such a test before, but we thought there was an interesting computational legal experiment here. Apple has recently published controversial research that AI LLM's are, in short, not true intelligence. We asked the most powerful commercially available AI, ChatGPT o3 Pro "Deep Research" mode, a simple question:

*"Did Judge Gonzales Rogers' rebuke of Tim Cook's Epic conduct create a legally grounded impetus for his termination as CEO, and if so, write a petition explaining such basis, providing contextual background on critics' views of Apple's demise since Steve Jobs' death."*

DECLARATION IN SUPPORT OF SHOW CAUSE MEMORANDUM
CASE NO. 3:24-CV-8660-EMC

Ten minutes later, the Petition was created by AI. I don't have the knowledge to know whether it is indeed 'intelligent,' but I was surprised at the quality of the work - so much so that (after making several minor corrections) I approved it for distribution and public input, to promote conversation on the complex implications herein. This is a matter ripe for discussion, and I request the motion be granted.

25. Hence, there exist no grounds for this legitimate evidence - which is what it is - to be stricken. Moreover, the implications of Apple's response - that it is improper manifesto- further substantiate the allegations in our underlying Sanctions motion. Apple unfairly attempts to chill and intimidate seemingly every single advocate; even an "unintelligent" AI is apparently writing 'manifesto' material Apple deems must be stricken for malicious intent. Think about that. It is nonsensical, I submit to the Court. We now know that Apple and counsel will break the law (in Epic) to subvert fair enforcement of the Sherman Act. The Court is now faced with cross-allegations of litigation harassment. We believe it goes so far as witness intimidation. The Court cannot resolve this issue on the papers, or likely, even in a brief hearing. Whatever tools the Court has at its powers - even forensic psychiatric evaluation of the few at Apple resisting Sherman Act (apparently a handful of counsel, a CFO, and Tim Cook, if I understand the *Epic* ruling correctly, I refer to them now as the "Apple Antitrust Team" of six or so core individuals that should be investigated) - is necessary to stop the internet and nations smartphones from being commandeered by a few individuals with consistent, proven intent to subvert justice, chill opponents, and even seek sanctions to bankrupt them, all to foster their own monopolistic greed.

26. I respectfully urge the Court to consider appropriate judicial remedies, potentially including the appointment of a neutral special master or even forensic psychiatric review, specifically to examine and clarify the intent, motivations, and underlying behavior of those at Apple Antitrust Team responsible for this persistent litigation misconduct.In short, whatever judicial tools the Court has available—whether procedural, forensic, or psychological—should be employed to ensure fairness and accountability. Such measures are fully justified to prevent the internet, smartphones, and app developers nationwide from continuing to be commandeered and intimidated by a few corporate officers and lawyers who have demonstrated a consistent, troubling intent to chill, obstruct, and retaliate against valid antitrust enforcement.

27. Finally, I note that Apple's Response to our Sanction motions proves it is not frivolous. They forfeited and/or failed to substantively address our core concerns. Apple simply never addresses our fraud-on-the-court allegations. Rachel Brass quadruple-downs that Apple had an "express assumption" about CRC during CR I. But she has never explained her email to me, telling me that the CR I plaintiffs, at least "Coronavirus Reporter" were null entities. And the record demonstrates zero express assumption by Apple about CRC, rather , it indicates Brass always cast doubt on the identity of the Plaintiffs and/or their existence or legitimacy, which is consistent with the above conduct I have detailed. In short, I actually agreed with Brass/Gibson Dunn on one of their endless critiques/DARVOs, and now I am being threatened with sanctions. Brass' response does not explain anything, it is rhetoric and procedural knit-picking that forfeits our main points.

DECLARATION IN SUPPORT OF SHOW CAUSE MEMORANDUM
CASE NO. 3:24-CV-8660-EMC

28. Worse, Brass quadruple-downs on her witness intimidation of Dr. Isaacs. She claims that he was represented by me, but that I didn't represent Greenflight, but that he was pro se, and that he represented Greenflight. These cannot all be true, obviously. The truth, for the clarity of the reader, is that Dr. Isaacs proceeded pro se in CR I as a Greenflight investor – not as Greenflight (which is forbidden by federal rules). He was muzzled, intimidated, and oppressed by Apple's counsel. This is outrage, and it is asinine. I demand justice for my client representative, Dr. Isaacs, who has truly suffered at the hands of Brass and her associates. She has no defense, it is clear. I demand discovery and evidentiary hearing on her sanctions response which constitutes forfeiture.

