**IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT
No. 26-10369
GREENFLIGHT VENTURE CORPORATION AND JEFFREY D. ISAACS,
M.D.,**
Plaintiffs-Appellants,
v.
**GOOGLE LLC,**
Defendant-Appellee.

**DECLARATION OF KEITH A. MATHEWS IN SUPPORT OF
GREENFLIGHT VENTURE CORPORATION'S OPPOSITION TO
APPELLEE'S MOTION TO STRIKE (DOC. 33)**

I, Keith A. Mathews, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 as follows:

1. I am an attorney licensed to practice law in New Hampshire and counsel of record for Appellant Greenflight Venture Corporation in this appeal. I submit this declaration in support of Greenflight's opposition to Appellee Google LLC's motion to strike (Doc. 33). I have personal knowledge of the facts stated below and am competent to testify to them.

2. I have represented Greenflight and related parties in federal antitrust litigation concerning the dominant technology platforms for more than five years, including the litigation Google cites at page 31, footnote 7 of its answering brief: *Coronavirus Reporter Corp. v. Apple Inc.*, No. 3:24-cv-08660-EMC (N.D. Cal.). I appeared as counsel in that action and am personally familiar with its docket.

1

3. Dr. Jeffrey D. Isaacs was not a party to that action. Order, Dkt. 102 at 1 (N.D. Cal. July 30, 2025) denied the request before it to find Dr. Isaacs a vexatious litigant. *Id.* No sanctions order issued against Dr. Isaacs in that litigation or any other litigation.

4. Google's answering brief states that Dr. Isaacs' supposed "penchant for filing frivolous lawsuits" "has resulted in a sanctions order against him." Google Br. 31 n.7. That statement is false as to Dr. Isaacs. Google's filing at Document 33 neither identifies an order against him nor defends the statement.

5. I am also familiar with the proceedings below in this case. The district court imposed no sanction on either Appellant and made no finding that either Appellant is serial or vexatious.

2

6. Immediately following this declaration as Exhibit 1 is the redacted Stanford Law School application transmitted through the Law School Admission Council ("LSAC"). I have reviewed both the unredacted original and the redacted copy that follows. I wrote the corresponding recommendation and submitted it directly through LSAC. Exhibit 1 is a true and correct copy of the application I reviewed, except that personal identifying fields were redacted for public filing. The redactions do not alter the substantive responses, essays, disciplinary disclosures, or other content relevant here. Exhibit 1 is a valid redacted version prepared to comply with the privacy requirements governing personal identifiers in public court filings.

7. To the extent Google's motion may be understood to question the authenticity of the LSAC application, I authenticate Exhibit 1 from my personal knowledge. It is what it purports to be: a true and correct redacted copy of Dr. Isaacs' Stanford Law School application transmitted through LSAC and supported by the recommendation I personally submitted through LSAC.

8. The application documents the person harmed by Google's false labels. It describes Dr. Isaacs' Vanderbilt legal education; years of serious engagement with competition law; effort to rebuild his vocation after his medical career; intent to complete his J.D. and teach antitrust law; and family history of service to the federal judiciary, including a role model with two decades directing the Federal Judicial History Office at the Federal Judicial Center. Those facts are directly responsive to the character account Google introduced.

9. I know Dr. Isaacs as a person, not as the label Google placed on him. I have observed his work over more than a decade. It has been persistent, deeply researched, and animated by a genuine belief that the historical Sherman Act must remain relevant today and not be weakened by digital platforms. I have also observed the substantial personal cost of that work and the effect of repeated public attacks.

10. On or about March 23, 2026, Dr. Isaacs sent Google's appellate counsel a written notice objecting to their personal characterizations of him, including the "serial litigant" label, and requesting correction. I received and reviewed the letter at the time and supported the effort to obtain a correction without further burdening this Court. Following the Stanford application as Exhibit 2 is a complete, true and correct copy of the two-page letter I reviewed.

11. Google did not correct the label. On July 1, 2026, it opened the Statement of the Case in its answering brief with "Plaintiff Jeffrey D. Isaacs is a serial litigant" and added the statement that a sanctions order had issued "against him." Google Br. 2, 31 n.7.

12. In a declaration previously filed with this Court (Doc. 32, Ex. B), I described under oath a pattern I have repeatedly observed: deny the underlying conduct, attack the complainant, and reverse the roles of victim and offender ("DARVO"). The sequence now before the Court is consistent with that pattern. Google published a false statement about Dr. Isaacs, left it undefended when confronted with the cited order, and then moved to strike Dr. Isaacs' documented defense, while portraying him as the procedural wrongdoer for defending his integrity.

13. Dr. Isaacs' law school applications are pending now. As a recommender, I am familiar with the weight that process places on character and candor. A published federal appellate brief asserting that a sanctions order issued against an applicant creates a direct and immediate need to protect the accuracy of the record. Dr. Isaacs must address Google's statement in his applications as well as in this Court. That burden is current and ongoing.

14. The exhibits filed with Document 32 establish the human and professional stakes that support Dr. Isaacs' requested extension. They also answer the extra-record character account Google itself chose to place in this appeal.

