**No. 26-10369**

---

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE ELEVENTH CIRCUIT**

---

GREENFLIGHT VENTURE CORPORATION AND JEFFREY D.

ISAACS,

*Plaintiffs-Appellants,*

v.

GOOGLE LLC,

*Defendant-Appellee.*

*ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF FLORIDA (NO. 9:24-cv-80395-RLR/KMM) (THE HONORABLE ROBIN L. ROSENBERG, J. AND K. MICHAEL MOORE, J.)*

---

# Reply Brief of Plaintiff-Appellant Greenflight Venture Corporation

---

Keith A. Mathews
American Wealth Protection
1000 Elm Street, Suite 800
Manchester, NH 03101
(603) 622-8100
keith@awplegal.com
Counsel for Plaintiff-Appellant
Greenflight Venture Corporation

# TABLE OF CONTENTS


INTRODUCTION ........................................................................................ 1

ARGUMENT ............................................................................................... 6

I. THE DISTRICT COURT NEVER TESTED THE VERBATIM DOJ MONOPOLIZATION CLAIM. ..................................................................... 6

II. GREENFLIGHT HAS STANDING BECAUSE GOOGLE DESTROYED A DIRECT COMPETITOR. ...................................................................... 7

A. OkCaller did not have to be another Bing. ............................................ 8

B. Greenflight was also Google’s customer. .............................................. 11

C. Google hoarded the data Greenflight needed to compete, then called Greenflight a non-competitor. ............................................................ 13

D. McCready does not help Google. ......................................................... 14

E. Greenflight is the right plaintiff, and the pleaded facts close the floodgates. 17

III. COUNTS I AND II WERE NOT WAIVED, AND THEY STATE CLAIMS. 18

IV. COUNT V WAS DISMISSED UNDER A RULE GOOGLE NOW CONCEDES IS WRONG. ..................................................................... 20

V. THE UNFAIR COMPETITION CLAIM DOES NOT RISE OR FALL WITH THE SHERMAN ACT. ....................................................................... 23

VI. THE ONE QUESTION THAT WOULD HAVE FOCUSED THE CASE ON SHERMAN IS THE QUESTION GOOGLE CALLED ABUSIVE. ..................... 24

CONCLUSION ........................................................................................ 28

## TABLE OF CITATIONS

** Authorities primarily relied upon.*

### CASES

American Tobacco Co. v. United States, 328 U.S. 781 (1946)............................. 21
Aquatherm Industries, Inc. v. Florida Power & Light Co., 145 F.3d 1258 (11th Cir. 1998)........................................................................................ 22
*Blue Shield of Virginia v. McCready, 457 U.S. 465 (1982) 2, 3, 4, 5, 8, 14, 16, 19
Bonner v. City of Prichard, 661 F.2d 1206 (11th Cir. 1981) (en banc) ................. 19
*Brown Shoe Co. v. United States, 370 U.S. 294 (1962) ............................... 10, 23
*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477 (1977)........... 10, 16
California Motor Transport Co. v. Trucking Unlimited, 404 U.S. 508 (1972)...... 28
Cargill, Inc. v. Monfort of Colorado, Inc., 479 U.S. 104 (1986) .......................... 18
*Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co., 20 Cal. 4th 163 (1999) ........................................................................... 23, 24
Construction Aggregate Transport, Inc. v. Florida Rock Industries, Inc., 710 F.2d 752 (11th Cir. 1983) ......................................................................... 17
Coronavirus Reporter v. Apple Inc., No. 3:21-cv-05567-EMC (N.D. Cal.).......... 25
Crimpers Promotions Inc. v. Home Box Office, Inc., 724 F.2d 290 (2d Cir. 1983) ......................................................................................... 17
Epic Games, Inc. v. Apple Inc., 67 F.4th 946 (9th Cir. 2023) .............................. 23
*Feldman v. American Dawn, Inc., 849 F.3d 1333 (11th Cir. 2017)............ 4, 5, 16
Fils v. City of Aventura, 647 F.3d 1272 (11th Cir. 2011)..................................... 20
Florida Seed Co. v. Monsanto Co., 105 F.3d 1372 (11th Cir. 1997) ..................... 10
*Giummo v. Olsen, 701 F. App’x 922 (11th Cir. 2017) (per curiam) (unpublished) ......................................................................................... 19
Hanover 3201 Realty, LLC v. Village Supermarkets, Inc., 806 F.3d 162 (3d Cir. 2015)........................................................................................ 16
In re Google Play Store Antitrust Litigation, 147 F.4th 917 (9th Cir. 2025) ......... 23
In re January 2021 Short Squeeze Trading Litigation, 105 F.4th 1346 (11th Cir. 2024)........................................................................................ 10
Inform Inc. v. Google LLC, No. 21-13289, 2022 WL 3703958 (11th Cir. Aug. 26, 2022) (per curiam) (unpublished)................................................................ 18
Lorain Journal Co. v. United States, 342 U.S. 143 (1951).................................... 11