29. For all these reasons, I respectfully request that the Court decline to impose any sanctions on Plaintiffs or counsel. We sought only to raise genuine antitrust issues that we felt were of great public importance, and we prosecuted this case with conviction and integrity. Now that the Court has ruled, we will abide by that decision and bring this dispute to a close unless the reconsideration motion succeeds . Further punitive measures would be excessive under the circumstances and would serve no positive purpose. We thank the Court for its consideration throughout this case, and we will respect the final judgment of the Court.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on July 14, 2025, at Manchester, New Hampshire.

/s/ Keith Mathews
Keith Mathews
Attorney for Coronavirus Reporter Corporation et al
*Pro Hac Vice*
NH Bar No. 20997
American Wealth Protection
1000 Elm Street, Suite 800
Manchester, NH 03105

DECLARATION IN SUPPORT OF SHOW CAUSE MEMORANDUM
CASE NO. 3:24-CV-8660-EMC

**American Wealth Protection**

Dear Law Admissions Committee,

I am delighted to recommend Dr. Jeffrey Isaacs as a candidate to your JD program. Over the past decade, I have had the privilege of working with Dr. Isaacs in various capacities: first as a client, then as a business partner and ally. Throughout our collaboration, I have consistently been impressed by his tenacity, intelligence, and unwavering drive.

I first met Dr. Isaacs in 2012, when he telephoned our firm seeking assistance with a legal dilemma affecting his post-graduate medical training at Dartmouth, just north of our office in Manchester. I had recently graduated law school myself, and took a keen interest in his case. By way of background, he had entered into a settlement agreement in 2007 with a California medical school. The only consideration of that agreement was a sealing of all academic records, with the intent to allow all parties to the agreement (including a medical school dean, an NIH director, and Dr. Isaacs) to move on with their careers. A second settlement agreement in 2008 acquitted and annulled any and all aspects of academic enrollment at that institution. Despite this, the matter was being held improperly against him, but we didn't know exactly how or why. The matter evolved over the course of the next decade; I worked with former Assistant US Attorney and Northeastern law professor Mark Josephs (deceased) who uncovered that the university was publishing the sealed records. Professor Josephs and I sought declaratory judgement to restore Dr. Isaacs' medical career. The American Academy of Medical Colleges (AAMC) had long before determined that the matter had been expunged; we sought federal declaration to augment the AAMC's position.

Over a decade later, having seen my fair share of injustices in the courtroom, Dr. Isaacs' matter stands out as most remarkable and extraordinary story of one individual's pursuit of justice – and a career – in circumstances that most clearly could not endure. Dr. Isaacs learned the workings of complex litigation and the judicial system from a most unfortunate perspective, to say the least.  But what stands out most to me was his determination to transform this adverse experience and into a force for good.

Having achieved considerable success in the new digital app economy, he came to me with a vision of a case meant to liberate the way smartphones are controlled and censored by the Big Tech. Along with NASA & John Glenn shuttle mission cardiologist Dr. Robert Roberts, he developed the first COVID tracking app – at a time when it was believed confined to Asia and small areas of Europe. Antitrust enforcement had been severely stalled as we started the case. Senators were blocked from bipartisan efforts to rein in Big Tech. Several other well-known efforts, such as *Epic,* were largely abandoned after expending vast resources. Even this year, the entire European Union is struggling to redress Apple's non-compliance with their regulations. We worked tirelessly on claim theories – applying Dr. Isaacs' economics and medical training – in *Coronavirus Reporter v. Apple.* (21-cv-5567-EMC, Nor. Cal.) and *Coronavirus Reporter Corporation v. Apple* (24-cv-53-SVS, Wyo.)

When we embarked on our claim against Apple we possessed limited experience in the specialized field of antitrust litigation. Dr. Isaacs' relentless intellectual curiosity and analytical prowess quickly became invaluable. Together, we developed innovative case theories that were ultimately championed by the Department of Justice in their recent case against Apple. His ability to navigate and understand intricate legal frameworks, in the scope of rapidly evolving global technological change, not only impressed me but also evidences his capability as a legal strategist of the highest caliber.