15. As of the date of this declaration, Google has neither defended the accuracy of its statement that a sanctions order issued against Dr. Isaacs nor corrected it.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on July 23, 2026, at Manchester, New Hampshire.

/s/ Keith A. Mathews
KEITH A. MATHEWS
American Wealth Protection
1000 Elm Street, Suite 800
Manchester, NH 03101
(603) 622-8100
keith@awplegal.com
Counsel for Plaintiff-Appellant
Greenflight Venture Corporation

Stanford University Law School  
Fall 2026 - JD Application

Isaacs, Jeffrey  
L440█████

## 1. Biographical

Applicant full name  
**██ Jeffrey Isaacs**  
Previous (other) name  
*no answer provided*  
Preferred or chosen first name  
**Jeffrey**  
Date of birth  
**0███████7**  
Place of birth: City/State/Country  
**████████ PA United States of America/Territories**  
LSAC account number  
**L44█████**

## 2. Biographical (Continued)

1. Select an umbrella category to describe your gender identity for systems and reporting purposes that can only support a single option.  
**Man**  
2. Please select the pronouns you use from the options below.  
**he/him/his**

## 3. Contact Information

**1. Current Address**  
Current address  
██████████  
**United States of America/Territories**  
Current mailing address good until date  
**01-March-2027**  
Current day phone number  
██████  
Current evening phone number  
██████

**2. Permanent Address**  
Permanent address  
██████████  
**United States of America/Territories**  
Permanent mailing address good until date  
**01-January-2027**  
Permanent day phone number  
██████  
Permanent evening phone number  
██████

**3. Other Contact Information**  
Primary email address  
██████████  
Secondary email address  
*no answer provided*  
Cell phone number  
██████  
Will accept text message to cell phone  
**Yes**

## 4. Demographics

**1. Citizenship**  
Citizenship  
**US Citizen**  
Country of citizenship  
**United States of America/Territories**  
Permanent resident number  
*no answer provided*  
Visa/Sevis number  
*no answer provided*

Page 1

Stanford University Law School                                      Isaacs, Jeffrey
Fall 2026 - JD Application                                                   L440████

Permanent city/state/country
*no answer provided no answer provided no answer provided*
What is your native language?
*no answer provided*

## 2. Ethnicity

████████████

## 5. Demographics (Continued)

This section does not apply to me.

## 6. Military Service

This section does not apply to me.

## 7. Background Information

1. Are you within the first generation of your family to attend a 4-year college or university?
*no answer provided*
2. Are you within the first generation of your family to attend graduate or professional school?
*no answer provided*
3. Did you grow up in a low-income household?
*no answer provided*
4. Parent/Guardian 1 Name:
Lynn ████ Ragsdale ████
5. Parent/Guardian 1 Address:

████████████████

Pennsylvania
United States of America/Territories
1████
6. Parent/Guardian 1 Education: List highest degree obtained and institution at which degree was obtained.
BA (English), ██████ University
7. Parent/Guardian 1 Profession/Occupation:
Retired(Director of Institutional Giving), Children's Hospital of Philadelphia
8. Parent/Guardian 2 Name:
William ████ Isaacs
9. Parent/Guardian 2 Address:

██████████████████

Florida
United States of America/Territories
████
10. Parent/Guardian 2 Education: List highest degree obtained and institution at which degree was obtained.
████Universit ████████
11. Parent/Guardian 2 Profession/Occupation:
██████████
12. Do you have any relatives who have attended Stanford Law School?
No
13. If so, please indicate their names, relationship to you, and year of graduation from Stanford Law School.
*no answer provided*

## 8. Previous Application

1. Have you previously applied for admission to Stanford Law School in the last three years?
No
2. If so, please select the entry year(s) for which you applied:
*no answer provided*

## 9. Education

1. List ALL educational institutions attended.

American University of the Caribbean
Education type
Graduate
Location
Cupecoy Saint Martin (Dutch part)
Attendance Dates

Page 2

8

Stanford University Law School                                      Isaacs, Jeffrey
Fall 2026 - JD Application                                          L440█████

        **08/2006 to 05/2010**
   Degree and Degree Date
        **MD 05/2010**
   Major
        **PREMEDICAL/MEDICINE**
   Other Major
        *no answer provided*
   GPA
        *no answer provided*
   Rank
        *no answer provided*

**INSEAD-Wharton MBA Program**
   Education type
        **Graduate**
   Location
        **Singapore Singapore**
   Attendance Dates
        **08/2002 to 01/2004**
   Degree and Degree Date
        **MBA 01/2004**
   Major
        **INTERNATIONAL BUSINESS**
   Other Major
        *no answer provided*
   GPA
        *no answer provided*
   Rank
        *no answer provided*

**VANDERBILT UNIVERSITY**
   Education type
        **Law**
   Location
        **NASHVILLE Tennessee United States of America/Territories**
   Attendance Dates
        ████████
   Degree and Degree Date
        *no answer provided*
   Major
        *no answer provided*
   Other Major
        *no answer provided*
   GPA
        *no answer provided*
   Rank
        *no answer provided*

**DARTMOUTH COLLEGE**
   Education type
        **Undergraduate**
   Location
        **HANOVER New Hampshire United States of America/Territories**
   Attendance Dates
        **09/1996 to 06/1999**
   Degree and Degree Date
        **BA 06/1999**
   Major
        *no answer provided*
   Other Major
        *no answer provided*
   GPA
        *no answer provided*
   Rank
        *no answer provided*