Mandeville Island Farms, Inc. v. American Crystal Sugar Co., 334 U.S. 219 (1948) ........ 17
McGuire Oil Co. v. Mapco, Inc., 958 F.2d 1552 (11th Cir. 1992) ........ 28
Mr. Furniture Warehouse, Inc. v. Barclays American/Commercial Inc., 919 F.2d 1517 (11th Cir. 1990) ........ 16
*Ohio v. American Express Co., 585 U.S. 529 (2018) ........ 12, 13
Proton AG v. Apple Inc. (N.D. Cal.) ........ 26
*Spanish Broadcasting System of Florida, Inc. v. Clear Channel Communications, Inc., 376 F.3d 1065 (11th Cir. 2004) ........ 22
U.S. Anchor Manufacturing, Inc. v. Rule Industries, Inc., 7 F.3d 986 (11th Cir. 1993) ........ 22
*United States v. Google LLC, 747 F. Supp. 3d 1 (D.D.C. 2024) ........ 6, 9, 14
United States v. One Piece of Real Property Located at 5800 SW 74th Ave., 363 F.3d 1099 (11th Cir. 2004) ........ 19
United Technologies Corp. v. Mazer, 556 F.3d 1260 (11th Cir. 2009) ........ 12
*Woodham v. American Cystoscope Co., 335 F.2d 551 (5th Cir. 1964) ........ 19, 20
Yelp Inc. v. Google LLC, No. 5:24-cv-06101-SVK, ECF No. 47 (N.D. Cal. Apr. 22, 2025) ........ 11

## STATUTES

Clayton Act § 16, 15 U.S.C. § 26 ........ 18
Clayton Act § 4, 15 U.S.C. § 15 ........ 3, 16
Sherman Act § 2, 15 U.S.C. § 2 ........ 6, 11, 16, 18, 21

## RULES

Fed. R. Civ. P. 12(b)(6) ........ 2, 8, 11, 19
Fed. R. Civ. P. 26(c) ........ 28
Fed. R. Civ. P. 8(d)(2)–(3) ........ 12
S.D. Fla. Local Rule 7.1(c) ........ 19

## OTHER AUTHORITIES

Final Judgment, United States v. Google LLC, No. 20-cv-3010, ECF No. 1462 (D.D.C. Dec. 5, 2025) ........ 14

## INTRODUCTION

This case seeks meaningful structural reform against a digital duopoly that exercises unprecedented control over the daily lives of American citizens. The Answering Brief ("GAB") filed by Google is a testament to why that reform has been so severely delayed, and it showcases exactly how the duopoly games the federal legal system.

Communities across the country cannot readily regulate even Google's data centers opposed with near-unanimous local support over their water use and their strain on the power grid.[1] If one visible, tangible piece of this company is that hard to check, the difficulty of achieving structural reform of the monopoly itself, let alone of the duopoly, is monumental. It is bogged down by the exact type of bad faith legal evasion demonstrated in Google's Answering Brief.

Google's Answering Brief is a quintessential example of manufactured legal fiction meant to exhaust the judiciary. Count I of Greenflight's Second Amended Complaint ("SAC") is based verbatim on the Department of Justice's monopolization claim, the exact claim on which Google was recently held liable under the Sherman Act after a landmark trial. Yet somehow, Williams & Connolly persuaded the district court to toss these proven government claims under a local

[1] Latitude Media, Data Center Water Use Can Be a 'Black Box.' Google Aims to Change That (June 3, 2026) (reporting that Google's Oregon data center consumed nearly 40% of the city's total water).

briefing rule, promoting the fiction that Greenflight lacked standing to challenge a monopoly that the United States government just proved exists. Why was this even a real question in the court below? How exactly did Google's elite defense counsel convince a federal judge to dismiss claims mirroring a federal antitrust verdict without even conducting a proper Rule 12(b)(6) merits analysis?

They achieved it through a profoundly dishonest invocation of *Blue Shield of Virginia v. McCready*, 457 U.S. 465 (1982). *McCready* is a competition law labyrinth. It is a case convoluted enough to confuse the most seasoned antitrust expert, rendering the treatises of Herbert Hovenkamp elementary by comparison. *McCready* involved the nuanced standing tensions between a patient, a psychologist, and a Blue Shield insurance company. But Google's counsel intentionally warped this doctrine, claiming that OkCaller had to be an indirect "conduit" to hurt another general search engine, like Bing, in order to have standing to sue Google.

The proof of that maneuver lies within the text of Google's own Answering Brief. On page 23, Google accurately quotes the governing rule: "The *McCready* plaintiff had standing because she was a participant in 'the very market directly distorted by the antitrust violation.'" GAB 23. But one page later, Google abandons its own cited rule. Instead of asking whether OkCaller was a participant in the directory market that Google directly distorted, Google suddenly demands

that Greenflight prove its erasure had the effect of "stifling Google's actual competitors in the general search engine market, such as Bing or Yahoo!" GAB 24.

This mid-breath bait & switch is a deliberate evasion. Google acknowledges that Section 4 of the Clayton Act protects participants in the market directly distorted, yet it refuses to acknowledge the downstream directory market defined in the SAC, forcing the standing inquiry exclusively into the upstream General Search market. In *McCready*, the Supreme Court explicitly warned against this exact type of defense engineering, declaring: "we have refused to engraft artificial limitations on the § 4 remedy." 457 U.S. at 472. *McCready* did not narrow Section 4 standing; it expanded it, establishing that even an indirect victim has standing when her injury is "inextricably intertwined" with the anticompetitive scheme. *Id.* at 484. Williams & Connolly is fully aware that vertical foreclosure of a downstream rival satisfies Section 4 standing. By contorting *McCready* to demand that a destroyed downstream directory provider must prove ricochet harm to Bing, Google manufactures the exact "artificial limitation" the Supreme Court expressly forbade.

To obscure the directness of Plaintiffs' injury even further, Google attempts to liken Greenflight to the dismissed plaintiff in *Feldman v. American Dawn, Inc.*, 849 F.3d 1333 (11th Cir. 2017). Google's analogy is insulting to the record. Greenflight is the polar opposite of the collateral linen commissions in *Feldman*.