1000 Elm Street, Suite 800, Manchester, New Hampshire 03101
Tel: 603-622-8100  Fax: 888-912-1497

A standout moment in our collaboration occurred during a crucial federal court hearing against Apple, represented by attorneys widely considered the best in their field, including Mark Perry and two of his partners at Gibson Dunn. This hearing concerned an injunction that would fundamentally change the way people used their smartphones, and certainly Apple would be prepared. Prior to the hearing, Dr. Isaacs and I participated in countless hours of mock-debate prep. Dr. Isaacs couriered me a copy of Herbert Hovenkamp's antitrust treatise several weeks beforehand. During our review sessions I realized how Dr. Isaacs truly loves teaching and problem solving as rewarding goals in their own right. And the more challenging a subject is, the more he thrives on reducing it to intuitive terms. This trait was invaluable for debate prep in high-stakes litigation.

The hearing was conducted by remote videoconference, and due to a technical issue I lost communication with the court, a scenario that would unsettle many litigators. However, Dr. Isaacs seamlessly stepped in with permission of the US District Judge. He articulated our arguments with poise and clarity, engaging effectively with the court on the complex legal issues of Sherman relevant economic markets. His performance not only upheld our case but also showcased his exceptional skill. We received numerous phone calls after the hearing, including a DOJ career attorney, saying the same thing: Dr Isaacs confidently beat Gibson Dunn on a debate performance involving the largest monopoly in world history.

The matter is now in its fifth year, and I recently argued our theories to the Ninth Circuit and Judicial Panel on Multidistrict Litigation (JPML). We have already succeeded in raising awareness, and I firmly expect these theories to ultimately prevail – I hope sooner rather than later.

Dr. Isaacs possesses a natural talent for the practice of law; he is, in every sense, a born litigator. Moreover, by the very uniqueness of his experience, he is an unyielding advocate for justice. His insight into legal matters is complemented by his strong ethical compass; he believes deeply in the fairness of the justice system and is motivated by a commitment to justice above all else. This conviction has led him to take on some of the hardest cases imaginable, not merely as a challenge but as a testament to his belief that the legal system can and should provide equitable outcomes and improve the world. His passion for justice, combined with his formidable legal acumen, makes him an asset in any endeavor.

Looking back, from the moment he telephoned my office, it was uncannily clear that he was destined for this profession. His ability to synthesize original arguments on the most complex of subjects is truly remarkable. His writing is artful, demonstrating an innate understanding of the nuances of legal arguments and the art of persuasion. Dr. Isaacs is truly one of the most persistent individuals I have ever encountered. When he commits to a pursuit, he dedicates himself fully, giving 110% until the task is completed. Even his opponents recognize his tireless work ethic, notably mentioning his maintained focus on antitrust reform spanning five years.

I wholeheartedly recommend and endorse Dr. Jeffrey Isaacs' application. Your program will enable him to take on leadership roles that will serve others well. Dr. Isaacs' interdisciplinary background in medicine and economics provides him with a unique perspective that will enrich the classroom. His exceptional communication skills not only make him a persuasive advocate but also enable him to collaborate effectively with professionals across various fields. His commitment to public service and his proven ability to overcome challenges will make him an outstanding law student.

Regards,

Keith Mathews, Esq.
Partner, AWP Legal

Keith Mathews
*Pro Hac Vice*
American Wealth Protection
1000 Elm Street, Suite 800
Manchester, NH 03105
keith@awplegal.com
(603) 923-9855

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CORONAVIRUS REPORTER CORPORATION, CALID INC., GREENFLIGHT VENTURE CORPORATION<br><br>*on behalf of themselves and all others similarly situated*<br><br>Plaintiffs,<br><br>*vs.*<br><br>APPLE INC.<br>Defendant. | Case No. 3:24-cv-8660-EMC<br><br><br>**PLAINTIFFS' PROPOSED REPLY IN SUPPORT OF ANTI-SLAPP MOTION**<br><br><br>The Honorable Edward M. Chen |

**PLAINTIFFS' REPLY IN SUPPORT OF ANTI-SLAPP MOTION TO STRIKE APPLE'S SANCTIONS MOTION (CAL. CODE CIV. PROC. § 425.16**

## I. APPLE'S SANCTIONS MOTION FUNCTIONS AS A DISGUISED ABUSE-OF-PROCESS ACTION, SUBJECTING IT TO ANTI-SLAPP SCRUTINY.

Apple insists that anti-SLAPP (CCP §425.16) does not apply because it filed a "motion" rather than a formal complaint. Apple cites limited authority (e.g., *Sheley v. Harrop*) stating anti-SLAPP generally does not apply to routine procedural motions such as joinder or intervention. Apple's sanctions motion is not "routine" or procedural; it seeks extraordinary affirmative relief—a nationwide injunction barring future litigation, punitive fees of roughly $500,000, review of conduct in *Supreme Court and JPML proceeding,* and revocation of counsel's pro hac vice privileges. (Apple Mot. at 1-3). This sweeping punitive relief, against unknown 'associate' non-parties, is well beyond typical sanctions remedies under Rule 11 or §1927, which aim narrowly at specific abusive filings rather than future litigation bans.