**UNIVERSITY OF PENNSYLVANIA**
   Education type

Stanford University Law School
Fall 2026 - JD Application

Isaacs, Jeffrey
L44▮▮▮▮

**Undergraduate**
Location
**PHILADELPHIA Pennsylvania United States of America/Territories**
Attendance Dates
**09/1995 to 05/1996**
Degree and Degree Date
*no answer provided*
Major
*no answer provided*
Other Major
*no answer provided*
GPA
*no answer provided*
Rank
*no answer provided*

2. Have you ever attended any law school?
**Yes**
3. Did you leave the law school under less than good standing?
**No**
4. Has your education in college, university, or professional school been interrupted for one term or more for any reason?
**Yes**
5. If your education was interrupted, explain the circumstances.
**My MD enrollment at USC Keck was annulled, which subsequently impacted Graduate Medical Education at Dartmouth-Hitchcock Medical Center. See Addenda, which addresses Character & Fitness Academic response of "No" to Question 1.**
6. List academic honors and awards, or other recognitions you have received.
Name of Award/Honor
**Ben Franklin Scholar**
Date/Term Received
**05/1996**
Description
**Top 5% of First Year Class**
School
**University of Pennsylvania**
Name of Award/Honor
**Honors A.B. Dipoma**
Date/Term Received
**06/1999**
Description
**Information Theory search-engine thesis**
School
**Dartmouth College**

## 10. Employment
1. List all employment including internships
**Greenflight Venture Corporation**
Employment type
**Part-time**
Location
**Wellington FL United States of America/Territories**
Employment Dates
**06/2012 to**
Position
**Founder**
Hours per week
**35**
Reason for leaving
*no answer provided*
This employment was during the academic year
**No**

**Merrill Lynch**
Employment type
**Full-time**
Location
**New York NY United States of America/Territories**
Employment Dates

Page 4

10

Stanford University Law School
Fall 2026 - JD Application

Isaacs, Jeffrey
L440

**07/2000 to 05/2002**
Position
**Analyst IBK**
Hours per week
**100**
Reason for leaving
**MBA**
This employment was during the academic year
**No**

**Cairnwood Capital International**
Employment type
**Full-time**
Location
**Paris France**
Employment Dates
**08/1999 to 05/2000**
Position
**Venture Capital**
Hours per week
**60**
Reason for leaving
**One year position**
This employment was during the academic year
**No**

2. Full-time job experience
Total number of months
**140**
3. List your extracurricular, community, or other activities.
Name/Organization
**Ornithology**

Dates
**2011-Present**
Description
**General hobb** 
Hours/Week
**10**

## 11. Standardized Testing

1. If you have taken or plan to take the LSAT, please indicate test dates (mm/dd/yyyy).
**12/08/2025**
2. If you have taken or plan to take the GRE, please indicate test dates (mm/dd/yyyy).
**10/11/2023**

## 12. Other Stanford Programs
**This section does not apply to me.**

## 13. Character & Fitness

1. Have you ever at any college or university been in other than good standing because of academic deficiencies, been sanctioned for misconduct, or been the subject of disciplinary proceedings?
**No**
2. Have you ever been convicted of, or is any charge now pending against you for any crime other than a traffic violation?
**No**
3. Have you ever been subject to discipline by a professional organization?
**Yes**

## 14. Notices & Certification
1.
# Demographics (Continued)

Upon admission, Stanford Law School may contact you for outreach purposes based on information provided in the Biographical,

Page 5

Stanford University Law School
Fall 2026 - JD Application

Isaacs, Jeffrey
L440

Demographics, Demographics (Continued), and Background sections. Do you consent to participating in Stanford Law School's outreach efforts?

Yes

2.
# Consent Details

If you wish to opt out of certain outreach efforts, please inform us accordingly below.
*no answer provided*

3.
# ABA Bar Admission Notification

The American Bar Association requires that applicants for admission to law schools be advised to obtain information regarding the requirements for admission to the Bar in the state(s) in which the applicant intends to practice. Please be aware that all states evaluate the moral character and academic accomplishments of applicants for admission to the Bar, and some states require registration before beginning the study of law. In addition to a bar examination, there are character, fitness, and other qualifications for admission to the bar in every U.S. jurisdiction. Applicants are encouraged to determine the requirements for any jurisdiction in which they intend to seek admission by contacting the jurisdiction. Addresses for all relevant agencies are available through the National Conference of Bar Examiners.
**I acknowledge the above.**

4.
# Notices: Stanford Non-discrimination Policy and Campus Security

Stanford University admits qualified students of any race, color, national or ethnic origin, sex, age, disability, religion, sexual orientation, gender identity, veteran status, or marital status to all the rights, privileges, programs, and activities generally accorded or made available to students at the University. Consistent with its obligations under the law, in the administration of the University's programs and activities, Stanford prohibits unlawful discrimination on the basis of race, color, national or ethnic origin, sex, age, disability, religion, sexual orientation, gender identity or expression, veteran status, marital status or any other characteristic protected by applicable law; Stanford also prohibits unlawful harassment including sexual harassment and sexual violence. Race, color, or national origin includes shared ancestry or ethnic characteristics.