Greenflight is not an employee, an agent, or a remote supplier seeking lost commissions from an unpled labor market. Greenflight is the producer and property owner whose primary commercial output (twelve million indexed, patented directory pages) was targeted and extinguished by Google's search index.

Truthful, accurate analogies would make this an open and shut matter. Consider a privatized highway that demolished the off-ramps to independent rest stops to force all drivers into its own, in-house restaurants. Or a monopoly grocery store that took an independent cereal off its shelves and threw it in the dumpster to ensure consumers could only buy Google's private-label brand. In these scenarios, the independent rest stop and the cereal maker suffer direct, textbook antitrust injury. OkCaller's customers, i.e. the end-users searching for phone numbers, might face a *McCready* hurdle if they attempted to sue Google for market distortion. But OkCaller does not. It is the direct target. It does not lack standing simply because it does not build asphalt highways or brick-and-mortar supermarkets. Yet, that is the absurd, intellectually dishonest logic Google sold to the court below to secure a dismissal.

This may very well explain Google's preference for a superseded pleading (GAB 5 n.2). The operative Second Amended Complaint does not allege a decline in search rank; it explicitly alleges an absolute, algorithmic erasure from twelve million indexed pages to zero (SAC ¶ 30). The operative pleading says so in terms:

OkCaller's pages "were not merely lowered in rankings; they were removed from the index." ¶ 62. The district court described the same fact—OkCaller's "views dropped to zero, or near zero." DE 65 at 5. On de novo review, this Court must evaluate the operative complaint as filed. Google's decision to recast the total market erasure of a 12-million-page directory as a website that merely "fell in prominence," GAB 2, combined with its distortion of *Feldman* and *McCready*, is an engineered evasion designed to avoid defending its actual exclusionary conduct.

This procedural gamesmanship is a direct extension of the exact same corporate playbook exposed by the DOJ "Communicate with Care" program. It is the same dishonest application of federal rules to subvert the Sherman Act. When a monopolist must resort to citing superseded complaints, and inventing non-existent "conduit" requirements, the legal emptiness of its position is evident.

In the era of Artificial Intelligence, the consequences of another decade of lost Sherman Act enforcement are existential. George Orwell's warning of an inescapable "Big Brother" is materializing not through a totalitarian government, but through a private, unaccountable corporate duopoly that unilaterally decides which businesses exist, which information is discoverable, and which voices are erased from the public square. This Court's intervention is respectfully requested.

# ARGUMENT

## I. THE DISTRICT COURT NEVER TESTED THE VERBATIM DOJ MONOPOLIZATION CLAIM.

Count I of the SAC is explicitly captioned: "Maintaining Monopoly of General Search Engines in Violation of Sherman Act § 2 (DOJ Verbatim Cause of Action)" (SAC ¶¶ 106–112). Its elements track the government's complaint: the general search market, Google's monopoly power in it, ¶ 68, and exclusionary distribution agreements that "lock up the preset default positions for search access points." ¶¶ 107–109. Following a nine-week trial, Judge Amit Mehta held that this exact conduct violated Section 2 of the Sherman Act: "Google is a monopolist, and it has acted as one to maintain its monopoly." *United States v. Google LLC*, 747 F. Supp. 3d 1, 32, 187–88 (D.D.C. 2024). It is legally untenable for Google to defend (and for the district court to have entered) a dismissal that swept away the very monopolization theory the United States just proved against this same defendant, on the ground that the brief describing it was "an incoherent collection of technical jargon and legal phrases." DE 65 at 7.

To defend the district court's dismissal, Google makes a bold, and ultimately false, assertion to this Court. Google claims: "Plaintiffs did not suggest anywhere outside Greenflight's response to Google's motion to dismiss that OkCaller is Google's customer. Compare Dkt.63:p.3, with Dkt.61." GAB 17. That statement is directly contradicted by the plain text: "Plaintiffs are consumers of Google GSE

platform through their provision of content via tools like GWT." SAC ¶ 110. Furthermore, Paragraph 64 of the SAC explains the mechanics of this consumption, defining GSEs as platforms serving "two symbiotic customer groups: end-users seeking information and the developers and publishers who supply content to be discovered." ¶ 64.

Paragraph 110 does more than establish consumer status. It also alleges that Google "leveraged this monopoly to injure downstream … Directory Services as a whole by reducing competition and consumer choice," and that, given index access, Plaintiffs would be competitors. ¶ 110. That is what Count I adds to the government's framework: the private plaintiff's place in the market. Read with ¶¶ 64–67 and 74–79, those allegations supply the market participation the district court said it could not find.

## II. GREENFLIGHT HAS STANDING BECAUSE GOOGLE DESTROYED A DIRECT COMPETITOR.

Google insists that under *Blue Shield of Virginia v. McCready*, 457 U.S. 465 (1982), a plaintiff who does not operate a general search engine like Bing or Yahoo! can establish standing only if its injury served as an indirect "conduit" or "fulcrum" through which Google inflicted harm on an upstream search competitor. Google then asserts that because de-indexing OkCaller did not injure Bing, Plaintiffs' claims fail as a matter of law. When stripped of Google's artificial conduit theory, the standing inquiry under Rule 12 is straightforward. There is

direct market participation: Greenflight supplied content and consumed distribution through Google's search platform (SAC ¶ 110) while competing directly in the directory market (¶¶ 74–79, 94). There is direct causal injury: Google did not indirectly affect OkCaller; Google affirmatively de-indexed twelve million pages of OkCaller's content while leaving copycat competitors untouched and directing queries to Google's own directory properties (¶¶ 30, 38, 75, 94). And there is antitrust harm: the injury alleged is precisely what the Sherman Act addresses: the reduction of independent output, the degradation of search and directory quality, and the elimination of consumer choice by an upstream bottleneck monopolist (¶¶ 90–95). This is a textbook antitrust injury.