In short, Apple provides no case law that a motion like this cannot be construed as an action. It simply provides examples of motions which are not actions. That is like all rectangles are squares, it simply isn't true. This may be a matter of first impression, as best as Undersigned can ascertain, and the Court should certify it for immediate resolution if it has any doubt on the Ninth Circuit's position.

In California, courts have recognized that court filings that are not formal complaint pleadings can qualify as "causes of action" subject to anti-SLAPP if they effectively assert a substantive claim for affirmative relief. Here, Apple's motion seeks remedies comparable to an abuse-of-process or vexatious litigant action under California law. Such claims are unquestionably subject to anti-SLAPP. See *Rusheen v. Cohen*, 37 Cal. 4th 1048, 1056–57 (2006) (claims challenging use of litigation process are SLAPPable).

Apple's cases (Sheley, supra) concern purely procedural steps (joinder, intervention) and do not involve substantive demands for punitive injunctive relief or monetary penalties. Those cases do not control here, where Apple is attempting to leverage the sanctions mechanism to obtain what is effectively state-law abuse-of-process relief. Thus, §425.16 applies directly.

## II. APPLE'S SANCTIONS MOTION TARGETS PROTECTED PETITIONING ACTIVITY UNDER §425.16(e).

Apple next argues that its sanctions motion does not arise from protected petitioning activity because it addresses only "misconduct" within this litigation. This is plainly false. Apple's motion explicitly attacks prior filings in other courts, including Supreme Court petitions, JPML proceedings, and the original Coronavirus Reporter litigation (CR I), along with statements made publicly and to the press. (Apple Mot. at 5-12.) These actions constitute classic protected petitioning activity under §425.16(e)(1)-(2).

The anti-SLAPP statute explicitly protects litigation-related communications, including filings and petitions before any judicial body. See CCP §425.16(e)(1)-(2); *Navellier v. Sletten*, 29 Cal. 4th 82, 90 (2002) ("filing, funding, and prosecution" of litigation is protected). Apple seeks to punish Plaintiffs for precisely such petitioning activities—indeed, it asks this Court to issue a nationwide injunction prohibiting Plaintiffs from exercising their right to petition in the future. This effort to penalize past and chill future petitioning unquestionably triggers anti-SLAPP protection. See Rusheen, 37 Cal. 4th at 1056 (claims designed to "throttle petitioning rights" are SLAPPs). Apple's reliance on narrow cases exempting ministerial motions (e.g., joinder) from anti-SLAPP is misplaced. Those cases simply hold that purely procedural filings that do not seek affirmative relief against petitioning activity are not SLAPPable. Apple's motion, in contrast, expressly seeks affirmative injunctive and monetary relief against Plaintiffs precisely because of their

protected petitioning in prior courts and in public discourse. Thus, Apple's motion squarely falls within the ambit of §425.16.

### III. APPLE'S MOTION IS FUNCTIONALLY A STATE-LAW CLAIM OF ABUSE-OF-PROCESS, NOT A ROUTINE FEDERAL SANCTIONS MOTION.

Apple further argues that anti-SLAPP does not apply because it invokes Rule 11 and federal sanctions standards. But the substance, not the form, determines anti-SLAPP's applicability. See *Mission Beverage,* 15 Cal. App. 5th at 700 (substance over form determines anti-SLAPP applicability). Apple's requested remedies—including a broad filing injunction, pro hac vice revocation, and extensive fees—far exceed what Rule 11 or §1927 typically authorize. Federal courts do not ordinarily grant Rule 11 sanctions that bar future filings or litigation from non-parties for future harms. Such remedies are akin to California state-law vexatious litigant orders or abuse-of-process tort claims. Because Plaintiffs' filed a UCL claim, and Apple attacks it as sanctionable, there exists little question this matter falls within the authority of California Anti-SLAPP statutory law.