Stanford's Title IX Coordinator is responsible for administering Stanford's policies that prohibit discrimination based on sex or gender. Stanford's Title VI Coordinator is responsible for administering Stanford's policies that prohibit discrimination based on race, color, national or ethnic origin and shared ancestry. The following person has been designated to handle inquiries regarding all other types of discrimination under the nondiscrimination policy: Stanford's Director of the Diversity and Access Office, Krista Martinelli, Kingscote Gardens, 419 Lagunita Drive, Suite 130, Stanford, CA 94305-8550; (650) 723-0755 (voice), (650) 723-1791 (fax), sndpolicy@stanford.edu (email). Stanford's Title IX and Title VI Coordinator, Adrienne Lyles, has been designated to handle inquiries regarding sex, gender, race, color, national or ethnic origin and shared ancestry, as well as inquiries regarding sexual harassment and sexual violence: Kingscote Gardens, 419 Lagunita Drive, Suite 310, Stanford, CA 94305; (650) 497-4955 (voice), titleix@stanford.edu (email). Individuals may also file complaints directly with the Office for Civil Rights, within the United States Department of Education, by following the information on this website: https://www2.ed.gov/about/offices/list/ocr/complaintintro.html

Stanford University complies with the Jeanne Clery Disclosure of Campus Security Policy and Crime Statistics Act. A copy of Stanford's policies and statistics under this act are posted on the Department of Public Safety web site. A paper copy can be obtained by calling the Stanford Department of Public Safety at (650) 723-9633.
**I acknowledge the above.**

5.
# Certification

If you are offered admission, Stanford reserves the right to withdraw that offer of admission (even after enrolled attendance) if: 1) you show a significant drop in academic performance or fail to graduate from your current program; 2) there has been a misrepresentation in or a violation of any of the terms of the Stanford Law School (SLS) application process; 3) we learn that you have engaged in behavior prior to the first day of enrolled SLS attendance that indicates a serious lack of judgment or integrity; or 4) you reserve a place in our entering class and make an enrollment commitment or make a deposit at another law school. Stanford further reserves the right to require you to provide additional information and/or authorization for the release of information about any such matter.

We look forward to reviewing your application materials. We know that getting feedback, whether from a friend, parent, instructor, or other resource, is a potential aspect of drafting and revising creative work. We recognize you may seek feedback in developing your application to Stanford Law School; however, the work itself must ultimately be your own. Before completing your application and in accordance with the spirit of Stanford's Honor Code, we ask you to acknowledge that the work submitted in your application is ultimately your own.

By submitting this application electronically, I agree to the terms and conditions of the Stanford Law School admissions process (including those stated in the JD Application Procedure section on the Stanford Law School admissions website, and/ or as stated

Page 6

13

Stanford University Law School
Fall 2026 - JD Application

Isaacs, Jeffrey
L44

above). I hereby certify that the information provided on this application form and in any attached materials is true and complete, and that the personal statement and any submitted essays are my own work. I shall promptly inform the Law School if there is any change in any of the facts indicated herein. I also understand and agree that acceptance is conditional upon meeting any further requirements, terms, or conditions expressed at the time of acceptance. The Law School does not authorize nor is it bound by any requirements or conditions other than those communicated by the Office of Admissions.

**I acknowledge and agree to the above.**

Page 7

Jeffrey D. Isaacs
L440 ████

Dear Admissions Committee,

Thank you in advance for your time and consideration of the following statement concerning disputed disciplinary records from USC Keck School of Medicine. Below is a concise overview of these connected incidents, which collectively represent an unfortunate decades long saga. Documentary evidence is provided with corresponding institutional evidence. To clarify, I have never been charged with, nor convicted of, any crime. All controversies were civil regarding medical training and licensure, and no ongoing sanctions exist.

| Year | Institution | Issue | Resolution & Present Status |
|------|-------------|-------|----------------------------|
| 2005-2008 | Keck School of Medicine, Univ. of Southern California | Administrative charge of "failure to maintain essential characteristics" after I challenged certain conduct. | Two *court enforced settlement agreements* (2007 & 2008) *sealed* the disciplinary file, annulled the enrollment contract, and *acquitted* me of all charges. The LAPD declined to press charges. |
| 2011-2012 | Dartmouth-Hitchcock Medical Center (Psychiatry) | Program ended a federally funded position amid a dispute over whether the sealed USC matter had to be disclosed. | NH Employment Security Tribunal ruled my nondisclosure *proper* in light of the USC expungement; AAMC concurred. |
| 2012 | New Hampshire Board of Medicine | Board issued a sanction for nondisclosure of the USC matter (again ignoring the seal and acquittal). | An expired training license was revoked as reprimand for nondisclosure. |