**A. OkCaller did not have to be another Bing.**

The SAC does not allege that OkCaller duplicated Google's general search engine. Rather, the SAC specifically defines two distinct, interdependent product markets and alleges Google's active participation in both. The upstream GSE market is where Google exercises a durable 90%+ distribution monopoly (SAC ¶¶ 63–70, 107–109). The downstream Directory Information Services market is a distinct, curated market for specialized reverse lookup queries where OkCaller competed, and where Google directly supplies its own integrated, rival directory answers (¶¶ 74–79, 94). By collapsing these two markets into one, Google pretends

that the only harm an upstream monopolist can inflict is harm against an upstream duplicate.

The government court drew the same line: specialized providers such as Yelp are not in the general search market, even though GSEs "may compete for … local queries against Yelp." 747 F. Supp. 3d at 114. That is the structure the SAC pleads, ¶¶ 75, 77, and it is why Google's rivalry with OkCaller was vertical rather than a contest between search engines. When framed this way, standing is not a multi-step puzzle. OkCaller is a direct competitor in the directory market, and Google used its search monopoly to crush it.

The analogies set out in the Introduction identify the legal error exactly. Google's defense to this Court is the equivalent of the supermarket arguing: "Because you do not build supermarket buildings (Bing), you are not our competitor, and you have no standing under the antitrust laws." That is not the law. The Sherman Act has never required a victim to duplicate the monopolist's entire distribution empire to challenge exclusionary foreclosure. A distributor that leverages its retail monopoly to destroy an independent brand on its shelves and capture the product market causes direct, actionable antitrust injury. The toll highway version has the same structure: tearing out a downstream rival's off-ramp while keeping the owner's own open is exclusionary conduct, and the stranded

repair shop suffers injury "of the type the antitrust laws were intended to prevent." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977).

Google does address the directory market, but its answer is that the market is "far too broad for Google to plausibly monopolize," because the SAC names Yelp, Whitepages, and Yellowpages as competitors. GAB 35. That misreads the complaint twice over. The SAC does not claim that Google monopolized directory services; its monopoly claim is general search (Count I). The directory market is where the injury landed and where Count II's restraint operates, and what the SAC principally alleges there is market power, ¶ 78, expressly reserving the monopoly-power question for discovery. And a market is not defective because it has competitors in it. Under *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962), the question is reasonable interchangeability of use, and ¶¶ 74–79 allege a distinct service (finding who is behind a number), identified providers, competition on "quality, reliability, and comprehensiveness" rather than price, and Google's own rival offering. Google's cases deny standing to plaintiffs hurt in markets they did not plead or occupy. *Florida Seed Co. v. Monsanto Co.*, 105 F.3d 1372, 1374–75 (11th Cir. 1997) (cited GAB 15). Here the SAC pleads the directory market, pleads OkCaller in it, pleads Google in it, and pleads what the erasure did to output, quality, and choice in it. ¶¶ 74–79, 90–95.

Google's remaining answer is that it runs no reverse phone site of its own; that misses the entire framework of vertical foreclosure. A gatekeeper does not need to duplicate every product on its platform to violate Section 2; it violates the law when it leverages its distribution monopoly to eliminate independent options and force users into its own monetized search results. *Lorain Journal Co. v. United States*, 342 U.S. 143 (1951).

The closest case is one Google discusses without naming. Yelp—a specialized local directory provider—alleged that Google leveraged its general search monopoly to promote its own local directory answers and suppress independent vertical rivals. The court sustained Yelp's Section 2 monopolization claims past Rule 12. *Yelp Inc. v. Google LLC*, No. 5:24-cv-06101-SVK, ECF No. 47, at 31–33 (N.D. Cal. Apr. 22, 2025). Google calls it a "nonbinding, distinguishable order … analyzing different antitrust claims," GAB 13, but never identifies the distinction.

**B. Greenflight was also Google's customer.**

The district court was confused by Greenflight pleading that it was both a consumer of search distribution (via Google Webmaster Tools) and a competitor in directory services. These two roles do not contradict each other; they reflect the reality of multi-sided digital platforms. If a cereal brand is a consumer of a supermarket's shelf space, a web developer is a consumer of Google's search

distribution space. FRCP 8(d)(2)–(3) expressly authorizes plaintiffs to plead alternative, independent claims. This Court is "not troubled" by allegations a district court reads as inconsistent; Rule 8(d) permits them. *United Technologies Corp. v. Mazer*, 556 F.3d 1260, 1273–74 & n.14 (11th Cir. 2009). If Google Search is analyzed as a two-sided platform under *Ohio v. American Express Co.*, 585 U.S. 529 (2018), Greenflight participated directly on the publisher side (SAC ¶ 110). If the markets are analyzed separately, Google deployed its upstream GSE monopoly to vertically foreclose Greenflight from the downstream directory market (¶¶ 74–79, 94).

The publisher side is pleaded in facts: website owners "effectively 'purchase' distribution services" through Google's webmaster tools, the arrangement "mirrors a bookstore's role in distributing books from publishers to readers," and developers have no alternative with comparable reach. SAC ¶¶ 64–67. A publisher does not stop being the bookstore's customer because it owns no bookstore, or because it pays in content rather than dollars.