This Court should look past Apple's formalism to the actual nature of the relief Apple seeks and recognize it as a disguised state-law-style SLAPP.

### 1.    IV. APPLE FORFEITED ANY LEGITIMATE DEFENSE TO PLAINTIFFS' ALLEGATIONS OF FRAUD, RETALIATION, AND FLIP-FLOPPING.

Plaintiffs' Anti-SLAPP motion directly argued that Apple's sanctions motion was retaliatory and premised upon distortions of fact and fraud upon the Court. Apple's opposition fails entirely to rebut Plaintiffs' showing that Apple itself engaged in litigation misconduct—including inconsistent positions regarding

Plaintiff entities' existence, status, and litigation capacity. Apple has notably never explained its "flip-flop" regarding Coronavirus Reporter's corporate existence and Dr. Isaacs' pro se representation—key issues underpinning its sanctions request. It has never address the Lawlor new conduct issue in any meaningful way – demonstrating their sanctions motion has zero likelihood to prevail, because CR II extends far beyond the conduct (and timeline) of CR I.

Failure to respond to critical arguments constitutes forfeiture. See *Rodriguez v. Hayes*, 591 F.3d 1105, 1118 n.6 (9th Cir. 2010) (arguments not raised in opposition brief are forfeited). Apple has thus forfeited any defense to Plaintiffs' arguments that Apple's sanctions motion rests upon factual distortions, fraudulent representations, or retaliatory litigation tactics. This forfeiture alone warrants rejecting Apple's sanctions motion, as Plaintiffs' allegations remain unrebutted.

**THE BALANCE OF EQUITIES STRONGLY FAVORS PLAINTIFFS; APPLE'S ATTEMPT TO PRECLUDE PLAINTIFFS WHILE IDENTICAL CLAIMS PROCEED IS INEQUITABLE.**

Finally, equity weighs decisively against granting Apple's motion. Apple seeks harsh punitive measures against Plaintiffs and their counsel for raising antitrust tying claims that are currently being pursued by the U.S. Department of Justice and sophisticated developers in active litigation, including Proton AG, PhantomALERT, and (non-tying but overlapping conduct claims) Pure Sweat Basketball. Apple notably fails to address this crucial equitable argument, thereby conceding that its sanctions would unfairly single out Plaintiffs among a broader universe of developers and litigants who have asserted identical or substantially similar antitrust theories against Apple.

PROPOSED ANTISLAPP REPLY
CASE NO. 3:24-CV-8660-EMC

Courts recognize the inequity of penalizing early advocates of claims that later gain widespread recognition. See, e.g., *Lawlor v. Nat'l Screen Serv. Corp.,* 349 U.S. 322 (1955) (claims arising after an initial judgment not barred,). Apple now seeks to weaponize Rule 11 sanctions to immunize itself against these claims, despite the DOJ and others successfully pursuing them elsewhere. Sanctioning Plaintiffs would unfairly chill lawful antitrust advocacy and disincentivize whistleblowers and early claimants from raising emerging antitrust issues. This Court should reject such inequitable and punitive tactics.

### Conclusion

Apple's sanctions motion seeks extraordinary relief that functions precisely as a disguised SLAPP: it retaliates against past protected petitioning and improperly seeks to chill future litigation. Apple forfeited key rebuttals, cites irrelevant narrow cases, and cannot justify punishing Plaintiffs for claims now accepted and pursued by others, including the DOJ. This Court should grant Plaintiffs' Anti-SLAPP motion under CCP §425.16, strike Apple's sanctions motion entirely, and award Plaintiffs fees and costs as provided by the statute.

Submitted on this 14th day of July, 2025.

/s/ Keith Mathews
Keith Mathews
Attorney for Coronavirus Reporter Corporation et al
*Pro Hac Vice*
NH Bar No. 20997
American Wealth Protection
1000 Elm Street, Suite 800
Manchester, NH 03105

5

**CERTIFICATE OF SERVICE**

I, Keith Mathews, do declare as follows:

I certify that a copy of the foregoing REPLY to ANTISLAPP was delivered via ECF to all interested parties.

Executed on this 14th day of July, 2025.


/s/ Keith Mathews
Keith Mathews
Attorney for Coronavirus Reporter Corporation et al
*Pro Hac Vice*
NH Bar No. 20997
American Wealth Protection
1000 Elm Street, Suite 800
Manchester, NH 03105

PROPOSED ANTISLAPP REPLY
CASE NO. 3:24-CV-8660-EMC