**Detailed Chronological Discussion**

**2005–2006:  Administrative action at USC Keck School of Medicine**
A personal dispute with a classmate escalated to an appearance before the Keck Student Performance Committee. The committee suspended then dismissed me for "failure to maintain essential characteristics of a physician," which are a set of academic qualifications deemed necessary to be a medical student at Keck.  I contested both process and outcome in federal court (*Cal. Central cv-06-3338-GAF*). Two settlements ensued which I maintain have annulled the entire matter. The intent of the settlement agreements with USC is not reasonably disputable. I offered to dismiss the individual defendants upon USC's agreement to seal my disciplinary files, specifically making it the singular condition of dismissal. "By completely sealing and clearing my record at USC, your client will be removing any burden on me to disclose these events in future career endeavors. I believe this makes everyone better off." (*SAC Exhibits*, p. 8) The only consideration was my disciplinary record sealing in exchange for dismissal of the USC defendants. The actual language of the settlements reinforces that USC was aware of and committed to fully sealing and acquitting any disciplinary charges:

- **Individual Settlement (July 17, 2007):**

14

*"USC will not release or disclose Isaacs' disciplinary records to any third party, including but not limited to other educational institutions and/or potential employers, unless it receives written consent from Isaacs or a subpoena or court order."* (*Bates* 2*, Ex. p.74*)

- **Global Settlement (March 31, 2008):** This agreement further solidified the exoneration: *"As a material inducement to Isaacs to enter into this Agreement, USC does hereby irrevocably and unconditionally release, acquit, and forever discharge Isaacs from any charges, complaints, claims, liabilities, obligations, promises & agreements…of any nature whatsoever, known or unknown." Moreover, it specifically included, "The parties further agree that Isaacs is not required to disclose this matter to anyone."* (*Bates* 6*, Ex. p. 78*)

These provisions directly affirm that USC entered into a complete sealing of disciplinary history and release of all obligations for future disclosure. Under the Family Educational Rights and Privacy Act (FERPA), educational institutions have mandated federal obligations to disclose certain types of student disciplinary records and enrollment histories to authorized third parties, particularly other academic institutions and licensing bodies, even *without* the student's consent or a court order (see *20 U.S.C. § 1232g; 34 CFR Part 99*).

In my case, the executed settlement agreements expressly provided that USC could only release the disputed records by *subpoena or court order*. Because FERPA requires disclosure under certain circumstances (such as requests from subsequent schools or licensing authorities) for USC to lawfully commit itself to a blanket nondisclosure without including exceptions for these scenarios necessarily implies USC legally treated these records as effectively *expunged, annulled, and rendering me factually innocent.* Under federal law, USC could not agree to withhold these academic disciplinary records unless the records themselves no longer had any recognized academic validity. USC's extraordinary contractual promise not to disclose the records (except upon court order) demonstrates conclusively that USC considered the records legally nullified and exonerated, in line with a "factual innocence" standard (analogous to California Penal Code § 851.8). To argue otherwise places USC in a contradictory and untenable legal position: either USC entered an unlawful agreement it could never uphold under FERPA, or it genuinely and lawfully intended to expunge and annul these records as legally non-existent. The latter interpretation is both logically and legally favored, and was demonstrably the parties' mutual intent. The statutory role of FERPA therefore provides independent confirmation that my reliance on the settlements' language of "complete sealing and clearing" and "factual innocence" was entirely reasonable and justified.

### 2011–2012:  Dartmouth Hitchcock Residency

Despite the existence of two valid settlement agreements, Dartmouth terminated my residency training alleging "dishonesty" for nondisclosure. Dartmouth's Program Director, Christine Finn, however, openly acknowledged under oath that despite her unilateral authority to terminate my federally funded graduate medical education, she did not possess the legal expertise to interpret the USC settlement agreements. "I did not know the specifics of the law that governs sealed academic records…They were a little confusing…I'm not comfortable legally" (*Deposition p. 130, Ex. p. 52*). Further, Finn candidly admitted she would defer to a competent authority such as AAMC—yet Dartmouth subsequently refused to reinstate me, and cancelled the "Fair Hearing" required under accreditation bylaws, despite the AAMC's positive determination and Finn's promise (*Deposition p. 132, Ex. p. 52*)

15

Although the Keck records were at times mischaracterized as a behavioral violation or even criminal record[1], the faculty surgeon who issued my final clinical performance assessment at Keck saw something very different:

> *"Jeff is a sensitive, soft-spoken young man who works hard as a student physician.  He thinks logically, has a good fund of knowledge and embraces constructive comments.  His verbal milestone was very well organized.  He is strikingly kind and intelligent and implements his assets maximally." (USC clinical evaluation, Bates* 593*, Ex. p.103).*

That assessment is consistent with every other academic setting in which I have studied: Penn (Ben Franklin Scholar), Vanderbilt Law, Wharton, INSEAD, Dartmouth (undergrad honors), American University of the Caribbean (neurosurgery level board scores), and Villanova. None of these institutions ever invovled conduct concerns.  I have always cherished the educational opportunities I was fortunate to attain, and would never intentionally place them at risk. The 2006 Keck dispute therefore stands out not as a pattern but as an isolated conflict involving a small circle of classmates and administrators who became locked in competing allegations, and ultimately created liability for each other which made a scapegoat convenient.  To this day – nearly two decades later – I firmly maintain that this entire disciplinary matter at USC Keck was exaggerated to the point of being frivolous, arising from a small group of individuals in Los Angeles whom I encountered under unfortunate circumstances. The cascade of allegations, counter-allegations, and administrative retaliation was, in my view, the product of an imperfect if not corrupted process rather than any genuine reflection about my character or professionalism.