Google answers that *American Express* applies only to "two-sided transaction platforms" and that a search query is not one. GAB 17–19. The Court need not decide the classification. If search is a transaction platform, the SAC pleads participation on one side of a single platform market. If it is not, Google's own brief says the separate sides are then "considered independent markets," GAB

18, and the publisher-facing service pleaded at ¶¶ 64–67 and 110 is analyzed on its own terms. Either way there is a pleaded market in which Greenflight is a customer, and the district court never examined it.

**C. Google hoarded the data Greenflight needed to compete, then called Greenflight a non-competitor.**

Greenflight rests its standing on the two present roles just described, but the SAC pleads a third, and the district court's treatment of it shows the flaw in Google's whole approach. In SAC Paragraph 7, Greenflight alleged that its "previous success in large-data operations renders it a competitor to Google; with access to Googlebot's indexing raw data, Greenflight could, and would, develop competing GSE products." SAC ¶ 7. Paragraph 2 alleges that the government case proposed opening Google's index data to developers "like Plaintiffs," and ¶ 110 repeats the point. The district court rejected the theory because a search engine requires "significant capital, highly complex technology, access to effective distribution, and adequate scale," and Greenflight "possesses none of those things." DE 65 at 10–11.

That reasoning assumes its conclusion. It demands that a would-be entrant already hold the assets the monopolist's conduct keeps from it. The government court found that capital, distribution, and scale are precisely the barriers protecting Google's monopoly, and that Google's exclusive distribution agreements gave it "access to scale that its rivals cannot match." 747 F. Supp. 3d at 119–22, 159. The

remedial judgment now orders Google to share specified search-index and user data, and to syndicate its results, with "Qualified Competitors," a term that expressly reaches a "potential entrant" in general search with "a plan to invest and compete." Final Judgment §§ IV–VI, IX.E, IX.V, at 5–15, 30, 32–33, *United States v. Google LLC*, No. 20-cv-3010, ECF No. 1462 (D.D.C. Dec. 5, 2025). A monopolist cannot illegally hoard the essential data required to build a search engine, and then weaponize the resulting lack of horizontal competitors to claim that no one has standing to sue it.

The final judgment confirms that index data and syndication are the very assets a would-be entrant needs, corroborating the SAC's allegation that Google's control of that data is itself the barrier. Reviewing the dismissal de novo, that allegation cannot be rejected on the pleadings.

**D. McCready does not help Google.**

*McCready* is a doctrine for plaintiffs outside the restrained market. Carol McCready was a patient whose psychologist's care went unreimbursed; she needed a theory for why an outsider's injury counts, and the Court supplied one: her injury was "inextricably intertwined" with the scheme to exclude psychologists. Feldman needed the same theory and failed it. Greenflight needs neither. It participates in the directory market, that market is pleaded as restrained, and Google competes in

it. That is ordinary *Brunswick* antitrust injury; *McCready* is corroboration, not a prerequisite.

Foreclosure of a direct competitor in an adjacent market inflicts "injury of the type the antitrust laws were intended to prevent," *Brunswick*, 429 U.S. at 489, without any reference to *McCready*. Even viewing the case through upstream distribution, Google's reading of *McCready* is incorrect. *McCready* does not require a plaintiff to be collateral damage in a fight between giants. The defendants argued that because *McCready* was not a competitor psychiatrist, her injury was merely collateral. The Supreme Court rejected that argument, holding that *McCready*'s injury was "inextricably intertwined" with the anticompetitive scheme because denying her reimbursement was the exact mechanism used to exclude psychologists. 457 U.S. at 479, 484. Two features of that holding matter: the denial of reimbursement was "the very means" of the exclusion, *id.* at 479, and *McCready* was a participant in the market whose competition was distorted, *id.* at 480–81. Google keeps the first, discards the second, and then asks whether OkCaller was the means of harming Bing. But the SAC does not allege a scheme against Bing. It alleges a scheme against independent directory providers, carried out by deleting one of them from the index. ¶¶ 30, 75, 94. Google's theory would eliminate vertical foreclosure from Section 2 of the Sherman Act, immunizing any gatekeeper that crushes a downstream competitor so long as its horizontal peers are

unaffected. Section 4 of the Clayton Act, 15 U.S.C. § 15, gives a remedy to any person injured in business or property by conduct the antitrust laws forbid; it does not condition that remedy on a ricochet injury to a general search rival.

OkCaller was not collateral fallout from an effort to harm Bing. De-indexing OkCaller was the direct mechanism of market foreclosure. Google's reliance on *Feldman v. American Dawn, Inc.*, 849 F.3d 1333 (11th Cir. 2017), highlights the directness of Plaintiffs' injury. The holding turns on where the injury sits. *Feldman* lost commissions in a labor market no one claimed was restrained, 849 F.3d at 1340–42, while Greenflight lost the output of the directory provider it owns, in the market it pleads was restrained. See also *Mr. Furniture Warehouse, Inc. v. Barclays American/Commercial Inc.*, 919 F.2d 1517, 1521 (11th Cir. 1990) (denial of credit "not a necessary component" of the scheme). And the Third Circuit decision Google borrows for its "fulcrum, conduit or market force" test found standing because the challenged conduct was "the very means by which" the defendants kept a rival out. *Hanover 3201 Realty, LLC v. Village Supermarkets, Inc.*, 806 F.3d 162, 175–76 (3d Cir. 2015); GAB 24. Removing a rival's pages from the index is not a side effect of excluding that rival; it is the exclusion.