**2012–2014: New Hampshire Board of Medicine's Erroneous Determinations**
After two years of investigation, in 2014 the New Hampshire Board of Medicine (NHBOM) significantly compounded the injustice of my residency termination by publishing incorrect findings publicly. The Board held that the USC settlement contained "no provision sealing the disciplinary records," despite the specific language USC had plainly agreed upon (*NH Board of Medicine Order, Ex. p. 60*). Moreover, the Board acknowledged that USC never followed through on its promise to remove the disciplinary actions, effectively punishing me for USC's contractual failure. This fundamentally erroneous order had severe and lasting impacts on my medical career and personal reputation. It should be noted that the NHBOM hearing proceeded *in absentia*, despite a request to appear by video conference and postpone in light of a significant blizzard. *Id.*

My understanding of the settlement obligations was repeatedly confirmed by impartial bodies:

- **AAMC ERAS (May 2012):** After careful examination, AAMC stated my viewpoint of USC being nondisclosable annulled records was "reasonable" and AAMC thereafter expunged its own investigation completely. (*AAMC email dated May 3, 2012, Ex. p. 50*)

- **NH Employment Security Tribunal (June 2012):** An independent tribunal conducted extensive cross-examination and concluded my reliance on the settlement agreements was

---

[1] USC's own records prove they improperly maintain transcripts reporting this as a "non-academic" (i.e. conduct) violation, which it was not. "Essential Standards" are curricular requirements by definition. See *USC Dismissal Letter* identifying "Essential Standards" as cause for issuance. (*Bates* 416*, Ex. p 101)*. Early documentation from both Dartmouth and the NHBOM claimed the organizations did not hold the "underlying" Keck accusations against me on the merits, but rather, objected solely to the nondisclosure of past training on my residency application.

16

justified and sufficient grounds not to disclose the USC disciplinary event. "Reliance on the USC settlement agreements served as a sufficient reason to not disclose USC on his Dartmouth application." (*Affidavit, p.3*)

Thus, multiple independent assessments indicate the settlements absolved me of all disclosure obligations and found I can treat the underlying student controversy as a nullity. While it may initially seem unusual for an institution and a student to agree to treat an academic record as fully sealed, expunged, and annulled – as though the enrollment never occurred – the reality is that private entities enjoy substantial latitude under the law to structure binding agreements that fit their particular circumstances. Just as competitors in a compromised race might annul its result due to referee bribery or participant cheating, USC and I agreed that my enrollment had been fundamentally compromised by the disputed disciplinary process. As such, our mutual decision to legally treat my USC academic history as effectively annulled was both a legitimate and legally enforceable arrangement, entirely within our constitutional rights under contract law.

**2019: USC Disavows Settlement after Former Federal Prosecutor Uncovers Non-Compliance**
Nearly fifteen years after the fact, I learned that Keck dishonored the first settlement agreement almost immediately after the ink had dried. In 2019, USC refused mediation to address this breach, tersely stating they "decline" to discuss resolution, effectively admitting their intentional breach (*Letter from USC Counsel Andreas Meyer. Ex. p. 41*). USC's denial of the settlement intent sparked a stern dissent from a Ninth Circuit judge.
My following statement is responsive to a follow-up query from the US Office of Civil Rights "**How did you learn in August, 2019 that USC did not seal your records?**":

> *"The 'AAMC profile' (*Exhibits*, p.* 100*) was printed on June 14 2006 and placed in page 169 of my USC Keck SOM student file. I did not know this at the time. In 2007, the CACD cv-06-3338 litigation was in discovery, and I requested USC produce my entire Keck SOM student file. They claimed to do so, but omitted the AAMC profile. Had they included it, the past twelve years of confusion and proceedings simply would not have happened. I would have realized they were dishonoring the settlement agreement and the matter would have been resolved that year. As it turns out, USC responded to a Dartmouth subpoena in early 2015, which also requested my entire Keck SOM file. This time, they included the AAMC profile (the Deans had resigned from USC and counsel had changed, presumably the prior efforts to cover up this document were no longer enforced). Because the Keck SOM student file is approximately 400 pages, my attorneys and I only noticed the difference upon review of the document in August 2019. We were scrutinizing evidence during correspondence with USC/Fogelman and discovered the discrepancy. I understand that because the AAMC profile was intentionally withheld in 2006, equitable estoppel will prevent them from now raising statutes of limitations on the matter."*

Ultimately USC joined the NHBOM's position that nothing "sealed" the records. Gibson Dunn Partner James Fogelman declared "nothing in the settlement acquitted Isaacs." That single line, signed by Gibson Dunn on USC's behalf, was a total about-face from the 2007/2008 contracts in which USC expressly promised to "[release, acquit and forever discharge] Isaacs from any charges…of any nature whatsoever" and to keep the disciplinary file sealed unless compelled by court order (Individual Settlement §2; Global Settlement §5). Seeing a global law firm – whose partners now bill in the eight figures – assert that those very settlements mean nothing drove home a larger

17

truth: deeply connected counsel can rewrite history in a few dismissive sentences, and the integrity of every field they touch (from environmental stewardship to consumer safety) is jeopardized. Experiences like this convinced me that society desperately needs more safeguards in place for legal proceedings.