Nor must the target be the monopolist's horizontal competitor. The Sherman Act "does not confine its protection to consumers, or to purchasers, or to competitors, or to sellers"; it protects "all who are made victims of the forbidden

practices by whomever they may be perpetrated." *Mandeville Island Farms, Inc. v. American Crystal Sugar Co.*, 334 U.S. 219, 236 (1948). A tradeshow promoter that competed with no network had standing when a programming monopolist boycotted its show to keep independent programmers from reaching buyers. *Crimpers Promotions Inc. v. HBO*, 724 F.2d 290 (2d Cir. 1983). And this Circuit sustained a hauler's Sherman Act claim against a rock producer that used control of the upstream product to eliminate it from the adjacent transport market. *Construction Aggregate Transport, Inc. v. Florida Rock Industries, Inc.*, 710 F.2d 752 (11th Cir. 1983). Greenflight owns the excluded directory provider, pleads the directory market, pleads Google in it, and pleads what the erasure did to output, quality, and choice. ¶¶ 74–79, 90–95.

**E. Greenflight is the right plaintiff, and the pleaded facts close the floodgates.**

Google's footnote says the efficient-enforcer factors fail because the injury is "indirect and remote." GAB 15–16 n.6. They do not. Greenflight owns the business that was removed, and the removal was Google's own act; nothing intervenes.

In *Inform*, a digital media advertising company (not another general search engine) sued Google for technological exclusion. This Court held that it pleaded antitrust injury and "need be only 'an efficient enforcer' of the antitrust laws, … not the only or even the most efficient one." *Inform Inc. v. Google LLC*, No. 21-

13289, 2022 WL 3703958, at *5–7 (11th Cir. Aug. 26, 2022) (per curiam) (unpublished). *Inform* is this Circuit's closest analogue: a specialized digital platform stated antitrust injury and efficient-enforcer status from Google's technological exclusion without being a general search engine. Google's Answering Brief never addresses it.

The district court's deeper standing objection was a floodgates fear: if use of Google's search engine conferred standing, "every person who has ever posted something on the internet" could sue, DE 65 at 10 n.6, and if OkCaller could be a potential competitor, so could "every website on the internet with a search bar," *id.* at 11. The SAC pleads defined classes and seeks class-wide injunctive relief, SAC ¶¶ 96–97, 104, so a single judgment resolves the class rather than spawning suits.

## III. COUNTS I AND II WERE NOT WAIVED, AND THEY STATE CLAIMS.

Google argues that this Court can affirm the dismissal of Counts I and II on the threshold ground that Greenflight "waived" them under Local Rule 7.1(c) because the district court characterized Greenflight's response brief as "incoherent jargon." GAB 29–34; DE 65 at 7 & n.4. Google claims that an opposition deemed "incomprehensible" is equivalent to no response at all. Binding precedent says otherwise. In *Woodham v. American Cystoscope Co.*, 335 F.2d 551, 556–57 (5th Cir. 1964), no opposition was filed at all, and the former Fifth Circuit still reversed a dismissal entered under a local rule: such a rule "contains no sanctions, no

provision authorizing dismissal," and at most lets the judge decide "the motion on the papers before him." *Id.* at 556; see *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc). Applying *Woodham*, this Court held that a district court abused its discretion by granting a motion to dismiss "based solely on the plaintiffs' failure to respond," because such a dismissal "is not a ruling on the merits of whether the complaint failed to state a claim." *Giummo v. Olsen*, 701 F. App'x 922, 924–25 (11th Cir. 2017) (per curiam); accord *United States v. One Piece of Real Property Located at 5800 SW 74th Ave.*, 363 F.3d 1099, 1101–02 (11th Cir. 2004). A judge simply cannot use a local briefing rule to throw out a cause of action that was verbatim to the case the DOJ prevailed in against the Defendant.

In fact, there was no failure to respond. DE 63 specifically addressed market participation, platform distribution, the ISA Agreement, *McCready*, and vertical foreclosure. A court may disagree with an advocate's writing style or legal conclusions. The judge did have every right to be perplexed with a few paragraphs that were especially dense with confusing competition law. And that is why the Rules allow for oral argument, to help clarify matters of significant complexity. The fact there was no hearing, and a DOJ verbatim claim was dismissed as jargon, doesn't square with the notion of equal justice.

The district court did not stop at the local rule. It said the motion was "due to be granted" for non-response "alone," then made its "best guess" at Greenflight's theories and rejected four of them. DE 65 at 9–12. The decision to treat a filed, substantive brief as no brief is reviewed for abuse of discretion, *Fils v. City of Aventura*, 647 F.3d 1272, 1282–83 (11th Cir. 2011), and a court abuses its discretion when it reads a rule to permit what *Woodham* forbids.

Nor was the theory ever unintelligible. Even assuming arguendo it was, the court ordered Isaacs to show cause, his response stated it in one sentence—"GWT is not a separate market but an integral, interdependent component of the GSE ecosystem." The court dismissed his claims "for the same reasons," DE 69, without engaging it. This 12(b)(6) analysis bypass is simply not permitted under the Rules.

## IV. COUNT V WAS DISMISSED UNDER A RULE GOOGLE NOW CONCEDES IS WRONG.

The district court's first ground for dismissing Count V was that "monopoly means one, not two." DE 65 at 18. Google's own answering brief conceded that this legal theory is incorrect: "it has always been true that two parties, conspiring together, can satisfy Section 2." (GAB 41). That is the statute's text: "combine or conspire with any other person or persons, to monopolize," 15 U.S.C. § 2. *American Tobacco Co. v. United States*, 328 U.S. 781, 809 (1946) held it "the crime of monopolizing" for parties "to combine or conspire to acquire or maintain the power to exclude competitors …, provided that they have the intent and

purpose to exercise that power." Greenflight's opposition below should have marked its rendering of *American Tobacco* as a paraphrase, GAB 40–41; the opinion's actual words carry the same point, and Google now accepts it.