**Conclusion**

Multiple institutions and courts have had to grapple with this entirely preventable situation. My correctness in relying on the settlement language has been repeatedly confirmed by neutral third parties. I therefore respectfully submit to the Admissions Committee that the settlements absolved me of any future disclosure obligations. Independent third-party assessments validated my correct understanding and actions. Subsequent allegations were consequences of USC's intentional breach and not due to any dishonesty on my part.

As I complete my legal studies, I seek to move forward and contribute constructively, bringing with me the invaluable insights gained from this adversity. There exists no single lesson learned or regret; no single etiology identified with the benefit of hindsight. Rather, a substantial collection of knowledge emerged from these adverse experiences. My perspective on conflict, litigation, and even our sociological infrastructure, generally, will be forever guided by this journey.



various reasons that lead us to the program. By the end, and over a decade later, my peers often identify it as the single most formative experience of their lives. We went to the island after being denied a medical curriculum, but the camaraderie we forged was ▨▨▨▨▨▨▨▨▨▨

Sincerely,

*Jeffrey D. Isaacs*

Jeffrey D. Isaacs, M.D.

18

I have had the chance to work in areas that are now converging into the central legal and moral questions of the next decade: computing, medicine, and the realities of regulating concentrated power that has never existed until now. I now aim to formalize this experience and join a community where I can be a contributor to the leadership society will desperately need as technological change accelerates faster than ever before.

My academic life began in computer science at Dartmouth during the early Internet boom. At the time, the prevailing mood was optimistic: that more connectivity would naturally create a more open and fair society. My first college term paper was about the Internet as a democratizing force for information. I still believe in the optimism that technology can improve the human experience. But I also watched the opposite become true. The same tools that empower individuals can concentrate control, which results in potential for misuse. Yesteryear's science fiction is the reality we now live in.

My exposure to medicine reinforced that lesson in a different language. While earning my MD/MBA, I trained in teaching hospitals including Mount Sinai, Cleveland Clinic Florida, and St. George's in London. Medical training forces one to think clearly under sustained pressure, recognize one's own weaknesses and bias, and perhaps most importantly, to accurately observe, document, and respond to the presenting needs of others. It also trains one in advocacy. For me that means continuously analyzing how institutions might fail a patient, and mitigating whenever possible.

During medical school, an adverse matter changed my path; I address it fully in the addendum. The losses that followed affected not only me, but those who trained and believed in me, depended on me, or were otherwise connected to me. I learned we truly are a part of something bigger than the individual. This deepened my respect for what law is supposed to be at its best: a discipline of fairness and due process, and a way for a person to be heard when what is expedient contradicts what is right.

19



. I have learned that these disputes are not merely economic concerns. They affect not only competition, but censorship, individual autonomy, and even the routine aspects of daily life.

That is why I am pursuing a J.D. at Stanford. I am not a young person looking to make a living. I am someone hoping I might be able to benefit the world with what I have seen. My goal is to become a lawyer who can work genuinely at the junction of medicine, technology, and regulatory leadership so that the future we are entering remains compatible with human dignity, truth, and the natural world.

20

My understanding of how the open internet should function in a democratic nation was diametrically opposite to the position advanced by Apple and Gibson Dunn to the courts. Apple has been ranked as the most admired corporation for nearly two decades, is the largest corporate entity in history, and arguably the greatest American success story of all time. Their attorneys are considered the best in the field and have a remarkable understanding of the judicial system. How on earth could I seriously contend that my independent interpretation of their own digital marketplace was, actually, the intellectually correct one? There is no simple answer to this, and I, more than anyone, wishes there were. Years of diligent research and reflection can help refine how to tell a story. Perseverance allows newly unfolding circumstances to potentially challenge errors and contradictions by the opposing counsel. Public scrutiny, which has not truly occurred in this matter, certainly can influence outcomes. The only true consolation, and it is certainly just that, is the fact that the effort raised is admirable and worthy of debate, and might lay the foundation for future reform.

Since Senator Sherman first envisioned it in 1890, competition law has transformed into a field where scientific and technical understanding are paramount. In modern technology markets, power is built through mechanisms and algorithms that are easy to describe incorrectly if you don't understand the underlying function. If law cannot see those mechanisms clearly, it cannot regulate them competently. Perhaps the single most striking aspect of my two decades of litigation is just how nearly impossible it can seem to convey a simple known truth to others. This is especially true if a highly respected entity presents a different view of the truth.

I am motivated as a calling to apply my experiences to help in whatever way society will need most. Artificial intelligence will cause social structures to be stressed, torn down, and rebuilt. Even with good intentions, there will be harms no one can fully prevent. In the life sciences, the challenge is even more direct. The capability to design and "print" biological life will be a reality. I recall at ✖✖✖✖✖✖r in 2015 I ✖✖✖✖✖✖ what scared me about AI most, if it ever came

21

22

to fruition, wasn't AI itself but an AI that understood the biological genome and phenotype relationship.  By the time I would graduate from Stanford Law School, I believe ████████ ██create living things that would have been unthinkable a generation ago. We need legal thinkers who understand what the technology is, what the incentives are, and what real preventative measures look like. And they need a safe community of peers to challenge dominant platforms.