The SAC does not allege that Google and Apple are innocent bystanders coexisting in a competitive vacuum. Google "exercises control over U.S. internet content access in concert with Apple," SAC ¶ 146, and the two firms act "[b]y jointly foreclosing competitive channels and reinforcing each other's entrenched market positions," ¶ 149. Count V incorporates the ISA Agreement and its $20 billion annual payment. ¶¶ 9, 116, 145. Those allegations invoke § 2's conspiracy branch; the "stable two-firm environment" Google points to, GAB 41, is the alleged result of the concert, not its absence.

A conspiracy to monopolize requires "(1) an agreement in restraint of trade (2) deliberately entered into with the specific intent of achieving a monopoly (3) which could have had an anticompetitive effect and (4) at least one overt act in furtherance of the conspiracy." *Spanish Broadcasting System of Florida, Inc. v. Clear Channel Communications, Inc.*, 376 F.3d 1065, 1078 (11th Cir. 2004). A dangerous probability of success is not among them. *U.S. Anchor Manufacturing, Inc. v. Rule Industries, Inc.*, 7 F.3d 986, 1001 (11th Cir. 1993). Nor is this *Aquatherm Industries, Inc. v. Florida Power & Light Co.*, 145 F.3d 1258, 1261–62 & n.4 (11th Cir. 1998), where the plaintiff named no conspirator beyond

unidentified "manufacturers and sellers" and did not allege that the defendant competed in the market at issue. Count V names Apple, identifies a written agreement, and alleges Google's participation in content access through web search. ¶¶ 85–87, 146–147. The district court applied none of the four elements. DE 65 at 18–19.

The court's second ground for dismissing Count V was that Greenflight had not alleged that it competes in smartphone app distribution, DE 65 at 19, and Google makes the same point, GAB 35–36. But Count V does not allege that Greenflight competes in app distribution. It alleges that Greenflight is a publisher and developer dependent on both channels to reach users, and that it was excluded from each. ¶¶ 86–87.

Web search and app distribution are the two "on ramps" to online content, and attempts to bypass one "push content providers into the other's domain." ¶¶ 85–86. Under *Brown Shoe*, the outer boundaries of a product market are determined by the "reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." 370 U.S. at 325.

Imagine a media landscape where citizens access daily news in only two ways: buying a printed newspaper at the city's sole Downtown Newsstand or receiving a digital edition via the only Home Delivery Network. An independent newspaper publisher can distribute its articles through either channel. If the

Newsstand owner and the Delivery Network enter into an exclusive revenue sharing agreement to fix distribution terms, divide user referral channels, and systematically exclude independent publishers (whether, "The Daily News", or here, OkCaller), they have formed an actionable combination in restraint of the Content Delivery Market.

The SAC pleads that sequence as applied to OkCaller itself. When a content publisher faces arbitrary demotion or exclusion in Apple's App Store, its only alternative for national reach is the open web via Google Search (SAC ¶ 86). When Google then deploys its search monopoly to erase twelve million of that same publisher's web pages to zero (¶ 30), the publisher is foreclosed from the entire digital economy (¶ 87).

## V. THE UNFAIR COMPETITION CLAIM DOES NOT RISE OR FALL WITH THE SHERMAN ACT.

The Ninth Circuit has twice rejected the argument Google makes that the unfair prong rises or falls with the antitrust claims, as "foreclosed by California law." *In re Google Play Store Antitrust Litigation*, 147 F.4th 917, 933 n.3 (9th Cir. 2025); *Epic Games, Inc. v. Apple Inc.*, 67 F.4th 946, 1000–01 (9th Cir. 2023). Google cites *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.*, 20 Cal. 4th 163, 187 (1999), GAB 43—the very page holding that conduct is unfair when its effects "significantly threaten[] or harm[] competition"—and does not mention *Epic*.

The district court quoted that test, DE 65 at 17, and then applied a different one: because "every factual allegation" in Count IV was also incorporated into the federal counts, Count IV fell with them. *Id.* at 17–18. Factual overlap is not a safe harbor; *Cel-Tech* asks whether the effects of the conduct threaten or harm competition. The SAC pleads that tether: the removal of independent output, self-preferencing of Google's own directory results, higher entry barriers, and diminished innovation, quality, and choice, ¶¶ 90–95, 135–137. And it alleges that Google's conduct "violates the spirit of State Competition Laws like UCL, even if Defendant is not found guilty of directly monopolizing the relevant Sherman markets." ¶ 140. Count IV required independent analysis under *Cel-Tech*, and it received none.

## VI. THE ONE QUESTION THAT WOULD HAVE FOCUSED THE CASE ON SHERMAN IS THE QUESTION GOOGLE CALLED ABUSIVE.

Unable to defend its algorithmic destruction of OkCaller on the merits, Google devotes significant portions of its Answering Brief to attacking Plaintiffs by repeatedly citing litigation regarding App Store tying, *Coronavirus Reporter v. Apple, Inc.* (GAB 2, 5). This is not an accident; it is the exact playbook the duopoly deploys to suffocate private antitrust enforcement. By halting discovery and adopting the defense's narrative that Greenflight's claims were abusive, the district court rewarded a calculated strategy designed to bury substantive antitrust enforcement under ad hominem attacks.