22

**The library in the town where you grew up has been destroyed. Choose three books to contribute to rebuilding the library's collection.**

**Bruce A. Ragsdale, Washington at the Plow: The Founding Farmer and the Question of Slavery**

My uncle's book taught me what intellectual inquiry looks like over a lifetime. He served for two decades as director of the Federal Judicial History Office at the Federal Judicial Center, and this book was written after retirement about a subject and era he loves. It won Mount Vernon's George Washington Prize.

**Dr. Seuss, The Lorax**

It seems recently environmental concern often arrives categorized neatly into ideological camps and reduced to one's view on carbon accounting. *The Lorax* cuts beneath that. It insists that the underlying issue is stewardship of a shared home, and that responsibility is personal before it is political.

**Denis Judd, Lord Reading: Rufus Isaacs, First Marquess of Reading…**

A biography ███ █████████ ████████████████████████████████████████████████ ████████████████████████████████████████. I value it as a study in professional excellence, barriers overcome, and the moral strain of authority.

24



VANDERBILT
Law School

*Office of Student Life*

January 13, 2026

## CERTIFICATE OF ENROLLMENT

This is to certify that **Jeffrey Isaacs** attended Vanderbilt University Law School as a full-time student from August 23, 2004, through December 18, 2004. Additionally, he was enrolled as a full-time student from August 25, 2003, through September 24, 2003; and from January 10, 2005, through February 21, 2005. He was in good academic standing when he withdrew as a student.

Vanderbilt University Law School is accredited by the American Bar Association, which originally approved the school on January 20, 1925.

Rachel P. Harrell
Director of Academic Operations

VANDERBILT
Law School

24

**VIA EMAIL**

March 23, 2026

Kenneth C. Smurzynski (ksmurzynski@wc.com)
Edward M. Mullins (emullins@reedsmith.com)

**RE:** *Greenflight Venture Corp., et al. v. Google LLC*, **No. 26-10369 (11th Cir.)**

Google Counsel:

I am writing to formally identify a series of material misrepresentations and procedural violations contained in Google's recent court filings. I formally request that Google immediately concede these errors and indicate in writing how it intends to correct the record before the Eleventh Circuit.

As you are aware, this litigation alleges that Google more likely than not committed felony witness retaliation under 18 U.S.C. § 1512 by destroying OkCaller to punish protected petitioning. Notably, please confirm that at no point has Google ever refuted that they terminated OkCaller after learning about my antitrust petitioning. This is significant given the fact we are three years into litigation, including Mr. Mathews' eighteen months of pre-litigation attempts to mediate this matter amicably. Your recent appellate tactics confirm that this retaliatory posture has transitioned from the competition market into the courtroom.

Your contradictory postures on the FRAP Local Rules demonstrate procedural bad faith. In Document 22, you explicitly moved to deny our extension based on a "failure to consult with opposing counsel before filing." Yet, in that same document, you embedded a "Request" for affirmative relief—asking the Court to grant summary affirmance as unopposed—without seeking my assent or the assent of Greenflight's counsel on that request or the underlying motion. You cannot use 11th Cir. R. 27-1 as a shield while simultaneously using the lack of conferral as a sword to attack a pro se party. This is a bad faith application of the rules intended to manufacture a procedural default and evade the merits from being properly heard.

There exist multiple instances where you violated your Duty of Candor. You represented to the Court that your motion was "unopposed" while in full possession of Greenflight's March 17 Emergency Motion (Doc. 19), which explicitly requested a "corresponding adjustment of any related briefing deadlines." To represent a motion as "unopposed" while an active request for an extension of that very deadline is pending is a blatant attempt to mislead the judiciary and secure a dismissal that the facts do not support.

You have chosen to use the appellate record to improperly denigrate me as a "serial litigant." This is not zealous advocacy; it is a continuation of the underlying witness retaliation. By labeling me as "showing contempt for the Court's rules" in the same breath that you are violating them, you are attempting to prejudice the Court against a victim of your client's alleged felonies. I will not tolerate being subjected to further oppression and character assassination during the pendency of this appeal. It is ironic that you emphasize ill-will to my prior litigation (which was not 'serial') in

25

the very case accusing you of witness retaliation. I reserve all rights to raise this as evidence in future proceedings.

Your current tactics mirror your conduct in the court below regarding *Yelp v. Google*. You represented that those tying claims were dismissed, and you stood silent when I notified you that leave to amend was pending—and later, when those claims survived. You have a documented history of leaving misrepresentations on the record once they have served their purpose. I am identifying this pattern now to ensure it does not continue in the Eleventh Circuit.

I demand that you acknowledge these misrepresentations and rule violations identified above. Further, please indicate by 5:00 PM EST on March 26, 2026, exactly how you intend to correct these statements in the Eleventh Circuit.

If you do not provide a clear plan for corrective action, I will take all necessary steps to seek protection from this pattern of bad faith, denigration, and ongoing witness harassment.

I reserve all rights.

Sincerely,

Dr. Jeffrey D. Isaacs, pro se

26