What Google intentionally omits is that the foundational antitrust claim in *Coronavirus Reporter*—the illegal tying of the iOS smartphone market to the App Store distribution market—was never adjudicated on its merits. That non-adjudication remains on appeal for the same reason as this case: false allegations to discredit legitimate antitrust petitioning. Google's footnote erroneously suggests the Ninth Circuit appeal is finished, GAB 48 n.8, but what was denied there was an anti-SLAPP structural ruling mandamus petition, not the appeal docketed as *Coronavirus Reporter Corp. v. Apple Inc*., No. 25-8111 (9th Cir.).

To discredit the case, defense counsel had to actively disavow the medical leadership of the application's Chief Medical Officer, Dr. Roberts. Dr. Roberts is a world-renowned cardiologist who invented the MBCK gold standard for diagnosing heart attacks, a breakthrough that has saved countless lives. Furthermore, he is a physician with deep ties to this Circuit: two of *Coronavirus Reporter*'s co-founders lectured and served as staff physicians at the Medical College of Georgia at Augusta University, giving significant parts of their careers to that community. To tell a federal judge that a pandemic epidemiological tool built by a physician of Dr. Roberts's stature had "no connection to medicine other than Isaacs" was an engineered smear designed solely to dismiss the case prematurely. *Coronavirus Reporter v. Apple Inc.*, No. 3:21-cv-05567-EMC (N.D. Cal.), Dkt. 64 at 8.

Years later, when Dr. Roberts's role became useful to Apple to defend the dismissal of "the same case," the defense reversed course. That reversal sits on the very docket Google cites to this Court today. GAB 31 n.7 (citing *Coronavirus Reporter Corp. v. Apple Inc.*, No. 3:24-cv-8660-EMC (N.D. Cal.)).

There is an unacceptable human cost to this strategy. Dr. Roberts was in his late-seventies when this dispute began. He is in his mid-eighties now. These delays have been Apple & Google's true objective: not a ruling that the tying theory failed, or that OkCaller was never a Bing-like competitor, but years consumed by threshold motions, stayed discovery, and shifting characterizations of who the plaintiffs were and what they built.

The exact *CR* tying theory has now been recognized by multiple AmLaw 100 firms. Just like the SAC's core theory is being litigated by *Yelp*, and was already won by the DOJ. This is a clear pattern of suppression and both are therefore pending similar appeals.

Plaintiffs saw this matter coming and tried to stop it in advance. Because Apple's counsel had successfully discredited the earlier case by wrongly raising expunged academic records, Plaintiffs moved to foreclose the exact same maneuver here before it started. A single, highly specific Request for Admission

would have cleared the record: "Admit that Google considers Plaintiff's CEO, Dr. Isaacs, to have a valid medical degree." (RFA No. 32).

Google refused to answer it. Instead, the same play ran as it did four years prior with Apple. Williams & Connolly flipped the harassment victim and offender, stating the RFA was seeking "abusive discovery from Google." (DE 42 at 4–5). The district court stayed all discovery the very next day. (DE 43). The one question asked to prevent an ad hominem attack became the defense's "proof" of abuse.

Having successfully frozen discovery, Williams & Connolly then ran the attack anyway. Mr. Smurzynski personally signed the Answering Brief before this Court, which opens by falsely calling Isaacs a "sanctioned" "serial litigant." GAB 2. Two years ago, Google refused to answer the one question that would have settled this matter and re-focused the district court on the Sherman Act, where it belonged.

When a private plaintiff brings a verbatim government antitrust claim to the court, and it is summarily dismissed as "incoherent," these tactics clearly worked. OkCaller was a direct victim of the conduct the government spent years investigating and successfully prosecuting.

The district court's refusal to permit discovery was an abuse of discretion and must be reversed. Furthermore, it must be noted that *Noerr-Pennington*

doctrine protects legitimate petitioning, but it provides no safe harbor for objectively baseless, bad-faith harassment designed solely to intimidate adversaries and derail substantive antitrust scrutiny—conduct that falls squarely within the "sham" exception recognized by this Circuit. *McGuire Oil Co. v. Mapco, Inc.*, 958 F.2d 1552 (11th Cir. 1992). On remand, Rule 26(c) empowers the district court to protect any party or person from "annoyance, embarrassment, oppression, or undue burden or expense." FRCP 26(c)(1).

## CONCLUSION

This class action lawsuit seeks to reform the architectural control of the modern internet. Greenflight is a plain example of the anticompetitive effects of search opacity and censorship: an independent directory serving hundreds of millions of customers, erased without standards, explanation, or recourse. That is what makes the standing question straightforward. Count I is the government's own monopolization claim, and a private suit built on it is the follow-on enforcement the antitrust laws exist to provide. The judgment of the district court must be reversed. The case should be remanded for proceedings on the merits.

Respectfully submitted,

/s/ Keith A. Mathews
KEITH A. MATHEWS
American Wealth Protection
1000 Elm Street, Suite 800
Manchester, NH 03101

(603) 622-8100
keith@awplegal.com
Counsel for Plaintiff-Appellant
Greenflight Venture Corporation

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B)(ii) because, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Eleventh Circuit Rule 32-4, this brief contains 6,454 words.

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Mac in 14-point Times New Roman.

/s/ Keith A. Mathews

## CERTIFICATE OF SERVICE

I certify that on August 26, 2026, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit using the appellate CM/ECF system. All participants in this case are registered appellate CM/ECF users and will be served by that system.

/s/ Keith A. Mathews